# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **RAMIRO F. GONZALES,** | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **CIVIL NO. SA-10-CA-165-OG** |
| | § | |
| **RICK THALER, Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Correctional Institutions Division,** | § | |
| **Respondent.** | § | |

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

## THIS IS A CAPITAL DEATH PENALTY CASE

**MICHAEL C. GROSS**
**State Bar No. 08534480**
**106 South St. Mary's Street, Suite 260**
**San Antonio, Texas  78205**
**(210) 354-1919**
**(210) 354-1920 Fax**

**Attorney for the Petitioner,**
**RAMIRO F. GONZALES**

## <u>TABLE OF CONTENTS</u>

PAGE

I.      CONFINEMENT AND RESTRAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     HISTORY OF PRIOR STATE COURT PROCEEDINGS . . . . . . . . . . . . . . . . . . 2

        A.      TRIAL PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.      DIRECT APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        C.      STATE HABEAS CORPUS PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . 3

III.    PROCEEDINGS IN THIS COURT PURSUANT TO 18 U.S.C. § 3599 . . . . . . . 5

IV.     STATEMENT REGARDING EXHAUSTION OF STATE REMEDIES . . . . . . . 7

V.      STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

VI.     CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        CLAIM I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                THE PETITIONER'S TRIAL COUNSEL FAILED TO
                PROVIDE EFFECTIVE ASSISTANCE OF COUNSEL.

                ARGUMENT AND AUTHORITIES IN SUPPORT OF CLAIM I . . . . . 13
                        The law in general . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
                        Failure to obtain proper experts to present mitigation evidence . . . 18
                                Lack of fetal alcohol spectrum disorders expert . . . . . . . . . 18
                                Lack of sexual, emotional, physical, biological
                                        abuse expert . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
                        Providing privileged work product to state . . . . . . . . . . . . . . . . . . . 25

        CLAIM II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

                THE PETITIONER'S RIGHT TO COUNSEL, AS
                GUARANTEED BY THE SIXTH AMENDMENT OF THE
                UNITED STATES CONSTITUTION, WAS VIOLATED
                WHEN THE TRIAL JUDGE ORDERED DISCLOSURE OF

DOCUMENTS WHICH IN PART COMPRISED ATTORNEY WORK PRODUCT.

ARGUMENT AND AUTHORITIES
IN SUPPORT OF CLAIM II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

CLAIM III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

THE TRIAL JUDGE FAILED TO PROPERLY INSTRUCT THE JURY ON MITIGATION IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

ARGUMENT AND AUTHORITIES
IN SUPPORT OF CLAIM III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

CLAIM IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

THE EVIDENCE IS INSUFFICIENT TO SUSTAIN THE CONVICTION.

STATEMENT OF FACTS CONCERNING
CLAIM IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

ARGUMENT AND AUTHORITIES
IN SUPPORT OF CLAIM IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
    Capital murder in the course of committing
        aggravated sexual assault . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    Capital murder in the course of committing kidnaping  . . . . . . . . 56
    Capital murder in the course of committing robbery  . . . . . . . . . . 58

CLAIM V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

THE TRIAL JUDGE REVERSIBLY ERRED IN ALLOWING THE STATE EXPERT TO TESTIFY, AT THE PUNISHMENT PHASE OF THE TRIAL, AS TO THE FUTURE DANGEROUSNESS OF THE PETITIONER BECAUSE THE STATE FAILED TO SHOW THE RELIABILITY OF THE TESTIMONY BY CLEAR AND CONVINCING EVIDENCE AT THE <u>DAUBERT</u> HEARING.

CLAIM VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

> THE TRIAL JUDGE REVERSIBLY ERRED IN ALLOWING
> THE STATE EXPERT TO TESTIFY, AT THE PUNISHMENT
> PHASE OF THE TRIAL, AS TO THE FUTURE
> DANGEROUSNESS OF THE PETITIONER BECAUSE THE
> TRIAL JUDGE FAILED TO PROPERLY ACT AS A
> "GATEKEEPER."

CLAIM VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

> THE TRIAL JUDGE REVERSIBLY ERRED, UNDER TEXAS
> RULE OF EVIDENCE 702, IN ALLOWING THE STATE
> EXPERT TO TESTIFY, AT THE PUNISHMENT PHASE OF
> THE TRIAL, AS TO THE FUTURE DANGEROUSNESS OF
> THE PETITIONER.

CLAIM VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

> THE PETITIONER'S RIGHT TO DUE PROCESS, AS
> GUARANTEED BY THE FIFTH AMENDMENT TO THE
> UNITED STATES CONSTITUTION, WAS VIOLATED
> WHEN THE TRIAL JUDGE ALLOWED THE STATE
> EXPERT TO TESTIFY, AT THE PUNISHMENT PHASE OF
> THE TRIAL, TO THE FUTURE DANGEROUSNESS OF THE
> PETITIONER.

CLAIM IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

> THE PETITIONER'S RIGHT TO A FAIR TRIAL, AS
> GUARANTEED BY THE SIXTH AMENDMENT TO THE
> UNITED STATES CONSTITUTION, WAS VIOLATED
> WHEN THE TRIAL JUDGE ALLOWED THE STATE
> EXPERT TO TESTIFY, AT THE PUNISHMENT PHASE OF
> THE TRIAL, TO THE FUTURE DANGEROUSNESS OF THE
> PETITIONER.

> STATEMENT OF FACTS CONCERNING
> CLAIMS V THROUGH IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

ARGUMENT AND AUTHORITIES
IN SUPPORT OF CLAIM V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

ARGUMENT AND AUTHORITIES
IN SUPPORT OF CLAIM VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

ARGUMENT AND AUTHORITIES
IN SUPPORT OF CLAIM VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
     Studies reveal that predictions of future dangerousness
       are unreliable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
     Applicable methodology - base rate . . . . . . . . . . . . . . . . . . . . . . 73
     Applicable methodology - HCR20 & VRAG . . . . . . . . . . . . . . . 73
     Applicable methodology - limiting the risk factors
       and empirical measures . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
     Dr. Gripon failed to employ proper methodology . . . . . . . . . . . . 77
     The opinions of Dr. Gripon were unreliable . . . . . . . . . . . . . . . . 79
     The error was harmful . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

ARGUMENT AND AUTHORITIES
IN SUPPORT OF CLAIMS VIII AND IX . . . . . . . . . . . . . . . . . . . . . . . 81
     Reliability and accuracy are indispensable prerequisites to a
       reasoned determination of whether to sentence someone
       to death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
     Barefoot allows for "unreliable" evidence to be used to
       determine whether or not to sentence someone to death . . . 84
     Barefoot was the basis for the lower court to affirm the
       future danger testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
     Daubert prohibits the admissibility of unreliable testimony . . . . . . 86
     Courts and the psychological community believe that Barefoot
       future danger testimony is inadmissible under Daubert . . . 88
     The testimony was inadmissible in the case at bar . . . . . . . . . . . . 95

VII.   THE PRESUMPTION OF CORRECTNESS OF 28 U.S.C. § 2254(d) & (e)
       SHOULD NOT ATTACH TO STATE COURT FINDINGS OF FACT . . . . . 102

VIII.  PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

IX.    CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

XI.    APPENDIX OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
    1.    Judgment and Sentence
    2.    Order of Assignment of the Honorable Antonio Cantu

3.      Habeas Orders signed by the Honorable Mickey Pennington
4.      State Writ of Habeas Corpus
5.      File of state habeas attorney
6.      State's Response to State Writ of Habeas Corpus
7.      Order of Unauthorized Visiting Judge Recommending Denial of Habeas Relief
8.      District Clerk affidavit
9.      Order of Texas Court of Criminal Appeals Denying Habeas Relief
10.     Dr. Richard Adler affidavit
11.     Gerald Byington affidavit with excerpts trial mitigation specialist's report
12.     Brief for the Appellant for the state direct appeal
13.     Opinion of Texas Court of Criminal Appeals on direct appeal

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **RAMIRO F. GONZALES,** | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **CIVIL NO. SA-10-CA-165-OG** |
| | § | |
| **RICK THALER, Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Correctional Institutions Division,** | § | |
| **Respondent.** | § | |

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

## THIS IS A CAPITAL DEATH PENALTY CASE

RAMIRO F. GONZALES, the Petitioner in the above styled and numbered cause, pursuant to 28 U.S.C. § 2254, petitions this Honorable Court to issue a writ of habeas corpus ordering the Petitioner's release from confinement on the ground that the Petitioner is being denied his liberty as a result of an illegal and unconstitutional judgment of conviction for capital murder and sentence of death.

## I.

## CONFINEMENT AND RESTRAINT

The Petitioner is confined on death row at the Polunsky Unit, Texas Department of Criminal Justice, Correctional Institutions Division, Livingston, Texas.  Rick Thaler, the Director of the Texas Department of Criminal Justice, Correctional Institutions Division, is the state official responsible for the confinement of the Petitioner.  The District Court of

1

Medina County, Texas, 38th Judicial District, in and for Medina County, the Honorable

Antonio G. Cantu presiding, entered the judgment and sentence under attack.  See Exhibit

1.[1]  The judgment was signed on September 6 and 26, 2006.  Id.  The Petitioner is confined

pursuant to this judgment imposing the death penalty for the offense of capital murder in

Cause No. 04-02-9091-CR.  Id.  The Petitioner is indigent and has been indigent throughout

all prior proceedings in this cause.

## II.

## HISTORY OF PRIOR STATE COURT PROCEEDINGS

### A.

### TRIAL PROCEEDINGS

The indictment alleged the complainant was murdered on January 15, 2001.  (T - 8-

9).[2]  The Petitioner was arrested on February 6, 2004 while incarcerated in the Medina

County jail for another offense.  Id. at 15.  The Petitioner was indicted for capital murder on

February 5, 2004.  (T - 10).  The indictment alleged that Ramiro committed capital murder

on or about January 15, 2001 by causing the death of the complainant in the course of

committing or attempting to commit aggravated sexual assault, kidnaping, or robbery of the

complainant.  Id. at 8-9.

---

[1]The exhibits cited to in this amended writ are the same as in the original writ, so for judicial economy, the exhibits have not again been attached to this amended writ.  See the original writ for the listed exhibits.

[2]The clerk's record from the trial will be referred to as "T and page number."  The court reporter's record from the trial will be referred to as "R and volume and page number."

The trial began with jury selection on June 26, 2006.  (R - v.6 - 1).  After the jury was empaneled and sworn on August 22, 2006, the prosecutor read the indictment which alleged capital murder.  (R - v.35 - 1, 6, 17-18).  The Petitioner's counsel entered a plea of not guilty. Id. at 18.  The jury returned a verdict on August 25, 2006 finding the Petitioner guilty of capital murder as charged in the indictment.  (R - v.38 - 1, 54).  The jury returned an affirmative answer to Special Issue Number One and a negative answer to Special Issue Number Two on September 6, 2006.  (R - v.43 - 1, 78).  As required by the jury's verdict, the trial judge sentenced the Petitioner to death.  Id. at 80-81.

## B.

## DIRECT APPEAL

The Texas Court of Criminal Appeals, in an unpublished opinion, affirmed the conviction and sentence on June 17, 2009 with two judges concurring and one judge dissenting.  Gonzales v. State, No. AP-75,540 (Tex. Crim. App., June 17, 2009).  A petition for writ of certiorari was denied on February 22, 2010.  Gonzales v. Texas, ___U.S.___, 130 S.Ct. 1504, 176 L.Ed.2d 118 (2010).

## C.

## STATE HABEAS CORPUS PROCEEDINGS

A visiting judge, Antonio Cantu, was assigned on August 18, 2005, to preside over this cause "from this date until plenary jurisdiction has expired or the undersigned Presiding Judge has terminated this assignment in writing."  See Exhibit 2.  The Presiding Judge of the 38th Judicial District Court was the Honorable Mickey Pennington.  Id.  Judge Pennington

signed the orders for payment of the habeas experts and the request for extension of time to file the state habeas.  See Exhibit 3.

On September 22, 2008, counsel timely filed with the 38th Judicial District Court the Applicant's Application for Writ of Habeas Corpus.  See Exhibit 4.  This writ was only nine pages in length including the signature page.  Id.  The state habeas attorney never met with the Petitioner.  The undersigned counsel requested and received from the state habeas attorney a copy of the state habeas attorney's file.  See Exhibit 5.  This file is only 4 pages long.  The writ was filed before the direct appeal was completed, so no days elapsed from the time that the direct appeal was completed until the filing of the writ.  The State filed its Response to the State Writ on October 3, 2008.  See Exhibit 6.  The State conceded that "certain facts are not presently before the Court which could prove relevant to the claims pending before the Court.  Consequently, the respondent does not oppose the applicant's request for an evidentiary hearing on the issues presented."  Id.  The State, in its Conclusion and Prayer, stated "the respondent, State of Texas, would respectfully submit that this Court should hold an evidentiary hearing in order to resolve the unresolved factual issues pertinent to the allegations contained in the applicant's writ of habeas corpus."  Id.  When this Court, however, stayed the federal writ and remanded this case back to the State court, the State changed its position, without explanation, and argued against a hearing.

A visiting judge improperly signed the  Findings of Fact and Conclusions of Law on October 23, 2008 denying a hearing on the state writ and recommending relief be denied.

<u>See</u> Exhibit 7.  There was no assignment in any of the clerk's records allowing Judge Simmonds to take any action in this cause.  <u>See</u> Exhibit 8.  No hearings were held on this state writ even though both the state and the defense requested hearings.  Counsel for the Petitioner failed to file any proposed findings of fact and conclusions of law.  The State did not file any proposed findings of fact and conclusions of law.  On September 23, 2009, the Texas Court of Criminal Appeals adopted, in part, the findings of fact and conclusions of law and recommendation of the unassigned visiting judge and denied relief.  <u>See</u> Exhibit 9.  After this Court stayed the federal writ and remanded this cause back to the state court, the Court of Criminal Appeals on its own motion requested the state habeas judge review all the claims raised by the Petitioner.  Without a hearing and after denying the Petitioner the opportunity to obtain experts and develop the claims raised before the state habeas court, the state habeas court denied relief on the claims raised by the Petitioner.

**III.**

**<u>PROCEEDINGS IN THIS COURT PURSUANT TO 18 U.S.C. § 3599</u>**

On February 25, 2010, the Petitioner filed with this Court a motion for appointment of counsel pursuant to 18 U.S.C. § 3599.  This Court appointed counsel on March 2, 2010 to represent the Petitioner in this federal habeas corpus proceeding challenging the Petitioner's state criminal conviction for capital murder and sentence of death.  This Court's Order Appointing Counsel and Setting Deadlines ordered that this federal habeas corpus petition be filed on or before July 6, 2010.  On May 17, 2010, this Court extended the due

date for the filing of the federal habeas corpus petition to on or before October 1, 2010.  On August 7, 2010, this Court extended the due date for the filing of the federal habeas corpus petition to on or before January 20, 2011.  As discussed below, this due date is clearly within the limitation period for the filing of the federal petition.

Pursuant to 28 U.S.C. § 2244(d)(1), the one-year period of limitation for the filing of the federal petition for writ of habeas corpus begins to run when the judgment becomes final on direct appeal or the expiration of the time for seeking such review.  "'[A] conviction becomes final when a defendant's options for further direct review are foreclosed,' whether or not those options have been pursued."  United States v. Gamble, 208 F.3d 536, 537 (5th Cir. 2000), citing United States v. Thomas, 203 F.3d 350, 352 (5th Cir. 2000); Kapral v. United States, 166 F.3d 565, 571 (3rd Cir. 1999); Rhine v. Boone, 182 F.3d 1153, 1155 (10th Cir. 1999), cert. denied, 528 U.S. 1084, 120 S.Ct. 808, 145 L.Ed.2d 681 (2000).  The one-year limitation period is tolled, pursuant to 28 U.S.C. § 2244(d)(2), during the pendency of a properly filed state application for post-conviction relief.  There was no lapse in days between the date the judgment became final on direct appeal and the date the state application for post-conviction relief was filed since the writ was filed before the judgment became final on direct appeal.  State habeas relief was denied on September 23, 2009.  The petition for writ of certiorari on direct appeal, however, was denied on February 22, 2010.  One year from this date is February 22, 2011.  The original federal writ petition, therefore, was timely filed within a year after the judgment became final on direct appeal.

## IV.

## STATEMENT REGARDING EXHAUSTION OF STATE REMEDIES

The Petitioner has exhausted the state remedies for the claims he is presenting in this amended federal habeas corpus action. The Petitioner's claims were made in the state habeas action, considered by the state habeas court, but denied in state court. The trial judge recommended denial of relief which was approved by the Court of Criminal Appeals. The Petitioner has met the burden, pursuant to 28 U.S.C. § 2254(b)(1), that an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the state.

## V.

## STATEMENT OF FACTS

While pregnant with the Petitioner, Ramiro "Toto" Gonzales, his mother used alcohol, marijuana, and volatile inhalants during the pregnancy and intentionally overdosed during the pregnancy in an attempt to abort Ramiro while he was a fetus. See Exhibit 10. A neuropsychologist testified at trial about Ramiro's history of developmental delay, immaturity, and learning problems in the areas of reading, vocabulary, and problems with social skills, problem solving/coping. Id. There was also testimony about school failure, multiple retentions, and early onset of substance abuse. Id. The psychological testing (over five years old) reflected a split (significant difference) between verbal and nonverbal

performance on the IQ test used.  Id.  The IQ test used by the neuropsychologist pretrial, however, is suboptimal for the forensic evaluation of fetal alcohol spectrum disorders (FASD).  Id.  Ramiro should be retested with the Wechsler Adult Intelligence Scale - IV to properly evaluate for FASD.  Id.  The neuropsychologist discovered constructional apraxia, central dysarthria, and problems on the Bender-Gestalt Test, but failed to pursue this information.  Id.  Further information about these, including raw data, the neuropsychologist's report, and testimony at trial must be pursued.  Id.  The neuropsychologist concluded that Ramiro did not have ADHD, but the scope of the inquiry into that issue was less than adequate.  Id.  There should also have been testing using the computerized Conner's Continuous Performance Test - II. Id.  The neuropsychologist failed to investigate Ramiro's functional/adaptive behavior.  Id.  Such assessment is critically important to a thorough evaluation of FASD.  Id.  "**In summary, there is abundant information to support the conclusion that FASD should be HIGHLY SUSPECTED and that a thorough diagnostic evaluation to address this should be undertaken.**"  Id. (emphasis in original).

From the ages of 5 to 12, Ramiro was sexually abused by his uncle, Gilbert Trevino, who was in his late 30's or early 40's.  See Exhibit 11.  When Ramiro was 5 years old, Trevino engaged in oral sex with Ramiro.  Id.  The oral sex incidents occurred two to three times and were mostly during the day.  Id.  Ramiro was scared and instructed by Trevino to not say anything about the oral sex.  Id.  Trevino took Ramiro to a wooded area by a golf

course and "his mouth was on my penis."  Id.  "After this happened, Ramiro felt, 'No one cared for me.  I was alone.'"  Id.  Trevino did not testify at Ramiro's trial.

Witnesses were interviewed pretrial by the defense and provided information about Ramiro's history of being the victim of sexual abuse.  Id.  Ramiro's cousin, R.G., admitted to the mitigation specialist pretrial that R.G. had also been sexually abused by Trevino.  Id.  The mitigator's notes state that, "R[.]G[.], cousin admitted that Gilbert Trevino was sexually abusive to her for [sic] age 6-7 when he babysat her while living with her family.  Her mother M[.] added that Gilbert's father, Juan, sexually abused his daughters and raped his wife."  Id.  Neither R.G. not her mother, M., testified at Ramiro's trial.  Id.

The mitigator's notes state that, "Ramiro disclosed sexual abuse for the 1st time to another person at the initial interview with this investigator and his lawyer, Emmett Harris.  The sad and scared affect and embarrassment was noted by dropping eye gaze, tearfulness, lowering of voice.  It appeared to match the disclosure content.  Both this writer and the lawyer found it credible."  Id.  The mitigator's notes state that Ramiro's aunt, Vicky Wilson, and Ramiro's cousin, Jessica Keegan, "both suspect Gilbert Trevino, the son of Leon, Frances Gonzales older sister.  Gilbert lived with the family for about a year.  Vicky reports he would peak through a hole into bath room and look through window to watch girls getting dressed.  Vicky reports that Gilbert would get blow jobs from his brothers."  Id.

Ramiro's aunt, Maggie Moreno, his mother's twin sister, was interviewed pretrial by the mitigator.  Id.  Maggie stated that, "Gilbert molested Ramiro, Ramiro told her; when

Gilbert lived with them, he would sit in the living room naked and masturbate." Id. Even

thought Maggie was interviewed pretrial by the defense, she did not testify at Ramiro's trial.

Id.

When Ramiro was 12 years old, a 20 year old woman reportedly became pregnant by

Ramiro. Id. The woman gave birth to a female child in Bandera and then relocated to avoid

possible prosecution for her sexual abuse of Ramiro. Id. At the time the child was born,

Ramiro was 13 years old. Id. Research indicates that this type of abuse has a significant

impact on the development of male children. Id. The National Criminal Justice Reference

Service has published articles regarding this type of sexual abuse. Id. The mitigator

recognized the importance of this type of sexual abuse. Id. In her report, the mitigator stated,

"Due to the sexual nature of both crimes, highly encourage an ABEL assessment for sexual

offenders, best is Mark Steege[].  I can contact once you get funding." Id. Funding was

never sought for Mr. Steege, LCSW, LPC, who is a treatment professional who specializes

in treating sexual disorders and abuse. Id.

Defense witnesses testified about the sexual abuse of Ramiro, but no expert witness

ever brought all this information together and explained the importance of this history. Id.

No expert explained the potential for this type of history of abuse to contribute to later

problems for Ramiro. Id. Witnesses testified the Ramiro was a victim of additional

emotional, physical, and biological abuse and neglect, but there was no attempt to pull

together this information and identify an expert that could present the jury with information

about the significance of these emotional, physical, and biological abuses and neglect factors. Id.  The mitigator recommended the defense obtain a testifying expert on sexual abuse and trauma, but no such expert was obtained by the defense even thought this was essential.  Id. "Because a sexual assault was part of both the Capital Offense and the prior felony conviction that resulted in a life sentence it would seem essential to provide the jury with an understanding of how Ramiro's prior history of being a victim of sexual assault was a significant contributing factor in this case." Id.

No expert addressed the impact of substance abuse on Ramiro.  Id.  No expert addressed the impact of neglect and rejection on the development of Ramiro.  Id.  No expert addressed the synergy of the effects of Ramiro's sexual victimization, emotional and physical abuse, neglect and rejection by his mother and caregivers, exposure to alcohol and other drugs in utero, and his own substance abuse problem with the fact that he was only 72 days past his 18th birthday at the time of the offense in this case.  Id.  "Each of these issues has been well documented in the literature to have significant, severe and dysfunctional consequences on the cognitive, emotional, characterological and social development of a child." Id. "Ramiro had all of these issues simultaneously present in him." Id.  "Because of the comorbid presence of these conditions it would seem to be essential for the defense to not only address the individual impact of these issues, but to also assist the jury in understanding the impact of this constellation of dysfunctions." Id.

Given the evidence that Ramiro's mother used alcohol, drugs, and inhalants during her pregnancy with Ramiro, "A systematic evaluation of this might have confirmed that

Ramiro was impaired at birth." Id.  Many of Ramiro's characteristics and performance difficulties are regularly associated with a diagnosis of FASD.  Id.  "Further specific evaluation of this issue appears warranted." Id.  The neuropsychologist testified at trial that Ramiro had a "normal brain" and an "average IQ" but "a more specific and thorough evaluation of this issue might have revealed additional brain function and possibly brain structure problems." Id.

"It appears that the defense did not have a clear understanding of how each of the above issues could have had a significant impact on the defendant." Id.  "Thus, they did not pursue specific investigation of each of those issues nor did they attempt to do any type of evaluation or investigation into how the presence of all of these issues had impacted Ramiro." Id.  "It is my opinion that there was a distinct difference between what was known and available to the trial team and what was presented by the trial team to the jury." Id.  "Several factors which were well known to the trial team were only minimally presented at trial; if presented at all." Id.  "Additionally some aspects of these factors were not pursued or thoroughly investigated." Id.  "Had these factors been more adequately investigated and then presented in a manner that identified the significance of the factors to Ramiro's abilities and behaviors, I believe that the jury would have had significantly more relevant information to consider regarding Ramiro's cognitive and emotional abilities and disabilities as well as the behavioral consequences of these factors." Id.

12

# VI.

# CLAIMS FOR RELIEF

## CLAIM I

## THE PETITIONER'S TRIAL COUNSEL FAILED TO PROVIDE EFFECTIVE ASSISTANCE OF COUNSEL.

### ARGUMENT AND AUTHORITIES
### IN SUPPORT OF CLAIM I

### The law in general.

Effective assistance of counsel is a right guaranteed by the Sixth Amendment of the United States Constitution, applied to the States through the Fourteenth Amendment of the United States Constitution. State v. Thomas, 768 S.W.2d 335, 336 (Tex. App. - Houston [14th Dist.] 1989, no pet.). The federal test for effective assistance of counsel stated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) is also the test in Texas. State v. Thomas, supra at 336, citing Wilkerson v. State, 726 S.W.2d 542, 548 (Tex. Crim. App. 1986). Under this test, one must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. Id. Prejudice means there is a reasonable probability that but for counsel's acts or omissions, the outcome of the proceeding would have been different, and a reasonable probability is a probability sufficient to undermine confidence in the outcome. Strickland v. Washington, supra. An ineffective assistance of counsel claim is a mixed question of law and fact subject to plenary review under the Strickland test. Baxter v. Thomas, 45 F.3d 1501, 1512 (11th Cir. 1995).

13

The Supreme Court of the United States has recently conducted a materiality standard for a <u>Brady</u> claim which is the same showing required to demonstrate the above prejudice from counsel's deficient performance. <u>Kyles v. Whitley</u>, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Materiality does not require a defendant to demonstrate by a preponderance of the evidence that the absence of the error would have ultimately resulted in an acquittal or a life sentence. <u>Id.</u> at 1566-1567. The test is whether the error undermines confidence in the jury's sentence of death or conviction for capital murder. <u>Id.</u> at 1566. This is not a sufficiency of the evidence test - that is, the defendant is not required to demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would have been insufficient evidence remaining to convict or return a sentence of death. <u>Id.</u> The reviewing court should view the favorable evidence and determine if it reasonably puts the whole case in such a different light so as to undermine confidence in the verdict. <u>Id.</u>; <u>See</u> <u>Lindsey v. King</u>, 769 F.2d 1032, 1042 (5thCir. 1985)(suppressed impeachment evidence may have consequences for the case far beyond discrediting the witness' testimony). Materiality must be assessed in terms of the suppressed evidence considered as a whole, not item by item. <u>Kyles v. Whitley</u>, <u>supra</u>, 115 S.Ct. at 1567. Prejudice under <u>Strickland</u> should be considered in the same manner. <u>See also</u> <u>Wesley v. Johnson</u>, 83 F.3d 714, 719 (5th Cir. 1996)(prejudice analysis should not focus on determination of outcome but on whether error ensures that the result of the proceeding was fundamentally unfair or unreliable); <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

14

Thorough factual investigation is required for effective representation.  Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932).  "It is not enough to assume that defense counsel thus precipitated into the case thought that there was no defense, and exercised their best judgment in proceeding to trial without preparation.  Neither they nor the court could say what a prompt and thorough-going investigation might disclose as to the facts."  Id. at 58; See Strickland v. Washington, supra, 466 U.S. at 691.  "Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary."  Strickland v. Washington, supra, 104 S.Ct. at 2066; see Kimmelman v. Morrison, 477 U.S. 365, 385, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).  Counsel's failure to at least seek out an expert witness is outside the range of competent assistance.  Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987).  The Fifth Circuit has discussed counsel's omissions as follows:

> Whether counsel's omission served a strategic purpose is a pivotal point in Strickland and its progeny.  The crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this court.  For example, in Nealy we found counsel's performance deficient and stressed that at a post-conviction hearing, the defense counsel did not testify that such efforts would have been fruitless, nor did he claim that the decision not to investigate was part of a calculated trial strategy.  He simply failed to make the effort.  Counsel did not **choose**, strategically or otherwise, to pursue one line of defense over another.  Instead, [he] simply abdicated his responsibility to advocate his client's cause.

Loyd v. Whitley, 977 F.2d 149, 158-159 (5th Cir. 1992), cert. denied, 508 U.S. 911, 113 S.Ct. 2343, 124 L.Ed.2d 253 (1993), citing Nealy v. Cabana, 764 F.2d 1173, 1178 (5th Cir. 1985)(emphasis in original).

Failure to interview witnesses or discover readily available evidence is an error in trial preparation, not trial strategy.  Kenly v. Armontrout, 937 F.2d 1298, 1304 (8th Cir.), cert. denied sub nom, Delo v. Kenly, 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991).  Any decision or judgment that flows from lack of diligence in preparation and investigation, therefore, is not protected by the presumption in favor of counsel having acted reasonably. Id.  "Tactical decisions must be made in the context of a reasonable investigation, not in a vacuum.  'It is not enough to assume that counsel . . . thought there was no defense, and exercised [his] best judgment . . .'" Bouchillon v. Collins 901 F.2d 589, 597 (5th Cir. 1990), citing Powell v. Alabama, supra.

Counsel is ineffective during the penalty phase of a capital trial when counsel fails to adequately investigate and present mitigation evidence.  Baxter v. Thomas, supra.  When determining whether defense counsel conducted a reasonable investigation, the reviewing court looks at three factors: (1) whether a reasonable investigation should have uncovered the mitigating evidence; (2) whether the failure to put this evidence before the jury was a tactical choice by trial counsel; and (3) if the choice was not tactical, whether there is a reasonable probability that absent the errors, the sentencing body would have concluded that the balance of the aggravating and mitigating circumstances did not warrant a sentence of death.  Id. at 1513.  "Our case law rejects the notion that a 'strategic' decision can be

reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." Id. at 1515.

Counsel is ineffective during the penalty phase of a capital trial when counsel fails to prepare and present evidence of a defendant's mental state at the time of the offense. Hill v. Lockhart, 28 F.3d 832 (8th Cir. 1994). Regarding the presentation of mitigating factors:

> In the context of a capital sentencing hearing, it is particularly important that counsel not be allowed to shirk her responsibility. Thus, while we defer to legitimate, strategic decision-making, from the perspective of strategic competence, we hold that defense counsel must make a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors.

Hall v. Washington, 106 F.3d 742 (7th Cir.), cert. denied, 522 U.S. 907, 118 S.Ct. 264, 139 L.Ed.2d 190 (1997), citing Kubat v. Thieret, 867 F.2d 351, 369 (7th Cir. 1989); see Harris v. Dugger, 874 F.2d 756 (11th Cir. 1989); Osborn v. Shillinger, 861 F.2d 612 (10th Cir. 1988); Hyman v. Aiken, 824 F.2d 1405 (4th Cir. 1987); King v. Strickland, 748 F.2d 1462 (11th Cir.), cert. denied, 471 U.S. 1016 (1984); Bolder v. Armontrout, 713 F.Supp. 1558 (W.D. Mo. 1989); Mathis v. Zant, 704 F.Supp. 1062 (N.D. Ga. 1989).

A jury must be afforded the ability to consider and give effect to any relevant mitigating evidence proffered by a defendant as a basis for a sentence less than death. Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

"[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." United States v. Chronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).  In such a case, there is a presumption that the "conviction was insufficiently reliable to satisfy the Constitution."  Id. at 662.

### Failure to obtain proper experts to present mitigation evidence.

### Lack of fetal alcohol spectrum disorders expert.

While pregnant with the Petitioner, Ramiro "Toto" Gonzales, his mother used alcohol, marijuana, and volatile inhalants during the pregnancy and intentionally overdosed during the pregnancy in an attempt to abort Ramiro while he was a fetus.  See Exhibit 10.  A neuropsychologist testified at trial about Ramiro's history of developmental delay, immaturity, and learning problems in the areas of reading, vocabulary, and problems with social skills, problem solving/coping.  Id.  There was also testimony about school failure, multiple retentions, and early onset of substance abuse.  Id.  The psychological testing (over five years old) reflected a split (significant difference) between verbal and nonverbal performance on the IQ test used.  Id.  The IQ test used by the neuropsychologist pretrial, however, is suboptimal for the forensic evaluation of fetal alcohol spectrum disorders (FASD).  Id.  Ramiro should be retested with the Wechsler Adult Intelligence Scale - IV to properly evaluate for FASD.  Id.  The neuropsychologist discovered constructional apraxia, central dysarthria, and problems on the Bender-Gestalt Test, but failed to pursue this

18

information.  Id.   Further information about these, including raw data, the neuropsychologist's report, and testimony at trial must be pursued.  Id.   The neuropsychologist concluded that Ramiro did not have ADHD, but the scope of the inquiry into that issue was less than adequate.  Id.  There should also have been testing using the computerized Conner's Continuous Performance Test - II. Id.  The neuropsychologist failed to investigate Ramiro's functional/adaptive behavior.  Id.  Such assessment is critically important to a thorough evaluation of FASD.  Id.  "**In summary, there is abundant information to support the conclusion that FASD should be HIGHLY SUSPECTED and that a thorough diagnostic evaluation to address this should be undertaken.**"  Id. (emphasis in original).

In the case at bar, the jury never heard that Ramiro has FASD.  The reason the jury never heard this is because the defense failed to obtain a FASD expert to perform the proper testing and provide the correct diagnosis.  The expert used by the defense failed to administer the correct tests to Ramiro and failed to properly diagnose Ramiro as FASD.  This is vital mitigation evidence that was not provided to the jury.  Defense counsel's performance was deficient in failing to obtain a FASD expert in this case especially given the amount of drugs and alcohol taken by Ramiro's mother while pregnant with Ramiro.  This deficient performance prejudiced the defense in that the verdict is not worthy of confidence since the jury was never informed that Ramiro has FASD.  Ramiro should receive a new sentencing hearing.

19

**Lack of sexual, emotional, physical, biological abuse expert.**

From the ages of 5 to 12, Ramiro was sexually abused by his uncle, Gilbert Trevino, who was in his late 30's or early 40's.  <u>See</u> Exhibit 11.  When Ramiro was 5 years old, Trevino engaged in oral sex with Ramiro.  <u>Id.</u>  The oral sex incidents occurred two to three times and were mostly during the day.  <u>Id.</u>  Ramiro was scared and instructed by Trevino to not say anything about the oral sex.  <u>Id.</u>  Trevino took Ramiro to a wooded area by a golf course and "his mouth was on my penis."  <u>Id.</u>  "After this happened, Ramiro felt, 'No one cared for me.  I was alone.'"  <u>Id.</u>  Trevino did not testify at Ramiro's trial.

Witnesses were interviewed pretrial by the defense and provided information about Ramiro's history of being the victim of sexual abuse.  <u>Id.</u>  Ramiro's cousin, R.G., admitted to the mitigation specialist pretrial that R.G. had also been sexually abused by Trevino.  <u>Id.</u>  The mitigator's notes state that, "R[.]G[.], cousin admitted that Gilbert Trevino was sexually abusive to her for [sic] age 6-7 when he babysat her while living with her family.  Her mother M[.] added that Gilbert's father, Juan, sexually abused his daughters and raped his wife."  <u>Id.</u>  Neither R.G. not her mother, M., testified at Ramiro's trial.  <u>Id.</u>

The mitigator's notes state that, "Ramiro disclosed sexual abuse for the 1[st] time to another person at the initial interview with this investigator and his lawyer, Emmett Harris.  The sad and scared affect and embarrassment was noted by dropping eye gaze, tearfulness, lowering of voice.  It appeared to match the disclosure content.  Both this writer and the lawyer found it credible."  <u>Id.</u>  The mitigator's notes state that Ramiro's aunt, Vicky Wilson,

and Ramiro's cousin, Jessica Keegan, "both suspect Gilbert Trevino, the son of Leon, Frances Gonzales older sister. Gilbert lived with the family for about a year. Vicky reports he would peak through a hole into bath room and look through window to watch girls getting dressed. Vicky reports that Gilbert would get blow jobs from his brothers." Id.

Ramiro's aunt, Maggie Moreno, his mother's twin sister, was interviewed pretrial by the mitigator. Id. Maggie stated that, "Gilbert molested Ramiro, Ramiro told her; when Gilbert lived with them, he would sit in the living room naked and masturbate." Id. Even thought Maggie was interviewed pretrial by the defense, she did not testify at Ramiro's trial. Id.

When Ramiro was 12 years old, a 20 year old woman reportedly became pregnant by Ramiro. Id. The woman gave birth to a female child in Bandera and then relocated to avoid possible prosecution for her sexual abuse of Ramiro. Id. At the time the child was born, Ramiro was 13 years old. Id. Research indicates that this type of abuse has a significant impact on the development of male children. Id. The National Criminal Justice Reference Service has published articles regarding this type of sexual abuse. Id. The mitigator recognized the importance of this type of sexual abuse. Id. In her report, the mitigator stated, "Due to the sexual nature of both crimes, highly encourage an ABEL assessment for sexual offenders, best is Mark Steege[]. I can contact once you get funding." Id. Funding was never sought for Mr. Steege, LCSW, LPC, who is a treatment professional who specializes in treating sexual disorders and abuse. Id.

Defense witnesses testified about the sexual abuse of Ramiro, but no expert witness ever brought all this information together and explained the importance of this history.  Id. No expert explained the potential for this type of history of abuse to contribute to later problems for Ramiro.  Id.  Witnesses testified the Ramiro was a victim of additional emotional, physical, and biological abuse and neglect, but there was no attempt to pull together this information and identify an expert that could present the jury with information about the significance of these emotional, physical, and biological abuses and neglect factors. Id.  The mitigator recommended the defense obtain a testifying expert on sexual abuse and trauma, but no such expert was obtained by the defense even thought this was essential.  Id. "Because a sexual assault was part of both the Capital Offense and the prior felony conviction that resulted in a life sentence it would seem essential to provide the jury with an understanding of how Ramiro's prior history of being a victim of sexual assault was a significant contributing factor in this case."  Id.

No expert addressed the impact of substance abuse on Ramiro.  Id.  No expert addressed the impact of neglect and rejection on the development of Ramiro.  Id.  No expert addressed the synergy of the effects of Ramiro's sexual victimization, emotional and physical abuse, neglect and rejection by his mother and caregivers, exposure to alcohol and other drugs in utero, and his own substance abuse problem with the fact that he was only 72 days past his 18th birthday at the time of the offense in this case.  Id.  "Each of these issues has been well documented in the literature to have significant, severe and dysfunctional consequences on the cognitive, emotional, characterological and social development of a

child."  Id.  "Ramiro had all of these issues simultaneously present in him."  Id.  "Because of the comorbid presence of these conditions it would seem to be essential for the defense to not only address the individual impact of these issues, but to also assist the jury in understanding the impact of this constellation of dysfunctions."  Id.

Given the evidence that Ramiro's mother used alcohol, drugs, and inhalants during her pregnancy with Ramiro, "A systematic evaluation of this might have confirmed that Ramiro was impaired at birth."  Id.  Many of Ramiro's characteristics and performance difficulties are regularly associated with a diagnosis of FASD.  Id.  "Further specific evaluation of this issue appears warranted."  Id.  The neuropsychologist testified at trial that Ramiro had a "normal brain" and an "average IQ" but "a more specific and thorough evaluation of this issue might have revealed additional brain function and possibly brain structure problems."  Id.

"It appears that the defense did not have a clear understanding of how each of the above issues could have had a significant impact on the defendant."  Id.  "Thus, they did not pursue specific investigation of each of those issues nor did they attempt to do any type of evaluation or investigation into how the presence of all of these issues had impacted Ramiro."  Id.  "It is my opinion that there was a distinct difference between what was known and available to the trial team and what was presented by the trial team to the jury."  Id.  "Several factors which were well known to the trial team were only minimally presented at trial; if presented at all."  Id.  "Additionally some aspects of these factors were not pursued or thoroughly investigated."  Id.  "Had these factors been more adequately investigated and

then presented in a manner that identified the significance of the factors to Ramiro's abilities and behaviors, I believe that the jury would have had significantly more relevant information to consider regarding Ramiro's cognitive and emotional abilities and disabilities as well as the behavioral consequences of these factors." Id.

In the case at bar, the jury never heard the effect on Ramiro of the synergy of Ramiro's sexual victimization, emotional and physical abuse, neglect and rejection by his mother and caregivers, exposure to alcohol and other drugs in utero, and his own substance abuse problem with the fact that Ramiro was barely an adult since he was only 72 days past his 18th birthday. The jury never heard how these issues (all simultaneously present in Ramiro) have a significant, severe, and dysfunctional consequence on the cognitive, emotional, characterological, and social development of a child like Ramiro. The jury was never advised about the impact of this constellation of dysfunctions on Ramiro. The reason the jury never heard this is because the defense failed to obtain a sexual, emotional, physical, and biological abuse expert to explain to the jury how the presence of all of these issues impacted Ramiro. The expert used by the defense was a neuropsychologist and not an expert in sexual, emotional, physical, and biological abuse. As such, the defense expert failed to explain to the jury how the presence of all of these issues impacted Ramiro. See (R - v.42 - 8, 9, 10-11, 23, 28, 40-41, 44-45, 48-51, 61, 65-66, 76, 82-86). This was vital mitigation evidence that was not provided to the jury. Defense counsel's performance was deficient in failing to obtain a sexual, emotional, physical, and biological abuse expert in this case. This deficient performance prejudiced the defense in that the verdict is not worthy of confidence

since the jury was never informed how the presence of all of these issues impacted Ramiro. Ramiro should receive a new sentencing hearing.

### Providing privileged work product to state.

On February 5, 2004, the Petitioner was indicted in this cause.  (T - 10).  The record does not reflect exactly when initial counsel were appointed for the Petitioner.  On February 17, 2004, the trial judge stated on the record at arraignment that counsel had been previously appointed in this cause.  (R - v.1 - 1, 3).  On May 2, 2005, Dr. Milam evaluated the Petitioner as the court appointed psychologist for the defense.  (T - 336).  Dr. Milam's invoice regarding this and other services, however, was filed unsealed with the district clerk.  Id.  On March 27, 2006, the state filed the State's Motion for Discovery of Defense Expert Witnesses' Underlying Facts and Data.  (T - 560-563).

At a pretrial hearing on June 1, 2006, the trial judge granted, without objection by the defense, the State's Motion for Discovery of Defense Expert Witnesses' Underlying Facts and Data.  (T - 562; R - v.4 - 1, 5-7).  At this hearing, the trial judge ordered the defense to provide the written expert report to the state as follows:

> COURT:  I have something here that I was supposed to hold until the certification was accomplished.  I'm not sure about this.  I believe this is the State's Motion for Discovery of Defense Expert Witnesses' Underlying Facts and Data.
>
> STATE:  Yes, sir.
>
> COURT:  I'm prepared to rule on that now.
>
> STATE:  You are not or you are?

25

COURT:  I am now since everybody is certified.  Is there any objection from the defense on this motion?

DEFENSE:  Which one is that?

DEFENSE:  It's this one here, about giving this information. We have offered the names and we have offered -- Well, the work product is the part that I'm concerned about.  Anything that our expert has done with the client is, in basis, to prepare for our case.  She has not been involved in any of the interviews with the investigator or the investigation expert.  However, she has had confidential communication with our client.  I believe that those are confidential and it's work product, Judge.

COURT:  What is it that you are looking for exactly?

STATE:  Well, what I'm looking for is what their expert is --

COURT:  What the experts are basing their opinions on?

STATE:  Yes, sir.  All of the information that I would be entitled to on cross, I would like to get that ahead of time in order to prevent a needless delay to review that stuff.  I would also like it to make sure that it's actually brought to court because a lot of times I've found that, you know, we have to take a break when the expert says, "I didn't bring that.  I will have to send for it."

COURT:  Yes, I've heard that before.

STATE:  I would like to have it for a couple of days to review it before they testify.  That's what I'm getting at here.

DEFENSE: At this point I know that she has not written a report.  We've had meetings with her, but she has not written a report out.

COURT: But I assume that she's going to have an opinion to give.

DEFENSE: Sure.

COURT: Well, the State wants the basis for that opinion, so when it's written I would expect that you would provide that to them.

DEFENSE: Yes, sir.

COURT: I don't think I have been given an order on that. Do you have an order prepared for that?

STATE: I thought I attached one to the motion.

COURT: I'll tell you what. I'll just mark on there the notation of "granted" on the motion itself.

STATE: Okay.

(R - v.4 - 5-7).

After the guilty verdict and before the start of the punishment phase of the trial on August 29, 2006, the state revisited the State's Motion for Discovery of Defense Expert Witnesses' Underlying Facts and Data. (R - v.39 - 1, 3-6). At this hearing, the following occurred:

COURT: Do you need to put something on the record?

STATE: Yes, Your Honor. If you will recall several months ago we had a pretrial hearing in this case. I don't know if it was in March or exactly when, but we had a pretrial hearing in this case. One of the motions that I presented was a motion to have the defense experts disclose their underlying data that they were going to use in forming their opinions so that I could have that for cross examination. You did order the expert to turn that over to me, and I can't recall if you said before the trial started or by the first day of the trial. Well, that has not been done. Now what I did get from their expert was just a bare-bones list of certain things that she looked at, and half of which I can't even tell you what she's talking about. But specifically I received none of the data, the testing sheets or the forms or any of that

27

stuff, which I had specifically requested in my motion that you ruled on.  None of that has been turned over to me to date.

COURT:  Why hasn't that been done?

DEFENSE:  Let me respond, Judge.  We turned over, like she said, a bare-bones list.  I got with my expert and she said that she had used various psychological evaluations.  As per the motion, it stated that Ms. Popps wanted the test, the forms or the protocols that she used.  She gave me a list last week to get together for her, Ms. Popps did.  I called my expert but I did not get a hold of her until yesterday.  I don't know why.  I called her office and I called everything that I had.  She is getting that information together for us.  I was supposed to have it here before, I think it was, the first day of trial, but I didn't get it.  I was going to have it for Ms. Popps this morning, but my expert can't get it to me until ten o'clock.  Wendy is going to go pick it up in Kerrville for me.  I don't know where my expert is today.  I think she's testing somewhere today, but I got a hold of her in the afternoon the other day.  I would hope to have that here for her tomorrow or just as soon as Wendy can get back from Kerrville, which hopefully will be around ten o'clock or so.  Now some of the stuff I had to talk with my expert about in order to try to clear it up, because I didn't quite understand what it was saying myself.  From what my expert is saying, everything was turned over to Ms. Popps, like two books worth, and that that is what she looked at, besides the interviews that are listed on the sheet as to the people that she talked to.  Now the final data is what I need to get to Ms. Popps.

COURT:  Is that going to do you any good tomorrow?

STATE:  Not really.  It's not going to give me time to review it, which is the whole reason that I filed my motion many, many months before trial.

COURT:  Yes.

DEFENSE:  The other thing is that my expert, when I talked to her, and I talked to Ms. Popps last week, is that I thought that she had told us that the sentencing phase was going to go on a

little longer, and it may or it may not.  We have all of our witnesses lined up for Friday, but my expert is also not going to be available Friday but the first thing on Tuesday morning. Now that way Ms. Popps will have an extra weekend to review this material.  I know that's not giving her a ton of time, but she will at least have Saturday, Sunday and Monday to review the material, besides Wednesday, Thursday, and Friday.

COURT:  Well, I guess that's the best we can do.

STATE:  I would just like to point out that I feel like this is somewhat intentional on the expert's part, not on the part of Ms. Jarrett.  She is claiming that she has to have a signed order from the judge before she turns it over, but she knows that you have ordered that be done.  Ms. Jarrett, I'm sure, has told her that you ordered that it be turned over.

COURT:  Why didn't she say something about that a long time ago?

DEFENSE:  I could get that signed order over to her today.

COURT:  But surely she knows that I ordered that, and that's enough.  If she doesn't, then I'm not going to pay her.  The first thing to do is to get a signed order, and then we will see what we will do about it tomorrow or what tomorrow looks like.  If it doesn't look like it's going to be helpful to you, then we can bring her in and depose her while the jury sits out there.

STATE:  Thank you.

(R - v.39 - 3-6).

The record does not reflect that the state ever conducted a hearing outside the presence of the jury to determine the facts underlying the opinion of Dr. Milam.  The record does not reflect what defense records or expert records were provided to the state pursuant to the court order.

29

The defense made the following opening statement during the punishment phase of the trial:

> Good afternoon.  So far you have heard about what the defendant has done.  You have heard about it through testimony from peace officers on the stand and from lay witnesses.  You have also heard some testimony about what some people say that the defendant has done, and that has come from the mouths of inmates on this stand.  Now those people are commonly known as snitches in a prison society.
>
> Now on this phase of the trial you will learn who Ramiro is.  You are going to hear, through a string of witnesses, some friends, some family members, about how Ramiro was raised.  You will learn from these witnesses about Julia Saldana, his mother, and how Ramiro was virtually dumped by her right after his birth.
>
> You will also learn about his formative years and how he had no supervision, or at the most, inadequate supervision.  You will learn about his experiences with drugs and alcohol at an early age and on through his life.
>
> You will also learn about the abuse on Ramiro, both verbal and physical, by Mario, Julia Saldana's boyfriend, and the sexual abuse at about age twelve by a twenty-year-old woman, who then ends up becoming pregnant with this twelve-year-old's child.  She leaves.  She takes the baby and is never seen again.
>
> You will learn about the years of incarceration, both in the jails that you have heard about, and also in prison, in prison society.
>
> At the very end of these witnesses it will all be wrapped up together and tied together by an expert in the field of psychology.
>
> Now we all talked at length in voir dire with you.  Each one of you said that you could listen to all of the testimony

before you made a decision as to the ultimate penalty on whether to kill Ramiro Gonzales or not.

I know that in a case such as this that is going to be extremely difficult for you, but I would just ask you to hold yourself to that promise, and that you listen to the evidence because, which you heard this in voir dire as well, that's what the law requires you to do, and you must consider the mitigating evidence that is offered here.

There are no excuses for what Ramiro did. There may be some explanation, and there may be remorse, or there may be a hope of rehabilitation here. In the next couple of days we intend to bring you the evidence that you will need to consider in mitigation.

I thank you in advance for your continued attention.

(R - v.41 - 122-124).

The defense direct examination of Dr. Milam was, in pertinent part, as follows:

Q. Did you perform a full neuropsychological evaluation on Ramiro Gonzales?

A. Yes, I did.

* * *

Q: What does a neuropsychological evaluation consist of?

A: It's a ten-hour evaluation, generally done over a two-day period. I do the Halstead-Reitan test; that's a test battery, and it's done in a very systematic way. For instance, if you're trying to look at motor, you type on a board. If you're going to look at visual memory, you have tests that where you have to look at something then remember it.

* * *

31

Q.   What else, if anything, besides the evaluation, did you review to prepare for your testimony?

A.   I looked at literally stacks of records.  I looked at school records, I looked at probation records; I looked at incident reports from jail, I looked at the reports that were gathered at the time of his offenses.  Stacks of material.

* * *

Q.  Besides the ten-hour neuropsychological evaluation, did you have any other time with Ramiro to spend?

A.  No, I did not spend any more time with him.  I did go to the ranch and talked to his grandmother and his grandfather and his cousin Georgine, and I'm trying to think who else was in that room.  I also reviewed all of the interviews that were produced by the mitigator, and, of course, the records.

Q.  Was the other person Thomas Keese?

A.  Yes, I also interviewed the ranch foreman.  As a matter of fact, I spent maybe an hour and a half, maybe even two hours, with him.

Q.  Why was it so long with him?

A.  He took me on a tour of the ranch to show me what the ranch layout was like.

Q.  Did you ever interview Julia Saldana?

A.  No, I did not.  I really wanted to.

Q.  Do you know who that is?

A.  Yes, I do.  That's his mother.

Q.  And why did you not interview her?

32

A. She refused to cooperate in any way with in anyone who has tried to talk to her; so much so that when the mitigator went out to gather information about Ramiro's childhood, she reported her to the Board, her Board for harassment. I've never seen that happen before.

Q. I may not be -- I'm not a psychologist; I may not be asking this right, Doctor. But what did you find from that ten-hour neuropsychological evaluation of Ramiro?

A. I found that he was absolutely within normal limits. There was no brain damage; none whatsoever.

* * *

Q. Did you learn anything else from the records, your interview with Ramiro, that was important to you?

A. Yes. One of the things I did was give him a set of projectives, which is paper and pencil test, true and false. And one of them, which is the most standard one, the MMPI, and it was an invalid test. It was an invalid test because he totally tried to come across as mentally ill. I mean, it was a gigantic score; it was over 100. It was 115, I believe. It invalidated the whole test. So the way I was looking at it is he was trying to make himself look mentally ill.

Q. You've talked about his education; you've talked about his past. Is there anything so far, in what we've talked about, that you think excuses what he did or his behavior?

A. No, I think we're all responsible for our behavior.

Q. Dr. Milam, you said you performed the MMPI and that test was invalid.

A. Right.

* * *

33

Q.   In your evaluations and using the tests and evaluations of Ramiro, what did you determine about antisocial personality?

A.   I think he has antisocial personality features now.  I really do.   I think his primary diagnosis is a reactive attachment disorder.

(R - v.42 - 8, 9, 10-11, 23, 28).

The state's cross-examination of Dr. Milam was, in pertinent part, as follows:

Q.  Dr. Milam, you and I have never met before; is that correct?

A.  No, we haven't.

Q.  And at the end of last year or early this year, you're aware that there was a pretrial hearing where we asked to have your raw data from the examination you did with Ramiro and have that turned over to us and the Court ordered you to do that?

A.  No, I didn't have a court order.

Q.  You were aware that the Court had ordered that, were you not?

A.  No.  In fact, I got asked for a court order.

Q.  Well, after trial started, you asked for a court order.  But the attorneys did not tell you to get that stuff ready and give it to us? A.  I was asked to produce it and I said I had to have a court order to do that.  It has to be a judge's order to release it.  And last Monday I was told that Judge Cantu had sighed a judge's order.  I immediately copied it and I hand-carried it to Kerrville and handed it to the private investigator.  And hand-carried it over here under judge's order.

Q.  Is it your testify that you were not aware, prior to trial, that the Court had, at least, verbally ordered for you to turn that stuff over to us prior to trial?

34

A.  In a judge's order, no.

Q.  And then once trial started and we kept asking for this stuff, we didn't get it until last Wednesday, did we?

A.  No, you did not.  And I kept asking for a judge's order.
Q.  So it wasn't good enough that you'd been verbally ordered; you need a written order?

A.  Yes, I did.

Q.  Did you do a report in this case?

A.  No, I did not.

Q.  Why is that?

A.  Because I wasn't asked to and I don't produce work that I'm not requested to do.

* * *

Q. Okay.  Now, the parts that test personality, the MMPI, the Millon test that you gave, those parts are more readily manipulated?

A.  Yes.

Q. And you testified that the defendant, in fact, answered those questions in a clear attempt to appear mentally ill.

A. Correct.

Q. Which completely invalidated the test.

A. Correct.

* * *

35

Q.   Can this happen if this is used for a criminal setting, someone can manipulate these results?

A.   They can answer true or false in an inappropriate way.

Q. All right.  And it says here that this offender's response time may indicate a tendency to magnify levels of illness, to complain, or feelings of extreme vulnerability associated with chronic acute turmoil.  Which could be this trial.

A.   Uh-huh.

Q.   This offender's scale scores may be somewhat exaggerated and the interpretations should be read with this in mind.

A. Absolutely.  What's exactly what happened in the MMPI and MCPI, he was exaggerating.

Q.   It says that a poor reporter of his personal histories and increasingly withdrawn from his problems, he may be difficult to engage in therapeutic intervention.   Meaning, he'll be difficult to treat, correct?

A.   I think it's a nonissue.  He won't get treatment.

Q.   Is that what that says, that he would be difficult to treat?

A.   When you say this, this is saying that — basically what it says to the therapist is you're going to have to use confrontative-type therapy.  That's what it says to the therapist:  Heads up, you're going to have to use confrontative.  You can't say "you poor, poor baby."

Q. Well, it says specifically here:  He may be difficult to engage in therapeutic intervention?  Would you agree with that?

A.   I agree.

Q.   This defendant's response style may indicate a broad tendency to magnify the levels of illness or characterological tendency to complain or to be self-pitying.  Correct?

36

A. Correct.

Q. And some of his answers were: "Sometimes I can be pretty rough and mean with my relations with my family."  Under emotional decontrol.

A. That's what he said.

Q. "And lately I've began to feel like smashing things." Correct?

A. However, all tests —

Q. Is that what he said, ma'am?  They'll have a chance to go back with you and you can say as much.  But this can take all day long if I don't get your answers and go on.

A. Yes, that's what it states.

Q. And that he often gets angry with people who do things slowly?

A. That's one response.

Q. There was another test given to him — and maybe if I'm incorrect, let me know.  But this personality assessment inventory, that was a separate test?

A.  That was invalid.

Q. MMPI and separate from the one we just talked about.

A.  Yes.

Q.  And this, too, was invalid because he was lying on it, correct?
A.  He was exaggerating.

Q.  He was exaggerating.  So every time you made attempts to kind of figure out what's going on with him, your tests come back invalid; he won't answer the question.

A.  It was "ain't it awful?  Ain't it awful?"  We call it the Ain't it Awful Syndrome.

Q.  So is he complaining and exaggerating symptoms?

A.  Uh-huh.

Q. The test results on this could only be assumed to be invalid, therefore no clinical interpretation was provided?

A.  Yes.

* * *

Q. I don't know if I got your notes mixed up.  At  which point – this is part of the interview. But he's  telling you that he's feeling he wanted to hurt  somebody, especially his cousin, and that he would go through stages where he would get mad and want to hurt somebody and then he'd get depressed.

A. That was the cousin that he said sexually  abused him.

Q. Okay.  And that "when I don't like" – that's why he didn't like to be around people, because when he got to that stage, he hurts somebody.  He told you that.

A. Yes, he did.  Where are you at now?

* * *

Q. But it's also to determine if someone – their willingness to admit responsibility to a crime, their  remorse.  These were factors that you talked about earlier, correct?

A. Correct.

Q. And he's displaying none of that.

A. He says a lot of things.  He changes his story a lot of times.

Q. But he's not taking responsibility for his crimes or showing you remorse for his crimes whatsoever, is he?

A. On that day, no.

Q. Are you saying later he admitted to the crimes to you?  I mean, I thought that was the only day you talked to him.
A. That was the only day I talked to him, yes.

* * *

Q. Just so we're clear, you've testified that this defendant is not insane.

A. Correct.

Q. He's not mentally retarded.

A. Correct.

Q. He was completely normal on his testing.

A. Correct.

Q. He's not schizophrenic.

A. Correct.

Q. And you didn't diagnose with any mental illness.

A. No.

Q. Okay.  He's not suicidal, you've testify to that, correct?

A. Correct.

Q. And his IQ is normal.

A. Correct.

* * *

Q. So he's repeatedly broken the law.  Even if you took those out, he's admitted to you that he did drugs every day and sold drugs.

A. Yes, he did.

Q. Deceitfulness, as indicated by repeated lying,  use of aliases or conning others for personal profit or pleasure.  He was deceitful to you, even admitting that he committed these crimes, was he not?

A. Yes.

Q. And he was deceitful on the tests, when he tried to exaggerate.

A. Yes.

Q. Impulsivity or failure to plan ahead.  Do you agree that the defendant shows signs of impulsivity and failure to plan ahead?

A. Yes.

Q. Irritability and aggressiveness as indicated by repeated physical fights or assault.

A. I didn't find that much fighting.  I found it was mostly verbal.

Q. Did you see the assault where he and four other  inmates attacked the one inmate and he had to go to the hospital?

A. Actually, I think he had a bloody nose, didn't he?

Q. He had to go to the hospital, did he not?

A. Okay.

Q. If you don't remember him going to the  hospital, that's fine.  But they did attack him and beat him up, did they not?

A. Yes.

Q. And then there was another fight with another inmate, that we know of, where they had to be separated.

A. Was this a fight or altercation? I remember one physical assault is what I'm remembering.

Q. That's aggressiveness, is it not?

A. Yes.

Q. And aggressiveness can be even in the form of threats to people, to kill them, can it not?

A. It certainly can.

Q. Reckless disregard for safety of self or others. He's shown that, has he not?

A. Yes.

Q. Consistent irresponsibility as indicated by repeated failure to sustain work behavior or honor financial obligations.

A. Okay. Number one, I think he did have -- I'm not even arguing because I do think he has features of antisocial behavior. But when he was allowed to work, he got good reports on his work.

Q. But then when his check didn't come through, he went and sold the drugs on the streets.

A. Yes.

Q. And then lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated or stolen from another. We know he's shown that, has he not?

A. At times, yeah.

Q. By completely denying that he's committed these offenses and then by trying to rationalize that the victim somehow asked for sex or offered sex, correct?

A. I believe that was remorse.  That he showed remorse.  But I do think that he had that it-isn't-me-it's-not-me, -it's- somebody -else kind of kid thing.  Which is a little bit different than lack of remorse.

Q. So he actually didn't just meet three of the  seven; he met all seven of the criteria and had evidence of a conduct disorder while he was a young teen, correct?

A. Yes.

Q. So it's not just that he has criteria of it, or however you put it, you could actually diagnosis this  antisocial –

A. Now you could.

Q. Now you could, exactly.  And you said that this person has no sense of right and wrong, someone with antisocial personality, correct?

A. That's why there is this lack of guilt in them.  And I do think, I really do think that he feels very guilty and he does have a sense that he did something wrong.  That's the reason he's in denial.

Q. But you said a minute – well, first of all, you said, yes, you could diagnosis him with antisocial personal disorder today.

A. Today.

Q. And that these people are the type of people that have no sense of right and wrong, correct?  That's what you said a minute ago.

A. I believe that the true diagnosis for him is a reactive attachment disorder.

Q. I understand, but just answer my question.  You've testified that people with antisocial personality disorder have no sense of right and wrong.

A. Yes.

Q. And that they have no remorse.

A. Yes.

Q. And that the key thing is guilt.  They have no guilt over what
they've done.

A. Yes.

(R - v.42 - 40-41, 44-45, 48-51, 61, 65-66, 76, 82-86).

The state habeas attorney stated in the original state habeas that, "The materials given
to the State included numerous items that are not subject to disclosure under the Rules of
Evidence.  Having Dr. Milam testify does not cure any error involving the disclosure of
communications between Dr. Milam and Trial Counsel that involved defense strategy,
potential difficulties in issues and any other number of privileged matters contained in the
e-mails and memos."  <u>See</u> Exhibit 4 at p. 4.  There was no objection to attorney-client
privilege or work product.  <u>Id.</u> at 6.  "When the State was given the documents and notes of
Dr. Milam they consisted of more than just underlying data, but also included privileged e-
mails and memos between trial counsel and Dr. Milam."  <u>Id.</u>  Disclosure of this material
violated the right to effective assistance of counsel and attorney-client privilege.  <u>Id.</u>  The
state was allowed to conduct a searing cross-examination of Dr. Milam because of this
production by defense counsel of work product.  Dr. Milam was the best witness the defense
presented regarding the mitigation evidence of abuse and neglect of Ramiro.  Counsel's
performance was deficient in providing work product to the state resulting in the searing

43

cross-examination of Dr. Milam.  This deficient performance prejudiced the defense by resulting in a verdict not worthy of confidence.  Ramiro should receive a new sentencing hearing.

Ramiro included all claims in this amended writ in the subsequent state writ.  Relief was denied on these claims in the subsequent writ.  Ramiro cannot be faulted for the original state habeas counsel filing a 9 page writ without any exhibits or attachments.  Ramiro has informed the undersigned that the state habeas counsel never met with Ramiro either before or after filing the state writ.  Ramiro cannot be faulted for the state habeas judge denying a hearing on this issue even though both the state and Ramiro's original state habeas counsel both agreed that a hearing was necessary on this issue and on the subsequent state writ the state argued against a hearing.  Ramiro cannot be faulted for the original state habeas attorney having a 4 page habeas file to provide to the undersigned.  Ramiro cannot be faulted for the original state habeas attorney not specifically identifying those records, e-mails, and memos provided to the state by the defense.  The undersigned met with Dr. Milam and she no longer has a file, so Dr. Milam is unable to inform counsel about what records, e-mails, and memos were provided to the state by the defense.  The undersigned traveled to Austin, Texas and reviewed the state's file and discovered that there is no file that reflects what records, e-mails, and memos were provided to the state by the defense.

**CLAIM II**

**THE PETITIONER'S RIGHT TO COUNSEL, AS GUARANTEED BY THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION, WAS VIOLATED WHEN THE TRIAL JUDGE ORDERED DISCLOSURE OF DOCUMENTS WHICH IN PART COMPRISED ATTORNEY WORK PRODUCT.**

**ARGUMENT AND AUTHORITIES
IN SUPPORT OF CLAIM II**

The subsequent state writ addressed this claim which was denied relief by the state habeas court and the Court of Criminal Appeals.  The original state habeas writ regarding this issue stated, in only one page, as follows.  See Exhibit 4.  The grounds for relief raised under this issue has been clearly recognized by the Supreme Court of the United States.  United States v. Nobles, 422 U.S. 225 (1975).  There are qualified privileges attached to the investigative reports prepared by agents working for the defense.  The trial court ordered Dr. Milam to tender to the state all materials prepared by Dr. Milam.  A portion of those materials consisted of hand written notes of interviews and memos and e-mails between Dr. Milam and defense counsel involving defenses and testimony.  The Applicant requests a hearing to fully develop the extent of the violation of attorney-client privilege.  The Court of Criminal Appeals has also recognized this privilege in Skinner v. State, 956 S.W.2d 532 (Tex. Crim. App. 1997); Pope v. State, 207 S.W.3d 352 (Tex. Crim. App. 2006).  The state cannot argue that this error was waived by counsel calling Dr. Milam to testify.  The materials given to the state included numerous items that are not subject to disclosure under

45

the Rules of Evidence.  Having Dr. Milam testify does not cure any error involving the disclosure of communications between Dr. Milam and Trial Counsel that involved defense strategy, potential difficulties in issues and any other number of privileged matters contained in the e-mails and memos.

Ramiro cannot be faulted for the original state habeas counsel filing a 9 page writ without any exhibits or attachments.  Ramiro has informed the undersigned that the state habeas counsel never met with Ramiro either before or after filing the state writ.  Ramiro cannot be faulted for the state habeas judge denying a hearing on this issue even though both the state and Ramiro's original state habeas counsel agreed that a hearing was necessary on this issue but on the subsequent writ addressing this issue the state argued against a hearing. Ramiro cannot be faulted for the original state habeas attorney having a 4 page habeas file to provide to the undersigned.  Ramiro cannot be faulted for the original state habeas attorney not specifically identifying those records, e-mails, and memos provided to the state by the defense.  The undersigned met with Dr. Milam and she no longer has a file, so Dr. Milam is unable to inform counsel about what records, e-mails, and memos were provided to the state by the defense.  The undersigned traveled to Austin, Texas and reviewed the state's file and discovered that there is no file that reflects what records, e-mails, and memos were provided to the state by the defense.

## CLAIM III

## THE TRIAL JUDGE FAILED TO PROPERLY INSTRUCT THE JURY ON MITIGATION IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

### ARGUMENT AND AUTHORITIES IN SUPPORT OF CLAIM III

The state habeas based this claim upon the Brief for the Appellant that was filed on the direct appeal of this cause.  See Exhibits 4, 12.  The highest court in Texas, the Court of Criminal Appeals, ruled on this claim so it should be considered exhausted.  Therefore, the argument in the Brief for the Appellant will comprise this issue and the remaining issues that follow in this writ.  Additionally, this claim was brought on the subsequent state writ and denied by the state habeas court and Court of Criminal Appeals.

A capital jury must be allowed to give effect to any mitigating evidence that holds general relevance.  McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990).  In a capital sentencing proceeding, just like any other sentencing proceeding, the general relevancy standard applies - i.e., does the evidence tend to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  Id.  A capital defendant is not required to establish a nexus between his mitigating evidence and his crime to trigger an Eighth Amendment prohibition to his execution.  Tennard v. Dretke, 542 U.S. 274, 287, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004).

47

Article 37.071 of the Texas Code of Criminal Procedure requires a trial judge to instruct a capital jury that the jury "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." Capital sentencing procedures are constitutionally infirm if they do not allow a jury to give full consideration and effect to mitigating circumstances in deciding the appropriate sentence. Smith v. Texas, 543 U.S. 37, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004). The Smith case appears to establish a new rule regarding mitigating evidence that is in conflict with Article 37.071 and its limiting definition of mitigating evidence.

In the case at bar, the defense recognized this defect with Article 37.071 and objected pursuant to Tennard v. Dretke at the jury instruction conference to attempt to correct this deficit. (R - v.43 - 5). The jury, however, was instructed that mitigating evidence is evidence that a juror might regard as reducing the defendant's moral blameworthiness. (T - 1021).

Such an instruction leads a reasonable juror to believe that the juror cannot consider evidence as mitigating unless it reduces the defendant's blame. This definition is contrary to the above dictates of the United States Supreme Court in Smith and Tennard. This definition limits the relevance of the evidence for the jury unless the jury believes the evidence reduces the defendant's blame. This definition also requires a nexus between the evidence and the circumstances of the offense since the definition requires the evidence to reduce the defendant's blame for the offense before it can be considered as mitigating.

48

Ramiro was harmed by the above instruction and definition.  The trial judge reversibly erred in overruling the objection regarding this issue.  Ramiro should receive a new sentencing hearing.

## CLAIM IV

## THE EVIDENCE IS INSUFFICIENT TO SUSTAIN THE CONVICTION.

### STATEMENT OF FACTS CONCERNING CLAIM IV

Ramiro was charged with capital murder in the course of committing or attempting to commit aggravated sexual assault, kidnaping, or robbery of the complainant on or about January 15, 2001.  (T - 8-9).  The indictment alleged Ramiro caused the death of the complainant by shooting the complainant with a firearm.  Id.

The complainant had been missing for over a year as of 2002.  (R - v.35 - 64).  A man from Bandera County had returned home one day and his girlfriend, the complainant, was not home.  Id. at 66.  Her car was at the home, her purse was at the home, and her clothes were at the home.  Id.  On October 7, 2002, Ramiro made a statement to the sheriff about the case of the complainant.  Id. at 60, 61, 67.  Ramiro took the sheriff to the ranch of Ramiro where the remains of the complainant were located.  Id. at 68-69.  The ranch of Ramiro is on the Bandera/Medina county line.  Id. at 70.  Hunters use this ranch.  Id.  Ramiro took the sheriff to a location on the ranch where Ramiro claimed he shot the complainant, but the body was not exactly where Ramiro remembered it was located.  Id. at 75-76.  Ramiro

49

described a necklace and a ring the complainant had been wearing.  Id. at 75, 78.  The bones of the complainant had been scattered by wild hogs and animals for over a year or two years. Id. at 76.  A necklace and a ring were located at the scene.  Id. at 77.

Ramiro initially stated members of the Mexican Mafia had brought the body to the ranch, and he then stated he was present but other men committed the crime.  Id. at 80-81. On the same day, October 7, 2002, Ramiro told a Texas Ranger that on January 15, 2001, Ramiro drove to the home of the complainant and her boyfriend to burglarize the home and steal the cocaine stash of the boyfriend.  Id. at 134-135.  Ramiro took between $150.00 and $500.00 from the bedroom closet.  Id. at 135.  He then bound the complainant and drove her in a truck to his ranch.  Id.  He then took a rifle from the truck to shoot the complainant.  Id. at 136.  He worked the bolt action on the rifle and a shell fell out of the rifle.  Id.  Ramiro had sex with the complainant and then the complainant put on her clothes.  Id. at 136-137. Ramiro then shot the complainant with a .243 caliber rifle.  Id. at 137.  Ramiro drove back home and threw away the empty shell casing.  Id.  The complainant had a bracelet on her wrist.  Id. at 137-138.  The boyfriend had claimed that $200.00 had been taken from the closet.  Id. at 143.

The boyfriend testified that the complainant moved into his house in the summer of 2000.  (R - v.37 - 55).  He testified that he kept his cash in a box in the bedroom closet and that the money was missing on January 15, 2001.  Id. at 76.  He found the purse of the complainant and inside the purse was a bracelet that he had not given to her.  Id. at 85.  He

50

learned that an ex-boyfriend of the complainant had given her the bracelet.  Id. at 85-86.

State Exhibits 77-78 (jewelry from the scene of the bones) were similar jewelry that he had

bought the complainant.  Id. at 88.  A friend of the complainant testified that State Exhibit

95 (from the scene of the bones) is a ring the complainant would wear.  Id. at 102-103.

The medical examiner testified that the ME office received, in connection with this

case, bones in multiple evidence bags, a human skull without the lower jaw, a femur, a sock

with multiple bones of a foot, three small bags of teeth, and some nonhuman bones.  (R -

v.37 - 11).  There were no ribs or a spinal column.  Id. at 12.  The medical examiner stated

that if a person was shot in the chest, the ME office could not confirm this without having

any bones from the chest area.  Id.  The ME office believed this was a female between the

age of 19 and 22 years of age.  Id. at 13.  The medical examiner testified that, based on what

bones were found, the cause of death could not be determined and there was no evidence of

premortem trauma.  Id. at 22-23.

The state DNA expert testified that all items recovered from the scene were tested.

(R - v.36 - 44).  All findings were negative for semen and for blood.  Id.  Ramiro was

excluded from all the items recovered from the scene.  Id. at 44-45.  No panties were found

at the scene and only part of one sock was found at the scene.  Id. at 43.

A rifle, Remington Model 788 caliber .243, was identified on October 8, 2002 by

Ramiro as the murder weapon and introduced at trial at State Exhibit 6.  (R - v.35 - 155, 159).

On October 8, 2002, three .243 shell casings and a fired bullet fragment were found at the

scene of the bones and introduced at trial as Exhibits 71-73, 85.  (R - v.36 - 11, 21, 30-31).

None of these were fired from the alleged murder weapon.  Id. at 116-117.  A state investigator testified that 52 shell casings of various calibers were found at the scene and at the house on the ranch in April 2005 and were used at trial as State Exhibit 97.  (R - v.36 - 99).  The age of these shell casings was unknown.  Id. at 103.  Six casings were fired from the alleged murder weapon.  Id. at 119.  On October 8, 2002, a shirt and bra were found at the scene of the bones and used at trial as State Exhibits 12, 84.  Id. at 10-11, 19, 30.  No gunshot residue or lead was found on the bra.  Id. at 121.  No visual gunshot residue was found on the shirt, but lead was found on the back of the shirt and on eight spots on the front of the shirt.  Id. at 124.  It is unknown if the lead came from a bullet or from another source.  Id. at 126.

## ARGUMENT AND AUTHORITIES IN
## SUPPORT OF POINT OF CLAIM IV

When an appellate court determines if the legal sufficiency of the evidence supports a judgment, the court views the evidence in the light most favorable to the verdict and determines if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560, 573 (1979); Watson v. State, 204 S.W.3d 404 (Tex. Crim. App. 2006).  In a legal sufficiency review, the appellate court does not review the fact finder's credibility and weighing of the evidence.  Watson v. State, supra.  If the evidence is determined to be legally insufficient, then the appellate court must enter a judgment of acquittal.  Tibbs v. Florida, 457 U.S. 31, 42, 102 S.Ct. 2211, 2218, 72 L.Ed.2d 652 (1982); Burks v. United States, 437

U.S. 1, 15-18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); Greene v. Massey, 437 U.S. 19, 24-27, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).

"It is well settled that a confession, alone, is not sufficient to support a conviction." Smith v. State, 363 S.W.2d 277, 279 (Tex. Crim. App. 1963); Brown v. State, 576 S.W.2d 36, 42-43 (Tex. Crim. App. 1978).  A confession must be corroborated.  Id.  The prosecution must establish that the offense was committed - i.e., the corpus delicti.  Id.  The confession may be used to help prove the offense was committed, but the confession is not alone sufficient.  Id.  If a defendant confesses to an offense, later additional statements by the defendant about the offense are not considered corroboration.  Marsh v. State, 342 S.W.2d 435 (Tex. Crim. App. 1961).  In capital murder cases based on the commission of an underlying felony, such as kidnaping, there must be corroborating evidence concerning the commission of the underlying felony and the murder.  Cardenas v. State, 30 S.W.3d 384, 390 (Tex. Crim. App. 2000).

In murder cases, the corpus delicti of the offense is evidence that: (1) a human being is dead; and (2) the death was caused by a criminal act of another.  Fisher v. State, 851 S.W.2d 298, 303 (Tex. Crim. App. 1993); Smith v. State, 180 S.W.2d 622, 625-626 (Tex. Crim. App. 1944).  In capital murder cases with kidnaping as part of the capital murder, commission of kidnaping is proved by evidence that someone entered the room of the complainant, bound the complainant, and took the complainant away.  Cardenas v. State, supra 30 S.W.3d at 390-391.  The corroborating evidence must establish that the complainant

was moved while still alive.  Gribble v. State, 808 S.W.2d 65 (Tex. Crim. App. 1990).  For robbery cases, the corroborating evidence must establish that property was taken in connection with the assault on the complainant.  Ruff v. State, 249 S.W.2d 922, 923 (Tex. Crim. App. 1952); Thomas v. State, 807 S.W.2d 803, 806-807 (Tex. App. - Houston [1st Dist.] 1991, pet. ref'd).

<b>Capital murder in the course of<br>committing aggravated sexual assault.</b>

Section 19.03(a)(1) of the Texas Penal Code states that a person commits capital murder if the person intentionally commits murder in the course of committing aggravated sexual assault.  Section 19.02 of the Texas Penal Code states that a person commits murder if the person intentionally or knowingly causes the death of an individual.  Section 22.021 of the Texas Penal Code states that a person commits aggravated sexual assault if the person intentionally or knowingly causes the penetration of the anus or sexual organ of another person by any means, without the person's consent, and the person either: (1) causes serious bodily injury or attempts to cause the death of the victim in the course of the same criminal episode; or (2) by acts or words places the victim in fear that death, serious bodily injury, or kidnaping will be imminently inflicted on any person; or (3) uses or exhibits a deadly weapon in the course of the same criminal episode.  Section 22.011(b) of the Texas Penal Code states that a sexual assault is without the consent of the other person if: (1) the actor compels the other person to submit or participate by the use of physical force or violence; or (2) the actor compels the other person to submit or participate by threatening to use force or violence

54

against the other person, and the other person believes that the actor has the present ability to execute the threat.

In the case at bar, a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt. There is insufficient corroborating evidence concerning the commission of the underlying felony, aggravated sexual assault, and the alleged murder. It is clear that the complainant, a human being, is dead, but there is insufficient corroborating evidence that the death of the complainant was caused by a criminal act of another - i.e., from a firearm. The medical examiner testified that the cause of death was unknown, and the state ballistics expert testified that no gunshot residue was found on any items collected from the scene. The DNA expert for the state testified that neither semen nor blood were found on any items collected from the scene and that Ramiro was not identified by DNA on any of the collected items. There is insufficient corroborating evidence that the alleged murder of the complainant was committed in the course of committing or attempting to commit aggravated sexual assault. There is insufficient corroborating evidence that any person caused the penetration of the anus or sexual organ of the complainant by any means, without the consent of the complainant. There is insufficient corroborating evidence that anyone caused serious bodily injury or attempted to cause the death of the complainant, let alone in the course of the same criminal episode; or by acts or words placed the complainant in fear that death, serious bodily injury, or kidnaping will be imminently inflicted on any person; or used or exhibited a deadly weapon in the course of

the same criminal episode.  The evidence is legally insufficient.  This Court should enter a judgment of acquittal as to capital murder in the course of committing or attempting to commit aggravated sexual assault on the complainant.

**Capital murder in the course of
committing kidnaping.**

Section 19.03(a)(1) of the Texas Penal Code states that a person commits capital murder if the person intentionally commits murder in the course of committing kidnaping. Section 19.02 of the Texas Penal Code states that a person commits murder if the person intentionally or knowingly causes the death of an individual.  Section 20.03 of the Texas Penal Code states that a person commits kidnaping if the person intentionally or knowingly abducts another person. Section 20.01(2) of the Texas Penal Code states that "abduct" means to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force. Section 20.01(1) of the Texas Penal Code states that "restrain" means to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person.  Restraint is without consent if it is accomplished by force, intimidation or deception.

In the case at bar, a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt.  There is insufficient corroborating evidence concerning the commission of the underlying felony, kidnaping, and the alleged murder.  It is clear that the complainant, a human being, is dead, but there is insufficient corroborating

56

evidence that the death of the complainant was caused by a criminal act of another - i.e., from a firearm. The medical examiner testified that the cause of death was unknown, and the state ballistics expert testified that no gunshot residue was found on any items collected from the scene. The DNA expert for the state testified that neither semen nor blood were found on any items collected from the scene and that Ramiro was not identified by DNA on any of the collected items. There is insufficient corroborating evidence that the alleged murder of the complainant was committed in the course of committing or attempting to commit kidnaping. There was no sign of a struggle in the house. There is insufficient corroborating evidence that the complainant was alive before she was allegedly moved anywhere. There is insufficient corroborating evidence that anyone restrained the complainant, or while alive, let alone with intent to prevent her liberation. There is insufficient corroborating evidence that anyone secreted or held her in a place where she was not likely to be found; or used or threatened to use deadly force against her. There is insufficient corroborating evidence that anyone restricted the movements of the complainant while she was alive or without consent, so as to interfere substantially with her liberty, by moving her person from one place to another while alive or against her will or by confining her. There is insufficient corroborating evidence that the complainant was subjected to force, intimidation or deception. The evidence is legally insufficient. This Court should enter a judgment of acquittal as to capital murder in the course of committing or attempting to commit kidnaping of the complainant.

## Capital murder in the course of
## committing robbery.

Section 19.03(a)(1) of the Texas Penal Code states that a person commits capital murder if the person intentionally commits murder in the course of committing robbery. Section 19.02 of the Texas Penal Code states that a person commits murder if the person intentionally or knowingly causes the death of an individual.  Section 29.02 of the Texas Penal Code states that a person commits robbery if, in the course of committing theft and with the intent to obtain or maintain control of the property, he: (1) intentionally, knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.  Section 29.01 of the Texas Penal Code states that "[i]n the course of committing theft" means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft.  Section 31.03 of the Texas Penal Code states that a person commits theft if he unlawfully appropriates property with intent to deprive the owner of property. Appropriation of property is unlawful if it is without the owner's effective consent.  Section 31.01(5) of the Texas Penal Code states that "[p]roperty" means: (A) real property; (B) tangible or intangible personal property including anything severed from land; or (C) a document, including money, that represents or embodies anything of value.

In the case at bar, a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt.  There is insufficient corroborating evidence concerning the commission of the underlying felony, robbery, and the alleged murder.  It is

clear that the complainant, a human being, is dead, but there is insufficient corroborating evidence that the death of the complainant was caused by a criminal act of another - i.e., from a firearm.  The medical examiner testified that the cause of death was unknown, and the state ballistics expert testified that no gunshot residue was found on any items collected from the scene.  The DNA expert for the state testified that neither semen nor blood were found on any items collected from the scene and that Ramiro was not identified by DNA on any of the collected items.  There is insufficient corroborating evidence that the alleged murder of the complainant was committed in the course of committing or attempting to commit robbery.  There is insufficient corroborating evidence that the money allegedly taken from the house belonged to the complainant.  There is insufficient corroborating evidence that  if, in the course of committing theft and with the intent to obtain or maintain control of the property, anyone intentionally, knowingly, or recklessly caused bodily injury to the complainant; or intentionally or knowingly threatened or placed the complainant in fear of imminent bodily injury or death.  The evidence is legally insufficient.  The court should enter a judgment of acquittal as to capital murder in the course of committing or attempting to commit robbery of the complainant.

## CLAIM V

**THE TRIAL JUDGE REVERSIBLY ERRED IN ALLOWING THE STATE EXPERT TO TESTIFY, AT THE PUNISHMENT PHASE OF THE TRIAL, AS TO THE FUTURE DANGEROUSNESS OF THE PETITIONER BECAUSE THE STATE FAILED TO SHOW THE RELIABILITY OF THE TESTIMONY BY CLEAR AND CONVINCING EVIDENCE AT THE <u>DAUBERT</u> HEARING.**

## CLAIM VI

**THE TRIAL JUDGE REVERSIBLY ERRED IN ALLOWING THE STATE EXPERT TO TESTIFY, AT THE PUNISHMENT PHASE OF THE TRIAL, AS TO THE FUTURE DANGEROUSNESS OF THE PETITIONER BECAUSE THE TRIAL JUDGE FAILED TO PROPERLY ACT AS A "GATEKEEPER."**

## CLAIM VII

**THE TRIAL JUDGE REVERSIBLY ERRED, UNDER TEXAS RULE OF EVIDENCE 702, IN ALLOWING THE STATE EXPERT TO TESTIFY, AT THE PUNISHMENT PHASE OF THE TRIAL, AS TO THE FUTURE DANGEROUSNESS OF THE PETITIONER.**

## CLAIM VIII

**THE PETITIONER'S RIGHT TO DUE PROCESS, AS GUARANTEED BY THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION, WAS VIOLATED WHEN THE TRIAL JUDGE ALLOWED THE STATE EXPERT TO TESTIFY, AT THE PUNISHMENT PHASE OF THE TRIAL, TO THE FUTURE DANGEROUSNESS OF THE PETITIONER.**

## CLAIM IX

**THE PETITIONER'S RIGHT TO A FAIR TRIAL, AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION, WAS VIOLATED**

**WHEN THE TRIAL JUDGE ALLOWED THE STATE EXPERT TO TESTIFY, AT THE PUNISHMENT PHASE OF THE TRIAL, TO THE FUTURE DANGEROUSNESS OF THE PETITIONER.**

### STATEMENT OF FACTS CONCERNING CLAIMS V THROUGH IX

On February 5, 2004, Ramiro was indicted in this cause. (T - 8-10). On May 3, 2004, Ramiro filed a Motion in Limine to Exclude Psychiatric or Psychological Testimony Concerning Future Dangerousness. (T - 123-151). On December 7, 2004, the prosecution filed a State's Motion for Psychiatric Evaluation of the Defendant for Purposes of Rebuttal to have Dr. Edward Gripon evaluate Ramiro and be prepared to address any claims raised by the defense regarding competency, sanity, future dangerousness, or other mitigation issues. (T - 297-299). This motion was granted by the trial judge on December 21, 2004. (T - 294-295). On January 26, 2005, Ramiro filed an Objection to State's Proposed Order Regarding Gripon Examination on the grounds that if the report is unsealed, both sides should receive a copy of the report, and Dr. Gripon should not be allowed to determine if Ramiro cooperated in the evaluation. (T - 314-316). Dr. Gripon evaluated Ramiro for three hours in July 2005, and the report of this evaluation was sealed with the trial judge and the district clerk. (R - v.41 - 20, 42). Dr. Gripon never referenced during his testimony this interview with Ramiro.

The Motion in Limine to Exclude Psychiatric or Psychological Testimony Concerning Future Dangerousness contained both the motion and a memorandum of law in support of the motion. (T - 123-151). Ramiro cited in his motion the Fifth, Sixth, Eighth, and

61

Fourteenth Amendments to the United States Constitution; Article I, §§ 10, 13, 15, and 19 of the Texas Constitution; Rules 401, 403, 702, 703, and 705 of the Texas Rules of Evidence; Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); Kelly v. State, 824 S.W.2d 568 (Tex. Crim. App. 1992); E.I. du Pont de Nemours and Co. v. Robinson, 923 S.W.2d 549 (Tex. 1995); Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713 (Tex. 1998); and Nenno v. State, 970 S.W.2d 549 (Tex. Crim. App. 1998). Ramiro incorporated the above in his memorandum of law and stated that a prediction by an expert regarding future dangerousness is inadmissible because such an opinion is unreliable and irrelevant. (T - 123-151). The memorandum of law also included citations to psychological articles and the American Psychiatric Association. Id.

Before the prosecution called its psychological expert to testify, Ramiro objected to the expert testifying about the future dangerousness of Ramiro and cited the trial judge to the Motion in Limine to Exclude Psychiatric or Psychological Testimony Concerning Future Dangerousness. (R - v.41 - 3-8). The trial judge stated, " . . . as much as I may agree with some of [Ramiro's] argument, I'm bound by the court of criminal appeals rulings already [presumably Lagrone], so I don't really have a choice to overrule their rulings . . ." Id. at 9. The trial judge overruled the objection. Id. at 9.

The expert for the prosecution, Dr. Gripon, then testified outside the presence of the jury at a "Daubert hearing." Id. at 22. The prosecution asked Dr. Gripon if he is commonly asked to give an opinion regarding future dangerousness in capital cases, and he responded

that ***such opinions are less common*** in the last five years.  Id. at 28.  When asked if

predictions of future dangerousness fall within the scope of forensic psychiatry, Dr. Gripon

replied, "Yes, it is.  It's been common now for many years.  ***It's highly contentious and***

***controversial***, but it's still there."  Id. at 30.  Dr. Gripon claimed that, in forming an opinion

as to future dangerousness, he reviews "collateral information," does an interview if allowed,

reviews past history, and uses actuarial methods concerning "how often certain things do

occur in a given population."  Id. at 34-35.  He stated that, "The best predictor here as to

future behavior, you know, it would certainly be one's past history."  Id. at 35.  He stated that

the most important information for a prediction of future dangerousness is the life history of

the individual.  Id. at 40.  He admitted, however, that he did not contact the family of Ramiro

to ascertain the past history of Ramiro.  Id. at 48-49.  He stated that actuarial methods are

***"very hard" to apply for people on death row and such methods may not be correct***.  Id.

at 35.  He stated that he is aware that the American Psychiatric Association (APA) has

concluded that a psychiatrist is no better and no more accurate than any other lay individual

in predicting future dangerousness.  Id. at 44.  He stated that he does not agree with this

conclusion of the APA.  Id.  He stated that he has given approximately fifty future

dangerousness opinions.  Id. at 39.  He has never, however, subsequently reviewed his cases

to determine the accuracy of those evaluations.  Id. at 46-47, 48.  He agreed that he could

have been wrong on many of his future dangerousness evaluations.  Id. at 47.  The trial judge

ruled that Dr. Gripon could testify.  Id. at 49.  Error was preserved.

Dr. Gripon testified before the jury.  Id. at 50.  He stated that, in forming his opinion as to the future dangerousness of Ramiro, he reviewed the following: criminal records, offense reports, jail records, and audio recordings of calls from the jail.  Id. at 62.  He then testified that it was his opinion that Ramiro "would pose a risk to continue to commit threats or acts of violence."  Id. at 66.  He said he reached this conclusion based on the following history of Ramiro: delinquent behavior problems at an early age, a record of violent behavior (two sex assault cases and one murder), and jail records that reflect he was "less than a model prisoner."  Id. at 67.  He claimed the history of Ramiro reflected a conduct disorder and antisocial personality disorder.  Id. at 70.  He stated that Ramiro is a threat in the free world and in a prison setting.  Id. at 92, 94.

The court below, the Texas Court of Criminal Appeals, in an unpublished opinion, on direct appeal affirmed the conviction on June 17, 2009.  Gonzales v. State, No. AP-75,540 (Tex. Crim. App., June 17, 2009).  See Exhibit 13.  In that appeal below, Ramiro claimed that the trial judge reversibly erred under Daubert, and violated Ramiro's rights to due process and a fair trial under the Fifth and Sixth Amendments, in allowing the psychiatrist to testify as to the future dangerousness of the Petitioner.  Ramiro argued that the future danger testimony was inadmissible under Daubert, was unreliable, and violated the Eighth Amendment in that it resulted in an arbitrary and capricious punishment.  The court below held that the trial judge did not abuse his discretion in allowing the future danger testimony. Judge Womack dissented and was joined in his dissent by Judge Johnson.  Judge Womack,

64

in his dissent, stated as follows:

> The Court holds (ante, at 13-15) that the trial court did not abuse its discretion in allowing the psychiatrist to offer an expert opinion on the probability that the defendant will commit future acts of dangerousness that will constitute a danger to society.
>
> The fact that there was no evidence introduced (and there seems to be no evidence at all, anywhere) of the reliability of these predictions of future dangerousness should be dispositive. "Now the ordinary rules of evidence require that evidence be reliable in order to be admissible. Reliability in the context of scientific evidence requires scientific validity. It is doubtful that testimony about future dangerousness could withstand Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)] analysis." (Citing Erica Beecher-Monas & Edgar Garcia-Rill, "The Law and the Brain," 1 Journal of Appellate Practice & Process 243, 274 (1999)). We apply that analysis to psychiatrists' and psychologists' predictions of future dangerousness. (Citing Russeau v. State, 171 S.W.3d 871, 883-84 (Tex. Cr. App. 2005)).
>
> It must always be remembered that the capital murderer who is not sentenced to death will be sentenced to prison for life without parole. So the relevant question is whether he will commit violent acts in prison.
>
> Our laws permit people with communicable diseases to be quarantined. The laws are based on scientific research that has shown that, without quarantining, the diseases will be spread. Before we accept an opinion that a capital murderer will be dangerous even in prison, there should be some research to show that this behavior can be predicted reliably.
>
> I respectfully dissent.

Id.

## ARGUMENT AND AUTHORITIES IN
## SUPPORT OF CLAIM V

In determining the ***reliability*** and admissibility of proffered expert evidence, a trial judge considers the following factors: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community; (2) the qualifications of the expert testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity in which the underlying scientific theory and technique can be explained; and (7) the experience and skill of the person who applied the technique on the occasion in question.  Kelly v. State, supra.  If the testimony concerns "soft science," the trial judge also considers the following factors: (1) whether the field of expertise is a legitimate one; (2) whether the subject matter of the testimony of the expert is within the scope of that field; and (3) whether the testimony of the expert relies on the principles involved in that field.  Nenno v. State, supra.

"Soft science" includes psychology, economics, political science, anthropology, and sociology.  Weatherred v. State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).  Rule 702 requires that the proponent of the scientific evidence establish by clear and convincing evidence that the proffered expert testimony is sufficiently reliable and relevant to assist the jury in understanding other evidence or determining a fact in issue.  Id.  An appellate court applies the abuse of discretion standard in reviewing the ruling of a trial judge on the admissibility of scientific evidence.  Id.

In the case at bar, the state failed to establish by clear and convincing evidence that the testimony of Dr. Gripon was sufficiently reliable and relevant to assist the jury in determining if Ramiro was a future danger. It was clear at the hearing that the underlying scientific theory and technique are not accepted as valid by the relevant scientific community. Dr. Gripon testified that predictions of future dangerousness are "***highly contentious and controversial*** . . ." and that the American Psychiatric Association (APA) has concluded that a ***psychiatrist is no better and no more accurate than any other lay individual in predicting future dangerousness***. (R - v.41 - 30, 44). The state, therefore, failed to establish that this field of expertise is legitimate. The pretrial motion filed by Ramiro and considered by the trial judge clearly detailed the existence of literature rejecting the underlying scientific theory and technique of Dr. Gripon. (T - 130-138, 145-148). As for the potential rate of error of the technique, Dr. Gripon testified that he has given approximately fifty future dangerousness opinions, but he admitted that he has never subsequently reviewed his cases to determine the accuracy of those evaluations. (R - v.41 - 39, 46-48). He agreed that he could have been wrong on many of his future dangerousness evaluations. Id. at 47. He stated that actuarial methods are ***"very hard" to apply for people on death row and such methods may not be correct***. Id. at 35. The literature provided by Ramiro in his pretrial motion cited studies that determined the potential rate of error here is two out of three times with some studies indicating an accuracy rate as low as 8%. (T - 130). Since Ramiro established at the hearing that the APA and other sources condemn such testimony, Ramiro established that other experts have tested and evaluated the technique and found that it is unreliable. As to

experience and skill, Dr. Gripon testified at the hearing that the best predictor for future behavior is the past history of the person, but he admitted, however, that he did not contact the family of Ramiro to ascertain the past history of Ramiro.  (R - v.41 - 35, 48-49).  The above testimony of Dr. Gripon revealed that he did not rely on the principles involved in this field.

The state failed to establish by clear and convincing evidence that the testimony of Dr. Gripon was admissible as either hard science or soft science.  The testimony of Dr. Gripon as to the future dangerousness of Ramiro, therefore, was inadmissible.  The trial judge reversibly erred in ruling that Dr. Gripon could testify before the jury that Ramiro was a future danger.

**ARGUMENT AND AUTHORITIES IN
SUPPORT OF CLAIM VI**

Rule 702 requires a trial judge to perform a critical "gatekeeping" function concerning the admissibility of expert scientific evidence.  Daubert v. Merrell Dow Pharmaceuticals, Supra, 509 U.S. at 589.  This gatekeeping function requires a trial judge to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility pursuant to Rule 702.  Id.  The role of the trial judge is especially significant since the opinion of the expert "can be both powerful and quite misleading because of the difficulty in evaluating it."  Id. at 595.  The proffered expert testimony must be supported by appropriate validation which means good grounds based on what is known.  Id. at 590.  The trial judge has the task of ensuring that the testimony of the expert "rests on

a reliable foundation." Id. at 597.  In evaluating the reliability of scientific expert opinion,

a trial judge must assess "whether the reasoning or methodology underlying the testimony

is scientifically valid and . . . whether that reasoning or methodology properly can be applied

to the facts in issue."  Id. at 592-593.  A witness cannot provide expert scientific evidence

merely because the witness has an advanced degree since the "adjective 'scientific' implies

[that one's opinion has] a grounding in the methods and procedures of science."  Id. at 589-

590.  With respect to this gatekeeping function:

> [T]he objective of that requirement is to ensure the reliability
> and relevancy of expert testimony.  It is to make certain that an
> expert, whether basing testimony upon professional studies or
> personal experience, employs in the courtroom the same level of
> intellectual rigor that characterizes the practice of an expert in
> the relevant field.

Kumho Tire Co. v. Carmichael, supra, 526 U.S. at 152.

The Daubert gatekeeping function of the trial judge is also recognized in Texas.

Hartman v. State, 946 S.W.2d 60 (Tex. Crim. App. 1997).  This gatekeeping function of the

trial judge is designed to discover and exclude testimony that lacks sound scientific

methodology and is therefore unreliable.  Id.  A trial judge is required to perform this

gatekeeping function regardless of whether or not the evidence is of a well-established

science.  Jackson v. State, 17 S.W.3d 664 (Tex. Crim. App. 2000).  Even recognized experts

with "impeccable qualifications" and "personal observations" are subject to this gatekeeping

function.  See Mata v. State, 46 S.W.3d 902, 914, 917 (Tex. Crim. App. 2001).  Even if the

trial judge has admitted testimony from the expert in previous trials, that does not equate to

the reliability of the expert in the current case, and the trial judge must still perform the gatekeeping function.  Hernandez v. State, 116 S.W.3d 26, 30 (Tex. Crim. App. 2003).  This Court has held that an expert may be qualified to give an opinion as to future dangerousness.  Lagrone v. State, 942 S.W.2d 602 (Tex. Crim. App. 1997).  This does not mean that every psychologist is automatically qualified to give such an opinion without any showing of reliability under Daubert.

In the case at bar, the trial judge heard argument from Ramiro as to why the opinion of Dr. Gripon was unreliable and inadmissible.  The trial judge stated, in response to the argument of Ramiro, that "as much as I may agree with some of [Ramiro's] argument, I'm bound by the court of criminal appeals rulings already, so I don't really have a choice to overrule their rulings . . ."  (R - v.41 - 9).  This was, in effect, the end of the inquiry by the trial judge into whether or not Dr. Gripon could testify.  This ruling was made by the trial judge before the Daubert hearing was even held.  As already stated above under the argument for Point of Error Two, the state failed to satisfy its burden of proof at the Daubert hearing.

By allowing Dr. Gripon to testify merely because of this Court's opinion in Lagrone, the trial judge abdicated its responsibility under Daubert as an active gatekeeper charged with determining if the testimony of Dr. Gripon in this case was reliable.  The trial judge failed to conduct an exacting analysis of the foundations of the expert opinion of Dr. Gripon to ensure it meet the standards for admissibility pursuant to Rule 702.  Lagrone does not automatically ensure that Dr. Gripon in the case at bar met these standards.  The trial judge failed to evaluate the reliability of the opinion of Dr. Gripon and failed to assess whether the

reasoning or methodology underlying the testimony of Dr. Gripon was scientifically valid. This constituted reversible error by the trial judge.  Dr. Gripon was allowed to testify that Ramiro is a future danger.  Such testimony is "both powerful and quite misleading because of the difficulty in evaluating it."  The jury sentenced Ramiro to death based, in part, on the testimony of Dr. Gripon.  This cause should be reversed and remanded for a new sentencing hearing.

Ramiro respectfully requests that this Court reconsider its opinion in Lagrone. Lagrone was based on Barefoot v. Estelle, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983) which held that psychiatric predictions of future dangerousness are not constitutionally impermissible.  Some courts are of the opinion that Kumho Tire, supra, is in conflict with Barefoot.  See Logerquist v. McVey, 1 P.3d 113 (Ariz. 2000).  Some scholars are of the opinion that Daubert, supra has overruled Barefoot sub silentio.  Medcalf v. Dep't of Licensing, 944 P.2d 1014 (Wash. 1997).  There is an increasing reason for concern that future dangerousness cannot be reliably predicted which suggests reconsideration of such predictions is warranted.  United States v. Sampson, 335 F.Supp.2d 166, 222-223 (D. Mass. 2004); see also Thomas Regnier, Barefoot in Quicksand: The Future of "Future Dangerousness" Predictions in Death Penalty Sentencing in the World of Daubert and Kuhmo, 37 Akron L. Rev. 469 (2004); Michael H. Gottesman, From Barefoot to Daubert to Joiner: Triple Play or Double Error, 40 Ariz. L. Rev. 753 (1998); Erica Beecher-Monas & Edgar Garcia-Rill, Danger at the Edge of Chaos: Predicting Violent Behavior in a Post-Daubert World, 24 Cardozo L. Rev. 1845 (2003).  This Court should hold that opinion testimony as to future dangerousness is inadmissible.

71

## ARGUMENT AND AUTHORITIES IN
## SUPPORT OF POINT OF CLAIM VII

Rule 702 of the Texas Rules of Evidence states, "If scientific . . . knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise."

### Studies reveal that predictions of
### future dangerousness are unreliable.

A majority of early studies on the ability of psychologists and psychiatrists to predict future dangerousness concluded that there was no reliable method to make such predictions. See e.g., Gary B. Melton, et al., Psychological Evaluations for the Courts: A Handbook for Mental Health Professionals and Lawyers 182-183, 193-207 (1987); Christopher Slobogin, Dangerousness and Expertise, 133 U. Pa. L. Rev. 97 (1984). The early studies found that such future dangerousness predictions were accurate only one out of three times. See John Monahan, U.S. Dep't of Health & Human Serv., The Clinical Prediction of Violent Behavior 47-49 (1981). Such studies caused the American Psychiatric Association (APA) to conclude that, "Psychiatrists should not be permitted to offer a prediction concerning the long-term future dangerousness of a defendant in a capital case, at least in those circumstances where the psychiatrist purports to be testifying as a medical expert possessing predictive expertise in this area." The APA reached this conclusion, in part, because, "even under the best of conditions, psychiatric predictions of long-term future dangerousness are wrong in at least two out of every three cases." Id. at 3.

**Applicable methodology - base rate.**

One problem with scientifically predicting future dangerousness is establishing a

"base rate."   See Randy Borum, Improving the Clinical Practice of Violence Risk

Assessment: Technology, Guidelines, and Training, 51 Am. Psychologist 945 (1996).  Error

rates for predictions of future violence vary significantly depending on the base rate - i.e.,

the known frequency that a particular behavior will occur within a specified population over a

set period of time.  Id.  If the base rate is low, it is difficult to predict a specific occurrence

of the event with reliability, and there is a tendency to over-predict which results in false

positives.  See Monahan, Clinical Prediction, supra at 33-35.  Another problem is how to

define "dangerousness." Does the definition broaden to include verbal threats, fear-inducing

behavior, and physical attacks that do not require medical attention?  See Randy K. Otto,

Prediction of Dangerous Behavior: A Review and Analysis of "Second Generation"

Research, 5 Forensic Reps. 103 (1992).  Such definitions still do not greatly improve the

ability to predict future dangerousness.  Id.  The use by experts of structured professional

judgment techniques and actuarial tools generally produces more accurate results than

unstructured clinical approaches, but even under the best circumstances, mental health

professionals will still make a considerable number of incorrect predictions with false

positives being the most common type of error.  Id. at 128.

**Applicable methodology - HCR20 & VRAG.**

Another problem is attempting to predict future dangerousness based upon a

correlation with either general recidivism (occurrence of non-violent offense by a former

offender) or violent recidivism (occurrence of violent offense by a former offender) of people released to a community setting. See Monahan, Clinical Prediction, supra; John Monahan, Violence Risk Assessment, in 11 Handbook of Psychology: Forensic Psychology 527, 532-533 (2003); Paul Gendreau et al., A Meta-Analysis of the Predictors of Adult Offender Recidivism: What Works!, 34 Criminology 575 (1996). Studies have established that there is less recidivism relative to certain other variables. James Bonta et al., The Prediction of Criminal and Violent Recidivism Among Mentally Disordered Offenders: A Meta-Analysis, 123 Psych. Bull. 123 (1998). But most importantly, studies have revealed that committing a murder or sexual assault has a weaker association with future violent recidivism than do many other factors. Id. at 127. The HCR-20 is a structured, professional, judgment technique to predict both general and violent recidivism in the community. See Mairead Dolan & Michael Doyle, Violence Risk Prediction: Clinical and Actuarial Measures and the Role of the Psychopathy Checklist, 177 Brit. J. Psychiatry 303, 304-306 (2000); John F. Edens et al., Predictions of Future Dangerousness in Capital Murder Trials: Is It Time to "Disinvent the Wheel?", 29 Law & Hum. Behav. 55, 68-71 (2005). Another risk assessment tool derived and validated in studies is the Violence Risk Appraisal Guide (VRAG) which is an actuarial measure composed of demographic, criminal history, and psychological variables derived from scientific literature. Edens, Predictions, supra at 71-73. These instruments are useful to describe a methodology for scientifically forming risk assessments, but they are experimental for assessing the likelihood of violence in the community and have not been demonstrated to reliably predict violence in prison. Id.

**Applicable methodology - limiting the
risk factors and empirical measures.**

Another problem is that "predictions of violence concerning settings very different

from those in which violence has occurred in the past will be highly subject to error."

Thomas R. Litwack & Louis B. Schlesinger, <u>Assessing and Predicting Violence: Research,</u>

<u>Law, and Applications</u>, in <u>Handbook of Forensic Psychology</u> 205, 214 (1987); <u>see</u> Mark D.

Cunningham & Thomas J. Reidy, <u>Don't Confuse Me With the Facts: Common Errors in</u>

<u>Violence Risk Assessment at Capital Sentencing</u>, 26 Crim. Just. & Behav. 20, 25 (1999).  In

determining the dangerousness of a person who will be in prison, one should limit the risk

factors and empirical measures to the context of prison-based violence and take into account

prison-based risk management or violence reduction techniques.  <u>See</u> Mark D. Cunningham

& Alan M. Goldstein, <u>Sentencing Determinations in Death Penalty Cases</u>, 11 <u>Handbook of</u>

<u>Psychology: Forensic Psychology</u> 407, 426-428 (2003).  Very little research has examined

the reliability of predictions of prison-based violence which is the violence pertinent to

capital defendants.  It has been established that the base rate of violence within a prison is

extremely low.  <u>See</u> Jonathan R. Sorensen & Rocky L. Pilgrim, <u>An Actuarial Risk</u>

<u>Assessment of Violence Posed by Capital Murder Defendants</u>, 90 J. Crim. L. & Criminology

1251, 1256 (2000).  Such studies have determined that Texas inmates convicted of murder

have an overall likelihood of inmate-on-inmate homicide of only 0.2% during a 40-year

period and of aggravated assault on correctional staff members of one-half of 1.0%.  <u>Id.</u> at

1261-1264.  With such a low base rate of violence, it is highly unlikely that a scientifically

reliable opinion can be offered that any individual is more likely than not to commit a serious act of violence in that setting, and the false positive error rate for such predictions will be exceedingly high.  See Borum, supra at 946-947; Monahan, Clinical Prediction, supra at 33.

Rates of violence by former death-row inmates who were spared execution but still incarcerated are consistently low across all studies.  See Cunningham & Goldstein, supra at 426-427; Thomas J. Reidy et al., From Death to Life: Prison Behavior of Former Death Row Inmates in Indiana, 28 Crim. Just. & Behav. 62, 66, 79 (2001).  One study revealed that two-thirds of a nationwide sample of inmates whose death sentences were commuted between 1972 and 1987 had no disciplinary records for assaultive or violent behavior during their incarceration.  See Cunningham & Goldstein, supra at 426-427, citing James W. Marquart & Jonathan R. Sorensen, A National Study of the Furman-Commuted Inmates: Assessing the Threat to Society from Capital Offenders, 23 Loy. L.A. L. Rev. 5 (1989).  Another study revealed a low rate of disciplinary violations for assaultive or dangerous behavior in former death row inmates in Indiana while on death row and after transfer to the general population. See Reidy et. al., supra at 70.  Another study revealed that Texas capital defendants engage in less violent prison conduct than other inmate groups including life-sentenced and general population inmates.  See James W. Marquart et al., Gazing into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases?, 23 Law & Soc'y Rev. 449, 461 (1989).  Another study revealed that "both commuted death sentence and life sentence capital murderers followed for an average of more than 7 years in the Texas general prison population demonstrated one fifth the rate of serious violent prison rule violations compared

with the prison system as a whole, with 90% of these capital inmates eventually serving as trustees."  Cunningham et al., supra at 23-24.  This scientific study revealed that:

> [M]any risk assessment variables regarding prison behavior are counterintuitive.  For example . . . inmates facing more than 5 years of confinement (47% of whom were murderers) had lower rates of disciplinary infractions than did short-term inmates.  In other words, inmates convicted of more serious offenses and facing longer prison sentences displayed better prison adjustment than short-term, less serious offenders did.

Id. at 26.

### Dr. Gripon failed to employ proper methodology.

Dr. Gripon testified at the Daubert hearing that, in forming an opinion as to future dangerousness, he reviews "collateral information," does an interview if allowed, reviews past history, and uses actuarial methods concerning "how  often certain things do occur in a given population."  (R - v.41 - 34-35).  He never testified about the results of any interview with Ramiro, he stated that these nebulous actuarial methods are "very hard" to apply for people on death row, he stated that such actuarial methods may not be correct, and he did not testify that he applied actuarial methods in evaluating Ramiro.  Id. at 35.  He stated that the most important information for a prediction of future dangerousness is the life history of the individual, yet he admitted that he did not contact the family of Ramiro to ascertain the past history of Ramiro.  Id. at 40, 48-49.  This left Dr. Gripon with a review of "collateral information" which was comprised of a limited set of records from the prosecution - i.e., criminal records, offense reports, jail records, and audio recordings of calls from the jail.  Id. at 62.

In the presence of the jury, Dr. Gripon testified that he based his opinion on: (1) the past history of Ramiro which he believed reflected a "personality disorder;" (2) the criminal record of Ramiro and the facts of those prior offenses; (3) recidivism in these types of cases indicating an increased likelihood of "being a problem in a prison cell;" (4) the jail behavior of Ramiro; and (5) four telephone calls of Ramiro while in jail.  Id. at 66-97.

Dr. Gripon did not testify about his interview with Ramiro and any diagnoses he formed from that interview.  He formed an opinion that Ramiro had a "personality disorder" based upon the life history of Ramiro.  Dr. Gripon, however, admittedly failed to interview the family, friends, and acquaintances of Ramiro to obtain a life history of Ramiro.  Dr. Gripon based his recidivism analysis and subsequent future dangerousness opinion on the criminal history of Ramiro.  He failed to employ, however, any scientific methodology, such as the HCR-20 or the VRAG.  These are the previously described formal assessment tools researches have developed to measure risk factors and enhance the reliability of violence risk assessments.  Dr. Gripon failed to address the studies which indicate, contrary to what he testified to regarding recidivism, the violent offense index which reveals that committing a murder or sexual assault has a weaker association with future violent recidivism than many other factors.

Dr. Gripon failed to employ the rigorous scientific method of a base rate of violence. This is a critical error in his methodology since research has established that error rates for predictions of future violence vary significantly depending on the "base rate" or known frequency that a particular behavior will occur within a specified population over a set period

of time.  Such defects in methodology result in a tendency to over predict future dangerousness.  There was no testimony from Dr. Gripon regarding the base rate or his definition of "dangerousness" which resulted in the increased likelihood of an error in this case.

### The opinions of Dr. Gripon were unreliable.

The methodology used by Dr. Gripon in this case did not rise to the current professional standards for developing any type of reliable opinion regarding Ramiro.  Dr. Gripon admitted that opinions regarding future dangerousness are "highly contentious and controversial," and he admitted that he is aware that the APA has concluded that a psychiatrist is no better and no more accurate than any other lay individual in predicting future dangerousness.  (R - v.41 - 30, 44).  Dr. Gripon did not apply applicable base rates of violence in his analysis, and he concluded without adequate foundation that Ramiro was a future danger both in the prison system and in the free world.  He did not form an opinion based upon statistically analyzed data drawn from valid and reliable research.

Dr. Gripon stated that he has given approximately fifty future dangerousness opinions, but he has never subsequently reviewed his cases to determine the accuracy of those evaluations.  Id. at 39, 46-47, 48.  He agreed that he could have been wrong on many of his future dangerousness evaluations.  Id. at 47.  His rate of error, therefore, is unknown and his method of arriving at such an opinion has never been peer reviewed.  Given the low base rate for severe acts of violence within a secure prison setting, there is reason to believe that the

rate of error is exceedingly high for the manner in which Dr. Gripon arrives at his conclusions.

The testimony of Dr. Gripon at trial offered nothing more than an unstructured, subjective judgment which is the type of future dangerousness prediction that has been consistently shown to be unreliable. His opinion was not derived from statistically analyzed data drawn from valid and reliable research. He failed to use a formal compilation of risk factors or any standardized assessment tool. He relied on risk factors without a demonstrated correlation to institutional violence. He failed to consider the importance of risk management influences or the protective measures employed by a prison facility. He did no more than what a lay witness could have done - compiled a history of the prior violent acts of Ramiro and concluded Ramiro was a future danger. The scientific community does not generally accept the method in which Dr. Gripon arrived at his conclusion of future dangerousness in this case. The opinion of Dr. Gripon was unreliable and the trial judge reversibly erred in allowing Dr. Gripon to testify that Ramiro is a future danger. This cause should be reversed and remanded for a new sentencing hearing.

### The error was harmful.

The jury in the case at bar heard evidence from Dr. Gripon that had a "misleading aura of scientific infallibility." See Holmes v. State, 135 S.W.3d 178, 189 (Tex. App. - Waco 2004, no pet.); Franco v. State, 25 S.W.3d 26, 36 (Tex. App. - El Paso 2000, pet. ref'd) (McClure, J., concurring). "In a capital case, the specious testimony of a psychiatrist, colored

in the eyes of an impressionable jury by the inevitable untouchability of a medical specialist's words, equates with death itself." Barefoot v. Estelle, 463 U.S. 880, 916 (1983) (Blackmun, J., dissenting).  "There is virtual unanimity among courts and commentators that evidence perceived by jurors to be 'scientific' in nature will have particularly persuasive effect." John W. Strong, Language and Logic in Expert Testimony: Limiting Expert Testimony by Restrictions of Function, Reliability, and Form, 71 Or. L. Rev. 349, 367 (1992).  In the case at bar, Dr. Gripon improperly testified that Ramiro was a future danger.  The jury sentenced Ramiro to death based, in part, on this testimony.  This was harmful error.  This cause should be reversed and remanded for a new sentencing hearing.

### ARGUMENT AND AUTHORITIES IN
### SUPPORT OF CLAIMS X AND XI

The Fifth Amendment to the United States Constitution states, in part, that, "No person shall be . . . deprived of life, liberty, or property, without due process of law . . ."

The Sixth Amendment to the United States Constitution states, in part, that, "In all criminal prosecutions, the accused shall enjoy the right to . . . trial by an impartial jury . . ." This means that an accused has a Sixth Amendment right to a fair trial.  See Gilmore v. Taylor, 508 U.S. 333, 362, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993) (Blackmun, J., dissenting).

"The awesome severity of a sentence of death makes it qualitatively different from all other sanctions."  Satterwhite v. Texas, 486 U.S. 249, 262, 108 S.Ct. 1792, 1801, 100

L.Ed.2d 284 (1988).  "There is no question that death as a punishment is unique in its severity and irrevocability."  Gregg v. Georgia, 428 U.S. 153, 187, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976).  The Eighth Amendment strictly regulates the manner by which sentences of death are imposed and reviewed.  The "qualitative difference between death and other penalties *calls for a greater degree of reliability* when the death sentence is imposed."  Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2957, 57 L.Ed.2d 973 (1978) (emphasis added).  The need for reliability when the death sentence is imposed "requires a correspondingly greater degree of scrutiny of the capital sentencing determination."  Caldwell v. Mississippi, 472 U.S. 320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985).  Sentencing procedures in capital cases must ensure that the punishment will not be inflicted in an arbitrary and capricious manner.  Gregg v. Georgia, supra.

> **Reliability and accuracy are indispensable prerequisites to a reasoned determination of whether to sentence someone to death.**

A sentence of death cannot be arbitrarily or capriciously meted out by a jury.  Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).  A jury must have a guided discretion rather than unfettered discretion.  Id.  It is unconstitutional to mete out a death sentence upon the sole, unguided discretion of a jury.  Id.  Such a procedure produces an arbitrary and capricious result which violates the prohibition of cruel and unusual punishment under the Eighth Amendment.  Id.  The Eighth Amendment is applicable to the states through the Fourteenth Amendment.  Id.

Because death is different from a prison sentence, there is a particular need for reliability in the sentencing factors used to determine whether or not to sentence someone to death. Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). When a jury has discretion regarding whether or not to sentence someone to death, that discretion must be directed and limited to minimize a risk of a wholly arbitrary and capricious sentence by the jury. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). There is a vital need for accurate information in order for a judge to impose a rational sentence in a typical case. Id. Accurate sentencing evidence, therefore, is an indispensable prerequisite to a reasoned determination of whether or not to impose a death sentence by a jury who has never before made such a sentencing decision. Id. "[T]he qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The need for reliability in death cases "requires a correspondingly greater degree of scrutiny of the capital sentencing determination." Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

Factfinding procedures in capital cases "aspire to a heightened standard of reliability." Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). This concern for reliability stems from the fact that "execution is the most irremediable and unfathomable of penalties; that death is different." Id.

**Barefoot allows for "unreliable" evidence to be used to determine whether or not to sentence someone to death.**

Psychological evidence is admissible to predict future dangerousness since there is no indication that such psychological evidence is always wrong. Barefoot v. Estelle, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). Although psychological evidence that a defendant is a future danger may be "generally so unreliable that it should be ignored," this matter is for the defense to cultivate during cross-examination. Id. A jury can be trusted to sort out reliable from unreliable expert testimony through the adversary process. Id.

The dissent in Barefoot, however, stated that reputable scientific sources say that psychological evidence that a defendant is a future danger is wrong more often than it is correct. Id. It is not possible to justify this type of unreliable evidence especially given the paramount concern of reliability in death cases. Id. Even if such evidence is relevant, its unreliability detracts from its probative value and is unduly prejudicial because unreliable scientific evidence may mislead a jury. Id. A jury is unable to sort out valid from invalid expert testimony given the fact that not even psychological experts are able to agree on such expert testimony. Id.

Twenty-one states list the future dangerousness of a defendant as one of the aggravating factors to consider in determining whether or not to sentence a defendant to death. See Eugenia T. LaFontaine, A Dangerous Preoccupation with Future Danger: Why Expert Predictions of Future Dangerousness in Capital Cases are Unconstitutional, 44 B.C. L. Rev. 207 (2002); Jonathan R. Sorensen, Criminology: An Actuarial Risk Assessment of

Violence Posed by Capital Murder Defendants, 90 J. Crim. L. & Criminology 1251 (2000); Sandra B. McPherson, Psychological Aspects of Mitigation in Capital Cases (1996) (unpublished manuscript), cited in Mark D. Cunningham & Tom J. Reidy, Integrating Base Run Rate Data in Violence Risk Assessments at Capital Sentencing, 16 Behav. Sci. & L. 71 (1998).  Texas and Oregon are the only two states that require capital juries to predict future conduct before sentencing a person to life or death.  Id.

### Barefoot was the basis for the lower court to affirm the future danger testimony.

The court below, the Court of Criminal Appeals of Texas, stated in this case that, "This Court has repeatedly held that testimony from mental-health experts is relevant to the issue of future dangerousness."  Gonzales v. State, supra at 13.  For this statement of law, the court cited, in part, Russeau v. State, 171 S.W.3d 871, 884 (Tex. Crim. App. 2005), citing Griffith v. State, 983 S.W.2d 282, 288 (Tex. Crim. App. 1998).  In Griffith, the court below stated that, "Furthermore, this Court has previously recognized that testimony from mental health experts is relevant to that issue [future danger]."  Griffith v. State, supra, 983 S.W.2d at 288, citing McBride v. State, 862 S.W.2d 600 (Tex. Crim. App. 1993), cert. denied, 512 U.S. 1246, 114 S.Ct. 2765, 129 L.Ed.2d 879 (1994).  In McBride, the court below stated that, "This Court has long recognized that a trial court may admit, for whatever value it may have to a jury, psychiatric testimony concerning the defendant's future behavior at the punishment phase of a capital murder trial."  McBride v. State, supra, 862 S.W.2d at 610 (emphasis omitted), citing Barefoot v. State, 569 S.W.2d 875 (Tex. Crim. App. 1980), cert. denied, 453

U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981), aff'd sub nom., Barefoot v. Estelle, 463

U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983).

### Daubert prohibits the admissibility of unreliable testimony.

A trial judge is required to perform a critical "gatekeeping" function concerning the

admissibility of expert scientific evidence.   Daubert v. Merrell Dow Pharmaceuticals, supra,

509 U.S. at 589.   This gatekeeping function requires a trial judge to conduct an exacting

analysis of the foundations of expert opinions to ensure they meet the standards for

admissibility.   Id.   The role of the trial judge is especially significant since the opinion of the

expert "can be both powerful and quite misleading because of the difficulty in evaluating it."

Id. at 595.   The proffered expert testimony must be supported by appropriate validation

which means good grounds based on what is known.   Id. at 590.   The trial judge has the task

of ensuring that the testimony of the expert "rests on a reliable foundation."   Id. at 597.   In

evaluating the reliability of scientific expert opinion, a trial judge must assess "whether the

reasoning or methodology underlying the testimony is scientifically valid and . . . whether

that reasoning or methodology properly can be applied to the facts in issue."   Id. at 592-593.

A witness cannot provide expert scientific evidence merely because the witness has an

advanced degree since the "adjective 'scientific' implies [that one's opinion has] a grounding

in the methods and procedures of science."   Id. at 589-590.   With respect to this gatekeeping

function:

> [T]he objective of that requirement is to ensure the reliability
> and relevancy of expert testimony.   It is to make certain that an

> expert, whether basing testimony upon professional studies or
> personal experience, employs in the courtroom the same level of
> intellectual rigor that characterizes the practice of an expert in
> the relevant field.

Kumho Tire Co. v. Carmichael, supra, 526 U.S. at 152.

As a direct result of Daubert, a per se rule excluding all polygraph evidence was permissible. United States v. Scheffer, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). Such a per se rule was permissible given the risk the jury would be misled by the evidence "and the fact that the 'reliability of polygraph evidence has not been sufficiently established.'" Id. Courts have a legitimate interest in ensuring that reliable evidence is presented to the jury in a criminal trial. Id. There was no consensus that polygraph evidence is reliable, and "the scientific community remains extremely polarized about the reliability of polygraph techniques." Id. "[S]cientific field studies suggest the accuracy rate of the 'control question technique' polygraph is 'little better than could be obtained by the toss of a coin,' that is, 50 percent." Id. "[T]here is simply no way to know in a particular case whether a polygraph examiner's conclusion is accurate . . ." Id.

As stated below, future dangerousness opinions have clearly been shown to be unreliable, there is no consensus that they are reliable, the scientific community remains convinced that they are unreliable, studies suggest that they are wrong two out of three times (66% of the time), and there is no way to know if they are accurate. Future dangerousness opinions are less reliable than polygraphs. Future dangerousness opinions, therefore, should also be subject to a per se rule excluding such evidence.

When the trial judge improperly allowed Dr. Gripon to testify that Ramiro is a future danger, the jury was allowed to consider this as expert medical evidence and the state argued to the jury that Ramiro should be put to death, in part, because of the testimony of Dr. Gripon.  (R - v.43 - 54-55, 69).  This resulted in a violation of Ramiro's right to due process and a fair trial especially since "the specious testimony of a psychiatrist, colored in the eyes of an impressionable jury by the inevitable untouchability of a medical specialist's words, equates with death itself."  Ramiro should receive a new sentencing hearing.

### Courts and the psychological community believe that <u>Barefoot</u> future danger testimony is inadmissible under <u>Daubert</u>.

"[I]n <u>Barefoot</u>, the Supreme Court signaled that the evolution of events might cause it to revise its decision concerning the constitutionality of admitting expert testimony on future dangerousness.  It wrote:

> We are unconvinced, <u>at least as of now</u>, that the adversary process cannot be trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness, particularly when the convicted felon has the opportunity to present his own side of the case."

<u>United States v. Sampson</u>, 335 F.Supp.2d 166 (D.C. Mass. 2004) (emphasis added).

The law and recent scientific research have developed to the point that expert testimony on future dangerousness is too unreliable to be admitted in a capital case.  <u>Id.</u>  "The same considerations suggest that it may be timely for the Supreme Court to reconsider whether jurors can ascertain future dangerousness in a particular case with sufficient

certainty to satisfy the heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" Id., citing Woodson v. North Carolina, supra.

The Supreme Court has now placed strict limits on the admissibility of expert testimony. United States v. Sampson, supra, citing Daubert v. Merrell Dow Pharmaceuticals, Inc., and Kumho Tire Co., Ltd. v. Carmichael, both supra. There is now a "particularized need for reliability in expert scientific testimony." United States v. Sampson, supra, citing Daubert v. Merrell Dow Pharmaceuticals, Inc., supra. Courts determine if the theory has been tested and subjected to peer review and publication, what is the known or potential rate of error, the existence of standards controlling the operation of the technique, and the degree of acceptance of the theory by the scientific community. Id. The use of expert evidence to predict the future dangerousness of a defendant fails all five Daubert factors. United States v. Sampson, supra.

Recent literature confirms that the scientific community virtually unanimously agrees that future danger testimony is unreliable and unscientific:

> For nearly twenty years we have known that psychiatrists cannot predict whether a person who has committed a violent act will be violent in the future . . . Even the most scientific predictions based on thorough examination, diagnosis of mental symptoms, past patterns of behavior, and probabilistic assessment are wrong nearly as often as they are right. The most common courtroom predictions – frequently based solely on hypotheticals – are wrong twice as often as they are right.

Id., citing Erica Beecher-Monas & Edgar Garcia-Rill, Danger at the Edge of Chaos: Predicting Violent Behavior in a Post-Daubert World, 24 Cardozo L. Rev. 1845, 1845-46

(2003); see also Thomas Regnier, Barefoot in Quicksand: The Future of "Future Dangerousness" Predictions in Death Penalty Sentencing in the World of Daubert and Kuhmo, 37 Akron L. Rev. 469 (2004).

> Additional literature states:

>> Studies show both that clinicians [psychiatrists and psychologists] tend to think that they have more information than they really do and that they are poor at making extreme judgments. Clinical judgments tend to ignore the well-known difficulty in predicting statistically rare events (like violence). Stereotypes and prejudices are just as likely to taint the decisions of clinicians as those of lay people. As a result, clinicians are no better than lay people in making these predictions.

United States v. Sampson, supra, citing Erica Beecher-Monas, The Epistemology of Prediction: Future Dangerousness Testimony and Intellectual Due Process, 60 Wash. & Lee L. Rev. 353, 362-363 (2003).

A recent study examined 155 capital cases in Texas in which experts testified the defendants were future dangers, and the study concluded that the experts were wrong in 95% of the cases. United States v. Sampson, supra, citing Texas Defender Service, Deadly Speculation: Misleading Texas Capital Juries with False Predictions of Future Dangerousness 34 (2004) available at http://www.texasdefender.org/DEADLYSP.PDF.

In Barefoot, the Supreme Court stated that jurors could reliably predict future dangerousness so experts should not be prohibited from testifying on that issue. United States v. Sampson, supra. "However, the fact that there now seems to be increasing reason to be concerned that experts cannot reliably predict future dangerousness also generates, for

this court at least, increased concern that jurors cannot do so." Id.  Predictions of future

dangerousness are used in decisions on bail and revocation of supervised release, but "the

degree of reliability required to make those decisions in a manner that satisfies the

requirements of due process may be considerably less than the certainty that should be

required to establish a fact that may determine whether a person will live or die." Id.  "[T]he

court's experience in the case causes it to wonder whether it is impossible for lay jurors, as

well as for trained experts, to predict future dangerousness with the level of reliability

necessary to ensure that the death penalty is not being 'wantonly and . . . freakishly

imposed.'" Id., citing Furman v. Georgia, supra.

"[T]he evolution of the law, and of scientific research, presents the question of

whether it can now be said that future dangerousness can generally be predicted with

sufficient reliability to assure that the death penalty is not being imposed arbitrarily and

capriciously." United States v. Sampson, supra.  Relatively recent studies suggest that it is

impossible for jurors to reliably predict future dangerousness:

> Recent research on jury deliberations has shown that jurors'
> assessments of future dangerousness is highly subjective.
> Influenced by stereotypical images of the violent recidivist - the
> psychopathic serial killer disproportionately portrayed in the
> media and the new crime "true crime" genre of television shows
> - jurors seldom realize research has consistently found the true
> incidence of recidivism among murderers released from prison
> to be much lower than for other types of parolees.

Id., citing Jonathan R. Sorenson, Rocky L. Pilgrim, An Actuarial Risk Assessment of

Violence Posed by Capital Murder Defendants, 90 J. Crim. & Criminology, 1251, 1254

(2000) (citing William J. Bowers, Benjamin D. Steinor, <u>Death by Default: An Empirical</u>

<u>Demonstration of False and Forced Choices in Capital Sentencing</u>, 77 Tex. L. Rev. 605, 645-

65 (1999)).

    "On the basis of any evidence thus far presented to a court, it appears that the use of

psychiatric evidence to predict a murderer's 'future dangerousness' fails all five <u>Daubert</u>

factors." <u>Flores v. Johnson</u>, 210 F.3d 456 (5th Cir. 2000) (Garza, J., concurring).  Testing

of this theory has never truly been done.  <u>Id.</u>  Peer review of individual predictions is rare,

and peer review of making predictions of future dangerousness has been uniformly negative.

<u>Id.</u>, <u>citing</u> Grant Morris, <u>Defining Dangerousness: Risking a Dangerousness Definition</u>, 10

J. Contemp. Legal Issues 61, 85-86 (1999) (citing studies) ("More than twenty years ago,

Alan Stone acknowledged that psychiatrists cannot predict whether a person will engage in

dangerous behavior with a certainty, or beyond a reasonable doubt, or by clear and

convincing evidence, or even by a preponderance of the evidence.  As to clinically-based

predictions of dangerousness, the passage of time has not altered the accuracy of Stone's

judgment.") The rate of error is at least fifty percent.  <u>Flores v. Johnson</u>, <u>supra</u>, <u>citing</u> Randy

Otto, <u>On the Ability of Mental Health Professionals to "Predict Dangerousness": A</u>

<u>Commentary on Interpretations of the "Dangerousness" Literature</u>, 18 Law. & Psychol. Rev.

43 (1994).  Standards controlling the operation of the techniques are nonexistent.  <u>Flores v.</u>

<u>Johnson</u>, <u>supra</u>.

    Since Justice Blackmun authored <u>Daubert</u> and dissented in <u>Barefoot</u> by criticizing the

use of psychiatric evidence of future dangerousness, "several commentators have questioned

the viability of the Barefoot majority's analysis post-Daubert."  Flores v. Johnson, supra,

citing Erica Beecher-Monas & Edgar Garcia-Rill, The Law and The Brain: Judging Scientific

Evidence of Intent, 1 J. App. Prac. & Process 243, 222 (1999) (In light of Daubert's

emphasis on acceptable error rates, Barefoot's decision is highly questionable.); Michael H.

Gottesman, From Barefoot to Daubert to Joiner: Triple Play or Double Error, 40 Ariz. L.

Rev. 753, 755 (1998) (Daubert cannot be squared with Barefoot.); Randy Otto, supra; Paul

C. Giannelli, "Junk Science": The Criminal Cases, 84 J. Crim. L. and Criminology 105, 112

(1993).  In light of Daubert, "Justice Blackmun's statement that '[i]t is impossible to square

admission of this purportedly scientific but actually baseless testimony with the

Constitution's paramount concern for reliability in capital sentencing [his dissent in Barefoot]

becomes even more forceful.'"  Flores v. Johnson, supra.

"The scientific community virtually unanimously agrees that psychiatric testimony is,

to put it bluntly, unreliable and unscientific."  Id.  "It is as true today as it was in 1983 that

'[n]either the Court nor the State of Texas has cited a single reputable scientific source

contradicting the unanimous conclusion of professionals in this field that psychiatric

predictions of long-term future violence are wrong more often than they are right.'"  Id.

(citation omitted).  "[N]othing within the training of a psychiatrist makes him or her

particularly able to predict whether a particular individual will be a continuing threat to

society."  Id.

When an expert testifies that a defendant is a future danger, there is good reason to

fear that the testimony will be given more weight than it deserves:

> The problem here (as with all expert testimony) is not the
> introduction of one man's opinion on another's future
> dangerousness, but the fact that the opinion is introduced by one
> whose title and education (not to mention designation as an
> "expert") gives him significant credibility in the eyes of the jury
> as one whose opinion comes with the imprimatur of scientific
> fact.  As has been previously recognized, when a medical doctor
> testifies that "future dangerousness" is a scientific inquiry on
> which they have particular expertise, and testifies that a
> particular defendant would be a "continuing threat to society,"
> juries are almost always persuaded.

Id.

After Daubert, the Supreme Court held that a judge's reliability determination applied

to both conclusions and methodology (General Electric Co. v. Joiner, 522 U.S. 136, 118 S.Ct.

512, 139 L.Ed.2d 508 (1997)), then the Court applied Daubert's gatekeeper concept to all

expert opinion evidence (Kumho Tire Co., Ltd. v. Carmichael, supra).  Logerquist v. McVey,

1 P.3d 113 (Ariz. 2000).  The Supreme Court in Daubert "incorporated a reliability screen,

authorizing the trial judge to determine reliability (and eventually, in Kuhmo, essential

credibility) of a qualified expert's testimony as a prerequisite for the jury's determination of

the same issues." Id.  "It is impossible, indeed, to reconcile Kumho with the Court's earlier

decision in Barefoot v. Estelle, a capital case in which the prosecution presented psychiatric

opinion evidence predicting the possibility of the defendant's future dangerousness if not

sentenced to death." Id.  "Some scholars opine Daubert, sub silentio, overruled Barefoot v

Estelle which allowed receipt of questionable psychiatric evidence regarding 'future dangerousness.'" Medcalf v. Dep't of Licensing, 944 P.2d 1014 (Wash. 1997) (Sanders, J., dissenting), citing Paul C. Giannelli, Daubert: Interpreting the Federal Rules of Evidence, 15 Cardozo L. Rev. 1999, 2020-2021 (1994) (Barefoot is inconsistent with Daubert.).   " Ramiro should receive a new sentencing hearing.

### The testimony was inadmissible in the case at bar.

The court below cited Nenno v. State, 970 S.W.2d 549 (Tex. Crim. App. 1998) for its conclusion that the future danger testimony was scientifically valid and reliable.  Gonzales v. State, supra at 14-15.  In Nenno, the court below held that Texas uses the identical inquiry mandated by Daubert concerning the admissibility of scientific evidence.  Nenno v. State, supra, 970 S.W.2d at 560.  The factors that bear on this inquiry include: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error; and (4) general acceptance within the relevant scientific community.  Id.  In Nenno, the court below stated that these "flexible" four factors do not necessarily apply to soft sciences, such as psychology, and the absence of any of these factors, such as peer review, "affects the weight of the evidence rather than its admissibility."  Id. at 561-562.

The court below held that the future danger testimony in the case at bar was valid and reliable because: (1) the witness was a medical doctor with a specialty in psychiatry; (2) he had performed 40 to 50 future dangerousness evaluations and testified on the issue many

times; (3) he claimed that determinations of future dangerousness are a legitimate function of forensic psychiatrists; (4) psychiatrists rely on interviews, when allowed, and collateral information to develop a profile of a person; (5) the best predictor of future dangerousness is the person's past history; (6) actuarial methods involve "looking at how often things occurred in the death-row population versus the population of others convicted of murder;" (7) there is not one method of performing this evaluation that is "accepted as always right;" (8) his method is a combination of clinical assessment and actuarial method; and (9) he interviewed the petitioner and reviewed the Petitioner's juvenile records, criminal records, offense reports, jail records, and audio recordings of four telephone calls. Gonzales v. State, supra at 14-15.

A closer reading of the trial record in the case at bar, however, reveals that Dr. Gripon stated that: (1) future danger opinions were becoming less common in the five years preceding his testimony; (2) future danger opinions are "highly contentious and controversial;" (3) he did not contact the Petitioner's family to ascertain the past history of the Petitioner; (4) actuarial methods are "very hard" to apply for people on death row and such methods may not be correct; (5) the American Psychiatric Association has concluded that a psychiatrist is no better and no more accurate than any lay person in predicting future dangerousness; (6) he has never subsequently reviewed his cases to determine the accuracy of his opinions of persons being future dangers; and (7) he could have been wrong on many of his future danger evaluations.  (R - v.41 - 28, 30, 35, 44, 46-49).  For these reasons and

for the reasons stated below, this future danger testimony was unreliable and inadmissible under Daubert.

The methodology used by Dr. Gripon in this case did not rise to the current professional standards for developing any type of reliable opinion regarding Ramiro.  Dr. Gripon admitted that opinions regarding future dangerousness are "highly contentious and controversial," and he admitted that he is aware that the APA has concluded that a psychiatrist is no better and no more accurate than any other lay individual in predicting future dangerousness.  (R - v.41 - 30, 44).  Dr. Gripon did not apply applicable base rates of violence in his analysis, and he concluded without adequate foundation that Ramiro was a future danger both in the prison system and in the free world.  He did not form an opinion based upon statistically analyzed data drawn from valid and reliable research.

Dr. Gripon stated that he has given approximately fifty future dangerousness opinions, but he has never subsequently reviewed his cases to determine the accuracy of those evaluations.  Id. at 39, 46-47, 48.  He agreed that he could have been wrong on many of his future dangerousness evaluations.  Id. at 47.  His rate of error, therefore, is unknown and his method of arriving at such an opinion has never been peer reviewed.  Given the low base rate for severe acts of violence within a secure prison setting, there is reason to believe that the rate of error is exceedingly high for the manner in which Dr. Gripon arrives at his conclusions.

The testimony of Dr. Gripon at trial offered nothing more than an unstructured, subjective judgment which is the type of future dangerousness prediction that has been consistently shown to be unreliable.  His opinion was not derived from statistically analyzed data drawn from valid and reliable research.  He failed to use a formal compilation of risk factors or any standardized assessment tool.  He relied on risk factors without a demonstrated correlation to institutional violence.   He failed to consider the importance of risk management influences or the protective measures employed by a prison facility.  He did no more than what a lay witness could have done - compiled a history of the prior violent acts of the Petitioner and concluded the Petitioner was a future danger.  The scientific community does not generally accept the method in which Dr. Gripon arrived at his conclusion of future dangerousness in this case.  The opinion of Dr. Gripon was unreliable and the trial judge reversibly erred in allowing Dr. Gripon to testify that the Petitioner is a future danger.

A trial judge is required to perform a critical "gatekeeping" function concerning the admissibility of expert scientific evidence.  Daubert v. Merrell Dow Pharmaceuticals, supra, 509 U.S. at 589.  This gatekeeping function requires a trial judge to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility.  Id.  The role of the trial judge is especially significant since the opinion of the expert "can be both powerful and quite misleading because of the difficulty in evaluating it." Id. at 595.  The proffered expert testimony must be supported by appropriate validation which means good grounds based on what is known.  Id. at 590.  The trial judge has the task

of ensuring that the testimony of the expert "rests on a reliable foundation." Id. at 597.  In evaluating the reliability of scientific expert opinion, a trial judge must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592-593. A witness cannot provide expert scientific evidence merely because the witness has an advanced degree since the "adjective 'scientific' implies [that one's opinion has] a grounding in the methods and procedures of science." Id. at 589-590.  With respect to this gatekeeping function:

> [T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

Kumho Tire Co. v. Carmichael, supra, 526 U.S. at 152.

In the case at bar, the trial judge heard argument from the defense as to why the opinion of Dr. Gripon was unreliable and inadmissible.  The trial judge stated, in response to the argument of the defense, that "as much as I may agree with some of [the defense's] argument, I'm bound by the court of criminal appeals rulings already, so I don't really have a choice to overrule their rulings . . ."  (R - v.41 - 9).  This was, in effect, the end of the inquiry by the trial judge into whether or not Dr. Gripon could testify.  This ruling was made by the trial judge before the Daubert hearing was even held.

By allowing Dr. Gripon to testify merely because of the lower court's prior case law, the trial judge abdicated its responsibility under <u>Daubert</u> as an active gatekeeper charged with determining if the testimony of Dr. Gripon in this case was reliable.  The trial judge failed to conduct an exacting analysis of the foundations of the expert opinion of Dr. Gripon to ensure it meet the standards for admissibility pursuant to <u>Daubert</u>.  The trial judge failed to evaluate the reliability of the opinion of Dr. Gripon and failed to assess whether the reasoning or methodology underlying the testimony of Dr. Gripon was scientifically valid.  This constituted reversible error by the trial judge.  Dr. Gripon was allowed to testify that Ramiro is a future danger.  Such testimony is both powerful and quite misleading because of the difficulty in evaluating it.  The jury sentenced Ramiro to death based, in part, on the testimony of Dr. Gripon.

Additionally, the state failed to establish by clear and convincing evidence that the testimony of Dr. Gripon was sufficiently reliable and relevant to assist the jury in determining if Ramiro was a future danger.  It was clear at the hearing that the underlying scientific theory and technique are not accepted as valid by the relevant scientific community.  Dr. Gripon testified that predictions of future dangerousness are "***highly contentious and controversial*** . . ." and that the American Psychiatric Association (APA) has concluded that a ***psychiatrist is no better and no more accurate than any other lay individual in predicting future dangerousness***.  (R - v.41 - 30, 44).  The state, therefore, failed to establish that this field of expertise is legitimate.  The pretrial motion filed by the defense and considered by the trial

judge clearly detailed the existence of literature rejecting the underlying scientific theory and technique of Dr. Gripon.  (T - 130-138, 145-148).  As for the potential rate of error of the technique, Dr. Gripon testified that he has given approximately fifty future dangerousness opinions, but he admitted that he has never subsequently reviewed his cases to determine the accuracy of those evaluations.  (R - v.41 - 39, 46-48).  He agreed that he could have been wrong on many of his future dangerousness evaluations.  Id. at 47.  He stated that actuarial methods are ***"very hard" to apply for people on death row and such methods may not be correct***.  Id. at 35.  The literature provided by the defense in its pretrial motion cited studies that determined the potential rate of error here is two out of three times with some studies indicating an accuracy rate as low as 8%.  (T - 130).  Since the defense established at the hearing that the APA and other sources condemn such testimony, the defense established that other experts have tested and evaluated the technique and found that it is unreliable.  As to experience and skill, Dr. Gripon testified at the hearing that the best predictor for future behavior is the past history of the person, but he admitted, however, that he did not contact the family of Ramiro to ascertain his past history.  (R - v.41 - 35, 48-49).  The above testimony of Dr. Gripon revealed that he did not rely on the principles involved in this field.

The state failed to establish by clear and convincing evidence that the testimony of Dr. Gripon was admissible as either hard science or soft science.  The testimony of Dr. Gripon as to the future dangerousness of Ramiro, therefore, was inadmissible.  The trial judge reversibly erred in ruling that Dr. Gripon could testify before the jury that Ramiro was a future danger.  Ramiro should receive a new sentencing hearing.

**VII.**

**THE PRESUMPTION OF CORRECTNESS OF 28 U.S.C. § 2254(d) & (e) SHOULD NOT ATTACH TO STATE COURT FINDINGS OF FACT.**

28 U.S.C. §§ 2254(d)(2) and 2254(e)(1) state as follows:

> (d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . .
>
> > (2)     resulted in a decision that was based on an **unreasonable determination of the facts** in light of the evidence presented in the State court proceeding.
>
> (e)(1)  In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a **determination of a factual issue** made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(emphasis added).

2254(d)(2) provides for habeas relief if the state court's determination of the facts was **unreasonable** in light of the evidence presented in the state court proceeding.  If the state court's determination of the facts was reasonable, then 2254(e)(1) comes into play and presumes the court's **reasonable** determination to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  A petitioner is entitled to an evidentiary hearing to present this rebuttal evidence.  Demosthenes v. Baal, 495 U.S. 731, 735, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990); Patton v. Yount, 467 U.S. 1025, 1028, 104 S.Ct. 2885, 81

L.Ed.2d 847 (1984); <u>Sumner v. Mata</u>, 449 U.S. 539, 550, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

The above language from 2254(d)(2) and (e) regarding "determination of the facts" and "determination of a factual issue" language is identical to the language of superseded 28 U.S.C. § 2254(d).  "[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it."  <u>Evans v. United States</u>, 504 U.S. 255, 260, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992).  "Determination of a factual issue" from superseded 2254(d) refers to basic, primary, or historical facts but not to mixed questions of fact and law, which apply a legal standard to the historical-fact determinations. <u>Thompson v. Keohane</u>, 516 U.S. 99, 110, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).  The question of competency to stand trial, for example, is a mixed question of law and fact. <u>Washington v. Johnson</u>, 90 F.3d 945, 951 (5th Cir. 1996), <u>cert. denied</u>, 520 U.S. 1122, 117 S.Ct. 1259, 137 L.Ed.2d 338 (1997).

The language from 2254(d)(2) regarding whether the determination of the facts was unreasonable in light of the record evidence is substantially the same as the language in superseded 2254(d)(8) regarding whether the factfinding was fairly supported by the state court record.  Under superseded 2254(d)(8), a petitioner was entitled to a hearing if the factual determination by the state court was not fairly supported by the record as a whole since such an unreasonable determination of the facts is not afforded a presumption of correctness.  <u>Townsend v. Sain</u>, 372 U.S. 293, 313, 316, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963);

Purkett v. Elem, 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); Parker v. Dugger, 498 U.S. 308, 316-317, 320, 323-324, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991); Carriger v. Stewart, 132 F.3d 463, 473-475 (9th Cir. 1997), cert. denied, 523 U.S. 1133, 118 S.Ct. 1827, 140 L.Ed.2d 963 (1998); Jackson v. Herring, 42 F.3d 1350, 1366 (11th Cir. 1995).  A federal hearing is required if the factual determination was unreasonable in light of the evidence in the record where the record evidence strongly contradicts the state court findings of fact so that the federal court cannot rely on the state court findings of fact or where the evidence supporting the petitioner's claim is compelling.  Shillinger v. Haworth, 70 F.3d 1132, 1136-1138 (10th Cir. 1995); Cola v. Reardon, 787 F.2d 681, 698 (1st Cir.), cert. denied, 479 U.S. 930, 107 S.Ct. 398, 93 L.Ed.2d 351 (1986); Fitch v. Estelle, 587 F.2d 773, 777 (5th Cir.), cert. denied, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 111 (1979).

In the case at bar, on September 22, 2008, counsel timely filed with the 38th Judicial District Court the Applicant's Application for Writ of Habeas Corpus.  See Exhibit 4.  This initial writ stated, in part, that the Petitioner's Sixth Amendment right to counsel and right to effective assistance of counsel was violated when the defense expert, Dr. Milam, produced work product to the state under a court order.  Id.  These materials included communications between Dr. Milam and defense counsel that involved defense strategy, potential difficulties in issues, and other privileged matters contained in the e-mails and memos given to the state by Dr. Milam.  Id.  The trial record and state habeas record are barren regarding the actual documents Dr. Milam provided to the state and the prejudicial effects of producing these documents to the state.  The State filed its Response to the State Writ on October 3, 2008.

See Exhibit 6.  The State, given the above, understandably conceded that "certain facts are not presently before the Court which could prove relevant to the claims pending before the Court.  Consequently, the respondent does not oppose the applicant's request for an evidentiary hearing on the issues presented."  Id.  The state requested the hearing be held after the direct appeal was ruled upon by the Texas Court of Criminal Appeals (which was not until June 17, 2009).  Id.  The State, in its Conclusion and Prayer, stated "the respondent, State of Texas, would respectfully submit that this Court should hold an evidentiary hearing in order to resolve the unresolved factual issues pertinent to the allegations contained in the applicant's writ of habeas corpus."  Id.

That same month a visiting judge, who did not sit as the trial judge and did not sit as the state habeas judge, signed Findings of Fact and Conclusions of Law on October 23, 2008 denying a hearing on the state writ and recommending relief be denied.  See Exhibit 7.  There was no assignment in any of the clerk's records allowing that judge to take any action in this cause.  See Exhibit 8.  No hearings were held on this state writ even though both the state and the defense requested hearings.  Counsel for the Petitioner failed to file any proposed findings of fact and conclusions of law.  The State did not file any proposed findings of fact and conclusions of law.  On September 23, 2009, the Texas Court of Criminal Appeals adopted, in part, the findings of fact and conclusions of law and recommendation of the unassigned visiting judge and denied relief.  See Exhibit 9.

This Court stayed the federal writ and counsel filed a subsequent writ with the state habeas court.  The state habeas court denied experts requested by the Petitioner and the state

for the first time agrued that a hearing not be held on the merits of the case. The Court of Criminal Appeals directed the state habeas court to make findings even though the currently presiding state habeas court was not the presiding judge during the trial. The new state habeas court then recommended relief be denied on all claims without a hearing and without the assistance of experts whose help was timely requested by the Petitioner and denied by the new state habeas court. The findings of the new state habeas judge in the case at bar should be accorded less weight and dignity by this Court since the findings are clearly not the unfettered and independent judgment of a judge who was familiar with the trial of the case and heard the witness at trial. The judge who signed the findings of fact and conclusions of law did not preside over the trial or the state habeas proceedings. There is no evidence, given the state of this record, that the new state habeas judge could have adequately formulated her own findings of fact and conclusions of law in the course of the judge's consideration and determination of the evidence in this case since she never presided over the trial and denied a hearing and denied expert assistance on the subsequent state habeas proceedings in this case. This is clearly a violation of due process especially given the difficulty of obtaining an evidentiary hearing in federal court after the passage in 1996 of AEDPA. The presumption of correctness of 28 U.S.C. § 2254(e)(1), therefore, should not attach to the state court's findings of fact and conclusions of law.

106

## VIII.

## **<u>PRAYER</u>**

WHEREFORE, PREMISES CONSIDERED, the Petitioner prays that this Court: (1) vacate the Petitioner's conviction for capital murder and death sentence, or in the alternative, vacate the judgment affirming his conviction and death sentence on direct appeal, or in the alternative, vacate the death sentence; (2) order and conduct an evidentiary hearing at which proof may by offered and argument may be offered concerning the allegations of this Petition; (3) permit the Petitioner, because of his indigence, to proceed without prepayment of costs and fees; (4) allow the Petitioner a reasonable time in which to amend this Petition; (5) provide for discovery as requested by the Petitioner and grant the Petitioner the authority to obtain subpoenas in forma pauperis for witnesses and discovery of documents and other information necessary to prove the facts as alleged in this Petition; (6) grant the Petitioner sufficient funds to secure expert testimony necessary to prove the facts as alleged in this Petition; (7) enter findings of fact and conclusions of law recommending that the Petitioner's conviction and sentence be vacated and that the Petitioner's case be remanded for a new trial or a new sentencing hearing; and (8) grant such other relief as law and justice may require.

Respectfully submitted,


/s/ Michael C. Gross
Michael C. Gross
State Bar No. 08534480
106 South St. Mary's Street, Suite 260
San Antonio, Texas  78205
(210) 354-1919
(210) 354-1920 Fax

Attorney for the Petitioner,
RAMIRO F. GONZALES

## IX.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 25th day of October 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to Matthew Ottoway, Assistant Attorney General, P.O. Box 12548, Austin, Texas 78711-2548 , and I certify that there are no non-CM/ECF participants.


/s/ Michael C. Gross

108