IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| RAMIRO FELIX GONZALES, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | ACTION NO. SA-10-CA-165-OG |
| RICK THALER, | § | (Death Penalty Case) |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

**RESPONDENT THALER'S ANSWER WITH BRIEF IN SUPPORT**

Petitioner, Ramiro Felix Gonzales, was convicted of capital murder and sentenced to death for killing Bridget Townsend during the course of an aggravated sexual assault, a kidnapping, or a robbery. Gonzales seeks federal habeas relief in this Court, which possesses both personal and subject matter jurisdiction. *See* 28 U.S.C. §§ 2241, 2254. Respondent Rick Thaler (the Director) denies all of Gonzales's assertions of fact except those supported by the record or specifically admitted herein. Although Gonzales seeks habeas relief he has failed to show that any of his claims have merit or that he is entitled to further factual development. Accordingly, the Director respectfully requests that Gonzales's petition for a writ of habeas corpus be denied with prejudice.

## PETITIONER'S ALLEGATIONS

The Director understands Gonzales to allege the following grounds for relief:

1. Ineffective assistance of trial counsel for:
    A. Failing to hire and present testimony from experts in the fields of fetal alcohol spectrum disorders and "sexual, emotional, physical, [and] biological abuse."
    B. Allowing their expert to provide prosecutors with privileged work product as part of her disclosure of underlying data.

2. Trial court error for ordering the expert to provide prosecutors with her underlying data, which included privileged work product.

3. Trial court error for including a jury instruction which impermissibly narrowed the definition of "mitigating evidence."

4. Insufficient evidence to support the aggravating elements of capital murder alleged—aggravated sexual assault, kidnapping, and robbery.

5. Trial court error for allowing future dangerousness expert to testify despite the failure to show reliability under *Daubert*.

6. Trial court error for allowing future dangerousness expert to testify by abdicating its "gatekeeper" function.

7. Trial court error for allowing future dangerousness expert to testify despite not meeting the requisite standards under Rule 702 of the Texas Rules of Evidence.

8. Due process violation under the Fifth Amendment for allowing future dangerousness expert to testify.

9. Denial of fair trial under the Sixth Amendment for allowing future dangerousness expert to testify.

*See* Amend. Pet. 13–106, ECF No. 28.  As fully briefed below, Gonzales has failed to show that the Court of Criminal Appeals unreasonably adjudicated these claims or that he is otherwise entitled to habeas corpus relief under the

Antiterrorism and Effective Death Penalty Act (AEDPA).  The Court should deny Gonzales's requested relief and deny the petition with prejudice.

## STATEMENT OF THE CASE

A jury convicted Gonzales of capital murder for killing Bridget Townsend during the course of committing, or attempting to commit, an aggravated sexual assault, a kidnapping, or a robbery.  6 CR 980.[1]  After the punishment hearing the jury answered the submitted special issues in such a way that Gonzales was sentenced to death.  6 CR 1023–24, 1059–63.  The Court of Criminal Appeals, on direct appeal, affirmed the judgment of conviction, *Gonzales v. State*, No. AP-75540, 2009 WL 1684699 (Tex. Crim. App. June 17, 2009) (*Gonzales I*), and the Supreme Court denied Gonzales's petition for writ of certiorari off direct appeal, *Gonzales v. Texas*, 130 S. Ct. 1504 (2010).

With direct appeal still pending Gonzales filed an application for state habeas relief.  SHCR-01 at 11–19.[2]  The trial court, sitting in habeas, entered written findings and recommended that relief be denied.  SHCR-01 at 24–27.  The Court of Criminal Appeals adopted a majority of the findings and, on

---

[1] "CR" refers to the documents and pleadings filed in the state convicting court, or clerk's record, preceded by the volume number and followed by page number(s).

[2] "SHCR-01" refers to the documents and pleadings filed in the state habeas court, or state habeas clerk's record, in Gonzales's first state habeas proceeding, followed by page number(s).

their own review, denied relief. *Ex parte Gonzales*, No. WR-70969-01, 2009 WL 3042409, at *1 (Tex. Crim. App. Sept. 23, 2009) (*Gonzales II*). That proceeding, however, was reopened by the Court of Criminal Appeals on its own initiative to reconsider its original disposition of Gonzales's state habeas application and it remanded the matter back to the trial court. *Ex parte Gonzales*, Nos. WR-70969-01, WR-70969-02, 2012 WL 340407, at *1–2 (Tex. Crim. App. Feb. 1, 2012) (*Gonzales III*). The trial court re-adopted its original findings and again recommended denial of relief. SHCR-01 (EventID:2485471) 2–4.[3] The Court of Criminal Appeals once more adopted the trial court's findings and denied relief. *Ex parte Gonzales*, No. WR-70969-01, 2012 WL 2424176, at *1 (Tex. Crim. App. June 27, 2012) (*Gonzales IV*).

Between Gonzales's first state habeas proceeding and the Court of Criminal Appeals's reconsideration of that proceeding, Gonzales filed his initial federal habeas petition. Pet., ECF No. 12 & 12-1. Gonzales was thereafter granted a stay, Order Grant Stay, ECF No. 16, and he filed a subsequent state habeas application, SHCR-02 at 2–284.[4] The Court of Criminal Appeals found that Gonzales's subsequent state habeas application

---

[3] "SHCR-01 (EventID:2485471)" refers to the documents and pleadings filed in the state habeas court, or state habeas clerk's record, following the remand in Gonzales's first state habeas proceeding, followed by page number(s).

[4] "SHCR-02" refers to the documents and pleadings filed in the state habeas court, or state habeas clerk's record, in Gonzales's second state habeas proceeding, followed by page number(s).

was "an abuse of the writ" and it was dismissed. *Gonzales III*, 2012 WL 340407, at *1. Gonzales has returned to federal court and filed an amended petition for habeas relief. Amend. Pet., ECF No. 28. The Director submits the following answer in response.

## STATEMENT OF FACTS

### I.    Guilt-Innocence Facts.

The Court of Criminal Appeals accurately summarized the evidence presented at Gonzales's trial:

> [Gonzales] was charged with intentionally causing the death of Bridget Townsend by shooting her with a firearm during the course of committing or attempting to commit aggravated sexual assault, kidnapping, or robbery. The evidence at trial established that, while he was in the Bandera County jail waiting to be transported to prison on another matter, [Gardner] asked to speak with the sheriff, James MacMillian. When MacMillian met with him, [Gonzales] stated that he had information concerning Townsend, a person who had been reported missing almost two years earlier. Initially, MacMillian did not believe him, but when [Gonzales] asserted that he could show MacMillian where Townsend's body was, MacMillian took him more seriously. With [Gonzales] sitting in the passenger seat giving directions and the jail administrator riding in the back, MacMillian drove out of town to the ranch where [Gonzales] and his family lived. After the paved road ended at the ranch headquarters, they continued driving over caliche roads and jeep trails to a remote cedar-covered hillside. They then walked another hundred yards to the location where [Gonzales] indicated that they would find Townsend's remains. As they walked, [Gonzales] described the jewelry Townsend had been wearing, where she had been standing when he shot her, and where he had put her body. They saw a human skull about ten feet from the place [Gonzales] said he had left her. They then observed other bones that had been scattered by wildlife, and they found jewelry that was similar to

the jewelry described by [Gonzales]. After MacMillian and the jail administrator tied yellow evidence tape on the trees to mark the location, they drove back to Bandera. MacMillian left markers along the route so that he would be able to retrace it.

[Gonzales] volunteered two different stories during the drive back to the sheriff's office. Initially, he stated that some people in the Mexican Mafia had needed a place to dispose of a body, and so he let them use that location. Then, he stated that he was present while other people committed an offense, but all he did was show them how to get to that location. After they returned to the sheriff's office, [Gonzales] gave additional conflicting stories. A Texas Ranger, Skylor Hearn, testified that [Gonzales] first told him that [Gonzales] had been hired by the Mexican Mafia and Townsend's boyfriend, Joe Leal, to kill Townsend. Next, [Gonzales] indicated that the Mexican Mafia was not involved, but that he and Leal had agreed that he would kill Townsend. Finally, he stated that Leal had not been involved, and that he had killed Townsend on his own. [Gonzales] then admitted that his previous stories had been lies. Hearn testified that [Gonzales] provided details in his final story that were consistent with evidence that was discovered during the investigation. [Gonzales] gave a statement that was audiotaped and typed. [Gonzales] reviewed, revised, and signed the typed statement. At trial, Hearn read the typed statement out loud. The audiotape was played as well.

In his statement, [Gonzales] related that Leal, Townsend's boyfriend, was his drug supplier. On or about January 14, 2001, he had telephoned Leal's house because he wanted more drugs. Townsend answered the phone and told him that Leal was at work. Then, aware that Townsend was [not] there, he drove to Leal's house in order to steal cocaine. When Townsend answered the door, [Gonzales] walked past her to the bedroom closet where he knew that Leal kept drugs, and he began searching. He found between $150 and $500 in cash on a closet shelf, and he put it in his pocket. He did not respond when Townsend asked him what he was doing. Townsend picked up the telephone and started dialing, telling him that she was calling Leal. [Gonzales] pushed her down, dragged her into the bedroom, and tied her hands and feet with some nylon rope he had found in the closet. He asked her if Leal had any drugs, and she told him no. He then carried

6

her to the front door, where he paused to turn out the lights so no one would see them, and then he carried her to his truck.

[Gonzales] then drove Townsend to the ranch. When they arrived, [Gonzales stopped long enough to retrieve a high-powered .243-caliber deer] rifle with a scope that he knew was kept in his grandfather's ranch truck. [Gonzales] stated that, at the time he took the rifle, he intended to shoot Townsend because he did not want her to tell anyone that he had "torn up" Leal's house and kidnapped her. Armed with the rifle, he got back into his truck and drove Townsend to the location where her remains were later found. He untied Townsend and walked her toward the brush, but when he started loading the rifle, Townsend began crying and asking for her mother. She told [Gonzales] that she would give him money, drugs, or sex if he would spare her life. In response, [Appellant] unloaded the rifle and took Townsend back to his truck, where he had sex with her. After she dressed, he reloaded the rifle, walked her back into the brush, and shot her. He listened as her body hit the ground, and then he drove home. When he got back to his grandparents' house, he removed the empty shell casing from the rifle and slung the casing away from the house. He put the rifle back into his grandfather's ranch truck and went inside. There, he interacted with his family as though nothing had happened.

While Hearn was taking [Gonzales's] statement, MacMillian showed investigators the location of Townsend's remains. They found Townsend's skull, most of her long bones and some small bones, her clothing, her jewelry, and her shoes. Her rib cage and vertebrae were never found. Gunshot residue tests on Townsend's shirt revealed the presence of lead. Hearn later seized three high-powered rifles with scopes that he found in [Gonzales's] grandfather's house and ranch truck. He showed them to [Gonzales], along with a rifle that Hearn had borrowed from the sheriff's department, and asked [Gonzales] if he recognized any of them as the murder weapon. [Gonzales] immediately selected the .243-caliber rifle that Hearn had seized from the ranch truck.

Leal testified about the course of events that led him to report Townsend's disappearance to police. He had spoken to Townsend on the telephone around 6:00 p.m. or 7:00 p.m., and she told him that she had to get up early for work the next

morning. When he came home from work a little after midnight, he believed that Townsend was asleep. Her truck was parked outside and things "looked normal." Inside, her purse and keys were on the counter as usual, but the house was cold because the heater had not been turned on. Townsend was not asleep on the couch where Leal had expected her to be, so he went into the bedroom. When he saw that she was not in the bed, he looked around and noticed that the door to the bedroom closet was open. A small box that he kept on a closet shelf was sitting out on the ironing board, open and empty. It had contained between $200 and $300 in cash. Leal testified that Townsend never took money from that box without asking him first. Becoming concerned, Leal began calling friends and family to see if anyone knew where Townsend was. His sister and his friend helped him search the neighborhood. When they could not find her, Leal called the police. He also contacted [Gonzales] because Townsend had told him that [Gonzales] had come by the house earlier that day, and Leal hoped that [Gonzales] might have seen something while he was there. [Gonzales], however, denied that he had been there that day. When Leal told [Gonzales] that he might as well tell the truth because Townsend had told him that he had come by, [Gonzales] continued to deny it.

*Gonzales I*, 2009 WL 1684699, at *1–3 (footnote omitted).

## II.   State's Punishment Evidence.

More details, besides the fact that Gonzales killed Townsend, were revealed regarding Townsend's last hours.  Gonzales told a fellow inmate, Frederick Lee Ozuna, that he tortured Townsend and forced her to "fulfill his sexual fantasies."  39 RR 184–88.[5]  Gonzales also stated that Townsend had tried to escape but that he caught up with her and beat her for the attempt to

---

[5]  "RR" refers to the transcribed statement of facts of Gonzales's capital murder trial, or reporter's record, preceded by volume number and followed by page number(s).

flee. 39 RR 188. Additionally, Gonzales said that he had sex with Townsend's lifeless body three to four times, he did not regret murdering Townsend and he would do it again because he enjoyed it. 39 RR 188–89.

Gonzales also had a significant criminal history apart from Townsend's murder, including convictions for felony theft, forgery, and burglary of a habitation, for which he received probated sentences that were later revoked, and convictions for aggravated kidnaping and aggravated sexual assault, for which he received two life sentences. 39 RR 13–14; 40 RR 118–21.

The aggravated kidnapping and sexual assault convictions stem from the abduction and rape of Florence "Babo" Teich. She testified that Gonzales, whom she had never met before, entered her real estate office asking for a map. 40 RR 71–73. When Teich turned around to get one, Gonzales pulled a knife and put it up to her throat, and forced Teich into her truck. 40 RR 74–75. At knifepoint, Teich drove to a remote location on the ranch where he lived and bound Teich's hands and feet with duct tape. 40 RR 75–79. They then proceeded to a hunting cabin, where Gonzales cut off Teich's clothes, kissed her on the lips and breasts, and began raping her despite desperate pleas to let her go. 40 RR 79–84. Afterwards, Gonzales locked a naked and bound Teich in a closet and left. 40 RR 85–86. Teich was able to escape from the closet, cut off her bindings and trek three hours off the ranch. 40 RR 87–97. She then reported the crime to authorities. 40 RR 98.

Authorities then went to the ranch where they spotted Teich's truck, which took off at a high rate of speed.  40 RR 127–30.  They pursued the vehicle at high speeds for thirty-five to forty-five minutes until Gonzales crashed the truck into a tree.  40 RR 131–40, 142.  When he was arrested authorities discovered marijuana in Gonzales's pants pocket.  40 RR 141. Following his guilty pleas to kidnapping and raping Teich, Gonzales spoke with a reporter, Gina Galaviz, where he denied raping Teich, insisting it was a consensual encounter. 40 RR 142, 145–46.

Gonzales was also cited for trespassing on Wanda Obiedio's property. 40 RR 63.  She testified that Gonzales became interested in her teenage daughter while she and her family were visiting a local swimming hole one afternoon.   40 RR 50–53.   After Obiedio forbade her daughter from interacting with Gonzales, he began following the teenager, including parking outside of their home at all hours and scratching at their windows at night.  40 RR 55–59.  Gonzales refused to leave Obiedio's daughter alone, even after Obiedio confronted him, saying that Obiedio "wasn't going to keep him away."  40 RR 57.  On one occasion at the swimming hole, Gonzales and his friends were openly smoking marijuana and when heatedly confronted by Obiedio, he threatened to kill her.  40 RR 60–62.  Gonzales only stopped following Obiedo's daughter when they moved to a different house in the country, which was difficult to find.  40 RR 63.

Gonzales's lawless behavior continued after he was incarcerated for Teich's kidnapping and rape—he was disobedient, threatening and violent. For example, when Gonzales felt that Todd Heilig, a jailer, was disrespectful, or because Heilig would not smuggle cigarettes into the jail for him, Gonzales threatened to put a "cross" on Heilig, which meant a retaliatory killing or "hit." 39 RR 19–22. This was not an isolated incident as he also threatened to kill another jailer, Kassidy Johnson. 39 RR 93. Based on his experience as a jailer, Heilig believed that Gonzales would be a threat in prison. 39 RR 22–23. At least six other jailers expressed similar beliefs. 39 RR 44, 77, 101, 123, 179; 40 RR 45.

Further, Gonzales set fire to the mattress in his cell, causing the jail to be partially evacuated. 39 RR 34, 75. Gonzales told another jailer, Danny Bowermaster, that he set the fire because he was not allowed to watch television. 39 RR 75. Bowermaster testified that Gonzales showed no remorse for his actions despite placing other inmates' lives in danger. 39 RR 77. Jail personnel also discovered items of contraband on Gonzales, or in his cell, on numerous occasions, including a wooden "shank," cigarettes, and a razor blade. 39 RR 38, 51. He demonstrated to jailers multiple times how he planned to escape from the jail. 39 RR 37, 91. He, additionally, tried to bribe a jailer to smuggle in cigarettes and convinced his family to hide tobacco in his family-provided, specially-permitted shampoo. 39 RR 52; 40 RR 6–8.

11

The jail's administrator, Jan Quintana, testified that Gonzales spent most of his time in segregation because he repeatedly violated the jail's rules and had conflicts with other inmates.  39 RR 117–19.  In fact, in the four years Gonzales spent in jail, his longest stay in general population was three months, but he could usually only last three weeks to a month.  39 RR 117–19.  Quintana also stated that Gonzales was more of a problem than other capital murders that she had housed and, that leading up to trial, Gonzales attempted to behave better and find religion, but she suggested this was a ruse to look good at trial. 39 RR 121, 124–26.

In a recorded phone conversation, Gonzales said that Quintana's "getting me to the point where I'm going to end up doing something" regardless of "how bad I make myself look in court."  40 RR 15–16.  He also said that he might "end up hurting somebody" and that he thinks the jailers "deserve it."  40 RR 25.  And, despite pleas from his family "to behave," Gonzales said "I can't behave no more. I can't."  40 RR 32.

Jesse Rios, another jailer, described an incident where an enfeebled inmate refused to take his four-times-a-day pain medication, something he found extremely unusual.  39 RR 168–73.  When Rios gathered Gonzales from his cell to speak to him about the incident, Gonzales spontaneously offered that he was not "hogging," or stealing, anyone's pain medication, though Rios had not mentioned any such thing.  39 RR 173–74.   Rios also testified that

12

Gonzales struck another inmate over a dispute regarding a television show. 39 RR 175–77.

In another recorded phone call Gonzales described a disagreement over what movie to watch on television, which culminated in Gonzales "just beating [the inmate's] ass."  40 RR 36–37.  Gonzales said it was "the jail's fault because the jail put me in [general] population knowing that I'm a threat to [general] population, knowing that I had—I already had trouble with that dude before."  40 RR 37.  Gonzales concluded, "if they try to use it against me in the court, I'm just going to tell my lawyers it was—it's their fault.  It's the county's fault.  They know I'm a threat to [general] population." 40 RR 38.

Confirming Quintana's suspicions that Gonzales was manipulative, Ozuna testified that Gonzales told him he was pretending to be a Christian to help his case.  39 RR 189.  Ozuna also described Gonzales's plan to escape, which Gonzales tried to get other inmates to take part in.  39 RR 190. Gonzales said he would fake an injury to be taken to the jail's medical clinic, where he would then pull a gun on the jailer.  39 RR 190.  Further, he said that he would kill any officer who did not like him and he threatened to blow up one jailer's house and stab another.  39 RR 190–91.

Gonzales also had a morbid fascination with death and decay.  He admitted to jailer Heilig that he would kill animals simply to watch them

13

decay and told him that a human body rots faster than an animal.  39 RR 16–18.  Gonzales also filled out a "sick call slip" while in jail wherein he stated:

> The reason is, because when I committed my homicide capital murder the ranger asked me how many times I went back to see what I did, and I said one time, but I lied.  I actually went back almost every day to see the body rot away.  It's something I like doing.  All my life I lived on a ranch and I would kill all kinds of animals just to see the corpse rot away.  After seeing the human body rot away, well, that little bitch won't get out of my head.  I don't even want to sleep cause all I dream of is the rotting corpse.  Did you know that a human's corpse rots away faster than an animal's?  Just thought you wanted to know.

39 RR 31–32.  He told Bobbie Strickland, a case manager with Hill County Mental Health and Mental Retardation who was evaluating Gonzales at the request of his family, that he was obsessed with dead bodies, though Strickland determined that Gonzales was not mentally ill.  39 RR 135–41.

Finally, Dr. Edward Gripon, a forensic psychiatrist, testified.  41 RR 50–62.  After reviewing "a substantial amount of investigative work," including records concerning Gonzales's criminal history and jail behavior, Dr. Gripon opined that Gonzales "pose[d] a risk to continue to commit threats or acts of violence."  41 RR 62, 66.  He based this conclusion on Gonzales's long history of violent behavior, demonstrating a pattern of escalating brutality, evidence of a childhood conduct disorder and a probable diagnosis of antisocial personality disorder.  41 RR 66–71.  Dr. Gripon found Gonzales's level of violence alarming and testified that Gonzales displayed a "pattern of

14

wanton and blatant disregard of the welfare and concern for others." 41 RR 71. Gonzales's cruelty to animals and his "morbid interest in decomposition" were abnormal and Gonzales's return to watch Townsend's body decay had a "psychosexual sadistic component to it." 41 RR 73, 77. Dr. Gripon also testified that rapists had high recidivism rates and that this, coupled with Gonzales's history of aggressive behavior in jail, were indicative of potentially violent future behavior. 41 RR 86–90, 95.

## III. Gonzales's Punishment Evidence.

Thomas Keese, the long-time ranch manager of the Middle Verde Ranch, testified that Gonzales's grandfather had worked for him for over forty years. 41 RR 124–25. Keese said that Gonzales's mother left him with her parents, Gonzales's grandparents, when he was an infant and rarely visited. 41 RR 127–28. Gonzales's father was not in the picture at all. 41 RR 138. Gonzales, even as a toddler, had little supervision on the ranch while his grandparents worked. 41 RR 130. He was well-liked at school but had little educational help and encouragement at home so he quit school in the seventh or eighth grade. 41 RR 133–36. Around this same time, Gonzales began to display behavior inconsistent with his typical polite demeanor, including belligerently swearing at Keese. 41 RR 136–38. Keese believed that Gonzales's change in behavior was the result of drugs. 41 RR 139. He also believed that Gonzales would not have committed his crimes had he

stayed in school and avoided drugs.  41 RR 144.  Keese also noted that Gonzales was an excellent artist and that he could do good works while in prison, including sharing his newfound but honest conviction in Christianity. 41 RR 178, 182–83.

Vicky Wilson, Gonzales's aunt, testified that Gonzales's mother, then a teenager, "huff[ed] paint" while pregnant with Gonzales.  41 RR 152–57. Gonzales's mother left him with his grandparents shortly after his birth and, while she had occasionally visited the home, she never acknowledged or showed affection towards Gonzales.  41 RR 158–61.  Wilson said she witnessed Gonzales's mother's then-boyfriend physically abuse Gonzales on one occasion and had a "feeling" that a cousin sexually abused him as well. 41 RR 161–62, 167–68.  As a child, Gonzales was good at sports but had to quit because of "no pass-no play" rules and eventually dropped out of school in the eighth grade, at age fifteen.  41 RR 163–65.  A couple years later Gonzales's favorite aunt died and he became a "loner."  41 RR 165–66. Wilson believed that Gonzales had honestly found religion while incarcerated, that he was a different person off drugs and that he could be rehabilitated.  41 RR 169–70.

Emma Smythe, another aunt, testified that while pregnant, Gonzales's mother drank alcohol and smoked marijuana, and Smythe never witnessed Gonzales's mother receive prenatal care.  41 RR 187–92.  She also never saw

16

Gonzales with his mother and witnessed, on three or four instances, Gonzales's mother's then-boyfriend cornering Gonzales, which would cause Gonzales to go silent like he was in "shock."  41 RR 193–95.  Sammy Joe Sanchez, who thought his brother was Gonzales's father, also saw Gonzales's mother "huff[] paint" on many occasions.  41 RR 199–205.

Jessica Lynn Keegan, Gonzales's cousin and Smythe's daughter, grew up with him on the ranch.  41 RR 207–09.  She testified that Gonzales began drinking at twelve and did drugs as a teenager.  41 RR 210–11.  She recalled that Gonzales got very little attention growing up, his mother was not in his life and he quit school at sixteen.  41 RR 213, 217–18.  She also stated that Gonzales's mother's boyfriend was not "a nice person" and was verbally abusive to Gonzales.  41 RR 219–20.  Gonzales also had a sexual relationship with an eighteen-year-old woman when he was twelve to fourteen and she had a baby by him but "disappear[ed]" shortly after becoming pregnant to avoid prosecution.  41 RR 220–21.  Keegan also related that Gonzales lost "a mother-figure" when his favorite aunt died.  41 RR 221–22.  Gonzales was good at hunting and fishing and had worked for Keegan's father, who "wouldn't have paid him his paycheck if he wasn't working."  41 RR 222–23.  Keegan felt that Gonzales had been "lost in the system" and, had someone in authority intervened in his life, he would not have committed his crimes.  41 RR 225–26.

Dr. Milam, a neuropsychologist, conducted a full neuropsychological examination of Gonzales and determined that he did not have any brain damage.   42 RR 3–11.   She, instead, found him to be immature and developmentally delayed.   42 RR 14–16.   She found, based on her investigation, that Gonzales raised himself without any parental support system, which contributed to his immature behavior as he had little opportunity to learn adult behavior.   42 RR 17–18.   Based on his history of limited parental interaction and nurturing, Dr. Milam diagnosed Gonzales with reactive attachment disorder with antisocial personality features.   42 RR 28, 38–39.   She said this was a "very sad disorder" because its causation is "100 percent environment" and such diagnosis "is very debilitating as an adult."   42 RR 28–29.   Those with reactive attachment disorder have grown up without "norms and guidelines and standards," which causes them to be insecure and needy.   42 RR 30.   They also tend act with bravado, seek attention and attempt to be manipulative but rarely succeed, which is consistent with Gonzales's history.   42 RR 30–31. Indeed, Dr. Milam thought Gonzales was "probably . . . in top ten percent of [emotionally] damaged kids." 42 RR 73.

Finally, Larry Fitzgerald, a former Texas Department of Criminal Justice public information officer, testified on behalf of Gonzales.   42 RR 122–26.   He testified that, based on his research, Gonzales was a well-behaved

18

inmate while housed in state prison, as opposed to county jail, and was a "trustee" as a reward for good behavior. 42 RR 136–39. Fitzgerald also mentioned that inmates in state prison are closely monitored gave a detailed account of the process leading up to an execution from an inmate's perspective. 42 RR 139–48.

## ANSWER

## I.    Federal Habeas Standard Of Review.

Gonzales's petition is subject to AEDPA. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). "AEDPA 'imposes a highly deferential standard of review for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (per curiam) (quoting *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010)). This review "is limited to the record that was before the state court that adjudicated the claim on the merits" and "focuses on what a state court knew and did." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398–99 (2011).

Under 28 U.S.C. § 2254(d), as amended by AEDPA, a federal court may not grant habeas relief unless the state court adjudication (1) "was contrary to federal law then clearly established in the holdings of" the Supreme Court; or (2) "involved an unreasonable application of" clearly established Supreme Court precedent; or (3) "was based on an unreasonable determination of the facts in light of the record before the state court." *Harrington v. Richter*, 131

S. Ct. 770, 785 (2011) (internal quotation marks omitted) (quoting 28 U.S.C. § 2254(d)(1)–(2); *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (*Terry Williams*)).

A state court decision is contrary to clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from such precedent, yet reaches an opposite result. *Terry Williams*, 529 U.S. at 405–06. A state court unreasonably applies Supreme Court precedent if it correctly identifies the governing authority but unreasonably applies it to the facts of a particular case. *Id*. at 407–09. To determine whether a state court has made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 131 S. Ct. at 786.

Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Id*. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state-court decision is both incorrect and objectively unreasonable, "whether or not [the

reviewing federal court] would reach the same conclusion"). Further, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 664.

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, and not every jot of its reasoning. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc). Indeed, state courts are presumed to "know and follow the law." *Visciotti*, 537 U.S. at 24. And, even where the state court fails to cite applicable Supreme Court precedent or is unaware of such precedent, AEDPA nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002).

Additionally, if the Supreme Court "has not broken sufficient legal ground to establish [a] . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar." *Terry Williams*, 529 U.S. at 381. A federal court must be wary of circumstances where it must "extend a [legal] rationale" of the Supreme Court "before it can apply to the facts at hand" because such a process suggests that the proposed rule is not clearly established. *Alvarado*, 541 U.S. at 666.

AEDPA also provides that the state court's factual findings "shall be presumed to be correct" unless an inmate carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, "[t]he presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).[6]

---

[6] Gonzales argues that the presumption of correctness should not apply in this case because, essentially, pre-AEDPA case law required there to be fair support for a state-court finding of fact and an evidentiary hearing was permissible if such support was lacking. *See* Amend. Pet. 102–04. He asserts that, because of state-law procedural irregularities in his initial state habeas proceeding, *id.* at 104–05, and because the reconsideration of the initial proceeding was overseen by a judge who did not sit at trial, *id.* at 105–06, the presumption of correctness should fall. Gonzales's argument is contrary to the law in this circuit, *see Valdez*, 274 F.3d at 951 ("[W]e hold that a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review."), and a number of other circuits, *see Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010) ("AEDPA does not make deference to state court fact-finding dependent on the adequacy of the procedures followed by the state court."); *Teti v. Bender*, 507 F.3d 50, 59 (1st Cir. 2007) ("As Professors Fallon, Meltzer, and Shapiro have noted, these changes suggest that 'the presumption of correctness now applies across the board.'"); *Lambert v. Blackwell*, 387 F.3d 210, 238 (3d Cir. 2004) ("[T]he habeas statute no longer explicitly conditions federal deference to state court factual findings on whether the state court held a hearing."); *Mendiola v. Schomig*, 224 F.3d 589, 592–93 (7th Cir. 2000)("What is more, § 2254(e)(1) does not require findings to be based on evidentiary hearings."). Hence, the presumption of correctness applies.

Moreover, any procedural errors encountered during Gonzales's initial state habeas proceeding were corrected upon reconsideration. *See Gonzales IV*, 2012 WL 2424176, at *1 ("[T]he trial court re-adopted its prior findings of fact, conclusions of law, and recommendation. By this action, the trial court effectively found that any procedural variations did not affect the result of the proceedings."). Indeed, Gonzales has not even identified a specific finding of fact which he thinks incorrect based on a so-called procedural irregularity.

Finally, an evidentiary hearing is precluded on claims adjudicated on the merits by the state court. *Pape v. Thaler*, 645 F.3d 281, 288 (5th Cir. 2011). In certain other situations, an evidentiary hearing is unwarranted because the inmate has not diligently developed the state court record. *Williams v. Taylor*, 529 U.S. 420, 436 (2000) (*Michael Williams*). If diligence is not in issue, then an inmate may not obtain a hearing unless (1) an

---

Finally, Gonzales is incorrect that the state habeas trial court denied relief on all of the claims contained in Gonzales's subsequent state habeas application. Amend. Pet. 106. As the state habeas trial court's order makes clear, it only "re-evaluat[ed] the prior findings of fact and conclusions of law entered in [WR-70,969-01]." SHCR-01 (EventID: 2485471) at 3. The trial court also noted that the Court of Criminal Appeals had "dismissed the allegations brought forth in [Gonzales's] successive writ of habeas corpus on the grounds that the prerequisites of Art. 11.071, § 5(a) had not been met," meaning it was aware that the claims in Gonzales's subsequent state habeas application were not before the court. SHCR-01 (EventID: 2485471) at 3. And the trial court "re-adopt[ed] the *prior* findings of fact, conclusions of law and recommendation entered in this matter on October 23, 2008," a "matter" which did not include the claims raised in Gonzales's subsequent state habeas application. SHCR-01 (EventID: 2485471) at 3 (emphasis added). The Court of Criminal Appeals also adopted the trial court's new findings "and *again* den[ied] relief" in WR-70969-01, not WR-70969-02. *Gonzales IV*, 2012 WL 2424176, at *1 (emphasis added). In no way did the state habeas trial court or the Court of Criminal Appeals adjudicate the claims raised in Gonzales's subsequent state habeas application as it was, clearly, dismissed as an "abuse of the writ." *Gonzales III*, 2012 WL 340407, at *1. Any argument to the contrary ignores the explicit determination that Gonzales's subsequent state habeas application was dismissed as "an abuse of the writ," the precise wording of the trial court's reconsideration order, and the fact that relief was "again" denied in the initial state habeas proceeding—WR-70969-01—not the subsequent state habeas proceeding—WR-70969-02.

And any complaint concerning the state habeas process is not actionable in a federal habeas proceeding. *See Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004) ("It is axiomatic that 'infirmities in state habeas proceedings do not constitute grounds for federal habeas relief' because 'an attack on the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself.'") (citations omitted)

inmate's claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) the inmate establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2254(e)(2).  Assuming no procedural barriers, it is appropriate to deny an evidentiary hearing if sufficient facts exist to make an informed decision on the merits. *Schriro v. Landrigan*, 550 U.S. 465, 474–75 (2007).

## II.   Gonzales's Ineffective-Assistance-Of-Trial-Counsel Claims Are Without Merit (Claims 1A & 1B).

### A.   Gonzales's claim that trial counsel erred by failing to hire and present testimony by fetal alcohol spectrum disorders and "sexual, emotional, physical, biological abuse" experts is procedurally defaulted and, in any event, has no merit (Claim 1A).

Gonzales asserts that counsel were ineffective, not in their mitigation investigation, but in their choice of experts.  Amend. Pet. 13–25.  Gonzales argues that counsel should have hired "a multidisciplinary assessment group" to determine if Gonzales had fetal alcohol spectrum disorder and then presented such testimony at trial.  Amend. Pet. 18–19; *see also* Pet. Ex. 10, ECF No. 12-2.  He asserts that the neuropsychologist hired by counsel did insufficient testing to diagnose FASD, such a diagnosis "should be highly suspected" based on Gonzales's history, much of which he admits was before the jury, and further testing should occur.  Amend Pet. 18–19.  Similarly, he

believes that a "sexual, emotional, physical, biological abuse expert" should have been retained and whose testimony should have been before the jury. Amend. Pet. 20–25; *see also* Pet. Ex. 11, ECF No. 12-3. Although he concedes that much of the underlying abuse was disclosed to the jury, he disagrees with the manner of presentation because "no expert witness ever brought all this information together and explained the importance of this history." Amend. Pet. 22. Gonzales does not demonstrate ineffective assistance of counsel based on these allegations or with the evidence he has presented. Federal habeas relief should, therefore, be denied.

### 1.   The claim is procedurally defaulted

"A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Beard v. Kindler*, 130 S. Ct. 612, 614 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). Foreclosure of federal review "applies whether the state law ground is substantive or procedural." *Coleman*, 501 U.S. at 729. When an inmate fails to properly raise a claim in state court he "has deprived the state courts of an opportunity to address those claims in the first instance." *Id*. at 732. Accordingly, preventing review of claims decided on state law procedural grounds "ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." *Id*.

A state-law procedural bar is adequate to preclude federal consideration of a claim if it is "'firmly established and regularly followed.'" *Lee v. Kemna*, 534 U.S. 362, 885 (2002) (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)).  The discretionary nature of such a bar does not make it any less "adequate" for a "discretionary rule can be 'firmly established' and 'regularly followed' even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Beard*, 130 S. Ct. at 618.   And those situations where a state-law ground is found inadequate are but a "small category of cases." *Kemna*, 534 U.S. at 381.

Decisions by state courts "are independent of federal law [when] they do not depend upon a federal constitutional ruling on the merits." *Stewart v. Smith*, 536 U.S. 856, 860 (2002).  In federal habeas, there is no presumption that federal law was considered by the state court unless it "fairly appears to rest primarily on federal law, or to be interwoven with the federal law." *Coleman*, 501 U.S. at 735.  Where there is no "clear indication that a state court rested its decision on federal law, a federal court's task will not be difficult." *Id*. at 739–40.

When a claim has been procedurally defaulted in state court, federal review is only allowed when an inmate has shown cause and prejudice, or shown that a fundamental miscarriage of justice will occur but for review of the claim.  *Coleman*, 501 U.S. at 749–50.  An inmate can invoke the

miscarriage-of-justice exception only if he can show that he is factually, as opposed to legally, innocent of the crime or of the death penalty. *Sawyer v. Whitley*, 505 U.S. 333, 339–40 (1992). Actual innocence of the death penalty looks to eligibility for a death sentence, not the jury's discretion in imposing such punishment. *Id.* at 346–47.

Gonzales's claim that his attorneys should have hired experts in the fields of fetal alcohol spectrum disorders and "sexual, emotional, physical, [and] biological abuse," was presented in his subsequent state habeas application. SHCR-02 at 22–34. The Court of Criminal Appeals determined that Gonzales's allegations failed to merit an exception to the abuse-of-the-writ statute so his subsequent application was "dismissed as an abuse of the writ." *Gonzales III*, 2012 WL 340407, at *1. This determination is an adequate and independent state-law ground preventing federal review.

Despite many challenges, the abuse-of-the-writ bar remains an adequate state law ground precluding federal review. *See, e.g., Balentine v. Thaler*, 626 F.3d 842, 854 (5th Cir. 2010). And, in this case, there is no indication in the order of the Court of Criminal Appeals that it relied on federal law in dismissing Gonzales's subsequent application. "There must be more than silence" to eliminate the independence of a perfunctory dismissal by the Court of Criminal Appeals on abuse-of-the-writ grounds. *Id.* at 854. Because there is nothing more than that here, Gonzales's claim is

procedurally defaulted. *See, e.g., Ibarra v. Thaler*, 691 F.3d 677, 683–85 (5th Cir. 2012) (*Ibarra II*) (upholding procedural default ruling where inmate raised an insufficient-investigation claim in a subsequent state habeas application, which the Court of Criminal Appeals dismissed as an abuse of the writ).

To the extent that it is proper to independently review whether Gonzales could overcome the abuse-of-the-writ bar, *see Balentine*, 626 F.3d at 855 ("We now look at Section 5 itself."), he clearly does not. Initially, Gonzales made no argument in state court why this claim should have been reviewed on the merits despite its late presentation and he makes no argument of the sort now. In any event, he cannot show factual or legal unavailability of this claim, Tex. Code Crim. Proc. art. 11.071 § 5(a)(1), as the underlying facts were available at the time of his first state habeas application—namely, that counsel supposedly did not hire the proper experts at the time of trial—and the law governing such claims was undoubtedly available well before his initial application, *see, e.g., Wiggins v. Smith*, 539 U.S. 410 (2003). Moreover, this claim does not implicate Gonzales's innocence of capital murder and he makes no such claim for exception, Tex. Code Crim. Proc. art. 11.071 § 5(a)(2), nor does this claim implicate a categorical exemption from the death penalty, Tex. Code Crim. Proc. art. 11.071 § 5(a)(3), so he cannot prevail under that exception either, *see*

*Balentine*, 626 F.3d at 856 ("He instead argued that his counsel had been incompetent in investigating for mitigating evidence; better evidence might have convinced jurors not to sentence him to death.   The argument did not satisfy this requirement of Section 5(a)(3).").   Gonzales's ineffective-assistance-of-trial-counsel claim is therefore procedurally defaulted.

As to federal exceptions from procedural default, Gonzales makes no argument on these grounds either.   Rather, he simply asserts that this claim was denied in state court on the merits.   Amend. Pet. 7 ("Petitioner's claims were made in the state habeas action, considered by the state habeas court, but denied in state court.").   Contrary to Gonzales's assertion, it clearly was not a merits adjudication.   *Gonzales III*, 2012 WL 340407, at *1 ("We have reviewed this subsequent application and find that the allegations fail to satisfy the requirements of [Section 5].").   Regardless, there is no cause and prejudice in this case and Gonzales cannot demonstrate actual innocence of capital murder or a sentence of death.

As to cause, it is established only when "something *external* to the petitioner, something that cannot fairly be attributed to him . . . 'impeded [his] efforts to comply with the State's procedural rule.'"   *Id*. at 753 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).   Gonzales has not demonstrated any facts where an external impediment prevented him from raising this claim in his initial state habeas application.   To the extent that Gonzales

argues his state habeas attorney was ineffective as cause, *see Martinez v. Ryan*, 132 S. Ct. 1309, 1318–19 (2012) (holding that, in narrow circumstances, ineffective assistance of state habeas counsel may be cause for procedurally defaulted ineffective-assistance-of-trial-counsel claims), such argument has no purchase in this circuit, *see Ibarra v. Thaler*, 687 F.3d 222, 225–27 (5th Cir. 2012) (*Ibarra I*) (holding that *Martinez*'s narrow ruling was not applicable to Texas's direct appeal and collateral review systems). Therefore, no cause is shown.

Assuming *Martinez* does apply, Gonzales must show that state habeas counsel was ineffective for failing to raise his insufficient-investigation claim in his initial state habeas application and that the "claim is a substantial one." *Martinez*, 132 S. Ct. at 1318. He cannot make either showing. State habeas counsel was given funding for a mitigation specialist, presumably to review the work of trial counsel's investigation and develop additional, but un-presented, mitigating evidence, if any. *See* Pet. Ex. 3, ECF No. 12-2 (order authorizing funding for a mitigation specialist). A memo from "Ann"— undoubtedly Ann Matthews, the mitigation specialist hired by state habeas counsel—states that "[t]he trial team seems to have done plenty of good interviews and records request[s]." *See* Pet. Ex. 5, ECF No. 12-2. State habeas counsel, therefore, employed a mitigation specialist—the defense team member charged with finding "mitigating themes"—who reviewed trial

counsel's mitigation investigation and found it sufficient. *See* American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Revised Edition, 31 Hofstra L. Rev. 913, 959 (2003) (guideline 4.1, commentary).   It is clear that state habeas counsel investigated trial counsel's mitigation investigation but did not find it wanting.  The failure to present such a claim is not deficient performance, it is the opposite.  *See Smith v. Murray*, 477 U.S. 527, 535–36 (1986) (choosing not to raise weak claims but, instead, focusing on claims more likely to succeed is the definition of effective appellate practice).  And, in any event, the claim is insubstantial as explained below.  *See infra* Section I(A)(2)(i)–(ii). Either way, Gonzales cannot benefit from *Martinez* assuming it applies the Texas's postconviction review scheme.

Finally, Gonzales cannot demonstrate actual innocence of capital murder or the death penalty, though he makes no argument on these points. As the facts above demonstrate, he confessed to investigators that he killed Townsend.  He also confessed to a reporter, Gina Galavis, 35 RR 48, a jailer, Todd Heilig, 37 RR 107, and an inmate, Frederick Ozuna, 39 RR 184–88. Gonzales's confessions were substantially corroborated because: (1) Gonzales was able to take law enforcement directly to Townsend's body, despite the incredibly difficult nature of locating the spot where her remains were discovered, 35 RR 72–74; (2) Gonzales grew up on the ranch where

31

Townsend's remains were ultimately located, 35 RR 69; (3) Gonzales said he shot Townsend and lead was discovered on Townsend's shirt, 36 RR 124; (4) Gonzales stated that Townsend was wearing jewelry when abducted and jewelry was later recovered with the remains, 35 RR 98–99; (5) Gonzales admitted to stealing from Townsend's residence, including the location of the money taken and the approximate amount, a fact that was never publically released, 37 RR 39; (6) Townsend's boyfriend, Joe Leal, sold drugs to Gonzales who had been to Townsend's residence, 37 RR 67–68; (7) Gonzales said that he kidnapped Townsend between 8:00 p.m. and 9:30 p.m., which corresponded to Townsend taking a phone call from a burglar alarm salesman at 9:00 p.m. to 9:15 p.m., 37 RR 28, but before Leal arrived home shortly after midnight, 37 RR 73; (8) Townsend's truck and purse were at home, indicating an abduction, 37 RR 74; and (9) Townsend had to work the morning after her disappearance but never showed up, again, indicating an abduction. 37 RR 71–72.  This evidence, combined with the fact that he abducted and raped Florence Teich within a half-mile of Townsend's remains on the ranch, 40 RR 74–107, overwhelmingly demonstrates Gonzales's guilt of capital murder.  Finally, Gonzales makes no claim that he is mentally retarded or was under the age of eighteen at the time of Townsend's capital murder so as to be categorically exempt from the death penalty.  As such, he cannot demonstrate actual innocence of the death penalty.  Accordingly, he

cannot get around the adequate and independent state law ground precluding federal review on this claim.[7]  It should therefore be denied.

### 2. The claim has no merit

The familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984), governs ineffective-assistance-of-trial-counsel claims.   To prove ineffectiveness, an inmate must establish that the attorney's actions were deficient and that such deficiency prejudiced the defense.  *Id.* at 687.  A failure to prove either requirement results in denial of the claim.  *Id.* at 697.

To establish deficient performance an inmate must show that "counsel's representation fell below an objective standard of reasonableness" and there is a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance.   *Id.* at 688–89.   This presumption requires that courts not simply "give [an inmate's] attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons [an inmate's] counsel may have had for proceeding as they did." *Pinholster*, 131 S. Ct. at 1407 (internal quotation marks and citations omitted).

Concerning prejudice, an inmate must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the

---

[7] Alternatively, because Gonzales did not present this claim in a procedural posture that was likely to obtain merits review of the claim, it is unexhausted. *See infra* Section VI(A).

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. In this context, a reviewing court must "consider all the relevant evidence that the jury would have had before it if [the inmate] had pursued a different path—not just the . . . evidence [the inmate] could have presented, but also the . . . evidence that almost certainly would have come in with it." *Wong v. Belmontes*, 130 S. Ct. 383, 387 (2009).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010). "Even under de novo review, the standard for judging counsel's representation is a most deferential one." *Richter*, 131 S. Ct. at 789. And on federal review, assuming that Gonzales's claim was adjudicated on the merits as he claims, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Accordingly, "[e]stablishing that a state court's application of *Strickland* was unreasonable . . . is all the more difficult. The standards created by *Strickland* and [AEDPA] are both

34

'highly deferential,' and when the two apply in tandem, review is 'doubly' so."
*Richter*, 131 S. Ct. at 788 (internal citations omitted).

### i.    Counsel did not perform deficiently

The gist of Gonzales's claim is not that counsel failed to discover some particular piece of mitigating evidence in Gonzales's background—the investigation—it is that counsel did not hire enough experts. *See* Amend. Pet. 18–25.  In this case, Gonzales apparently believes that his defense team was at least two members short and this resulted in a substandard mitigation case.  *Id*.

In preparing for trial, counsel employed a variety of expert assistance: a mitigation specialist, Linda Mockeridge, 1 CR 25–27, 30; an investigator, Wendy Danford, 2 CR 319; a neuropsychologist, Daneen Milam, Ph.D., 2 CR 336; and a prison conditions expert, Larry Fitzgerald, 4 CR 736–41.  Clear from the invoices of these experts, and from the invoices of counsel, a competent and coordinated investigation of Gonzales's background was undertaken.  Counsel, the mitigation specialist, the investigator and the neuropsychologist all met with Gonzales on many occasions.  *See, e.g.*, 2 CR 319 ("Meeting Hondo Jail . . .4 hours"), 323 ("Interview with Mr. Gonzales" for over six hours, combined), 330 ("meeting w/ client").  The defense team conferred regularly with each other.  *See, e.g.*, 2 CR 319 ("Met with Linda Mock[e]ridge . . . 4 hours"), 330 ("meeting w/ defense team").  The mitigation

specialist, investigator and neuropsychologist researched and spoke with people who knew Gonzales, and obtained records pertinent to his background. *See, e.g.*, 2 CR 319 ("Research and calls to family . . . 3 hours" and "Ranch visit . . . 4 hours"), 323 ("Research finding records sources, interviews and telephone contacts to obtain records . . . review school records"). The neuropsychologist performed hours of testing on Gonzales, which included brain function, intelligence and psychological disorder testing. *See, e.g.*, 42 RR 8–9 (brain function), 23–25 (Minnesota Multiphasic Personality Inventory and Millon Clinical Multiaxial Inventory-III), 32 ("His IQ is within normal limits."). Counsel attended specific training on mitigation in capital cases. *See, e.g.*, 3 CR 427 ("Capital Mitigation Seminar . . . 7.00" hours). Counsel reviewed the work product of the defense team. *See, e.g.*, 3 CR 427 ("Review Documentation from Team"). And, as described above, counsel presented a robust mitigation case using family and friends to describe Gonzales's upbringing, a neuropsychologist to explain the impact of Gonzales's history on his mental health and a prison conditions expert to rebut testimony concerning Gonzales's potential for violence while incarcerated. This was not a deficient investigation—it is the quintessential framework for a thorough background inquiry. *See* American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Revised Edition, 31 Hofstra L. Rev. 913, 952

(2003) (guideline 4.1) ("The defense team should consist of no fewer than two attorneys . . . an investigator, and a mitigation specialist" and "should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments.").

As part of the investigation, counsel's neuropsychologist personally examined Gonzales. She evaluated him for brain impairment; however, "he was absolutely within normal limits. There was no brain damage; none whatsoever." 42 RR 11. She evaluated him for mental illness; however, "[i]t was an invalid test because he totally tried to come across as mentally ill." 42 RR 23. She evaluated him for intelligence; however, "[h]is IQ is within normal limits." 42 RR 32. She also knew about his immaturity, 42 RR 14, limited success in school, 42 RR 19–21, possible exposure to drugs and alcohol in utero, 42 RR 38, physical and emotional abuse, 42 RR 39, sexual abuse, 42 RR 39, and the loss of his only maternal figure, his favorite aunt, 42 RR 39. She explained that she took into account all of these factors in her diagnosis of reactive attachment disorder:

> Those were the things—th[ose were] the ingredients. It's like baking a cake. If all the things don't come together, you don't have a reactive attachment disorder, because it's all environment. So it takes everything: it takes benign neglect, it takes trauma, it takes being abandoned by the people that really think the most of you. It takes all of those things to bake this cake. And I just think the cake got baked.

42 RR 39–40.   Reactive attachment disorder, Dr. Milam explained, is a condition that was totally preventable and accounted for Gonzales's immaturity and antisocial behavior.   42 RR 29–32.   Gonzales, however, has failed to explain how counsel can be faulted for their good faith retention of a neuropsychologist—the same field, psychology, as the "multidisciplinary assessment group"—who did not diagnose FASD[8] and who took into account "sexual, emotional, physical [and] biological abuse" in diagnosing Gonzales

---

[8] There is good reason why Gonzales was not diagnosed with FASD, not to be confused with fetal alcohol syndrome (FAS), and that is because "[t]he term FASDs is *not* meant for use as a clinical diagnosis."   Centers for Disease Control and Prevention, Fetal Alcohol Spectrum Disorders (FASDs), http://www.cdc.gov/NCBDD D/fasd/facts.html (last updated Sept. 22, 2011).   Instead, the CDC is "working to put together diagnostic criteria for other FASDs, such as [Alcohol-Related Neurodevelopmental Disorder].   Clinical and scientific research on these conditions is going on now."   *Id*; *see also* Jeannette Lang, Ten Brain Domains: A Proposal for Functional Central Nervous System Parameters for Fetal Alcohol Spectrum Disorder Diagnosis and Follow-up, 4 J. FAS Int'l e12, at 1 (2006), http://www.motherisk.org/JFAS_documents/JFAS_5012_Final_e12_6.28.6.pdf ("The related diagnostic terms of Partial FAS, Fetal Alcohol Effects (FAE), Alcohol-Related Birth Defects (ARBD), and Alcohol-Related Neurodevelopmental Disorder (ARND) have been prevalent in the past, *but are not recognized in the ICD9, DSMIV, or other diagnostic coding resources in the USA.*" (emphasis added)).   This creates an unsolvable problem for Gonzales: how could he be diagnosed with a disorder that is not well recognized in the United States?   More importantly, how can he expect his expert to make such diagnosis?

It is also worth noting that Gonzales's federal habeas experts are affiliated with the University of Washington, which is home to the "FAS Diagnostic and Prevention Network," a legislatively established department.   Washington State Fetal Alcohol Syndrome Diagnostic & Prevention Network, What is the FAS DPN?, http://depts.washington.edu/fasdpn/htmls/whatisfasdpn.htm (last visited Dec. 21, 2012); *see also* Jeannette Lang, Ten Brain Domains: A Proposal for Functional Central Nervous System Parameters for Fetal Alcohol Spectrum Disorder Diagnosis and Follow-up, 4 J. FAS Int'l e12, at 2 (2006), http://www.motherisk.org/JFAS_do cuments/JFAS_5012_Final_e12_6.28.6.pdf (the "U of W Third edition Guidebook" provides a diagnostic form for FASD).

with reactive attachment disorder.  Indeed, the law is consistent that such facts do not demonstrate ineffective assistance of counsel.

Counsel is not deficient when, after retaining pertinent experts and providing them with the relevant background material, such experts do not discover the underlying mental health issue that should have supposedly been presented at trial.  *See Couch v. Booker*, 632 F.3d 241, 246 (6th Cir. 2011) ("Trial counsel may rely on an expert's opinion on a matter within his expertise when counsel is formulating trial strategy."); *McClain v. Hall*, 552 F.3d 1245, 1252 (11th Cir. 2008) ("McClain's counsel reasonably relied on Dr. Maish's opinion that McClain suffered from 'Antisocial Personality Disorder' but did not suffer from a frontal lobe disorder or from any 'significant emotional disorder.'"); *Sims v. Brown*, 425 F.3d 560, 585–86 (9th Cir. 2005) ("[A]ttorneys are entitled to rely on the opinions of mental health experts, and to impose a duty on them to investigate independently of a request for information from an expert would defeat the whole aim of having experts participate in the investigation."); *Dowthitt v. Johnson*, 230 F.3d 733, 747–48 (5th Cir. 2000) (counsel may rely upon their retained experts and need "not canvass[] the field to find a more favorable defense expert"); *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995) ("In general, an attorney is entitled to rely on the opinions of mental health experts in deciding whether to pursue an insanity or diminished capacity defense.").  The fact that Dr.

Milam did not identify FASD as a possible defense or suggest that another expert was needed to properly take into account Gonzales's history of abuse ends the matter at counsel's performance.[9]

But, even if counsel should have known about Gonzales's FASD—it is important to note that Gonzales's current experts do not diagnose him with FASD but only highly suspect it—counsel could have reasonably chosen to avoid this line of evidence.   Dr. Milam diagnosed Gonzales with reactive attachment disorder as explaining his antisocial behavior—because Gonzales was abandoned, physically and emotionally by his mother, and because there was no surrogate parental replacement along with significant childhood trauma, he did not develop adult interaction and coping skills and, as a result, he failed school and conducts himself in an immature and aggressive manner.  42 RR 28–31, 38–40.  Gonzales would have his experts explain this behavior and school failure through FASD.  Amend. Pet. 18–19.  This is simply providing a different explanation for the same results—Gonzales's failings and bad behavior—both of which were, tragically, avoidable. Gonzales, however, does not demonstrate deficient conduct on the part of his

---

[9] Gonzales, instead of critiquing counsel's performance, critiques Dr. Milam's professional performance.  For example, he alleges that she used a "suboptimal" intelligence test and that the Wechsler Adult Intelligence Scale-IV should be used instead.  Amend. Pet. 18.  However, Dr. Milam could *not* have used this test in 2006, when it was only published in 2008.  *See* Pearson Education, Inc., Product— Wechsler     Adult     Intelligence     Scale—Fourth     Edition     (WAIS-IV), http://www.pearsonassessments.com/HAIWEB/Cultures/en-us/Productdetail.htm?Pi d=015-8980-808 (last visited Dec. 21, 2012).

counsel merely because one avenue was taken while another was not.  *See, e.g., Darden v. Wainwright*, 477 U.S. 168, 185–86 (1986) (counsel reasonably withheld most of the defendant's available mitigation evidence), *Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.").  Stated another way, Gonzales's trial counsel are not deficient for explaining his poor behavior through reactive attachment disorder instead of through FASD, both of which could have been avoided had his mother behaved differently.  And the same is true for failing to present another expert concerning Gonzales's history of abuse—counsel could have reasonably chosen to present a single expert on abuse instead of two.[10]  This is not deficient performance.

Moreover, counsel could have chosen to avoid FASD because it is not a well-recognized disorder in the United States.  *See supra* Note 8.  Moreover,

---

[10] Counsel could have also reasonably believed that another "abuse expert" was not necessary given that Dr. Milam was a "sex offender treatment provider" who was contracted by Child Protective Services (CPS) to do testing, "a significant portion of that testing is on sexual abuse."  42 RR 89.  Further, Dr. Milam had done evaluations for CPS for fifteen years, 42 RR 5, undoubtedly concerning whether a child had experienced "sexual, emotional, physical [or] biological abuse," *see* 42 RR 29 ("Before ten or fifteen ago, we all believed [it] to be in the best interest of the child to be with their parents.  And so the children would stay in foster care for years, while the parent was trying to figure out how to keep them together.").  It is hard to think of an expert more qualified to discuss "sexual, emotional, physical [or] biological abuse" than a psychologist, who also treated sex offenders, and who regularly worked with children removed from their homes due to abuse.  This is yet another reason why counsel were not deficient in their choice of experts.

two of the proposed diagnostic criteria models for behavior-focused FASD specifically require that familial background or environment be ruled out as the sole source of the behavioral problems.  *See* Marion Malone & Gideon Koren, Alcohol-induced Behavioral Problems in Fetal Alcohol Spectrum Disorder Versus Confounding Behavioural Problems, 19 J. Popul. Ther. & Clinical Pharm. e32 at e33 (2012), http://www.cjcp.ca/far011027ra_e32_e40_k oren-r180309 ("Evidence of a complex pattern of behavior or cognitive abnormalities that are inconsistent with developmental level and cannot be explained by familial background or environment alone.").  But that cannot be the case here because Dr. Milam found that such behaviors were solely caused by reactive attachment disorder, an environment-based disorder.  In any event, because FASD is not well-recognized or because it is inconsistent with the facts in this case, or because the State would have undoubtedly cross-examined on these points, counsel would not have been ineffective for avoiding the FASD line of defense.  *See Mirzayance*, 556 U.S. at 127 ("The law does not require counsel to raise every available nonfrivolous defense. . . . Counsel also is not required to have a tactical reason—above and beyond a reasonable appraisal of a claim's dismal prospects for success—for recommending that a weak claim be dropped altogether."); *Haines v. Risley*, 412 F.3d 285, 289 (1st Cir. 2005) ("to couple a weak argument with a stronger one may detract from the latter").

Further, counsel could have chosen to avoid presenting a second abuse

expert [11] because such testimony would have been redundant of the

_____

[11] Much of the basis for Gonzales's claim that counsel should have hired a "sexual, emotional, physical, [and] biological abuse expert" comes from the affidavit of Gonzales's federal mitigation specialist, Gerald Byington, who largely utilizes the work-product of trial counsel's mitigation specialist. *See* Pet. Ex. 11, ECF No. 12-3. To the extent that Mr. Byington is acting as a "*Strickland* expert," *see* Pet. Ex. 11, at 1 ("I believe that the jury would have had significantly more relevant information to consider . . ."), he is not qualified and the testimony is not relevant, *see Johnson v. Quarterman*, 306 F. App'x 116, 128–29 (5th Cir. 2009) ("Expert testimony purporting to tell the court how [ineffective assistance] standards apply to the facts of a particular case invade the court's province as trier of the law, and are not helpful to the court in determining the facts of the case.").

Additionally, Gonzales improperly uses his attorney-client privilege as both a sword and a shield.  For example, he tries to imply that trial counsel were ineffective for failing to interview Gonzales's supposed sexual abuser, Gilbert Trevino, by attaching the work-product "mitigation report" developed by counsel, wherein the mitigation specialist stated, "Would it help to look into Ramiro's sexual perpetrator, Gilbert Trevino?"  Pet. Ex. 3 at 11.  He also tries to assert that counsel should have hired an additional sex offender treatment provider because the mitigation specialist stated, "Due to the sexual nature of both crimes, highly encourage an ABEL assessment for sexual offenders."  Pet. Ex. 3 at 12.  Following each of these quotations are paragraphs entirely blacked out, which for all anyone knows state, "It is highly unlikely that Gilbert Trevino will admit to sexually abusing Gonzales so interviewing him would likely be futile" or "Dr. Milam could also testify regarding the sexual nature of Gonzales's offenses because she is a sex offender treatment provider."  Such statements would obviously place Gonzales's claim in a much different light.

Because Gonzales uses his attorney-client privilege in both an offensive and defensive manner, the Director objects.  *See Willy v. Admin. Review Bd.*, 423 F.3d 483, 497 (5th Cir. 2005) ("The case law amply demonstrates the narrower proposition that the attorney-client privilege only prohibits a party from *simultaneously* using confidential information as both a shield and a sword."). Here, Gonzales reveals certain privileged work product in an effort to make counsel appear ineffective but then hides behind his privilege by redacting certain elements of those documents for unknown reasons (and it is unlikely that he has attached the entirety of trial counsel's investigation work product to his petition).  As such, the Director requests that the attached privileged material either be struck or that Gonzales be required to provide the Court and the Director with unredacted copies of such documents to ensure that the Court has the full facts of the matter before it, and because the privilege has been impliedly waived.  *See Nguyen v. Excel Corp.*,

underlying accounts of abuse—Keese's testimony that Gonzales lacked adult supervision as a child, 41 RR 130; Wilson's testimony that Gonzales's mother abandoned him, 41 RR 158, Gonzales's mother's boyfriend physically abused him, 41 RR 161, and an uncle sexually abused him, 41 RR 168; Smythe's testimony that Gonzales's mother abandoned him, 41 RR 193; and Gonzales's mother's boyfriend was verbally and physically abusive; Keegan's testimony that Gonzales's mother abandoned him, 41 RR 218, Gonzales's mother's boyfriend was verbally abusive, 41 RR 220, and Gonzales had a sexual relationship with an adult while he was still a teenager, 41 RR 220; and Dr. Milam's testimony which re-incorporated all of this evidence into a diagnosis, 42 RR 10, 17–28, 38–40.  Simply put, "[t]he sentencing jury was thus 'well acquainted' with [Gonzales's] background and potential humanizing features." *Wong*, 558 U.S. at 388.  Accordingly, "[a]dditional evidence on these points would have offered an insignificant benefit, if any at all." *Id*.

Likewise, counsel could have concluded that expert testimony, above what was already provided by Dr. Milam, was unnecessary to evoke a mitigating response from jurors, at least with respect to the abuse suffered by Gonzales.  This is because testimony of abuse is "neither complex nor technical [and i]t required only that the jury make logical connections of the

---

197 F.3d 200, 207 n.18 (5th Cir. 1999) ("Attempts at such improper dual usage of the privilege result in a waiver by implication.").

kind a layperson is well equipped to make." *Id*.  As such, "[t]he jury simply did not need expert testimony to understand the 'humanizing' evidence; it could use its common sense or own sense of mercy." *Id*.  Gonzales, therefore, fails to demonstrate deficiency.

Moreover, in considering these claims, it is also important to keep in mind that Gonzales's claim is not really a deficient-investigation claim, but a claim concerning whether to present *more* expert testimony based on Gonzales's thoroughly researched background.  This is an even harder standard to overcome.  *See Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009) ("We must be particularly wary of arguments that essentially come down to a matter of degrees.  Did counsel investigate enough?  Did counsel present enough mitigating evidence?  Those questions are even less susceptible to judicial second-guessing." (quoting *Dowthitt*, 230 F.3d at 743)).  Because Gonzales does not prove that counsel acted unreasonably in their investigation or in their choice of experts, Gonzales cannot show that counsel acted below an objective standard of reasonableness.

### ii.    Gonzales has not proven prejudice

Gonzales claims that he was prejudiced because "the jury never heard that [he] has FASD."  Amend. Pet. 19.  He also thinks that "the jury never heard the effect . . . of the synergy of [his] sexual victimization, emotional and physical abuse, neglect and rejection by his mother and caregivers, exposure

to alcohol and other drugs in utero, and his own substance abuse problem with the fact that [he] was barely an adult since he was only 72 days past his 18th birthday." Amend. Pet. 24.

For claims of deficient investigation, the inmate "'must allege with specificity what the investigation would have revealed and how it would have altered the outcome of trial.'" *Druery v. Thaler*, 647 F.3d 535, 541 (5th Cir. 2011) (quoting *Nelson v. Hargett*, 989 F.2d 847, 850 (5th Cir. 1993)). Similarly, where counsel is faulted for failing to call a particular witness, the inmate must name the witness, prove that the witness would have been available to testify, allege what the witness's testimony would have been and explain how the proposed testimony would have been beneficial. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)). These requirements are "not a matter of mere formalism" and all must be met in order to obtain relief. *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010). These requirements apply equally to uncalled expert and/or lay witnesses. *Id*.

For many of the same reasons that counsel were not deficient, their actions were not prejudicial. Regarding FASD, its lack of well-accepted diagnostic criteria would have made such "diagnosis" less than impactful. *See supra* Note 8. Further, because Dr. Milam diagnosed Gonzales with reactive attachment disorder, it is dubious that Gonzales would even merit a

diagnosis of FASD.  *See supra* Section II(A)(2)(i).  Whether these failures in the diagnosis are considered independently or because the State would have surely brought them to the attention of the jury through cross-examination, such does not prove prejudice.

More importantly, Gonzales has not produced any evidence where he has been diagnosed with FASD, only that FASD is "highly suspected," and the affidavit from "FASDexperts" does not indicate whether they would have been available to examine Gonzales in 2006,[12] or whether they could have testified at that time.  Pet. Ex. 10.  Suspicion of a disorder does not show prejudice, it is simply speculation.  *See, e.g., Dowthitt*, 230 F.3d at 745 ("[T]rial counsel's actions in not discovering and presenting the records to the jury to bring out indications of mental illness do not create a 'probability sufficient to undermine confidence in the outcome.'" (quoting *Strickland*, 466 U.S. at 694)).  And the failure to establish what the uncalled witnesses would have testified to and whether they were able to do so provides another basis to deny on grounds of prejudice.  *See Woodfox*, 609 F.3d at 808 (denying failure-to-call-an-expert claim because the experts' affidavits did not state whether they were available or could have testified to the same extent as

---

[12] Considering that "FASDexperts" desire to examine Gonzales with tests not in existence in 2006, it is dubious that a present examination would relate back to the time when the examination should have supposedly taken place—before trial. *See supra* Note 9.

explained in their affidavits); *see also Richter*, 131 S. Ct. at 792 ("The likelihood of a different result must be substantial, not just conceivable.").

Regardless of these deficiencies, testimony that FASD accounted for Gonzales's troubled behavior would merely have provided the jury with an alternate theory of *causation* because the jury was already told that his poor behavior could be attributed to reactive attachment disorder. Such a subtle change in explaining the *causation* of Gonzales's problematic behavior, a cause that, like Gonzales's abandonment and neglect, could have been entirely avoided, would not affect the jury's decision. Stated another way, if the jury rejected reactive attachment disorder as explaining Gonzales's behavioral woes, they, too, would have rejected any attempt to link his behavior with in utero exposure to alcohol.

These same deficiencies in Gonzales's FASD complaint apply to the abuse-expert complaint. Gonzales has not provided an affidavit naming the "sexual, emotional, physical, [and] biological abuse expert," nor setting out what testimony should or could have been presented at the time of trial. This requires denial of the claim. *See Woodfox*, 609 F.3d at 808. Additionally, the abuse that Gonzales now cites was before the jury, both in lay and expert format. *See supra* Section II(A)(2)(i). Repackaging this testimony in *another* expert's opinion is cumulative and the subject matter is not so difficult as to need expert interpretation, so prejudice is not shown on that basis either.

48

*See Wong*, 558 U.S. at 388.  And, any allegation that counsel did not properly investigate a particular topic is not followed with evidence of what counsel should have discovered.  This, also, fails to prove prejudice.  *See Druery*, 647 F.3d at 541.

In any event, even if this Court were to assume that Gonzales has FASD and that another expert could have testified regarding the impact of abuse on Gonzales, the result of the proceeding would be the same as the State's punishment case was overwhelming.  As explained above, Gonzales abducted Townsend from her home and took her to a remote wooded area at night.  He then marched her out to a clearing but did not kill her immediately because he took her up on the "offer" to have sex in exchange for her life. After raping her, he again forced her to walk into the clearing and, as she begged for her life and cried for her mother, Gonzales shot her with a high powered hunting rifle.  In discussing his crime with another inmate, he stated that he enjoyed the killing and would do it again.

He also abducted another woman, Teich, and took her to the same remote wooded area where she, too, was raped despite desperately pleading for mercy.  By the grace of luck and sheer will to live, a still-bound Teich was able to escape a locked closet while Gonzales temporarily left her alone. Despite pleading guilty to this crime, Gonzales refused, factually, to

acknowledge his guilt, claiming the encounter was consensual, and he balked at her victim allocution.

Moreover, Gonzales engaged in stalking behavior by repeatedly pursuing Obiedo's teenaged daughter and he had three additional felony convictions.  Further, no one had ever witnessed, and Gonzales never timely reported, his uncle for sexual abuse.  42 RR 52, 55.  Given that Gonzales purposely feigned mental illness when evaluated by Dr. Milam, his late-disclosure of sexual abuse is far from forceful, as would any expert testimony incorporating Gonzales's dubious self-reports.  *See Shuler v. Ozmint*, 209 F. App'x 224, 231–32 (4th Cir. 2006) (no prejudice where counsel did not introduce a suicide attempt that would have opened the door to evidence that defendant had malingered on previous psychological examinations).

Finally, Gonzales's behavior while incarcerated was incredibly disruptive, violent and dangerous.  He threatened to kill guards, he beat other inmates over petty disagreements, he repeatedly had contraband, including tools for violence, stole from other inmates, and ignited a fire which endangered the lives of the other inmates.  He also deflected blame for his misdeeds, saying that it was the jail's fault for his assault of another inmate.  And, in his own words, he acknowledged that he was a danger to the general inmate population.  This testimony, when weighed against scientifically questionable (FASD), cumulative (lay and expert testimony concerning

abuse) and speculative testimony (FASD and abuse), does not demonstrate a reasonable probability of a different result.[13]  Relief must therefore be denied.

## B.   Gonzales's claim that trial counsel erred by allowing their expert to include privileged material in her underlying-data disclosure lacks merit (Claim 1B).

Gonzales alleges that his expert, Dr. Milam, included privileged work product in her underlying data disclosure.  Amend. Pet. 25–44.  He claims that the improper disclosure allowed for "a searing cross-examination of Dr. Milam" and counsel were ineffective for allowing this disclosure of privileged material to occur.  *Id.* at 43–44.

This claim, as presented in Gonzales's initial state habeas application, contained the following basic assertions: (1) counsel hired Dr. Milam; (2) the State requested the data underlying Dr. Milam's opinion; (3) the trial court ordered disclosure without an objection from counsel.  SHCR-01 at 16.  Then, Gonzales claimed, without support, that "[w]hen the State was given the documents and notes of Dr. Milam they consisted of more than just underlying data, but also included privileged e-mails and memos between trial counsel and Dr. Milam."  SHCR-01 at 16.  This improper disclosure, Gonzales claimed, violated his right to effective assistance of counsel because

---

[13]  If this claim was adjudicated on the merits as Gonzales claims, the denial by the state court was not contrary to or an unreasonable application of Supreme Court precedent and relief should be denied on that ground too.  *See supra* Section I. Moreover, because this claim is insubstantial, assuming that *Martinez* applies to Texas, state habeas counsel was not ineffective in failing to raise the claim so there is no cause excusing procedural default.  *See supra* Section II(A)(1).

"the communications between the expert and trial counsel involve[ed] trial strategy and presentation of defensive issues . . . . [and] was clearly privileged." SHCR-01 at 16. This claim, as formulated above, was denied on the merits. *Gonzales IV*, 2012 WL 2424176, at *1. This was an objectively reasonable decision.

Like all claims of a constitutional violation, *see Ross v. Estelle*, 694 F.2d 1008, 1011–12 (5th Cir. 1983), ineffective-assistance-of-trial-counsel claims must be supported by more than mere conclusory allegations, *see Mallard v. Cain*, 515 F.3d 379, 383 (5th Cir. 2008). Important, too, is that counsel is presumed to render constitutionally adequate assistance, *see Strickland*, 466 U.S. at 688–89, and it is the inmate's burden to show otherwise, *id*. at 697. Equally important is that the inmate bears the burden of overcoming the deferential standard of review imposed by AEDPA, *see Pinholster*, 131 S. Ct. at 1388, which limits consideration to the record before the state court that adjudicated the claim on the merits, *id*. at 1400.[14]

---

[14] Gonzales's state habeas formulation of this claim was two pages long and did not contain the extensive record quotations that Gonzales now presents. *Compare* SHCR-01 at 14–16, *with* Amend. Pet. 25–44. The doctrine of "factual exhaustion" appears dead following *Pinholster*. *See Lewis v. Thaler*, No. 10-70031, 2012 WL 5860247, at *5–6 (5th Cir. Nov. 20, 2012) ("Here, we explicitly reject *Dowthitt*'s holding that where new affavits supplement rather than fundamentally alter a state court claim, they may be admissible for review of a habeas claim under § 2254(d)."); *Clark v. Thaler*, 673 F.3d 410, 416–17 (5th Cir. 2012) ("In light of the teachings in *Pinholster*, we are not tasked with determining whether all of the new evidence that Clark presented to the federal district court was exhausted."). The

Gonzales provided no evidence to the state court that privileged material was improperly divulged to the State.   He only described the purportedly improper disclosure as "privileged e-mails and memos between trial counsel and Dr. Milam," but did not even hint at what those emails or memos contained.   SHCR-01 at 6.   Accordingly, the underlying fact of whether improper disclosure occurred was conclusory.   A state court does not act unreasonably in denying a conclusory allegation of ineffective assistance of trial counsel.   *See, e.g., Green v. Johnson*, 160 F.3d 1029, 1040–41 (5th Cir. 1998).   The claim should therefore be denied.

Moreover, there is no inkling from the trial record that privileged material was disclosed to the State.   Dr. Milam was an experienced expert with extensive work in capital cases.   42 RR 6–7.   Clear from the record, Dr. Milam understood the phrase "facts or data" as she described the materials used to form her opinion: ten hour's of neuropsychological testing, "literally stacks of records," including school, probation, jail and investigative records,

---

claim should be reviewed solely based on the pleadings before the state court in Gonzales's initial state habeas proceeding, as required by *Pinholster*.

Nonetheless, the Director asserts that, to the extent factual exhaustion remains a viable legal concept, Gonzales has failed to place the additional facts he pled in federal court before the state court so as to be factually unexhausted.   *See infra* Section VI(A).   Accordingly, this new, factually-bolstered claim is procedurally defaulted because it would be barred in state court as an abuse of the writ, and, in fact, was barred as such in Gonzales's subsequent state habeas application.   *See infra* Section VI(A).   Ultimately, however, the additional record citations and quotes Gonzales provides reveal no indication that the State possessed privileged work-product or used it to their advantage.   *See infra* Section II(B).

personal interviews of individuals related to, and acquainted with, Gonzales, and "all of the interviews that were produced by the mitigator." 42 RR 8–10. Dr. Milam, in fact, was so cautious regarding the underlying facts or data that she would not disclose without a written order in hand.  42 RR 40–42.

As is the case in federal court, *see* Fed. R. Crim. P. 16(b); Fed. R. Evid. 705, so too it is the case in Texas court that an expert must disclose the "facts or data" underlying his or her opinion, Tex. R. Evid. 705(a).  The "facts or data" subject to disclosure include items that are "perceived by, reviewed by, or made known to the expert at or before the hearing."  Tex. R. Evid. 703. Examples of such disclosures include medical records, *see Penry v. State*, 903 S.W.2d 715, 761 (Tex. Crim. App. 1995), and a "mitigation report," *see Lizcano v. State*, No. AP-75879, 2010 WL 1817772, at *9–10 (Tex. Crim. App. May 5, 2010), if those items help to form the basis of the expert's opinion. Simply because the item takes the form of "e-mails or memos" does not wall off the item from disclosure, like the "mitigation report" in *Lizacano*, if relied upon by the expert.  None of the "facts or data" described by Dr. Milam bore resemblance to privileged material and, despite her guardedness in disclosing the underlying "facts or data," Dr. Milam gave no hint that she was concerned about improperly disclosing privileged material.

Moreover, the cross-examination by the State provides no suggestion that privileged material was in the State's hands.  42 RR 40–87.  Questions

by the State included quotations from the tests used by Dr. Milam, *e.g.*, 42 RR 48 ("And with respondents who do not fit this norm of the population or who have inappropriately taken the MCMI-III for nonclinical purposes may have inaccurate reports."), answers Gonzales gave to test questions, *e.g.*, 42 RR 50 ("And some of his answers were: 'Sometimes I can be pretty rough and mean with my relations with my family.'"), statements Gonzales made during testing, *e.g.*, 42 RR 52 ("And he told you in there that he doesn't consider his biological father important to him."), and quotations from records relied upon by the expert, *e.g.*, 42 RR 57 ("And you're aware that the defendant told [TDC] that he was sexually abused from the age of eight to ten by this cousin, correct?").   Nothing in these questions indicates that they emanated from privileged work product, for example, a belief regarding the strength or weakness of the defense's case.   Rather, the source of those questions was undoubtedly the underlying "facts or data" relied upon by Dr. Milam, as the questions clearly indicated.   *See, e.g.*, 42 RR 66 ("When you asked him about how much did he drink [sic] he said, 'I've never been arrested for drugs or alcohol.'").   Accordingly, it was reasonable for the state court to find no deficient performance as the trial record lacks any indication that privileged work product was disclosed.

Assuming, however, that counsel were deficient the state court was still reasonable in denying the claim on prejudice grounds.   First, assertions of

prejudice in the ineffective-assistance-of-counsel context cannot be conclusory and Gonzales offered no specific showing of harm in state court. *See Mallard*, 515 F.3d at 383. Second, as discussed above, the trial record does not disclose any discussion of privileged work product material. For example, Dr. Milam was not asked "Didn't you and counsel discuss this mitigating element of Gonzales's life and you tailored your diagnosis to that evidence?" Indeed, Dr. Milam was not asked any questions regarding her discussions with counsel or her thoughts about the case other than her diagnosis and basis therefor. Prejudice cannot be shown where there was no impact at trial. Finally, if some of the State's questions arose from access to privileged material, the overwhelming impact of the State's punishment case negated any harm produced by Dr. Milam's disclosure. As explained in more detail above, Gonzales abducted and raped Townsend before shooting her to death; he abducted and raped Teich; he denied his guilt for both crimes, showing no remorse; he stalked a teenage girl; and he was repeatedly violent while incarcerated. *See supra* Section II(A)(2)(ii). Assuming that the State's cross-examination of Dr. Milam was more pointed and forceful because they had access to privileged work product, when weighed against the State's punishment case, it does not demonstrate a reasonable probability of a different result. More importantly, such a decision is not objectively unreasonable, so relief must be denied.

56

### III.   Gonzales's Claim That The Trial Court Erred By Forcing Disclosure Of Privileged Work Product Lacks Merit (Claim 2).

Gonzales alleges that he was required to divulge privileged work product when the trial court erroneously ordered disclosure of "all materials prepared by Dr. Milam."  Amend. Pet. 45.  This supposedly included "hand written notes of interviews and memos and e-mails between Dr. Milam and defense counsel involving defenses and testimony."  *Id*.  Gonzales argues that the disclosure was harmful.  *Id*. at 46.

In Gonzales's initial state habeas application he argued that there exists a qualified privilege for work product produced by an attorney's agent and Dr. Milam was an agent of his attorneys.  SHCR-01 at 14.  From that, he asserted, the trial court erred by forcing Dr. Milam to disclose "all" the materials she prepared, including "hand written notes of interviews and memos and e-mails between Dr. Milam and defense counsel involving defenses and testimony."  SHCR-01 at 14.  He claimed that there was no waiver because documents were disclosed that were not subject to disclosure under the Texas Rules of Evidence.  SHCR-01 at 14.  This claim, as formulated above, was denied on the merits.  *Gonzales IV*, 2012 WL 2424176, at *1.  This decision to deny relief was objectively reasonable.

As discussed in the ineffective-assistance-of-counsel claim related to improper disclosure, *see supra* Section II(B), there was no evidence provided

to the state habeas court or in the trial court record indicating that privileged work product was disclosed by Dr. Milam.[15]  As such, the factual basis of the claim is conclusory and denial of unsupported claims is not unreasonable. *See Ross*, 694 F.2d at 1011–12.  Relief should therefore be denied.

In any event, Gonzales has not demonstrated harm.  An inmate shows harm due to trial court error if "the error 'had a substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see Fry v. Pliler*, 551 U.S. 112, 121–22 (2007) (holding that the *Brecht* standard applies regardless of whether a state court applied the more stringent beyond a reasonable doubt standard).  Stated another way, relief must be withheld if "'after pondering all that happened without stripping the erroneous action from the whole, . . . the judgment was not substantially

---

[15]  The hand written notes of interviews, such as interviews with Gonzales or his family and friends, are not privileged work product—they do not discuss trial strategy or thoughts concerning the strength or weakness of the case.  Instead, they are material that Dr. Milam relied upon in formulating her opinion, which make them clearly subject to disclosure.  *See* Tex. R. Evid. 705(a); *Lizcano*, 2010 WL 1817772, at *9–10; *Penry*, 903 S.W.2d at 761; *see also Buchanan v. Kentucky*, 483 U.S. 402, 422–23 (1987) ("[I]f a defendant . . . presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested.   The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.").  Moreover, because the interviews were used before the jury in Dr. Milam's testimony—she formed an opinion based on the interviews— Gonzales waived his ability to keep them privileged.  *See Nobles v. United States*, 422 U.S. 225, 239–40 (1975).

swayed by the error.'"  *Fry*, 551 U.S. at 125 (Stevens, J., concurring and dissenting in part) (quoting *Kotteakos*, 328 U.S. at 765).

Again, as explained above, *see supra* Section II(B), the jury was not exposed to the supposedly privileged material through the cross-examination by the State.  One can hardly prove "a substantial and injurious effect or influence in determining the jury's verdict" when there was nothing improper before the jury, even if certain evidence was improperly disclosed to the State.  And, in any event, the State's punishment case was overwhelming, *see supra* Section II(A)(2)(ii), so whatever benefit inured to the State through its access to privileged work product, if any, it did not substantially effect or influence the jury.  Relief must therefore be denied.

## IV.  Gonzales's Jury Instruction Claim Was Not Unreasonably Denied By The State Court (Claim 3).

Gonzales asserts that the trial court erred in its instruction of mitigating evidence.  Amend. Pet. 47–49.  He claims that the definition in Article 37.071 of the Texas Code of Criminal Procedure is too narrow because it focuses on a "defendant's moral blameworthiness."  *Id*. at 48.  He argues that this creates a "nexus" requirement between the mitigation evidence and the crime committed.  *Id*.  This, he claims, was harmful.  *Id*. at 49.

Gonzales claimed, on direct appeal, that the jury instruction mandated by Article 37.071 was too narrow, created an improper "nexus" requirement

and was harmful.  Br. Appellant at 44–46, *Gonzales v. State*, No. AP-75540, 2009 WL 1684699 (Tex. Crim. App. June 17, 2009).  The Court of Criminal Appeals denied this claim.  *Gonzales I*, 2009 WL 1684699, at *7.  Its decision was not an unreasonable application of Supreme Court precedent.

A sentence of death may not be imposed unless a jury is "allowed to consider a defendant's moral culpability and decide whether death is an appropriate punishment for that individual in light of his personal history and characteristics and the circumstances of the offense."  *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 263–64 (2007).  Jury instructions may interfere with the jury's discretion but only where "'there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'"  *Ayers v. Belmontes*, 549 U.S. 7, 14 (2006) (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).  When a court has adjudicated a claim of this nature on the merits, its decision must be contrary to or an unreasonable application of Supreme Court precedent as a precondition for relief.  *See Smith v. Spisak*, 130 S. Ct. 676, 681 (2010).

Here, following the presentation of the parties' cases on punishment, the jury was instructed, in relevant part:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of

> the defendant, there is sufficient mitigating circumstance or
> circumstances to warrant that a sentence of life imprisonment
> rather than a death sentence be imposed.
> . . . .
>    In deliberating on Special Issue Number 2, you shall
> consider mitigating evidence to be evidence that a juror might
> regard as reducing the defendant's moral blameworthiness.

6 CR 1020–21.  The jury was also provided a verdict form for "Special Issue

Number 2," or the mitigation special issue, that read:

> Taking into consideration all of the evidence, including the
> circumstances of the offense, the Defendant's character and
> background, and the personal moral culpability of the Defendant,
> do you find that there is sufficient mitigating circumstance or
> circumstances to warrant that a sentence of life imprisonment
> rather than a death sentence be imposed?

6 CR 1024.  The jury was instructed to answer either "Yes" or "No," and they

answered in the negative.  6 CR 1024.

The Supreme Court has never considered the constitutionality of

Texas's mitigation jury instruction or definition of mitigating evidence found

in Article 37.071.  The Court has, in passing, noted the "brevity and clarity"

of the jury instruction.  *Penry v. Johnson*, 532 U.S. 782, 803 (2001) (citing

Tex. Code Crim. Proc. art. 37.071 § 2(e)(1)).  And the Court has described its

precedent in this arena as requiring juries to "to consider a defendant's *moral

culpability* and decide whether death is an appropriate punishment for that

individual in light of his personal history and characteristics and the

circumstances of the offense."  *Abdul-Kabir*, 550 U.S. at 263–64; *see*

61

*California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring) ("Thus, the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime."). Any difference between "moral culpability" and "moral blameworthiness" is not so great as create a reasonable likelihood that jurors could not utilize the evidence in a mitigating fashion. *See* Black's Law Dictionary 406 (8th ed. 2004) (defining "culpability" as "blameworthiness"). Accordingly, the Court of Criminal Appeals's decision is not contrary to or an unreasonable application of Supreme Court precedent, especially given the Supreme Court's implicit endorsement of Texas's jury instruction and its requirement that juries consider a defendant's moral culpability. *See Blue v. Thaler*, 665 F.3d 647, 663–68 (5th Cir. 2011). Accordingly, relief must be denied.

## V.   The Court Of Criminal Appeals Did Not Unreasonably Apply Supreme Court Precedent In Denying Gonzales's Sufficiency-Of-The-Evidence Claim (Claim 4).

Gonzales alleges that the evidence supporting the aggravating factors in this case—aggravated sexual assault, kidnapping and robbery—was insufficient. Amend. Pet. 49–59. Gonzales's argument primarily focusses on Texas's requirement that a confession must be corroborated. *Id*. at 53–59.

The Court of Criminal Appeals had this claim before it on direct appeal. Br. Appellant at 10–21, *Gonzales v. State*, No. AP-75540, 2009 WL 1684699 (Tex. Crim. App. June 17, 2009). That court denied the claim, *Gonzales I*,

2009 WL 1684699, at *3–5, and the decision was not contrary to or unreasonable application of Supreme Court precedent.

The standard of *Jackson v. Virginia*, 443 U.S. 307 (1979) governs sufficiency of the evidence review.  *Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) (per curiam).  Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319.  "[T]he factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution."  *Id*.  That is to say, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."  *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011).  And, in federal habeas, "*Jackson* claims face a high bar . . . because they are subject to two layers of judicial deference."  *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam).

Initially, as recognized by the Court of Criminal Appeals, Gonzales intertwines a state rule of evidence with a due process sufficiency-of-the-evidence review.  *Gonzales I*, 2009 WL 1684699, at *3 ("Thus, the appellant has blended the standard for whether a confession is sufficiently corroborated with the standards for legal and factual sufficiency.  These standards are

distinct."). Considering this state-law rule of evidence in analyzing the sufficiency of the evidence would be error. *See Coleman*, 132 S. Ct. at 2064 ("[W]e note that it was error for the Court of Appeals to look to Pennsylvania law in determining what distinguishes a reasoned inference from 'mere speculation.'").

The requirement that a confession be sufficiently corroborated by independent evidence is a matter of state law. *See Gribble v. State*, 808 S.W.2d 65, 70 (Tex. Crim. App. 1990) (plurality op.) ("This Court has long subscribed to a variant of the common law rule that an extrajudicial confession of the accused is insufficient to support conviction unless corroborated."). Consequently, to the extent that Gonzales argues his confession required independent corroboration, such claim is not actionable in federal habeas. *See Swarthout v. Cooke*, 131 S. Ct. 859, 861 (2011) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law." (internal quotation marks omitted) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)); *see also Evans v. Luebbers*, 371 F.3d 438, 442–43 (8th Cir. 2004) ("Missouri's particular formation of the *corpus delicti* rule is of an evidentiary nature and we may not review any evidentiary rulings unless they implicate federal constitutional rights."). To the extent he believes that independent corroboration is required as a matter of constitutional law, he is incorrect. *See Lucas v. Johnson*, 132 F.3d 1069, 1078

(5th Cir. 1998) ("Texas' corpus delicti requirement is not constitutionally mandated."). Any attempt at relief predicated on independent corroboration of Gonzales's confessions must be denied.

Casting aside improper state-law evidentiary considerations, Gonzales's convictions are undoubtedly supported by constitutionally sufficient evidence. *See Coleman*, 132 S. Ct. at 2064 ("Under *Jackson*, federal courts must look to state law for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (quoting *Jackson*, 443 U.S. at 324 n.16)). As pertinent to Gonzales's case, capital murder occurs when an individual intentionally or knowingly causes the death of another while committing or attempting to commit aggravated sexual assault, kidnapping or robbery. Tex. Penal Code § 19.03(a)(2); *see* Tex. Penal Code § 19.02(b)(1). Aggravated sexual assault occurs when an individual intentionally or knowingly causes the penetration of the sexual organ of another by any means, without consent, and causes serious bodily injury or attempts to cause the death of the victim in the course of the same criminal episode, or by acts or words places the victim in fear that death, serious bodily injury, or kidnapping will be imminently inflicted, or exhibits a deadly weapon. Tex. Penal Code § 22.021(a)(1)(A), (a)(2)(A)(i)–(ii), (iv). Kidnapping occurs when an individual intentionally or knowingly abducts

65

another, which means to restrain a person with the intent to prevent liberation by secreting them or using or threatening to use deadly force. Tex. Penal Code § 20.03(a); *see* Tex. Penal Code § 20.01(2)(A)–(B). Finally, robbery occurs when an individual appropriates another's property without effective consent and with intent to deprive the owner of property, and intentionally, knowingly or recklessly causes bodily injury or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. Tex. Penal Code § 29.02 (a)(1)(2); *see* Tex. Penal Code 31.03(a)–(b)(1).

Gonzales's confession to law enforcement was sufficient to sustain all of the aggravating factors in this case. He admitted to, after entering Townsend's home with the intent to steal money from Leal, pushing Townsend down and binding her hands and feet and then driving her to a remote area on an already-secluded ranch. 35 RR 135. This is sufficient to prove kidnapping and robbery. He also admitted to holding Townsend at gunpoint and then having sex with her in the middle of nowhere. 35 RR 136. This is sufficient to prove aggravated sexual assault. Accordingly, it was entirely reasonable for the Court of Criminal Appeals to find that the evidence at trial was constitutionally sufficient to sustain Gonzales's capital murder conviction.

Assuming that corroboration was needed, the evidence is sufficient on that basis too. There was ample corroborative evidence, whether in terms of

corroborating the confession or the crime itself: (1) Gonzales admitted his guilt to more than just law enforcement, he also told a reporter, a jailer and an inmate that he killed Townsend, 35 RR 48; 37 RR 107; 39 RR 184–88; (2) Gonzales pled guilty to kidnapping and raping Teich and taking her within a half-mile of where Townsend's remains were found, a strikingly similar crime, 40 RR 74–107; (3) Gonzales took law enforcement straight to Townsend's body, despite its far-flung location, 35 RR 72–74; (4) Gonzales lived his entire life on the ranch where Townsend's remains were discovered, 35 RR 69; (5) Gonzales said he shot Townsend with a hunting rifle and lead was discovered on Townsend's shirt, 36 RR 124; (6) Gonzales described the rifle he used to kill Townsend, which was found on the ranch and in the location Gonzales said it would be, 35 RRR 150–51; (7) Gonzales described the jewelry Townsend was wearing when abducted and jewelry was later recovered with the remains, 35 RR 98–99; (8) Gonzales admitted to going over to Townsend's residence with the express purpose of stealing money and Gonzales described the exact location and approximate amount of money taken, facts never publically released, 37 RR 39; (9) Townsend's boyfriend, Joe Leal, sold drugs to Gonzales and Gonzales had been to Townsend's residence on at least one prior occasion, 37 RR 67–68; (10) Gonzales, in a phone conversation with Leal, denied going over to Leal's home on the day of Townsend's disappearance despite the fact that Townsend had phoned Leal

earlier in the day and told him that Gonzales had stopped by, 37 RR 83; (11) Gonzales stated that he kidnapped Townsend between 8:00 p.m. and 9:30 p.m., which comported with Townsend's last known conversation with a burglar alarm salesman at 9:00 p.m. to 9:15 p.m., 37 RR 28, but before Leal arrived home shortly after midnight, 37 RR 73; (12) Townsend's truck and purse were at home, and the heat was off in the residence, indicating an abduction, 37 RR 74; (13) Townsend had to work the next morning but never showed up, again, indicating an abduction, 37 RR 71–72; and (14) there was no sign of forced entry or an injury, meaning that Townsend was alive when taken from her home, 37 RR 29.   This was sufficient corroboration for constitutional purposes, if required at all.  *See West v. Johnson*, 92 F.3d 1385, 1393–94 (5th Cir. 1996) (holding that confession was "adequately corroborated—by evidence aliunde the confession—by bolstering parts of it to show trustworthiness, and that the theft "element" of burglary could be adequately proved by the confession itself").   Accordingly, the state-court decision on this claim was not objectively unreasonable and relief should be denied.

## VI. The Court Of Criminal Appeals's Decision Concerning The Admissibility Of An Expert's Future Dangerousness Testimony Was Not Contrary To, Or An Unreasonable Application Of, Supreme Court Precedent (Claims 5–9).[16]

Gonzales claims that it was error to allow the State's expert, Dr. Edward Gripon, to opine about the likelihood Gonzales would be a future danger.   Amend. Pet. 60–101.   He asserts that the testimony was not sufficiently reliable under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), Amend. Pet. 66–68, that the trial court abdicated its duty to act as a gatekeeper, *id.* at 68–71, and that the testimony was not admissible under Texas's rules of evidence, *id.* at 72–81.   Further, Gonzales claims that both the Fifth and Sixth Amendments were violated when Dr. Gripon testified. *Id.* at 81–101.

On direct appeal Gonzales complained that Dr. Gripon's testimony was insufficiently reliable under *Daubert*, the trial court impermissibly avoided its gatekeeper function, and the testimony was inadmissible under Rule 702 of the Texas Rules of Evidence.   Br. Appellant at 22–43, *Gonzales v. State*, No. AP-75540, 2009 WL 1684699 (Tex. Crim. App. June 17, 2009).   He also argued that his rights under the Fifth and Sixth Amendments were violated

---

[16] Although Gonzales makes five distinct claims regarding expert future dangerousness testimony, he briefs them collectively.   *See* Amend. Pet. 60–61.   The Director responds in like fashion.

when Dr. Gripon was allowed to testify.  *Id*. at 43–44.  The Court of Criminal

Appeals denied these claims.  *Gonzales I*, 2009 WL 1684699, at *6–7.

> **A.    Gonzales's Fifth and Sixth Amendment claims concerning Dr. Gripon's testimony are unexhausted and, as a result, procedurally barred (Claims 8 & 9).**

An inmate must exhaust available state remedies or federal habeas

relief must be withheld.  28 U.S.C. § 2254(b).  To exhaust, inmates must first

seek redress in state court.  *Heck v. Humphrey*, 512 U.S. 477, 480 (1994).

This means that an inmate must provide a state court "a fair opportunity" to

review the claim, that is, the inmate must present the issue in a procedural

context which insures that the state court will review the claim solely on the

merits.  *Castille v. Peoples*, 489 U.S. 346, 351 (1989).

Practically, exhaustion is met "when the substance of the federal

habeas claim has been fairly presented to the highest state court."  *Parr v.

Quarterman*, 472 F.3d 245, 252 (5th Cir. 2006) (quoting *Smith v. Dretke*, 522

F.3d 269, 275 (5th Cir. 2005)).  The Court of Criminal Appeals is the highest

court in Texas for criminal matters.  *Richardson v. Procunier*, 762 F.2d 429,

431 (5th Cir. 1985).  The determination of "whether a[n inmate] exhausted

his claim in state court is a case- and fact-specific inquiry."  *Moore v.

Quarterman*, 533 F.3d 338, 341 (5th Cir. 2008) (en banc).

Before the Court of Criminal Appeals Gonzales asserted that his Fifth

and Sixth Amendment rights were violated in a sum total of four paragraphs,

two of which were simply quoting the Fifth and Sixth Amendments, spanning less than two pages.  Br. Appellant at 43–44, *Gonzales v. State*, No. AP-75540, 2009 WL 1684699 (Tex. Crim. App. June 17, 2009).  After stating that enhanced reliability was required in death penalty cases, Gonzales argued nothing more than Dr. Gripon's testimony "resulted in a violation of [his] right to due process and a fair trial especially since 'the specious testimony of a psychiatrist, colored in the eyes of an impressionable jury by the inevitable untouchability of a medical specialist's words, equates with death itself.'"  *Id.* at 43–44.  This conclusory assertion is significantly different than what he now presents.

Here, in federal court, Gonzales, over a span of twenty-one pages, argues that his Fifth and Sixth Amendment rights were violated.  Amend. Pet. 81–101.  He argues that heightened standards of reliability are necessary under such amendments, *id.* at 82–84, that *Barefoot v. Estelle*, 463 U.S. 880 (1983), allows for unreliable evidence to be placed before juries, Amend. Pet. 84–86, and that *Daubert* has overruled *Barefoot*, Amend. Pet. 86–95.  Further, he argues that, under the constitutional rubric of the Fifth and Sixth Amendments, Dr. Gripon's testimony was inadmissible.  *Id.* at 95–101.  None of these specific complaints, as now argued under the Fifth and Sixth Amendment, were before the state court.  Rather, a conclusory assertion of a constitutional violation was all that the Court of Criminal

Appeals had before it.   It cannot be said that these incredibly specific constitutional complaints were fairly presented to the state court and, as such, they are unexhausted.

Gonzales did, however, present his expanded Fifth and Sixth Amendment future dangerousness claims in his subsequent state habeas application.   SHCR-02 at 90–110.   That application, however, was dismissed as abusive.   *Gonzales III*, 2012 WL 340407, at *1.   Consequently, Gonzales did not place these claims in a procedural posture making it likely that they would be reviewed on the merits and, therefore, the claims are unexhausted. And because return to state court would be unlikely to produce merits review, the claims are procedurally defaulted.   *See Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997).

Alternatively, the expanded claims of due process and fair trial violations based on Dr. Gripon's testimony were explicitly barred by the Court of Criminal Appeals.   *Gonzales III*, 2012 WL 340407, at *1.   As explained above, Texas's abuse-of-the-writ bar is an adequate and independent state law ground precluding federal review.   *See supra* Section II(A)(1).   Gonzales does not argue that he meets the cause and prejudice test or shows a miscarriage of justice and, again, as explained above, he meets none of those exceptions.   *See supra* Section II(A)(1).   Whether these claims are unexhausted because they were not presented to the Court of Criminal

Appeals in a procedurally proper manner, or because they were explicitly barred in Gonzales's subsequent state habeas application, the result is the same—they are procedurally defaulted and should be denied as a result.

**B.   The Court of Criminal Appeals did not contravene or unreasonably apply Supreme Court precedent when it denied Gonzales's future dangerousness-based claims (Claims 5–9).**

The only clearly established Supreme Court precedent concerning expert future dangerousness testimony is *Barefoot*, which held that its introduction at trial did not violate the Constitution. *See Barefoot*, 463 U.S. at 896–903; *see also United States v. Scheffer*, 523 U.S. 303, 334 (1998) (Stevens, J., dissenting) ("There is no legal requirement that expert testimony must satisfy a particular degree of reliability to be admissible. Expert testimony about a defendant's 'future dangerousness' to determine his eligibility for the death penalty, even if wrong 'most of the time,' is routinely admitted."). Gonzales provides this Court with no clearly established federal law to the contrary, or even supporting his position, so relief may not be granted. *See, e.g., Rivas v. Thaler*, 432 F. App'x 395, 404 (5th Cir. 2011) (refusing to even grant a certificate of appealability on the issue of expert testimony concerning future dangerousness).

Gonzales's other specific complaints as to Dr. Gripon's testimony also do not warrant federal habeas relief.   As to Gonzales's argument that

*Daubert* barred Dr. Gripon's testimony, he is certainly wrong as *Daubert* is an interpretation of Rule 702 of the Federal Rules of Evidence and, as such, has no application in a state court trial. *See Daubert*, 509 U.S. at 589 ("The primary locus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify."). Indeed, even in federal death penalty cases *Daubert* does not apply to the sentencing proceeding. *See United States v. Fields*, 483 F.3d 313, 341–43 (5th Cir. 2007). As to whether the trial court acted as a gatekeeper or properly admitted Dr. Gripon's testimony under Texas's Rules of Evidence, such claims are founded in state law, which means they cannot provide a basis for relief in federal habeas. *See Swarthout*, 131 S. Ct. at 861 (noting that errors of state law do not warrant federal habeas relief).

So, too, is there no basis for relief under the Fifth and Sixth Amendments. The *Barefoot* Court denied relief under the Fourteenth Amendment, which contains the Due Process Clause applicable to the States, *see Dunsenbery v. United States*, 534 U.S. 161, 167 (2002), and which defeats Gonzales's Fifth Amendment argument. *See Barefoot*, 463 U.S. at 885 ("Hence, their predictions are so likely to produce erroneous sentences that their use violated the Eighth and Fourteenth Amendments."). Moreover, Gonzales has not presented any case law to suggest that arguments made under the Fifth and Sixth Amendments would fare any better than those

made under the Eighth Amendment, undoubtedly more protective of capital defendants, which were ultimately rejected in *Barefoot*.  More importantly, he has not presented any clearly established Supreme Court precedent supporting his arguments so federal habeas relief is unavailable. Additionally, to the extent that Gonzales argues that the Constitution prevents the type of testimony offered by Dr. Gripon, such a rule would be new and foreclosed by the anti-retroactivity principles of *Teague v. Lane*, 489 U.S. 288 (1989).  *See Tigner v. Cockrell*, 264 F.3d 521, 526–27 (5th Cir. 2001). Relief must, therefore, be denied.

Assuming that Dr. Gripon's opinion was impermissibly admitted as evidence, the violation was harmless.   Initially, Dr. Gripon's testimony concerning his *opinion* on Gonzales's future danger was fairly limited.  He stated, "It would be my opinion that he would pose a risk to continue to commit threats or acts of violence."   41 RR 66.   After that, most of Dr. Gripon's testimony was in the form of general principles applicable to the facts in Gonzales's case.  For example, Dr. Gripon stated that sex offenders have a high probability of recidivism.   Such a statement is, truly, beyond doubt.  *See United States v. Allison*, 447 F.3d 402, 405–06 (5th Cir. 2006) ("Congress and the Sentencing Commission intended to impose life terms of supervised release on sex offenders.  Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders.").

It is also beyond a doubt that such evidence is highly relevant in a sentencing context.  *Id.*  Further, Dr. Gripon thought that Gonzales had antisocial personality disorder, 41 RR 92, a diagnosis that even Gonzales's own expert did not really dispute, 42 RR 80–85.[17]  Again, such a diagnosis was another highly relevant factor for the jury to consider in assessing Gonzales's punishment.  Because Dr. Gripon's testimony was not couched so much in his opinion as it was in bare facts or diagnoses, it was not the type of "speculative" testimony that Gonzales challenges.

Moreover, Dr. Gripon was significantly cross-examined by counsel. Counsel was able to: (1) attack Dr. Gripon's supposedly limited data source— the State—despite the importance of knowing all there is to know about a defendant's history when predicting future dangerousness, 41 RR 99–100; (2) elicit from Dr. Gripon that an individual does not choose to develop a conduct

---

[17]  Q.  Consistent irresponsibility as indicated by repeated failure to sustain work behavior or honor financial obligations.

A.  Okay.  Number one, I think he did have—I'm not even arguing because I do think he has features of antisocial behavior. . . .

. . . .

Q.  So he actually didn't just meet three of the seven; he met all seven of the criteria and had evidence of a conduct disorder while he was a young teen, correct?

A.  Yes.

Q.  So it's not just that he has criteria of it, or however you put it, you could actually diagnos[e] this antisocial—

A.  Now you could.

42 RR 83–85.

76

disorder, 41 RR 101–02; (3) gain acknowledgement that Gonzales confessed to his crimes thereby accepting responsibility, 41 RR 105–06; (4) get Dr. Gripon to accept that making a prediction of future dangerousness was "highly controversial," and opposed by the American Psychological Association as "unreliable and unscientific," 41 RR 106–07; and (5) have Dr. Gripon admit that he has never followed up on his other predictions of future dangerousness to determine whether he was right, 41 RR 108–09.  This is the exact adversarial testing that the Supreme Court "trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness." *Barefoot*, 463 U.S. at 901.

And, Dr. Gripon's testimony was not highly utilized in the State's closing argument.  Indeed, in the initial closing he was not even mentioned, 43 RR 26–42, and in the rebuttal closing Dr. Gripon was briefly mentioned twice, 43 RR 54–55, 69–70, taking up maybe a full page total in a closing argument spanning almost fifty pages, 43 RR 26–73.  Accordingly, Dr. Gripon's limited opinion testimony, attacked significantly by counsel and lightly relied upon by the State during closing was not so powerful as to have "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (internal quotation marks omitted).

Moreover, no less than seven jailers, based on their significant collective experience housing inmates, thought that Gonzales would pose a

risk in prison.  39 RR 22–23, 44, 77, 101, 123, 179; 40 RR 45.  Dr. Gripon's testimony was therefore cumulative of these lay witness opinions.  And, as explained above, the State's punishment case was overwhelming.  *See supra* Section II(A)(2)(ii).  Briefly, Gonzales abducted Townsend from her home, raped her and then killed her while she pled for her mother.  In a remarkably similar crime, he abducted Teich and raped her despite repeated, hopeless pleas to stop, and she lived only through a combination of good fortune (in a horrible circumstance) and incredible survival instincts.  Despite admitting his guilt in both cases, Gonzales continued to deny his responsibility in these vile crimes, saying, in one case, he enjoyed the crime and in the other it was consensual.

Moreover, Gonzales engaged in stalking behavior of a teenage girl, he had three additional felony convictions, and he was incredibly disorderly, menacing and unsafe while incarcerated.  He threatened to kill guards, he beat other inmates over petty disagreements, he repeatedly had contraband, including tools for violence, stole from other inmates and ignited a fire which endangered the lives other inmates in the jail.  He also deflected blame for his misdeeds, saying that it was the jail's fault for his assault of another inmate.  And, in his own words, he acknowledged that he was a danger to the general inmate population.  Even excluding Dr. Gripon's testimony in its entirety would not have changed the result in this case so it did not have "a

substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (internal quotation marks omitted). Consequently, relief must therefore be denied.

## CONCLUSION

Because Gonzales's claims have no merit, the Director respectfully requests that Gonzales's petition for writ of habeas corpus be denied with prejudice, that no certificate of appealability issue, and that further factual development be denied to the extent that Gonzales requests such relief.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division

/s/ Matthew Ottoway
*MATTHEW OTTOWAY
Assistant Attorney General
State Bar No. 24047707

*Counsel of Record

Post Office Box 12548, Capitol Station
Austin, Texas 78711
Tel: (512) 936-1400
Fax: (512) 320-8132

ATTORNEYS FOR RESPONDENT

79

## CERTIFICATE OF SERVICE

I do herby certify that on December 21, 2012, I electronically filed the forgoing pleading with the Clerk of the Court for the U.S. District Court, Western District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" to the following counsel of record, who consented in writing to accept the Notice as service of this document by electronic means:

Michael Gross
ATTORNEY AT LAW
106 South Saint Mary's Street, Suite 260
San Antonio, Texas 78205

                              /s/ Matthew Ottoway
                              MATTHEW OTTOWAY
                              Assistant Attorney General