# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

**FILED**

JAN 1 5 2014

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| RAMIRO FELIX GONZALES,<br>TDCJ No. 999513, | § | |
| | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| V. | § | CIVIL NO. SA-10-CA-165-OG |
| | § | |
| WILLIAM STEPHENS, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER DENYING RELIEF

Petitioner Ramiro Felix Gonzales filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 challenging his state criminal conviction for capital murder and sentence of death. For the reasons set forth at length hereinafter, petitioner is entitled to neither federal habeas corpus relief nor a Certificate of Appealability from this Court.

## I. Background

A.   The Offense in Petitioner's Own Words

There is no legitimate doubt as to the events of January 15, 2001 which resulted in the death of Bridget Townsend. On October 7, 2002, while in custody on unrelated criminal charges, petitioner (1) led the Bandera County Sheriff to partial skeletal remains located on the Middle Verde Ranch where petitioner resided which remains were later identified as those of Bridget Townsend, who had been missing since January of the previous year, and (2) told a Texas Ranger several

different versions of the events which culminated in petitioner's fatal shooting of Townsend.[1]

Eventually, petitioner recanted all of his prior versions and gave a written statement, which was later

admitted at petitioner's capital murder trial as State Exhibit no. 8, in which he confessed in pertinent

part as follows:

> I wanted to stay here and not go to TDC so I could visit with my family and other stuff, so I told the Sheriff that I knew about Briget [sic] Townsend. I had thought about it over the weekend and Sunday (10/06/2002) at the church service and knew it was time to tell the Sheriff. I initiated the conversation and volunteered to show the Sheriff where the body was at. I did so, and the following is what happened on that night.
>
> On 01/15/2001, between 8:00 PM and 9:30 PM, I drove my dad's Maroon Chevrolet pickup to Joe leal's residence located at Lot 120 Blackfoot, Bandera County, Texas. I had done about $200.00 worth of cocaine already that day, and I wanted some more. Joe was my dope supplier. I had called the house before I went and his girlfriend (TOWNSEND) said he was at work. I went to Joe's to burglarize the house to steal Joe's cocaine stash. I drove to the house and knocked on the door and his girlfriend (TOWNSEND) let me in the house. I immediately walked back to Joe's bedroom where I knew he kept his dope and I began searching for it. The girlfriend (TOWNSEND) kept asking me what I was doing. I found some money in the bedroom closet, about $150.00 to $500.00, and I took it and put it in my pocket. The girlfriend (TOWNSEND) picked up the phone and began dialing and said she was going to call Joe. I ran over to her and pushed her down. I pulled her into the bedroom and tied her hands behind her back and tied her feet with some nylon string or rope I found in Joe's closet. I asked her if Joe had any dope and she said no. I carried her to the front door and I turned the outside lights off so no one could see me. I carried her outside and pushed her through the driver's side over to the passenger's seat. I started the truck and took off to the ranch (Middle Verde). She never screamed or yelled, she just kept asking me what I was doing. I got to the ranch and pulled up to a ranch truck and grabbed a rifle from inside the truck. It was the truck my dad always drove and I knew it would have a rifle inside. I then drove to the back to the ranch where her body is now. My intention was only to shoot her. I did it because she knew me and could have told someone that I tore up Joe's house and kidnapped [sic] her. I untied her before we got out of the truck and then I told her to start walking. I was holding the rifle in my left hand and I had her by the shirt with my right hand. We walked about 100 yards into the brush. I pulled the bolt

---

[1] Statement of Facts from petitioner's trial (henceforth "S.F. Trial"), Volume 35, testimony of James MacMillian, at pp. 64-70; testimony of Skylor Hearn, at pp. 117-34.

back on the rifle to put a shell in the chamber and one fell out I think, but I loaded the gun. She started telling me about her mom and how she wanted to see her mom. She started crying for her mom and pleading with me. She said she would give me money, drugs, something else, and then said sex if [I] didn't kill her. I walked her back to the truck the same way. I took the shell out of the gun and put it back in the clip and put the gun on the hood of the truck. I took the shell out just in case she ran over and tried to get it. She started taking her clothes off of her own free will, but she was fearing for her life so I guess it wasn't like sex. I had sex with her on the seat inside the truck and I was on top. Afterward, she put her clothes back on. I got the gun and reloaded it and began walking her back into the brush. I guess she didn't run because it was dark and she didn't know where she was at. She kept asking me why I was going to do it and asking for her mom. We got to about the same spot as the first time and I pushed her away and the gun went off. Well, I pointed at her and pulled the trigger. I didn't aim or anything. I was only about 3 feet from her. The rifle was a high-powered deer rifle with a scope and I think it was a .243 caliber. I just fired one shot. After the shot, you could hear the body hit the ground like a big thump. I ran back to the truck and drove home. I took the empty shell casing out and slung it. I put the rifle back in the ranch truck ane walked inside the house. I was talking with my family like nothing ever happened. It was like a dream. A couple of months later, I went back to the place where the body was and saw the decaying body. The body was intact and the bracelet was still on the wrist.[2]

Subsequent forensic dental examination of the top portion of the skull and two lower teeth recovered from the location to which petitioner led law enforcement authorities were identified as those of Bridget Townsend.[3] A long time friend of Townsend's identified a distinctive braided ring with a dangling gold cross found at the same location as the partial skeletal remains as identical to

---

[2] Petitioner's written statement of October 7, 2002 was admitted into evidence as State Exhibit no. 8 and appears in S.F. trial, Volume 44. Once admitted, this statement was read into evidence in open court during petitioner's trial. S.F. Trial, Volume 35, testimony of Skylor Hearn, at pp. 134-38.

[3] S.F. Trial, Volume 36, testimony of Marden Alder, at pp. 144-64. Dr. Alder, a retired forensic dentist testified there were several features unique to Townsend's teeth that were consistent with the partial dental remains found at the location to which petitioner led law enforcement authorities, including distinctive bumps found in one tooth, a extended groove found in another tooth, an unusual seventy percent curve in both lower pre-molars, discoloration found in the lower teeth consistent with Townsend's lingual bar on her lower teeth, repair to a chipped upper left lateral incisor, and perfect consistency between every tooth found in the upper jaw and Townsend's dental records. *Id.*

one worn by Townsend.[4]  It was determined that the precise location on the ranch where Townsend's

remains were discovered was located in Medina County, Texas.

B.    <u>Indictment</u>

On March 5, 2001, a Medina County grand jury indicted petitioner in cause no. 04-02-9091-

CR on a single count of capital murder, to wit, fatally shooting Bridget Townsend with a firearm

while in the course of committing or attempting to commit aggravated sexual assault, kidnaping, or

robbery upon Townsend.[5]

C.    <u>Guilt-Innocence Phase of Trial</u>

The guilt-innocence phase of petitioner's capital murder trial  commenced on August 22,

2006.  In addition to the evidence summarized above, petitioner's jury heard testimony from (1) a

television reporter who had interviewed petitioner in October, 2002 regarding his involvement in

Townsend's murder,[6] (2) the former Sheriff of Bandera County regarding his conversations with

petitioner which led to petitioner directing and accompanying law enforcement officers to the

isolated location on the Middle Valley Ranch where Townsend's remains were recovered,[7] (3) the

---

[4] S.F. Trial, Volume 37, testimony of Dusty Lenz Christiana, at p. 103.  The ring in question was admitted at trial as State Exhibit no. 95.

[5] Transcript of pleadings, motions, and other documents filed in petitioner's state trial court proceeding (henceforth "Trial Transcript"), Volume 1 of 6, at pp. 8-10.

[6] S.F. Trial, Volume 35, testimony of Gina Galaviz, at pp. 39-55.  Ms. Galaviz testified without contradiction that she interviewed petitioner on October 4 and October 10, 2002.  *Id.*, at p. 41.  The videotaped recordings of her interviews with petitioner were played for the jury in open court. *Id.*, at p. 43.  Ms. Galaviz also testified the petitioner admitted to her that Townsend had begged for her life prior to petitioner fatally shooting Townsend.  *Id.*, at p. 55.

[7] S.F. Trial, Volume 35, testimony of James MacMillian, at pp. 58-80.  Former Sheriff MacMillian testified without contradiction, in pertinent part, (1) petitioner sought to speak with MacMillian in October, 2002 regarding an incident at the Bandera County Jail the previous weekend, (2) he personally gave petitioner the required Miranda warnings before questioning petitioner, (3) during the course of his conversation with petitioner, the petitioner indicated he could identify where Townsend's body was located, and (4) petitioner directed MacMillan and other law enforcement officers directly to an isolated location on the Middle Valley Ranch where a partial skull, jewelry, weathered clothing, and other human bones were discovered. *Id.*, at pp. 60-77.  Former Sheriff MacMillian testified petitioner gave several

4

Bandera County Jail Administrator to whom petitioner had first indicated a desire to discuss the Townsend case with law enforcement officers,[8]

(4) the Texas Ranger Lieutenant who took both petitioner's written statement and an audiotape recording of petitioner's statement regarding Townsend's murder,[9] (5) the Texas Department of Public Safety crime law employee who recovered Townsend's skull, bones, jewelry, and other items from the crime scene on the Middle Valley Ranch,[10] (6) the Chief Deputy of the Medina County Sheriff's Officer concerning the discovery of Townsend's remains, the videotape recording made of the crime scene the following day, i.e., on October 8, 2002, as well as aerial photographs of the ranch introduced into evidence,[11] (7) a criminal investigator from the Texas Attorney General's Office regarding photographs of the shell casings and jewelry recovered at the crime scene,[12] (8) the

---

different accounts of the events on the night in question which resulted in his fatal shooting of Townsend but, when questioned by Texas Ranger Skylor Hearn, petitioner stated he alone had been involved in Townsend's murder. *Id.*, at pp. 79-82.

[8] S.F. Trial, Volume 35, testimony of Della Baker, at pp.; 91-112. Ms. Baker testified without contradiction that (1) on October 7, 2002, petitioner requested to speak with the Sheriff regarding the Bridget Townsend case and confessed to having killed Townsend and disposed of her body on the ranch where petitioner resided, (2) when the Sheriff expressed skepticism about petitioner's involvement in Townsend's disappearance, petitioner took them to the location where petitioner said he had disposed of Townsend's body, (3) the location in question was several miles into the ranch, and (4) when they arrived at the location, Ms. Baker spotted bones, clothing, and jewelry scattered across the ground. *Id.*, at pp. 93-99.

[9] S.F. Trial, Volume 35, testimony of Skylor Hearn, at pp. 113-233. In pertinent part, Ranger Hearn testified, without contradiction, that (1) petitioner initially claimed to have knowledge of the location of Townsend's remains but denied any involvement in her murder, (2) when challenged, petitioner claimed that he had murdered Townsend at the behest of the Mexican Mafia and Joe Leal, Townsend's boyfriend, (3) petitioner then claimed he and Leal conspired to murder Townsend, (4) when challenged, petitioner again abandoned that claim and asserted he alone had been responsible for Townsend's murder, (5) petitioner gave both a formal written statement (which petitioner read and corrected before signing) and an audiotaped interview in which petitioner admitted his role in Townsend's murder, and (6) petitioner's statement included details of Townsend's abduction which had not been made public, including the location within leal's home where Leal stored his money which was taken the same night as Townsend's abduction. *Id.*

[10] S.F. Trial, Volume 36, testimony of Deborah Ann Roberts, at pp. 8-45.

[11] S.F. Trial, Volume 36, testimony of Randy Brown, at pp. 52-89.

[12] S.F. Trial, Volume 36, testimony of Forrest Mitchell, at pp. 89-110.

Texas Ranger Sergeant who coordinated the recovery of Townsend's bones, jewelry, and other items at the crime scene[13] (9) the forensic dentist who identified the upper jaw and loose teeth found at the crime scene as those of Townsend, based upon his comparison of those remains with Townsend's dental and orthodontic records,[14] (10) a forensic pathologist from the Bexar County Medical Examiner's Office who testified (a) no vertebrae or torso bones were recovered but (b) a female human skull sans lower jaw bone, the long bone from the upper leg, and a sock containing multiple foot bones were recovered, along with three small bags of loose human teeth, (c) there was no evidence of pre-mortem trauma, and (d) no cause of death could be determined from the partial skeletal remains,[15] (11) the former Bandera County Sergeant Investigator who investigated Townsend's disappearance in 2001 regarding the evidence of theft found at the residence where Joe Leal and Townsend resided,[16] (12) Joe Leal regarding (a) the condition of his residence when he returned home to find Townsend missing but her purse and other personal items, including her keys, still inside their residence and (b) the money missing from inside a box he kept hidden in his

---

[13] S.F. Trial, Volume 36, testimony of Coy Smith, at pp. 132-36.

[14] S.F. Trial, Volume 36, testimony of Marden Alder, at pp. 138-64. Dr. Alder testified, in pertinent part (1) every tooth found in the upper jaw was consistent with Townsend's dental records, (2) a pair of lower wisdom teeth also found at the scene were likewise consistent with Townsend's dental records, (3) there were no inconsistencies between the teeth found in the skull and Townsend's dental records, (4) a chipped upper incisor found in the skull had been repaired in exactly the same manner sown in Townsend's dental x-rays and records, (5) unusual curves in both the lower pre-molars found at the scene were consistent with Townsend's dental records, (6) discoloration found on the lower teeth recovered at the scene was consistent with the lingual bar Townsend had worn on her lower teeth, (7) at least three distinctive features of Townsend's bite surface were found in the teeth in the skull, and (8) based upon the foregoing, he concluded with a high degree of dental certainty that Townsend's antemortem records established the skull and lower teeth found at the scene were Townsend's. *Id.*, at pp. 154-64.

[15] S.F. Trial, Volume 37, John A. Stash, at pp. 4-23.

[16] S.F. Trial, Volume 37, testimony of Mike Belton, at pp. 23-51. This witness testified without contradiction that missing persons flyers posted immediately after Townsend's disappearance misled the public regarding the absence of any evidence of theft found at the Leal/Townsend residence. *Id.*, at p. 49.

bedroom closet,[17] (13) a friend of Townsend's who identified the distinctive gold ring with a dangling cross found at the crime scene as identical to one worn by Townsend,[18] and (14) a former Medina County jail employee to whom petitioner confessed that he had planned to rape and kill a woman in the brush and that, after he did so, he returned more than once to watch her body decompose.[19]

The defense presented no witnesses during the guilt-innocence phase of trial.

After deliberating just over two hours on August 25, 2006, the jury returned its verdict, finding petitioner guilty of capital murder as charged in the indictment.[20]

D.    Punishment Phase of Trial

The punishment phase of petitioner's capital murder trial commenced on August 29, 2006.

1.    The Prosecution's Evidence

The prosecution presented a sick call slip executed by petitioner in which petitioner stated that he went back to view Townsend's decomposing body almost daily.[21]  The prosecution also introduced testimony from (1) a former Medina County jail employee regarding (a) petitioner's admissions that he had returned to watch Townsend's body decompose several times in the months

---

[17] S.F. Trial, Volume 37, testimony of Joe Leal, at pp. 52-99.  Leal admitted that he had sold drugs to petitioner at his residence prior to the date of Townsend's disappearance and that he was subsequently convicted of dealing drugs. *Id.*, at pp. 63-69, 92-99.

[18] S.F. Trial, Volume 37, testimony of Dusty Lena Christian, at pp. 99-104.

[19] S.F. Trial, Volume 37, testimony of Todd Heilig, at pp. 105-07.

[20] S.F. Trial, Volume 38, at pp. 53-54; Trial Transcript, Volume 6 of 6, at pp. 971-77, 980.  The time stamps on the guilt-innocence jury charge and verdict form indicate the jury began its deliberations at approximately 10:58 AM and returned its verdict at approximately 1:12 PM the same date.

[21] S.F. Trial, Volume 39, at pp. 31-32.  The sick call slip in question, State Exhibit no. 13B, appears in S.F. Trial, Volume 44.

after he murdered her, (b) a death threat petitioner made against the jail employee after the jail employee refused to smuggle cigarettes into the jail for petitioner, and (c) a suicide attempt petitioner made in January, 2003 which the jail employee described as involving cuts to petitioner's arms that were no deeper than scratches,[22] (2) a former jailer at the Bandera County Jail regarding (a) a fire petitioner set in his own cell (by setting his mattress on fire) on October 5, 2002, the day after petitioner's first interview with a female television reporter regarding petitioner's involvement in a kidnaping and rape, (b) petitioner's possession of contraband in the form of a shank hidden in a light fixture, and (c) an incident in which petitioner demonstrated the ability to lift ceiling tiles in a holding cell,[23] (3) a former jailer at the Medina County jail concerning petitioner's possession of contraband (cigarettes and a pen),[24] (4) a former Medina County jailer who testified regarding an incident in January, 2002 in which petitioner and three other inmates assaulted a fellow inmate resulting in the victim suffering facial bruises and a broken tooth,[25] (5) a former Bandera County jail employee regarding (a) petitioner's possession of contraband (a razor blade), (b) petitioner's destruction of property (a book petitioner tore apart), and (c) threats petitioner made against her,[26] (6) a former Medina County Jail officer regarding petitioner's (a) many conflicts with other inmates

---

[22] S.F. Trial, Volume 39, testimony of Todd Heilig, at pp. 15-30.

[23] S.F. Trial, Volume 39, testimony of Michael Pitts, at pp. 32-48.
Other Bandera County Jail personnel testified regarding the fire petitioner set in October, 2002, describing the smoke generated by petitioner's fire as "thick" and "black" and explaining the fire was sufficiently serious as to warrant calling the local fire department and mandating removal of all jail inmates to another portion of the jail until fire personnel could extinguish it and ventilate the area. S.F. Trial, Volume 39, testimony of Danny J. Bowermaster, at pp. 69-80; testimony of Kassidy Johnson, at pp. 82-89.

[24] S.F. Trial, Volume 39, testimony of Henry Juarez, at pp. 49-55.

[25] S.F. Trial, Volume 39, testimony of Joseph Anthony Zavala, at pp. 56-69.

[26] S.F. Trial, Volume 39, testimony of Kassidy Johnson, at pp. 89-98.

at that facility, (b) lack of remorse for his criminal conduct, and (c) difficulty getting along with female jail personnel,[27] (7) the Medina County Jail Administrator regarding petitioner's (a) difficulty following jail rules during his pretrial detention, (b) lack of respect for jail personnel, (c) frequent placement in administrative segregation as a precaution for the safety of petitioner and other inmates, (d) frequent commission of disciplinary infractions, and (e) inability to function in the general jail population,[28] (8) a former mental health case worker regarding his evaluation of petitioner in January, 2003 which led him to conclude petitioner (a) had no family history of mental illness, (b) lacked suicidal ideation, (c) displayed no delusions or hallucinations, but (d) did give a history of drug abuse and a fascination with dead bodies,[29] (9) a former Medina County jail employee regarding an assault by petitioner upon another inmate and his investigation of a separate incident in which the petitioner had allegedly threatened a disabled inmate in an attempt to obtain the disabled inmate's prescription pain medication,[30] (10) a former Medina County Jail inmate to whom petitioner allegedly bragged that he had raped and tortured Townsend and forced her to fulfill his sexual fantasies before killing her and that he had sex with her dead body on multiple occasions thereafter,[31] (11) the mother of a teenage girl whom petitioner stalked,[32] (12) a woman who testified petitioner

---

[27] S.F. Trial, Volume 39, testimony of Bobby Ray Evans, at pp., 100-09.

[28] S.F. Trial, Volume 39, testimony of Jan Quintana, at pp. 115-34.

[29] S.F. Trial, Volume 39, testimony of Bobbie Strickland, at pp. 135-50.

[30] S.F. Trial, Volume 39, testimony of Robert Jesse Rios, at pp. 168-84. The officer described petitioner as "a bully" who intimidated other inmates. *Id.*, at p. 179.

[31] S.F. Trial, Volume 39, testimony of Frederick Lee Ozuna, at pp. 184-97. Ozuna also testified the petitioner had described a plan to escape that involved petitioner faking an injury in order to gain access to a guard with a gun and had made threats to shank guards and blow up a guard's home once he escaped. *Id.*, at pp. 190-91.

[32] S.F. Trial, Volume 40, testimony of Wanda Obiedio, at 50-71. Mrs. Obiedio also testified the petitioner threatened her when she instructed petitioner not to bother her daughter any more. *Id.*, at pp. 57, 61-62, 70.

(a) abducted her from her place of business at knife-point in September, 2001, (b) secured her ankles

and wrists with duct tape, (c) drove her to a cabin on the Middle Valley Ranch near the location

where Townsend's remains were later discovered, (d) ignored her pleas that he not rape her, (e)

repeatedly sexually assaulted her, and (f) locked her in a closet before she managed to make her

escape, find her way off of the ranch, and make contact with law enforcement officials,[33] (13) a

Bandera County Sheriff's Deputy regarding the ensuing high speed chase that resulted in petitioner

crashing and destroying his kidnap and sexual assault victim's pickup truck into a tree,[34] (14) the

same television reporter who testified during the guilt-innocence phase of trial regarding petitioner's

refusal to accept responsibility for his crimes during her interviews with him and his insistence that

(a) despite his guilty pleas, he had not kidnaped or sexually assaulted his most recent victim and (b)

both of his female victims had engaged in consensual sexual relations with him,[35] and (15) a

psychiatrist who testified (a) the best predictor of future violence is past conduct, (b) petitioner had

a substantial record of violent criminal activity as a young person, (c) petitioner committed two

extremely violent felonies as a young adult, (d) petitioner appeared to demonstrate a pattern of

---

[33] S.F. Trial, Volume 40, testimony of Florence "Babe" Teich, at pp. 71-120. Ms. Teich testified without contradiction that petitioner pleaded guilty to both aggravated kidnaping and aggravated sexual assault as a result of her ordeal. *Id.*, at pp. 116, 118.

    The prosecution also admitted copies of the judgments of conviction (based on guilty pleas) in petitioner's aggravated kidnaping and aggravated sexual assault cases, which were admitted as State Exhibit nos. 133 and 134 and appear in S.F. Trial, Volume 45. The prosecution also admitted copies of judgments revoking petitioner's probated sentences for his prior convictions for burglary of a habitation, felony theft, and forgery. Those judgments were admitted as State Exhibit nos. 187-89 and also appear in S.F. Trial, Volume 45.

[34] S.F. Trial, Volume 40, testimony of Joseph Roberts, at pp. 123-42. The Sheriff's Deputy testified without contradiction that the high speed pursuit of petitioner in the stolen pickup truck went through the downtown area of the City of Bandera. *Id.*, at p. 142.

[35] S.F. Trial, Volume 40, testimony of Gina Galaviz, at pp. 142-67. Ms. Galaviz testified without contradiction that petitioner told her during her interviews that he had not paid any attention to his kidnaping and sexual assault victim during her victim impact statement at his trial and that his only thoughts were of his own family. *Id.*, at p. 148. She also testified the petitioner told her he felt "no different" after having confessed to Townsend's murder. *Id.*, at p. 152.

escalating violence, (e) petitioner displayed the characteristics of a person with Antisocial Personality Disorder, i.e., a pattern of maladaptive behavior in which a person engages in self-serving activity which shows a wanton and blatant disregard for the welfare of others and an emotional coldness or callousness toward others, (f) petitioner's self-reported trips back to watch Townsend's body decompose suggested petitioner was deriving pleasure from his offense and added a psycho-sexual sadistic element to petitioner's personality, (g) petitioner's criminal behavior did not appear to be driven by drug abuse, (h) petitioner's unwillingness to take responsibility for his offenses suggested there was little possibility treatment or rehabilitation would be effective in petitioner's case, (i) sexual offenses are the hardest to treat medically, (j) there is a high recidivism rate for forcible rape, (k) persons with a history of aggressive behavior often have difficulty in a prison setting, (l) petitioner's criminal history suggests he tends to focus on those who are vulnerable and less capable4 of resisting, (m) it was not within the realm of reasonable psychiatric probability that the petitioner would just voluntarily stop his sexual offenses, and (n) he believed petitioner posed a threat of violence even in the prison setting.[36]

2.    The Defense's Evidence

The defense presented a number of punishment phase witnesses, including (1) the manager of the Middle Valley Ranch, who had known petitioner and petitioner's family the petitioner's entire

---

[36] S.F. Trial, Volume 41, testimony of Edward Brown Gripon, at pp. 50-121.

On cross-examination and re-direct examination, Dr. Gripon testified (1) a conduct disorder such as the one petitioner exhibited as a child, was not a volitional choice, (2) petitioner had no control over the family and environmental forces which helped shape his personality, (3) petitioner did confess to Townsend's murder and did plead guilty to his kidnaping and sexual assault offenses but later denied raping either of his victims, (4) petitioner was not mentally ill, and (5) the American Psychiatric Association had voted years before not to allow its members to render an opinion regarding future dangerousness in capital cases but forensic psychiatrists believe they can render informative opinions on this subject. *Id.*, at pp. 97-120.

life, and who testified petitioner's mother all but abandoned petitioner at birth,[37] (2) a pair of

petitioner's aunts who testified about petitioner's mother's drug abuse and affinity for men who

physically and verbally abused petitioner,[38] (3) an inmate at the

---

[37] S.F. Trial, Volume 41, testimony of Thomas H. Keese, at pp. 124-51, 178-85. Mr. Keese testified, in pertinent part, that (1) petitioner's mother left petitioner in the care of her parents, i.e., petitioner's grandparents, shortly after petitioner's birth, (2) when petitioner was a toddler, he often saw petitioner wandering around the ranch unsupervised in just a diaper, accompanied by a little dog, (3) early on petitioner was adventurous but did not get into anything he should not have, (4) he once observed petitioner and his dog drinking from water that had collected under a cattle guard, (5) when not in school, petitioner was a companion to petitioner's grandfather, who taught petitioner outdoor skills like hunting and fishing, (6) as early as age six or eight, petitioner would often go hunting with his grandfather until three a.m., (7) petitioner had a cousin who also grew up with petitioner's grandparents on the ranch, (8) petitioner's grades in elementary school were not the best because he did not have a lot of help at home with his homework, (9) petitioner's elementary school principal and teachers liked petitioner, (10) petitioner later served as a student side at Bandera Middle School, where petitioner passed most of his classes but just barely, (11) in his early teen years, petitioner hunted and fished, did work for his cousin, and helped his grandfather at the ranch, (12) Keese never saw or met petitioner's biological father, (13) petitioner's mother contributed nothing but trouble to petitioner, (14) petitioner dropped out of school in the seventh or eighth grade, (15) Keese recalled an incident when petitioner was in his mid-teens when petitioner cussed out Keese and appeared to be on drugs, (16) Keese's wife, a school teacher, informed Keese that she believed petitioner was on drugs, and (17) Keese believed petitioner's criminal behavior was linked to drug abuse. *Id.*, at pp. 124-45.

On cross-examination, Keese testified (1) petitioner's grandparents furnished petitioner with food, shelter, and clothes and helped petitioner participate in sports as a boy, (2) Keese observed no abuse of petitioner by his grandparents, who set a good example for petitioner, (3) petitioner chose to skip school and to quit working hard in school, (4) petitioner's cousin, who was raised with petitioner, had never been in trouble with the law, and (5) petitioner's grandparents did not understand the enormity of petitioner's drug addiction, which Keese blamed on petitioner's low self-esteem and falling in with the wrong crowd. *Id.*, at pp. 145-51.

Petitioner later recalled Keese to the stand and had him testify that (1) petitioner did "amazing" drawings while incarcerated, (2) while petitioner did not have even a remote touch with religion growing up, petitioner had found God while incarcerated, (3) petitioner had written letters to Keese in which petitioner apologized to Keese and others for the things he had done to them, and (4) Keese believed petitioner could be a voice for The Lord in prison if his life were spared. *Id.*, at pp. 178-85

[38] S.F. Trial, Volume 41, testimony of Virginia "Vicky" Wilson, at pp. 152-77; testimony of Emma Smythe, at pp. 187-99.

More specifically. Petitioner's aunt Vicky testified (1) petitioner's mother, Julia Saldana, was rebellious growing up, (2) their parents sent Julia to live for a time with one of Julia's older sisters in Hawaii when Julia was sixteen or seventeen, (3) she personally saw Julia "huffing" paint while Julia was pregnant with petitioner, (4) Julia returned from Hawaii in time to give birth to petitioner, (5) Julia gave petitioner to their parents once petitioner was born, (6) Vicky helped to raise petitioner until petitioner was about age three, (7) Vicky left home at age sixteen and her parents thereafter raised petitioner and another child who was the daughter of another of Vicky's sisters, (8) Julia occasionally visited the ranch but never acknowledged petitioner as her child, (9) Julia never sent petitioner birthday or Christmas cards, (10) Julia's boyfriend Mario physically and verbally abused petitioner, once kicking petitioner when petitioner was about two years old, (11) petitioner was an excellent athlete as a child and continued with sports until he was forced to drop athletics because he could not keep up his grades, (12) despite that, neither petitioner's grandparents nor his biological parents ever went to see petitioner play sports, (13) petitioner dropped out of school in the eighth grade at age fifteen, (14) petitioner's Aunt Loretta was married to one of Vicky's brothers and paid a lot of attention to petitioner, (15) petitioner's Aunt Loretta was killed in an auto accident when petitioner was seventeen years old, (16) petitioner was hurt

Medina County Jail who knew petitioner's mother and biological father (Jacinto Sanchez) and testified petitioner's mother "huffed" paint to get high while pregnant with petitioner "every chance she could get" and his brother was petitioner's biological father,[39] and (4) one of petitioner's female cousins who testified (a) she stayed at the ranch with her grandparents, petitioner, and their cousin Georgina almost every day, (b) she recalled petitioner drinking once when he was in his teens, (c) petitioner smoked both marijuana and cocaine but never disrespected their grandparents, (d) there was a lot of love between petitioner and his grandparents, (e) petitioner was very smart about things on the ranch but not book smart, (f) petitioner kept to himself, (g) she recalled an incident in which petitioner struck and choked her after she spilled a drink on him, (h) she and petitioner fought all the time, like siblings, (i) petitioner stopped going to middle school when he was sixteen, (j) Julia Saldana gave birth to petitioner but had no relationship with him thereafter, (k) she never saw Julia give petitioner a hug, (l) Julia had several other children she gave up for adoption, (m) Julia's boyfriend Mario verbally and physically abused petitioner, (n) when petitioner was twelve or

_____

badly when Loretta died and became a loner, isolating himself from his family, (17) Vicky's cousin Gilbert Trevino lived at the ranch when petitioner was three or four years old, (18) Vicky suspects Gilbert sexually abused petitioner, (19) petitioner was emotionally immature as an adult, (20) petitioner has found Jesus and is taking GED courses while in jail, (21) petitioner was a different person when he was on drugs. S.F. Trial, Volume 41, testimony of Virginia "Vicky" Wilson, at pp. 152-70. On cross-examination, Vicky testified (1) her parents, i.e., petitioner's grandparents were good parents to petitioner, loving and caring, (2) petitioner began skipping school and not applying himself in the eighth grade, (3) petitioner had drug problems and has anger management problems, and (4) petitioner had sexual relations with a young woman when petitioner was twelve or thirteen and fathered a child. *Id.*, at pp. 170-77.

       Petitioner's aunt Emma testified, in pertinent part (1) petitioner's mother Julia came to live with Emma and her ex-husband in Hawaii when Julia was sixteen or seventeen, (2) Julia drank heavily and smoked dope while pregnant with petitioner, (3) petitioner attempted to overdose while pregnant with petitioner, (4) Julia returned to Bandera a few weeks after attempting to overdose herself, (5) Emma never saw Julia with petitioner, (6_ her parents raised petitioner, (7) Julia married Mario five or six years after petitioner was born, (8) Emma saw petitioner very little until he was twelve or thirteen, and (9) she suspects Mario abused petitioner verbally and physically. S.F. Trial, Volume 41, testimony of Emma Smythe, at pp. 187-97. On cross-examination, Emma testified (1) her parents loved and provided for both petitioner and petitioner's cousin Georgina, (2) petitioner had everything he needed growing up, and (3) petitioner loved and respected his grandparents. *Id.*, at pp. 197-99.

       [39] S.F. Trial, Volume 41, testimony of Sammy Joe Sanchez, at pp. 199-207.

fourteen he hung out with an eighteen year old woman who became pregnant when petitioner was thirteen or fourteen, (o) their aunt Loretta was kind and loving toward petitioner, (p) Loretta's death tore everyone in their family apart because she had been a mother figure to many of them, (q) petitioner kept to himself.[40]

The defense also called a neuro-psychologist who had evaluated petitioner and testified (1) petitioner's mother refused to participate in any manner in her evaluation of petitioner, (2) the process of brain maturation continues until about age twenty-five and petitioner was barely eighteen on the date of his capital offense, (3) petitioner's educational records show he was developmentally delayed, had to repeat kindergarten, and could not really speak English but was placed in an English-speaking classroom, (4) as petitioner grew, he continued to have problems reading and writing English, (5) petitioner did okay in classes which taught phonics but by the fifth grade he simply could not keep up in reading comprehension and was doing very poorly and had hygiene problems, (6) petitioner basically raised himself, (7) petitioner's mother and father were never present in his life, (8) petitioner first met his biological father in jail, (9) around age twelve petitioner became involved with a woman who was nineteen or twenty and she had a daughter whom she took away from petitioner, (10) petitioner has never seen his daughter, (11) when she administered a MMPI examination, the results were invalid because petitioner had tried to come across as mentally ill, (12) petitioner is very paranoid but not schizophrenic, (13) petitioner is a loner who feels a lot of guilt, (14) petitioner never really developed the coping skills or social skills he needed growing up on the ranch, (15) not all Antisocial Personality Disorders involve criminal activity - many are simply very

---

[40] S.F. Trial, Volume 41, testimony of Jessia Lynn Keegan, at pp. 207-26.  On cross-examination, Ms. Keegan testified (1) the petitioner once spray-painted their school principal's car and (2) the petitioner told her that he had a relationship with his kidnap and rape victim before the incident to which he pleaded guilty. *Id.*, at pp. 227-34.

14

manipulative, conniving people with very little remorse and a focus on themselves, (16) petitioner has some features of Antisocial personality Disorder but she believes petitioner's primary diagnosis is Reactive Attachment Disorder, a purely environmental condition which arises when the child's care giver never develops an emotional attachment to the child, (17) Reactive Attachment Disorder is typified by bravado (trash talking) due to insecurity, attention seeking, immaturity, and being manipulative, (18) petitioner also has schizotypal personality features such as being a loner, lacking basic social skills, and a tendency to tell people what he thinks they want to hear, (19) while petitioner had been involved in numerous incidents while housed in local jails, his prison record indicates no incidents whatsoever during the months petitioner was housed in a state prison, (20) petitioner is "a very damaged young man," (21) petitioner's IQ is within normal limits as is his brain in spite of all the drugs he ingested and in spite of petitioner having been run over by a truck as a child, (22) petitioner's mother used drugs throughout her pregnancy and twice attempted to abort petitioner, (23) petitioner's mother called her parents from the hospital and told them to come and get petitioner, (24) petitioner was treated like a dog by his family growing up, i.e., he was fed and left on his own, (25) petitioner's mother married a man who physically and verbally abused petitioner, (26) petitioner was sexually abused from age five through twelve, (27) petitioner's favorite aunt used to smoke pot and snort cocaine with petitioner, (28) most of petitioner's family members are into drugs and writing hot checks,  (29) petitioner's attachment disorder is a function of many factors, primarily his having been abandoned as a child and suffered benign neglect and subsequent trauma (including sexual abuse) as a child, (30) petitioner suffers from depression, low self-esteem, unhappiness, and an inability to admit to himself that he committed crimes, (31) drug

abuse was the norm in petitioner's family, (32) petitioner felt very vulnerable as a child, and (33)

petitioner behaved very well in a highly structured environment at the TDCJ's Ferguson Unit.[41]

Petitioner's trial counsel also called a former state prison employee who testified generally

about the state prison system's diagnostic procedures, disciplinary procedures, and the fact the

petitioner was rewarded for good behavior at the Ferguson Unit by being made a unit trustee.[42]

3.   The Verdict

After deliberating just over four and a half hours on September 6, 2006, the jury returned its

verdict at the punishment phase of trial, finding (1) beyond a reasonable doubt there was a

probability the petitioner would commit criminal acts of violence that would constitute a continuing

threat to society and (2) unanimously that, taking into consideration all of the evidence, including

the circumstances of petitioner's offense and the petitioner's character, background, and personal

---

[41] S.F. Trial, Volume 42, testimony of Daneen Milan, at pp. 3-34, 38-40, 87-109.

On cross-examination, Dr. Mialm testified (1) petitioner exaggerated his condition on a pair of examinations she administered to him, (2) petitioner will require confrontation-type therapy to treat his attachment disorder, (3) petitioner tends to magnify his level of illness, i.e., exaggerates his symptoms, and tends to be self-pitying, (4) petitioner tends to get angry with those who do things slowly, (5) he does not consider his biological parents to be important parts of his life, (6) petitioner was sexually abused by his cousin Gilbert starting at age six, (7) petitioner's sexual abuse was common knowledge within his family but there are no records of any investigation into petitioner's alleged abuse and the first person petitioner ever told about being abused was his defense team's mitigation investigator, (8) petitioner's Aunt Loretta, used drugs with petitioner but also taught him right from wrong, (9) petitioner used drugs on a daily basis, spent all of his money on drugs, and even sold drugs on the street for Joe Leal, (10) petitioner broke into houses, including those of his own family to steal items to buy drugs, (11) petitioner denied kidnaping, raping, and murdering Townsend, (12) petitioner denied kidnaping and raping Teich, explaining he confessed to Teich's kidnaping and rape to spare his grandmother the trauma of a trial, (13) petitioner does not display any acceptance or responsibility or remorse for his crimes, (14) petitioner minimizes the bad things he has done in his life, (15) petitioner's grandparents were working when he was a child and were not there for him, (16) petitioner told her that no one had ever loved him, (17) petitioner is not insane, schizophrenic, or mentally ill, has a normal IQ, but nonetheless is about age thirteen or fourteen emotionally and mentally, (18) petitioner showed signs of conduct disorder as a teenager, has a history of criminal misconduct, as well as a history of deceitfulness, impulsivity, failure to plan ahead, irritability and aggressiveness, and reckless disregard for the safety of self and others, and (19) she believes petitioner should not be categorized as having Antisocial Personality Disorder because she believes petitioner does feel very guilty and does have a sense he did something wrong despite petitioner's demonstrated lack of remorse on some occasions whereas those with Antisocial Personality Disorder have no sense of right and wrong and feel no remorse. *Id.*, at pp. 40-87.

[42] S.F. Trial, Volume 42, testimony of Larry Fitzgerald, at pp. 122-48.

16

moral culpability, there was insufficient mitigating circumstance to warrant that a sentence of life imprisonment rather than a death sentence be imposed.[43]

E.    Direct Appeal

Represented by the same attorney who represents petitioner before this Court, petitioner filed his state appellant's brief on October 18, 2007, arguing therein ten points of error.[44]

In an unpublished collection opinions, the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence. *Gonzales v. State*, AP 75,540, 2009 WL 1684699 (Tex. Crim. App. June 17, 2009). The United States Supreme Court denied petitioner's petition for writ of certiorari on February 22, 2010. *Gonzales v. Texas*, 559 U.S. 942, 130 S.Ct. 1504, 176 L.Ed.2d 118 (2010).

F.    First State Habeas Corpus Proceeding

Petitioner filed his first state habeas corpus application on September 22, 2008, arguing therein (1) the petitioner's Sixth Amendment rights were violated bu virtue of the trial court's order directing the disclosure to the prosecution of defense expert Dr. Milam's work product and the

---

[43] S.F. Trial, Volume 43, at pp. 77-79; Trial Transcript, Volume 6 of 6, at pp. 1023-24. The time stamps in petitioner's state court records and the court reporters records reveal petitioner's jury began its punishment phase deliberations somewhere between 10:33 AM and 11:47 AM and returned its verdict at 3:12 PM the same date. The state court records before this Court do not reveal whether the jury retired for lunch at any point during its punishment phase deliberations.

[44] Petitioner's Appellant's Brief appears among the state court records relating to petitioner's state direct appeal submitted to this Court by respondent. As points of error in petitioner's Appellant's Brief, attorney Gross argued (1) the evidence at petitioner's trial was legally and factually insufficient to support the jury's guilty verdict because there was insufficient corroboration for the petitioner's confessions, (2) the state trial court erred in allowing the prosecution's mental health expert to opine regarding petitioner's future dangerousness in violation of petitioner's rights recognized in the Supreme Court's holding in *Daubert*, Rule 702 of the Texas Rules of Evidence, due process considerations, and the Fifth and Sixth Amendments, (3) the trial court erred in its definition of mitigating evidence when it instructed petitioner's jury that mitigating evidence reduces the defendant's moral blameworthiness, (4) the state trial court erred when it denied petitioner's request not to employ the definition or mitigating evidence the court included in petitioner's punishment phase jury instructions, and (5) the Texas twelve/ten rule contained in Article 37.071 of the Texas Code of criminal Procedure is unconstitutional because it forces a jury to continue to deliberate even after every juror has determined to answer a special issue favorable to the defense.

failure of petitioner's trial counsel to object to such disclosure and (2) the state trial court erred in failing to properly instruct petitioner's jury at the punishment phase of trial on the definition of mitigating evidence.[45]

In an Order issued October 24, 2008, the state trial court issued its findings of fact, conclusions of law, and recommendation that petitioner's first state habeas corpus application be denied.[46]

In an unpublished per curiam Order issued September 23, 2009, the Texas Court of Criminal Appeals adopted most of the trial court's findings and conclusions and denied relief. *Ex parte Ramiro Felix Gonzales*, WR 70,969-01, 2009 WL 3042409 (Tex. Crim. App. September 23, 2009).

G.    Initial Proceedings in this Court

On January 11, 2011, petitioner filed his original federal habeas corpus petition herein. *Docket entry no. 12.* Shortly thereafter, petitioner requested a stay in the proceedings before this Court to permit petitioner to return to state court and develop then-unexhausted claims for relief. *Docket entry no. 13.* In an Order issued January 31, 2011, this Court granted petitioner's motion for stay. *Docket entry no. 16.*

H.    Second State Habeas Proceeding & Other State Proceedings

On February 23, 2011, petitioner filed his second state habeas corpus application, arguing therein (1) petitioner's Fifth and Sixth Amendment rights were violated when an unauthorized visiting judge signed the findings of fact and conclusions of law in petitioner's first state habeas

---

[45] Petitioner's first state habeas corpus application is found among the state court records relating to petitioner's first state habeas corpus proceeding, i.e., App. 70,969-01 (henceforth "First State Habeas Transcript"), at pp. 11-19.

[46] First State Habeas Transcript, at pp. 24-27. The state trial court did not initially hold an evidentiary hearing on petitioner's state habeas claims.

18

corpus proceeding, (2) his trial counsel rendered ineffective assistance by (a) failing to obtain proper experts to present mitigating evidence showing petitioner suffers from fetal alcohol syndrome, (b) failing to present expert testimony showing petitioner suffered from sexual, emotional, physical, and biological abuse, and (c) providing privileges work product to the prosecution, (3) the trial court erred in directing the defense's expert to produce work product (i.e., Dr. Milam's file) to the prosecution, (4) the trial court failed to properly instruct the jury at the punishment phase of trial regarding the definition of mitigating evidence, (5) there was insufficient evidence to support petitioner's conviction, and (6) the trial court erred in permitting the state's mental health expert to express an opinion regarding petitioner's future dangerousness.[47]

In an unpublished per curiam Order issued February 1, 2012, the Texas Court of Criminal Appeals summarily dismissed petitioner's second state habeas corpus application pursuant to the Texas writ-abuse statute. *Ex parte Ramiro F. Gonzales*, WR 70,969-02, 2012 WL 340407 (Tex. Crim. App. February 1, 2012).

In the same Order, however, the Texas Court of Criminal Appeals also reopened and remanded petitioner's first state habeas corpus proceeding to the trial court for reconsideration and an opportunity to develop the record and re-evaluate the findings of fact and conclusions of law therein. *Ex parte Ramiro F. Gonzales*, WR 70,969-01, 2012 WL 340407 (Tex. Crim. App. February 1, 2012).

In an Order issued May 14, 2012, the state habeas trial court re-adopted its original findings and conclusions and recommendation in petitioner's first state habeas corpus proceeding. In an

---

[47] The petitioner's second state habeas corpus application appeals among the records relating to petitioner's second state habeas corpus proceeding submitted to this Court by respondent, i.e., App. 70,969-02 (henceforth "Second State Habeas Transcript"), at pp. 2-112.

unpublished per curiam Order issued June 27, 2012, the Texas Court of Criminal Appeals adopted the trial court's findings and conclusions and denied relief. *Ex parte Ramiro F. Gonzales*, WR 70,969-01, 2012 WL 2424176 (Tex. Crim. App. June 27, 2012).

I.    <u>Return to this Court</u>

On October 25, 2012, petitioner filed his amended federal habeas corpus petition herein, including eleven claims in which petitioner argues (1) his trial counsel rendered ineffective assistance by (a) failing to obtain expert testimony showing petitioner suffers from fetal alcohol syndrome, (b) failing to present expert testimony showing petitioner suffers from the adverse effects of sexual, emotional, and physical abuse he suffered as a child, and (c) providing privileged information (i.e., Dr. Milam's work product) to the prosecution, (2) the trial court violated the Sixth Amendment when it ordered the disclosure of Dr. Milam's test results and other documentation from her evaluation of petitioner, (3) the trial court failed to properly instruct petitioner's punishment phase on the definition of mitigating evidence, (4) there was insufficient corroborating evidence to support petitioner's conviction, (5) the state trial court erred in allowing the prosecution's mental health expert to testify regarding petitioner's propensity for future dangerousness, and (6) the admission of expert opinion testimony on the subject of future dangerousness violates Fifth, Sixth, and Eighth Amendment principles. *Docket entry no. 28.*

On December 21, 2012, respondent filed his answer to petitioner's amended petition, arguing, in pertinent part (1) petitioner's ineffective assistance claims were either procedurally defaulted or wholly conclusory and without arguable merit, (2) there were no fact-specific allegations in petitioner's pleadings establishing that any of Dr. Milam's test results or research notes constituted privileged attorney work product, (3) the definition of mitigating evidence employed by the state trial

court has repeatedly been approved by the federal courts, (4) petitioner's insufficient evidence claim is premised upon alleged violations of state evidentiary rules which do not warrant federal habeas corpus relief, (5) the federal courts have repeatedly upheld the admissibility of expert opinion testimony regarding a defendant's future dangerousness, and (6) the evidence presented during the punishment phase of petitioner's capital murder trial was so overwhelming as to render petitioner's complaints about the admission of Dr. Gripon's opinion testimony harmless error, at best. *Docket entry no. 29.*

## II. <u>Standard of Review</u>

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141, 125 S.Ct. 1432, 1438, 161 l.Ed.2d 334 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas

court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. at 141, 125 S.Ct. at 1438; *Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003)("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U.S. at 16, 124 S.Ct. at 10.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton*, 544 U.S. at 141, 125 S.Ct. at 1439; *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534-35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132-33, 130 S.Ct. 665, 673, 175 L.Ed.2d 582 (2010)("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of...clearly established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U.S. at 520-21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was

objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007)("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520, 123 S.Ct. at 2535; *Price v. Vincent*, 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003)("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

> As the Supreme Court has recently explained:

> Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Bobby v. Dixon*, ___ U.S. ___, ___, 132 S.Ct. 26, 27, 181 L.Ed.2d 328 (2011)(quoting *Harrington v. Richter*, 562 U.S. ___, ___, 131 S.Ct. 770, 786–87, 178 L.Ed.2d 624 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004)("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. Section 2254(d)(2) of Title 28, United States Code, provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's

adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, 558 U.S. 290, 301, 130 S.Ct. 841, 849, 175 L.Ed.2d 738 (2010)("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410, 120 S.Ct. at 1522 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood v. Allen*, 558 U.S. at 301, 130 S.Ct. at 849; *Rice v. Collins*, 546 U.S. 333, 341-42, 126 S.Ct. 969, 976, 163 L.Ed.2d 824 (2006).

In addition, Section 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U.S. at 473-74, 127 S.Ct. at 1939-40 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. 333, 338-39, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006)("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005)("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1). It remains unclear at this juncture whether Section 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under Section 2254(d)(2). *See Wood v. Allen*, 558 U.S. at 300, 130

S.Ct. at 849 (choosing not to resolve the issue of Section 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice v. Collins*, 546 U.S. at 339, 126 S.Ct. at 974 (likewise refusing to resolve the Circuit split regarding the application of Section 2254(e)(1)).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S. at 240, 125 S.Ct. at 2325 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003)("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010)(federal habeas review of a state court's adjudication involves review only of a state court's decision, not the written opinion explaining the decision), *cert. denied*, ___ U.S. ___, 132 S.Ct. 124, 181 L.Ed.2d 46 (2011); *St. Aubin v. Quarterman*, 470 F.3d 1096, 1100 (5th Cir. 2006)(holding Section 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 550 U.S. 921 (2007); *Amador v. Quarterman*, 458 F.3d 397, 410 (5th Cir. 2006)(holding the same), *cert. denied*, 550 U.S. 920 (2007); *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003)(holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable), *cert. denied*, 541 U.S. 1045 (2004);

*Anderson v. Johnson*, 338 F.3d 382, 390 (5th Cir. 2003)(holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002)(*en banc*)(holding a federal court is authorized by §2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 537 U.S. 1104 (2003).

### III. Insufficient Evidence Claim

A.    The Claim

In his fourth claim in his amended petition, petitioner argues there was insufficient evidence to corroborate petitioner's confession under each of the three theories of capital murder included in the indictment, i.e., murder in the course of committing robbery, sexual assault, and kidnaping.[48]

B.    State Court Disposition

Petitioner presented this same series of arguments as his first point of error on direct appeal.[49] The Texas Court of Criminal Appeals denied relief on the merits, concluding as follows:

> [T]here was ample independent corroborative evidence rendering it more probable than it would have been otherwise that Townsend's death was caused by the criminal act of another.
>
> Next, the appellant asserts that the independent evidence was not sufficient to corroborate his confession that he committed the underlying offenses of robbery, kidnapping [sic], or aggravated sexual assault. However, the jury could convict the appellant of capital murder if it found the murder was committed during the course of any one of these disjunctively charged underlying offenses. Here, the independent evidence sufficiently corroborated the appellant's confession to at least one of the underlying offenses.

---

[48] Petitioner's Amended Petition, filed October 25, 2012, docket entry no. 28 (henceforth "Amended Petition"), at pp. 49-59.

[49] *Brief for the Appellant*, at pp. 10-21.

26

Concerning the underlying offense of kidnapping [sic], Leal's testimony was evidence that Townsend had planned to be at home, and was home, on the night she disappeared. Townsend's purse, keys, and truck were still at the house in their usual places when she left. These facts tended to show that Townsend did not leave home willingly. That she was moved from the house, and that there were no signs of a struggle or an injury, tended to show that she was alive when she left. A rifle matching the one the appellant said he had used to shoot Townsend was found in his grandfather's ranch truck, where the appellant said he had obtained it, on the ranch where Townsend's remains were found. This evidence further indicates that Townsend was alive when she was taken from her house to the ranch. The appellant directed MacMillian on a circuitous route over caliche roads, jeep trails, and scrub land to the remote location of Townsend's remains. This fact corroborates his statement that he took her to that location.

There was also independent evidence to corroborate the appellant's confession to the robbery. Leal's testimony confirmed that money was taken from the house at the same time that Townsend disappeared. His testimony concerning the amount of money taken and its location on a shelf in his bedroom closet was consistent with the appellant's confession. This evidence rendered the appellant's commission of robbery more probable than it would have been, if it had been based on the appellant's confession alone.

*Gonzales v. State*, AP 75,540, 2009 WL 1684699, at *4 (*Footnotes omitted*).

Petitioner re-urged the same arguments as his fifth claim in his second state habeas corpus application.[50] The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application pursuant to the Texas writ-abuse statute. *Ex parte Ramiro F. Gonzales*, WR 70,696-02, 2012 WL 340407, at *1.

C.   Clearly Established Federal Law

For more than a generation, the United States Supreme Court has consistently applied a single standard for evaluating the sufficiency of the evidence to support a state criminal jury verdict. "In *Jackson v. Virginia,* 443 U.S. 307, [324], 99 S.Ct. 2781, [2791-92], 61 L.Ed.2d 560 (1979), we held that a state prisoner is entitled to habeas corpus relief if a federal judge finds that

---

[50] Second State Habeas Transcript, at pp. 58-68.

'upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'" *McDaniel v. Brown*, 558 U.S. 120, 121, 130 S.Ct. 665, 666, 175 L.Ed.2d 582 (2010)(*citation omitted*). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789; *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir.), *cert. denied*, 555 U.S. 995, 129 S.Ct. 496, 172 L.Ed.2d 358 (2008). To determine whether the evidence is sufficient to support a state criminal conviction, we must look to state law for the substantive elements of the relevant criminal offense. *Jackson v. Virginia*, 443 U.S. at 324 n.16, 99 S.Ct. at 2792 n.16. The standard of federal habeas review for insufficient evidence claims under the AEDPA is highly deferential. *See McDaniel v. Brown*. 558 U.S. at 133, 130 S.Ct. at 673 ("a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'").

D.   <u>AEDPA Analysis</u>

Respondent correctly points out that, insofar as petitioner argues there was "insufficient evidence" in the record to corroborate petitioner's confession to capital murder under the Texas corpus delicti rule, petitioner's argument is non sequitur. "Under *Jackson*, federal courts must look to state law for 'the substantive elements of the criminal offense,' 443 U.S., at 324, n. 16, 99 S.Ct. 2781, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman v. Johnson*, ___ U.S. ___, ___, 132 S.Ct. 2060, 2064, 182 L.Ed.2d 978 (2012).

28

Under Texas law, a person commits the offense of capital murder when he intentionally commits murder in the course of committing or attempting to commit kidnaping, burglary, robbery, aggravated sexual assault, or several other listed offenses. *Texas Penal Code Annotated, Section 19.03(a)(2) (Vernon Supp. 2011).*  Viewed in the light most favorable to the jury's verdict, petitioner's voluntary confession, quoted at length in Section I.A. above, established all of the essential elements of capital murder as defined by applicable Texas law.  Petitioner admitted (1) he went to Leal's home on the night in question with full knowledge Townsend would be there and with the intention of taking Leal's money, (2) after taking Leal's money, he assaulted and bound Townsend and transported her against her will to an isolated location where she unsuccessfully attempted to barter her sexual favors for her life, and (3) after having what was clearly involuntary sexual relations with Townsend, he shot her at point blank range and left her body in the isolated location to decompose.  Petitioner's confession furnished more than ample evidence from which a reasonable jury could conclude petitioner was guilty of capital murder under all three factual theories contained in petitioner's indictment.  In addition, the prosecution presented testimony from multiple witnesses establishing petitioner admitted he killed Townsend and then led law enforcement authorities to the isolated location on the ranch on which petitioner grew up where Townsend's skeletal remains and jewelry were discovered.[51]

E.    Conclusion

---

[51] S.F. Trial, Volume 35, James MacMillian, at pp. 64-82; testimony of Della Baker, at pp. 94-99; testimony of Skylor Hearn, at pp. 117-32.  During his confession, petitioner revealed the approximate amount and location of the money he took from Leal's bedroom closet on the night of Townsend's abduction, a pair of facts that were not known publically. *Id.,* testimony of Skylor Hearn, at pp. 142-44.

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's insufficient evidence claim in the course of petitioner's direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and direct appeal. Petitioner's fourth claim herein does not warrant federal habeas corpus relief.

### IV. Admission of Dr. Gripon's Opinion Testimony

A.     The Claims

In his fifth through ninth claims herein, petitioner argues the trial court's admission of opinion testimony from prosecution mental health expert Dr. Gripon regarding petitioner's future dangerousness was erroneous and violated (1) the reliability standard announced by the Supreme Court in *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); (2) the state trial court's duty to act as an impartial gatekeeper for scientific evidence under *Daubert, supra*, and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); (3) Rule 702 of the Texas Rules of Evidence;  (4) petitioner's constitutional rights under the Fifth and Sixth Amendment's Due Process principles, and (5) petitioner's constitutional rights under the Sixth Amendment's guarantee of a fair and impartial trial.[52]

B.     State Court Disposition

---

[52] *Amended Petition*, at pp. 60-101.
     The arguments petitioner makes under his "tenth" and "eleventh" claims herein appear to correspond to the petitioner's eighth and ninth claims herein. *Id.*, at pp. 81-101. Petitioner did not list a tenth or eleventh claim in the table of contents for his Amended Petition. Petitioner's Amended Petition does not include any other specific arguments supporting his eighth and ninth claims herein. The listing of heading "Argument and Authorities in Support of Claims X and XI" on page 81 of petitioner's Amended Petition appears to a typographical error. Therefore, this Court will construe pages 81-101 of petitioner's Amended Petition as addressing petitioner's eighth and ninth claims herein and will disregard the petitioner's reference to a tenth and eleventh claim.

Petitioner presented many but far from all of the same arguments contained in his fifth through ninth claims herein as his third through seventh points of error on direct appeal.[53]  The Texas Court of Criminal Appeals rejected petitioner's arguments on the merits, concluding as follows:

> In points of error three and four, the appellant makes a global, broad-based assertion that the trial court erred by taking judicial notice of the relevance and reliability of psychiatric and psychological expert testimony on the issue of future dangerousness, rather than performing an independent "gatekeeping" function and making an independent determination as to whether a psychiatric or psychological expert could ever offer an opinion on future dangerousness that would be sufficiently relevant and reliable.  However, the trial court did not abuse its discretion by taking judicial notice of the general relevance of such testimony. This Court has repeatedly held that testimony from mental-health experts is relevant to the issue of future dangerousness.  Furthermore, contrary to the appellant's assertion, the trial court did not take judicial notice of the reliability of the State's expert's testimony in this particular case; rather, the court held a hearing before making that determination. Points of error three and four are overruled.
>
> In points of error five, six, and seven, the appellant asserts that the trial court erred in finding that the future-dangerousness testimony of the State's expert in this case, Dr. Edward Gripon, was based on scientifically valid reasoning or methodology.  A trial court's ruling on the admissibility of scientific expert testimony is reviewed under an abuse of discretion standard.  When "soft" sciences are at issue, the trial court should inquire: (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies on or utilizes the principles involved in the field.

---

[53] Brief for the Appellant, at pp. 22-44.

As correctly pointed out by respondent, petitioner's brief on direct appeal did not include any of the legal arguments petitioner presents in support of his eighth and ninth claims herein. *Id.*, at pp. 43-44.  In fact, petitioner's Brief for the Appellant contained none of the Fifth, Sixth, and Eighth Amendment arguments petitioner now presents to this Court as his eighth and ninth claims herein. *Compare* Brief for the Appellant, at pp. 43-44 with *Amended Petition*, at pp. 81-101.  Thus, despite this court having stayed this cause to permit petitioner to exhaust available state habeas remedies on all claims petitioner wished to present to this Court, petitioner has deliberately failed to "fairly present" the state courts with any of the Fifth, Sixth, or Eighth Amendment legal arguments he presents to this Court in support of his eighth and ninth claims herein.

Prior to Gripon's testimony at trial, the trial court held a hearing to determine the reliability of his testimony. At the hearing, Gripon testified that he was a medical doctor with a specialty in psychiatry and board certifications in general and forensic psychiatry. He had performed forty to fifty future-dangerousness case evaluations and had testified on the issue of future dangerousness many times. He further testified that determinations of future dangerousness are a legitimate function of forensic psychiatrists. He related that forensic psychiatrists typically rely on interviews, when allowed, and all of the collateral information available, to develop a profile of the person. The best predictor of future dangerousness would be the person' past history. Gripon testified that actuarial methods involved looking at how often things occurred in the death-row population versus the population of others convicted of murder. Gripon acknowledged that there was not one method of performing a future-dangerousness evaluation that was accepted as always right.

Gripon described his method as obtaining "every shred of information" he could get and then fitting it into a "mental health jigsaw puzzle" to see what it looked like. This method was a combination of a clinical assessment and the actuarial method. He would then determine whether he had enough information to feel comfortable in offering an opinion. In this case, he had reviewed the appellant' juvenile records, criminal records, offense reports, jail records, and audio recordings of four telephone calls the appellant had placed from jail. He also interviewed the appellant, but he did not discuss the results of that interview. He testified that he had not attempted to investigate beyond the materials furnished by the State because he felt that those materials were enough to enable him to offer an opinion. The trial court accepted him as an expert.

Based on the record before us, we find the reliability of Gripon's testimony to be sufficiently established under *Nenno* and Rule 702. Thus, we conclude that the trial court did not abuse its discretion in admitting the expert testimony on future dangerousness. Points of error five, six, and seven are overruled.

*Gonzales v. State*, 2009 WL 1684699, at *5 -*6 (*Footnotes omitted*).

Petitioner presented an expanded version of his fifth through ninth claims herein as his sixth through tenth claims in his second state habeas corpus proceeding and included therein for the first time all of the Fifth, Sixth, and Eighth Amendment arguments contained in his eighth and ninth claims herein.[54] The Texas Court of Criminal Appeals dismissed petitioner's second

---

[54] Second State Habeas Transcript, at pp. 68-110.

32

state habeas corpus application pursuant to the Texas writ-abuse statute. *Ex parte Ramiro F. Gonzales*, WR 70,696-02, 2012 WL 340407, at *1.

C.     Clearly Established Federal Law

A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling violates a specific federal constitutional right or is so egregious it renders the petitioner's trial fundamentally unfair. *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991); *Darden v. Wainwright*, 477 U.S. 168, 179-83, 106 S.Ct. 2464, 2470-72, 91 L.Ed.2d 144 (1986); *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007), *cert. denied*, 552 U.S. 1314 (2008); *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005), *cert. denied*, 546 U.S. 1217 (2006); *Bigby v. Dretke*, 402 F.3d 551, 563 (5th Cir. 2005), *cert. denied*, 546 U.S. 900 (2005); *Wilkerson v. Cain*, 233 F.3d 886, 890 (5th Cir. 2000).

Insofar as petitioner complains about alleged errors by the state court in applying state procedural and evidentiary rules, those complaints do not, standing alone, furnish a basis for federal habeas corpus relief.  Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *See Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991)(holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990)(recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d 29 (1984)(holding a federal court may not issue the writ on the basis of a perceived error of state law).  In the course of reviewing state criminal convictions in

federal habeas corpus proceedings, a federal court does *not* sit as a super-state appellate court.

*Estelle v. McGuire*, 502 U.S. at 67-68, 112 S.Ct. at 480; *Lewis v. Jeffers*, 497 U.S. at 780, 110

S.Ct. at 3102; *Pulley v. Harris*, 465 U.S. at 41, 104 S.Ct. at 874.

>   When a federal district court reviews a state prisoner's habeas petition pursuant
>   to 28 U.S.C. § 2254 it must decide whether the petitioner is "in custody in
>   violation of the Constitution or laws or treaties of the United States." The court
>   does not review a judgment, but the lawfulness of the petitioner's custody
>   *simpliciter.*

*Coleman v. Thompson*, 501 U.S. 722, 730, 111 S.Ct. 2546, 2554, 115 L.Ed.2d 640 (1991).

>   The Supreme made clear in *Barefoot v. Estelle*, 463 U.S. 880,

103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), the admissibility of expert testimony regarding future

dangerousness in capital murder trial was not subject to debate among reasonable jurists:

>   The suggestion that no psychiatrist's testimony may be presented with
>   respect to a defendant's future dangerousness is somewhat like asking us to
>   disinvent the wheel. In the first place, it is contrary to our cases. If the likelihood
>   of a defendant committing further crimes is a constitutionally acceptable criterion
>   for imposing the death penalty, which it is, *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct.
>   2950, 49 L.Ed.2d 929 (1976), and if it is not impossible for even a lay person
>   sensibly to arrive at that conclusion, it makes little sense, if any, to submit that
>   psychiatrists, out of the entire universe of persons who might have an opinion on
>   the issue, would know so little about the subject that they should not be permitted
>   to testify. In *Jurek,* seven Justices rejected the claim that it was impossible to
>   predict future behavior and that dangerousness was therefore an invalid
>   consideration in imposing the death penalty. Justice STEVENS responded directly
>   to the argument, 428 U.S., at 274–276, 96 S.Ct., at 2957–2958:
>
>>   "It is, of course, not easy to predict future behavior. The fact that
>>   such a determination is difficult, however, does not mean that it
>>   cannot be made. Indeed, prediction of future criminal conduct is
>>   an essential element in many of the decisions rendered throughout
>>   our criminal justice system. The decision whether to admit a
>>   defendant to bail, for instance, must often turn on a judge's
>>   prediction of the defendant's future conduct. Any sentencing
>>   authority must predict a convicted person's probable future conduct
>>   when it engages in the process of determining what punishment to
>>   impose. For those sentenced to prison, these same predictions
>>   must be made by parole authorities. The task that a Texas jury

34

> must perform in answering the statutory question in issue is thus
> basically no different from the task performed countless times each
> day throughout the American system of criminal justice. What is
> essential is that the jury have before it all possible relevant
> information about the individual defendant whose fate it must
> determine. Texas law clearly assures that all such evidence will be adduced."

Although there was only lay testimony with respect to dangerousness in *Jurek,* there was no suggestion by the Court that the testimony of doctors would be inadmissible. To the contrary, the Court said that the jury should be presented with all of the relevant information. Furthermore, in *Estelle v. Smith,* 451 U.S. 454, 473, 101 S.Ct. 1866, 1878, 68 L.Ed.2d 359 (1981), in the face of a submission very similar to that presented in this case with respect to psychiatric testimony, we approvingly repeated the above quotation from *Jurek* and went on to say that we were in "no sense disapproving the use of psychiatric testimony bearing on future dangerousness." See also *California v. Ramos,* 463 U.S. 992, 1003, 1007-08, n. 17, 103 S.Ct. 3446, 3455, 3457, n. 17, 75 L.Ed.2d 1171 (1983); *Gregg v. Georgia,* 428 U.S. 153, 203–204, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976) (joint opinion) (desirable to allow open and far-ranging argument that places as much information as possible before the jury).

> Acceptance of petitioner's position that expert testimony about future dangerousness is far too unreliable to be admissible [sic] would immediately call into question those other contexts in which predictions of future behavior are constantly made.

*Barefoot v. Estelle,* 463 U.S. at 896-98, 103 S.Ct. at 3396-97.

The same term it decided *Barefoot,* the Supreme Court emphasized in *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), the importance of permitting a capital sentencing jury to consider all relevant evidence regarding the defendant's future dangerousness:

> "It is, of course, not easy to predict future behavior. The fact that such a
> determination is difficult, however, does not mean that it cannot be made. Indeed,
> prediction of future criminal conduct is an essential element in many of the
> decisions rendered throughout our criminal justice system.... And any sentencing
> authority must predict a convicted person's probable future conduct when it
> engages in the process of determining what punishment to impose. For those
> sentenced to prison, these same predictions must be made by parole authorities.
> The task that a Texas jury must perform in answering the statutory question in

35

> issue is thus basically no different from the task performed countless times each
> day throughout the American system of criminal justice. What is essential is that
> the jury have before it all possible relevant information about the individual
> defendant whose fate it must determine. Texas law clearly assures that all such
> evidence will be adduced."

*California v. Ramos*, 463 U.S. at 1002-03, 103 S.Ct. at 3454 (*quoting Jurek v. Texas*, 428 U.S. 262, 274-76, 96 S.Ct. 2950, 2957-58, 49 L.Ed.2d 929 (1976)).

D.     AEDPA Review of Exhausted Claims

In his fifth and sixth claims herein, petitioner argues the Supreme Court's opinions regarding the general standards for the admission of expert testimony set forth in *Daubert, supra,* and *Kumho Tire, supra*, effectively overruled its holding in *Barefoot* permitting the admission of expert testimony regarding future dangerousness at the sentencing phase of a capital murder trial. These same arguments were "fairly presented" to the Texas Court of Criminal Appeals and rejected by that state appellate court on the merits in the course of petitioner's direct appeal. The same is true with regard to petitioner's seventh claim herein, in which petitioner argues the admission of Dr. Gripon's opinion testimony on petitioner's future dangerousness violated Rule 702 of the Texas Rules of Evidence. These three claims, including the factual and legal arguments supporting same, have been fully exhausted and, thus, are properly before this Court in this federal habeas corpus proceeding and subject to review pursuant to the AEDPA.

Insofar as petitioner argues in his seventh claims herein that Dr. Gripon's testimony was inadmissible pursuant to Rule 702 of the Texas Rules of Evidence, that contention simply does not warrant federal habeas corpus relief. *See Little v. Johnson*, 162 F.3d 855, 862-63 (5th Cir. 1998)(emphasizing a federal habeas court does not sit to review the admissibility of evidence under state law and holding admissible expert opinion testimony regarding future dangerousness premised upon a hypothetical question), *cert. denied*, 526 U.S. 1118 (1999). Furthermore, in the

course of petitioner's direct appeal, the Texas Court of Criminal Appeals expressly rejected he

petitioner's state-law argument, holding the state trial court's admission of Dr. Gripon's expert

testimony was not an abuse of discretion under Rule 702 of the Texas Rules of Evidence.

*Gonzales v. State*, 2009 WL 1684699, at *6. A state court's interpretation of state law binds a

federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S.Ct. 602, 603,

163 L.Ed.2d 407 (2005); *Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009), *cert.*

*denied,* ___ U.S. ___, 131 S.Ct. 1050, 178 L.Ed.2d 870 (2011); *Wood v. Quarterman*, 503 F.3d

408, 414 (5th Cir. 2007), *cert. denied*, 552 U.S. 1314 (2008).

Insofar as petitioner argues in his fifth and sixth claims herein that the Supreme Court's

opinions in *Daubert* and *Kumho Tire* overruled *Barefoot sub silentio,* that contention has been

rejected repeatedly, both expressly and implicitly, by the Fifth Circuit. *See Roberts v. Thaler*, 681

F.3d 597, 608-09 (5th Cir.)(applying *Barefoot* in the course of rejecting an Eighth Amendment

challenge to a state trial court's limitation on the scope of a mental health expert's testimony at

the punishment phase of a capital trial), *cert. denied,* ___ U.S. ___, 133 S.Ct. 529, 184 L.Ed.2d

345 (2012); *United States v. Fields*, 483 F.3d 313, 343-45 (5th Cir. 2007)(applying the holding in

*Barefoot* to reject a complaint about the admission of allegedly "unreliable" expert testimony

regarding future dangerousness during a federal capital trial and specifically holding *Barefoot*

foreclosed Fifth and Eighth Amendment arguments challenging the admissibility of expert

testimony regarding future dangerousness), *cert. denied*, 552 U.S. 1144 (2008); *Guy v. Cockrell*,

343 F.3d 348, 351 n.1 (5th Cir. 2003)(denying a Certificate of Appealability on a complaint that

the prosecution presented "fundamentally unreliable expert testimony regarding future

dangerousness"); *Johnson v. Cockrell*, 306 F.3d 249, 253-55 (5th Cir, 2002)(rejecting the

contention that *Daubert* overruled *Barefoot* regarding the admissibility of expert testimony on

future dangerousness and holding a complaint that the defendant's trial counsel rendered

ineffective assistance by failing to object to the admission of such expert testimony was so

meritless as not to warrant a Certificate of Appealability), *cert. denied*, 538 U.S. 926 (2003).  In

each of the foregoing cases, decided subsequent to the Supreme Court's opinions in both

*Daubert* and *Kumho Tire*, the Fifth recognized the continuing vitality of the Supreme Court's

holding in *Barefoot* authorizing the admission of expert testimony regarding future

dangerousness during the punishment phase of a capital trial.  In so doing, the Fifth Circuit

implicitly rejected those portions of the legal arguments underlying petitioner's eighth and ninth

claims herein which petitioner "fairly presented" to the Texas Court of Criminal Appeals in the

course of petitioner's direct appeal.  The Supreme Court's holdings in *Barefoot and California v.*

*Ramos,* quoted extensively above, remain the law of the land.  Petitioner's contention that

*Daubert* and *Kumho Tire* implicitly overruled *Barefoot's* holding regarding the admissibility of

expert opinion testimony regarding future dangerousness in a capital murder trial has been

rejected by the Fifth Circuit consistently and does not warrant federal habeas corpus relief.

E.     Procedural Default and *De Novo* Review of Unexhausted Claims

1.     Procedural Default on Unexhausted Claims

Procedural default occurs where (1) a state court clearly and expressly bases its dismissal

of a claim on a state procedural rule, and that procedural rule provides an independent and

adequate ground for the dismissal, or (2) the petitioner fails to exhaust all available state

remedies, and the state court to which he would be required to petition would now find the

claims procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1, 111 S.Ct. 2546, 2557

n.1, 115 L.Ed.2d 640 (1991). In either instance, the petitioner is deemed to have forfeited his federal habeas claim. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S.Ct. 1728, 1734, 144 L.Ed.2d 1 (1999).

Before seeking federal habeas corpus relief, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' *federal* rights. *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S.Ct. 1728, 1731, 144 L.Ed.2d 1 (1999); *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995); *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); 28 U.S.C. §2254(b)(1). To provide the State with this necessary "opportunity," the prisoner must "fairly present" his claim to the appropriate state court in a manner that alerts that court to the federal nature of the claim. *See Baldwin v. Reese*, 541 U.S. at 29-32, 124 S.Ct. at 1349-51 (rejecting the argument that a petitioner "fairly presents" a federal claim, despite failing to give any indication in his appellate brief of the federal nature of the claim through reference to any federal source of law, when the state appellate court could have discerned the federal nature of the claim through review of the lower state court opinion); *O'Sullivan v. Boerckel*, 526 U.S. at 844-45, 119 S.Ct. at 1732-33 (holding comity requires that a state prisoner present the state courts with the first opportunity to review a federal claim by invoking one complete round of that State's established appellate review process); *Gray v. Netherland*, 518 U.S. 152, 162-63, 116 S.Ct. 2074, 2081, 135 L.Ed.2d 457 (1996) (holding that, for purposes of exhausting state remedies, a claim for *federal* relief must include reference to a specific constitutional guarantee, as well as a statement of facts that entitle the petitioner to relief and rejecting the contention that

the exhaustion requirement is satisfied by presenting the state courts only with the facts necessary to state a claim for relief).

The exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts and, thereby, to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. *Carey v. Saffold*, 536 U.S. 214, 220, 122 S.Ct. 2134, 2138, 153 L.Ed.2d 260 (2002); Duncan v. Walker, 533 U.S. 167, 179, 121 S.Ct. 2120, 2128, 150 L.Ed.2d 251 (2001); *O'Sullivan v. Boerckel*, 526 U.S. at 845, 119 S.Ct. at 1732; *Rose v. Lundy*, 455 U.S. 509, 518-19, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982).

Under the AEDPA, federal courts lack the power to grant habeas corpus relief on unexhausted claims. *Kunkle v. Dretke*, 352 F.3d 980, 988 (5th Cir. 2003)("28 U.S.C. § 2254(b)(1) requires that federal habeas petitioners fully exhaust remedies available in state court before proceeding in federal court."), *cert. denied*, 543 U.S. 835 (2004),; *Riley v. Cockrell*, 339 F.3d 308, 318 (5th Cir. 2003); *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003); *Henry v. Cockrell*, 327 F.3d 429, 432 (5th Cir. 2003)("Absent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief."), *cert. denied*, 540 U.S. 956 (2003); *Mercadel v. Johnson*, 179 F.3d 271, 276-77 (5th Cir. 1999); *Alexander v. Johnson*, 163 F.3d 906, 908 (5th Cir. 1998); *Jones v. Jones*, 163 F.3d 285, 299 (5th Cir. 1998), *cert. denied*, 528 U.S. 895 (1999). However, Title 28 U.S.C. §2254(b)(2) empowers a federal habeas court to deny an unexhausted claim on the merits. *Pondexter v. Quarterman*, 537 F.3d 511, 527 (5th Cir. 2008), *cert, denied*, 555 U.S. 1219, 129 S.Ct. 544, 173 L.Ed.2d 671 (2009)); *Moreno v. Dretke*, 450 F.3d 158, 166 (5th Cir. 2006), *cert.*

*denied*, 549 U.S. 1120, 127 S.Ct. 935, 166 L.Ed.2d 717 (2007); *Smith v. Cockrell*, 311 F.3d 661, 684 (5th Cir. 2002), *cert. dism'd*, 541 U.S. 913 (2004); *Daniel v. Cockrell*, 283 F.3d 697, 701-02 (5th Cir. 2002), *cert. denied*, 537 U.S. 874 (2002). The exhaustion of *all* federal claims in state court is a fundamental prerequisite to requesting federal collateral relief under Title 28 U.S.C. Section 2254. *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001); *Sterling v. Scott*, 57 F.3d 451, 453 (5th Cir. 1995), *cert. denied*, 516 U.S. 1050 (1996); 28 U.S.C. §2254(b)(1)(A).

In order to "exhaust" available state remedies, a petitioner must "fairly present" *all* of his claims to the state courts. *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995); *Picard v. Connor*, 404 U.S. at 270, 275-76, 92 S.Ct. 509, at 512-13, 30 L.Ed.2d 438 (1971); *Kunkle v. Dretke*, 352 F.3d at 988; *Riley v. Cockrell*, 339 F.3d at 318; *Anderson v. Johnson*, 338 F.3d at 386; *Jones v. Jones*, 163 F.3d at 296; *Shute v. State of Texas*, 117 F.3d 233, 237 (5th Cir. 1997)("a habeas petitioner 'must fairly apprize [sic] [the highest court of his state of the federal rights which were allegedly violated.'"). In Texas, the highest state court with jurisdiction to review the validity of a state criminal conviction is the Texas Court of Criminal Appeals. *Richardson v. Procunier*, 762 F.2d 429, 431-32 (5th Cir. 1985).

More simply, the exhaustion doctrine requires that the petitioner present his *federal* claim in a manner reasonably designed to afford the State courts a meaningful opportunity to address same. The exhaustion requirement is satisfied when the substance of the *federal* habeas claim has been "fairly presented" to the highest state court, i.e., the petitioner presents his claims before the state courts in a procedurally proper manner according to the rules of the state courts. *Baldwin v. Reese*, 541 U.S. at 29-32, 124 S.Ct. at 1349-51 (holding a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the

41

performance of said counsel "ineffective," without accompanying that label with either a reference to *federal* law or a citation to an opinion applying *federal* law to such a claim); *Moore v. Cain*, 298 F.3d 361, 364 (5th Cir. 2002), *cert. denied*, 537 U.S. 1236 (2003); *Mercadel v. Johnson*, 179 F.3d at 275.  However, the petitioner need not spell out each syllable of the claim before the state court for the claim to have been "fairly presented" and thereby fulfill the exhaustion requirement. *Riley v. Cockrell*, 339 F.3d at 318; *Fisher v. Texas*, 169 F.3d 295, 303 (5th Cir. 1999).

The exhaustion requirement is not met if the petitioner presents new legal theories or factual claims in his federal habeas petition. *Anderson v. Harless*, 459 U.S. 4, 6-7, 103 S.Ct. 276, 277-78, 74 L.Ed.2d 3 (1982); *Scott v. Hubert*, 635 F.3d 659, 667 (5th Cir.)(the exhaustion requirement has both a legal component and a factual component - the petitioner must present his claims to the state court within a "federal constitutional" framework and present the state court with the same material evidentiary support he offers the federal court), *cert. denied*, ___ U.S. ___, 132 S.Ct. 763, 181 L.Ed.2d 485 (2011); *Riley v. Cockrell*, 339 F.3d at 318 ("It is not enough that the facts applicable to the federal claims were all before the State court, or that the petitioner made a similar state-law based claim.  The federal claim must be the 'substantial equivalent' of the claim brought before the State court."); *Wilder v. Cockrell*, 274 F.3d at 259 ("where petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement"); *Finley v. Johnson*, 243 F.3d 215, 219 (5th Cir. 2001).  Likewise, to have "fairly presented" his <u>federal</u> claim, the petitioner must have reasonably alerted the state courts to the *federal* nature of his claim. *Baldwin v. Reese*, 541 U.S. at 29-32, 124 S.Ct. at 1349-51 (holding a petitioner failed to "fairly present" a claim of

ineffective assistance by his state appellate counsel merely by labeling the performance of said counsel "ineffective," without accompanying that label with either a reference to *federal* law or a citation to an opinion applying *federal* law to such a claim); *Wilder v. Cockrell*, 274 F.3d at 260 ("A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights.").

The Fifth Circuit has consistently held that federal habeas review on unexhausted claims presented by a convicted Texas criminal defendant is barred under the procedural default doctrine. See, e.g., Bagwell v. Dretke, 372 F.3d 748, 755-56 (5th Cir. 2004)(holding a petitioner procedurally defaulted by failing to "fairly present" a claim to the state courts in his state habeas corpus application), *cert. denied*, 543 U.S. 989 (2004); *Smith v. Cockrell*, 311 F.3d 661, 684 (5th Cir. 2002)(holding unexhausted claims were procedurally barred), *cert. dism'd*, 541 U.S. 913 (2004); *Jones v. Johnson*, 171 F.3d 270, 276-77 (5th Cir. 1999)(holding unexhausted ineffective claim procedurally barred from federal habeas review), *cert. denied*, 527 U.S. 1059 (1999); *Muniz v. Johnson*, 132 F.3d 214, 221 (5th Cir. 1998)(holding unexhausted claims procedurally barred), *cert. denied*, 523 U.S. 1113 (1998).

Section 5 of Article 11.071 of the Texas Code of Criminal procedure prohibits a successive state habeas corpus application except in limited circumstances which do not apply to petitioner's complaint about the violation of the presumption of innocence arising from the alleged vagueness of the first Texas capital sentencing special issue. *See* Art. 11.071, §5(a), Tex. Code Crim. Proc. Ann. (Vernon Supp. 2011)(barring consideration on the merits of new claims contained in a subsequent state habeas corpus application unless either (1) the new claims could

43

not have been presented in a previous application because the legal or factual basis for the new claims were unavailable at the time the previous application was filed, (2) by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt, or (3) by clear and convincing evidence, but for a violation of the United States Constitution, no rational juror would have answered in the state's favor one or more of the capital sentencing special issues).  Absolutely nothing prevented petitioner from asserting the legal arguments he presents to this Court in support of his final two claims herein in the course of his direct appeal or his second state habeas corpus proceeding. Petitioner did, in fact, present a highly abridged version of his eighth and ninth claims herein in his second state habeas corpus application.  However, petitioner's second state habeas corpus application did not even begin to "fairly present" even a substantial portion of the legal arguments set forth on pages 81-101 of his Amended Petition herein.

    2.    <u>Longstanding Exceptions to Procedural Default Doctrine</u>

The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus petitioner can show either (1) "cause and actual prejudice" for his default or (2) that failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750, 109 S.Ct. at 2565; *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989).  To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that petitioner's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson*, 501 U.S. at 753, 111 S.Ct. at 2566; *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)

(holding that proof of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine).  In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 335-36, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992).  In the context of the punishment phase of a capital trial, the Supreme Court has held that a showing of "actual innocence" is made when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under applicable state law. *Sawyer v. Whitley*, 505 U.S. at 346-48, 112 S.Ct. at 2523.  The Supreme Court explained in *Sawyer v. Whitley* this "actual innocence" requirement focuses on those elements which render a defendant *eligible* for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley*, 505 U.S. at 347, 112 S.Ct. at 2523.

Petitioner has wholly failed to make a colorable showing of factual innocence, either with regard to the guilt-innocence phase of his capital murder trial or in connection with the punishment phase of same.  Petitioner's confession established his guilt beyond a reasonable doubt and petitioner has identified no evidence before his capital sentencing jury (or identified at this juncture) which rendered petitioner ineligible for the death sentence under the Texas capital sentencing special scheme, i.e., which mandated an answer favorable to the defense on any of the Texas capital sentencing special issues.  The evidence at both phases of petitioner's trial was overwhelming.  Petitioner has failed to allege any specific facts showing any constitutional error occurred during either phase of his trial.  Thus, petitioner has failed to satisfy the "fundamental miscarriage of justice" exception to the procedural default doctrine.

Likewise, petitioner has failed to allege any specific facts sufficient to satisfy the "cause" and "actual prejudice" exception to the procedural default doctrine. Petitioner's complaints about the admission of Dr. Gripon's expert testimony regarding petitioner's future dangerousness are utterly without any arguable merit. *United States v. Fields*, 483 F.3d at 343-45; *Johnson v. Cockrell*, 306 F.3d at 253-55.

3.     Inapplicable Recently Recognized Narrow Exception

In a pair of recent decisions, the United States Supreme Court has recognized an equitable exception to the doctrine of procedural default where a federal habeas corpus petition can make a showing that his failure to exhaust available state remedies *on a federal constitutional claim of ineffective assistance by trial counsel* resulted from deficient performance on the part of the petitioner's state habeas counsel. More specifically, the Supreme Court's recent holding in *Martinez v. Ryan*, 566 U.S. 1,  132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), carved out of the Supreme Court's procedural default jurisprudence a narrow exception for *claims of ineffective assistance by trial counsel* which were not raised in a convicted criminal defendant's state habeas corpus proceeding because of the ineffective assistance of the defendant's state habeas counsel. *See Martinez v. Ryan*, 566 U.S. at ___, 132 S.Ct. at 1315 ("Inadequate assistance of counsel at initial review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial). In *Trevino v. Thaler*, ___ U.S. ___, ___, 133 S.Ct. 1911, 1912, 185 L.Ed.2d 1044 (2013), the Supreme Court reaffirmed the narrow focus of its holding in *Martinez*: "In *Martinez v. Ryan*, 566 U.S. 1, __, 132 S.Ct. 1309, 1320, 182 L.Ed.2d 272, this Court held that 'a procedural default will not bar a federal habeas court from hearing a

46

substantial claim of ineffective assistance at trial if, in the [State's] initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.'"

Petitioner's fifth through ninth claims herein do not present complaints of ineffective assistance by petitioner's trial counsel that were foreclosed from state habeas review by virtue of the ineffective assistance of petitioner's initial state habeas counsel. On the contrary, petitioner's fifth through ninth claims herein are attempts to (1) resurrect arguments which were rejected on the merits in the course of petitioner's direct appeal or (2) assert unexhausted legal arguments which petitioner's current federal habeas counsel failed to "fairly present" during the course of petitioner's second state habeas corpus proceeding. Petitioner's first state habeas counsel cannot reasonably be faulted for failing to re-assert claims in petitioner's first state habeas corpus proceeding which the Texas Court of Criminal Appeals rejected on the merits in the course of petitioner's direct appeal. Likewise, because petitioner's expanded eighth and ninth claims herein lack any arguable merit (*United States v. Fields*, 483 F.3d at 343-45; *Johnson v. Cockrell*, 306 F.3d at 253-55), petitioner's first state habeas counsel reasonably cannot be faulted for failing to assert those arguments in the course of petitioner's initial state habeas corpus proceeding. Petitioner has failed to demonstrate that his initial federal habeas counsel's failure to present petitioner's fifth through ninth claims herein in the course of petitioner's first state habeas corpus proceeding caused the performance of said counsel to fall below an objective level of reasonableness. Therefore, the narrow exception to the procedural default doctrine announced in *Martinez* and *Trevino* has no application to any of petitioner's fifth through ninth claims herein.

    4.    <u>Conclusions Regarding Procedural Default</u>

Petitioner procedurally defaulted on his expanded eighth and ninth claims herein by failing to "fairly present" the same legal arguments contained on pages 81-101 of his Amended Petition herein to the state courts, either on direct appeal or in his multiple state habeas corpus proceedings. Petitioner has failed to allege any facts which satisfy the long-standing exceptions to the procedural default doctrine for (1) "cause" and "actual prejudice" or (2) fundamental miscarriages of justice. Likewise, petitioner has alleged no facts which bring either of his final two claims herein within the narrow exception to the procedural default doctrine recognized by the Supreme Court in *Martinez* and *Trevino*.

As explained in note 53, *supra*, the more than twenty pages of legal arguments petitioner presents to this Court in support of his two final claims herein have never been "fairly presented" to any state court, either in the course of petitioner's direct appeal or in the course of either of petitioner's two state habeas corpus proceedings. As a result, petitioner's final two claims herein are currently unexhausted. Because there is no reasonable likelihood petitioner can overcome the Texas statutory barrier to obtaining merits review of those arguments in the context of a third state habeas corpus proceeding, petitioner's final two claims herein are procedurally defaulted. *See Trottie v. Stephens*, 720 F.3d 231, 239-40 (5th Cir. 2013)(federal habeas petitioner procedurally defaulted on unexhausted claims where factual allegations underlying the claims had not been presented to the state courts), *cert. pending November 13, 2013 (no. 13-7367)*; *Johnson v. Cain*, 712 F.3d 227, 234 (5th Cir.)(petitioner procedurally defaulted on ineffective assistance complaint by failing to fairly present same to the state courts), *cert. denied.* ___ U.S. ___, 134 S.Ct. 431, ___ L.Ed.2d ___ (2013); *Scott v. Hubert*, 635 F.3d 659, 667 (5th Cir.)(holding the exhaustion requirement has both a legal and a factual component which require

48

a federal habeas petitioner to present his claims to the state court (1) within the same federal

constitutional framework as he presents them to the federal habeas court and (2) with the same

material evidentiary support upon which he relies in the federal habeas court), *cert. denied*, ___

U.S. ___, 132 S.Ct. 763, 181 L.Ed.2d 485 (2011).  Petitioner did not fairly present the legal

arguments underlying his final two claims herein in his state appellant's brief or in either of his

state habeas corpus applications.  Petitioner thereby procedurally defaulted on those claims.  For

the reasons discussed hereinafter, petitioner cannot satisfy any of the exceptions to the procedural

default doctrine with regard to these claims.

F.    *Teague v. Lane* Foreclosure

Furthermore, adoption of the new rule of constitutional criminal procedure advocated by

petitioner in his fifth through ninth claims in this federal habeas corpus proceeding is foreclosed

by the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d

334 (1989).  Under the holding in *Teague*, federal courts are generally barred from applying new

constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen*,

510 U.S. 383, 389-90, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994).  A "new rule" for *Teague*

purposes is one which was not dictated by precedent existing at the time the defendant's

conviction became final. *See O'Dell v. Netherland*, 521 U.S. 151, 156, 117 S.Ct. 1969, 1973, 138

L.Ed.2d 351 (1997)(holding a "new rule" either "breaks new ground," "imposes a new obligation

on the States or the Federal Government," or was not "dictated by precedent existing at the time

the defendant's conviction became final").  Under this doctrine, unless reasonable jurists hearing

the defendant's claim at the time his conviction became final would have felt compelled by

existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

As of the date petitioner's conviction became final for *Teague* purposes (i.e., February 22, 2010), neither the United States Supreme Court nor the Fifth Circuit had ever held that any constitutional impediment existed to the admission during the punishment phase of a capital murder of expert testimony regarding the defendant's future dangerousness. Adopting such a rule in this federal habeas corpus proceeding, whether couched in terms of Fifth, Sixth, or Eighth Amendment principles, would apply an entirely "new rule" of constitutional criminal procedure and implicitly overrule the Supreme Court's clear holding to the contrary in *Barefoot.* This Court possesses the authority to do neither.

G.     Conclusions

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's fifth through seventh claims herein and abridged versions of petitioner's eighth and ninth claims herein in the course of petitioner's direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and direct appeal.

Petitioner procedurally defaulted on his expanded versions of his eighth and ninth claims herein by failing to "fairly present" the extensive legal arguments he has presented to this Court in support of same to the state courts in either his direct appeal or his multiple state habeas corpus proceedings. None of the exceptions to the procedural default doctrine recognized by the Supreme Court apply to petitioner's eighth or ninth claims herein. This Court is statutorily

precluded from granting federal habeas corpus relief on petitioner's currently unexhausted eighth and ninth claims herein. 28 U.S.C. Section 2254(b)(1). Alternatively, petitioner's eighth and ninth claims herein possess no arguable merit. *United States v. Fields*, 483 F.3d at 343-45; *Johnson v. Cockrell*, 306 F.3d at 253-55.

Finally, all of the legal arguments contained in petitioner's fifth through ninth claims herein are foreclosed by the Supreme Court's holding in *Teague v. Lane, supra.*

None of petitioner's fifth through ninth claims herein warrant federal habeas corpus relief.

## V. <u>Definition of Mitigating Evidence</u>

A.    <u>The Claim</u>

In his third claim herein, petitioner argues the statutory definition of mitigating evidence included in petitioner's punishment phase jury instructions violated the Supreme Court's holdings in *Tennard v. Dretke*, 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004), and *Smith v. Texas*, 543 U.S. 37, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004), and prevented the petitioner's jury from giving full effect to all of the petitioner's mitigating evidence.[55]

B.    <u>State Court Disposition</u>

At the punishment phase of petitioner's trial, the trial court instructed the jury, in pertinent part, as follows: "In deliberating on Special Issue Number 2, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness."[56]

---

[55] Amended Petition, at pp. 47-49.

[56] Trial Transcript, Volume 6 of 6, at p. 1021.

On direct appeal, petitioner pointed out his trial counsel unsuccessfully objected to this

portion of the punishment phase jury charge and argued in his eighth and ninth points of error, as

petitioner does in his third claim herein, that the trial court's instruction was erroneous because it

precluded the jury from giving full effect to all of petitioner's mitigating evidence.[57]   The Texas

Court of Criminal Appeals rejected these arguments on the merits as follows:

> In point of error eight, the appellant complains that the trial court
> reversibly erred by instructing the jury that mitigating evidence was evidence that
> reduced his moral blameworthiness. The trial court did not err in giving this
> instruction, which was required by Article 37.071 of the Texas Code of Criminal
> Procedure.  We have previously rejected a challenge to the constitutionality of this
> instruction.  Point of error eight is overruled.
>     In point of error nine, the appellant asserts that the jury should have been
> instructed that mitigating evidence does not require a nexus between the evidence
> and the commission of the crime. However, the appellant has not identified any
> alleged mitigating evidence that could not be given effect under the instructions
> that were given.  The mitigation instruction permitted the jury to give full effect to
> the mitigating evidence.  Point of error nine is overruled.

*Gonzales v. State*, 2009 WL 1684699, at *7 (*Footnotes omitted*).

Petitioner re-urged the same basic complaints as his third and fourth claims for relief in

his first state habeas corpus proceeding.[58]  The Texas Court of Criminal Appeals denied

petitioner's first state habeas corpus application on the merits. *Ex parte Ramiro Felix Gonzales,*

WR 70,969-01, 2009 WL 3042409, at *1 (Tex. Crim. App. September 23, 2009).

Petitioner re-urged the same set of arguments as his fourth claim in his second state

habeas corpus application.[59]  The Texas Court of Criminal Appeals dismissed petitioner's second

---

[57] Brief of the Appellant, at pp. 44-46.

[58] First State Habeas Transcript, at pp. 16-17.

[59] Second State Habeas Transcript, at pp. 56-58.

state habeas corpus application pursuant to the Texas writ-abuse statute. *Ex parte Ramiro F.*

*Gonzales*, WR 70,696-02, 2012 WL 340407, at *1.

C.     Clearly Established Federal Law

The Supreme Court established the standard for reviewing the adequacy of jury

instructions in *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), as

follows:

> We think the proper inquiry in such a case is whether there is a reasonable
> likelihood that the jury has applied the challenged instruction in a way that
> prevents the consideration of constitutionally relevant evidence. Although a
> defendant need not establish that the jury was more likely than not to have been
> impermissibly inhibited by the instruction, a capital sentencing proceeding is not
> inconsistent with the Eighth Amendment if there is only a possibility of such an
> inhibition. This "reasonable likelihood" standard, we think, better accommodates
> the concerns of finality and accuracy than does a standard which makes the
> inquiry dependent on how a single hypothetical "reasonable" juror could or might
> have interpreted the instruction. There is, of course, a strong policy in favor of
> accurate determination of the appropriate sentence in a capital case, but there is an
> equally strong policy against retrials years after the first trial where the claimed
> error amounts to no more than speculation. Jurors do not sit in solitary isolation
> booths parsing instructions for subtle shades of meaning in the same way that
> lawyers might. Differences among them in interpretation of instructions may be
> thrashed out in the deliberative process, with commonsense understanding of the
> instructions in the light of all that has taken place at the trial likely to prevail over
> technical hairsplitting.

*Boyde v. California*, 494 U.S. at 380-381, 110 S.Ct. at 1198 (*Footnotes omitted*).

D.     AEDPA Analysis

Petitioner's reliance upon the Supreme Court's holdings in *Smith* and *Tennard, supra,* is

misplaced. Petitioner's jury was charged in the manner prescribed by Article 37.071 *following*

its amendment to specifically include the Texas mitigation special issue as it currently exists in

Texas law. This was a radical departure from the schemes held unconstitutional in *Smith* and

*Tennard, supra,* which lacked such a mitigation special issue. Petitioner's punishment phase jury

53

charge did not suffer from the same constitutional defect as occurred in *Smith* and *Tennard*. *See Scheanette v. Quarterman*, 482 F.3d 815, 825-26 (5th Cir. 2007)(holding the current Texas capital scheme, which includes the mitigation special issue in question, adequately permits a Texas capital sentencing jury to give consideration to all relevant mitigating evidence before it), *stay of execution denied*, 555 U.S. 1160 (2009).

Insofar as petitioner argues his capital sentencing jury was unable to give a reasoned response to all of petitioner's mitigating evidence, petitioner's complaint fails for two reasons: first, petitioner has failed to identify any evidence in the record of his trial which he claims his sentencing jury was unable to adequately consider during the punishment phase of his trial; and second, petitioner's trial court specifically directed the jury to answer the following special issue: "*Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the Defendant*, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?"[60]  Petitioner alleges no specific facts showing there was a reasonable likelihood his capital sentencing jury applied his punishment phase jury charge in a way which prevented the consideration of any identified constitutionally relevant mitigating evidence. *Boyde v. California*, 494 U.S. at 380-81, 110 S.Ct. at 1198; *Scheanette v. Quarterman*, 482 F.3d at 826.  Juries are presumed to follow their instructions. *Zafiro v. United States*, 506 U.S. 534, 540-41, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993).

---

[60] Trial Transcript, Volume 6 of 6, at p. 1024.

Furthermore, this Court has previously rejected the same arguments underlying

petitioner's third claim herein:

> There is no clearly established federal law in the form of Supreme Court precedent mandating a definition of "mitigating evidence" broader than the one set forth in the Texas statute. On the contrary, the Supreme Court has twice approved the following state court definition: "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard v. Dretke,* 542 U.S. 274, 284, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004); *McKoy v. North Carolina,* 494 U.S. 433, 440, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990).
>
> The Texas statutory definition is fully consistent with the evolving notion of "mitigating evidence" contained in Supreme Court and Fifth Circuit precedent. *See Scheanette v. Quarterman,* 482 F.3d at 825-26 (rejecting the same arguments attacking the Texas capital sentencing scheme's definition of "mitigating evidence" raised by petitioner herein); *Beazley v. Johnson,* 242 F.3d at 260 (holding the same Texas statutory definition of "mitigating evidence" challenged by petitioner herein did not unconstitutionally preclude jury consideration of the mitigating aspects of any evidence of the defendant's character or background or the circumstances of the offense which the defendant presented at trial); *Cordova v. Johnson,* 993 F.Supp. at 489-98 (discussing the Supreme Court's analysis of mitigating evidence).
>
> The Supreme Court has expressly held States are not limited to submitting narrow special issues to the jury when the sentencing jury reaches the selection phase of a capital sentencing proceeding. More specifically, the Supreme Court held in *Tuilaepa,* at the selection stage, the States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Tuilaepa v. California,* 512 U.S. 967, 978, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). The Supreme Court has made it clear States are permitted to guide the discretion exercised by capital sentencing juries as long as the jury is not precluded from giving mitigating effect to evidence that does lessen the defendant's moral culpability or blameworthiness for his crime. *See Johnson v. Texas,* 509 U.S. at 362, 113 S.Ct. 2658 (holding there is no constitutional requirement of unfettered sentencing discretion in the jury, and States are free to "structure and shape consideration of mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty."); *Boyde v. California,* 494 U.S. at 377, 110 S.Ct. 1190 (holding the same). The Texas capital sentencing scheme's definition of "mitigating evidence" is a proper method of

guiding the discretion exercised by a capital sentencing jury. *Martinez v. Dretke,*
426 F.Supp.2d 403, 538-41 (W.D.Tex.2006).

*Bartee v. Quarterman,* 574 F.Supp.2d 624, 710-11 (W.D. Tex. 2008), *CoA denied,* 339 Fed.
Appx. 429 (5th Cir. July 31, 2009), *cert. denied,* 559 U.S. 1009 (2010).

E.      *Teague* Foreclosure

Petitioner's third claim herein is also foreclosed by the Supreme Court's holding in

*Teague.*  No federal court has ever held the Texas statute's definition of "mitigating evidence"

precludes a capital sentencing jury's consideration of any identifiable mitigating evidence. *Bartee*

*v. Quarterman,* 574 F.Supp.2d at 708.

F.      Conclusions

Petitioner's third claim herein is barred by the Supreme Court's holding in *Teague v.*

*Lane, supra,* foreclosing adoption of a new rule of constitutional criminal procedural in the

context of a federal habeas corpus proceeding.

The Texas Court of Criminal Appeals' denials on the merits in the course of petitioner's

direct appeal and first state habeas corpus proceedings of petitioner's complaints about the

definition of "mitigating evidence" included in petitioner's punishment-phase jury instructions

were neither contrary to, nor involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court of the United States, nor resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in the

petitioner's trial, direct appeal, and initial 8state habeas corpus proceedings.

Petitioner's third claim herein does not warrant federal habeas corpus relief.

## VI. <u>Erroneous Disclosure of Work Product</u>

A.    <u>The Claim</u>

In his second claim herein, petitioner argues, without any documentary or evidentiary support, that unspecified materials which included "hand written notes of interviews and memos and e-mails between [defense expert] Dr. Milam and defense counsel involving defenses and testimony" were disclosed to the prosecution after the trial court allegedly ordered Dr. Milan to tender for inspection by the prosecution "all materials prepared by Dr. Milam."[61] Petitioner contends this disclosure resulted in a violation of the attorney-client privilege as recognized by Texas law.[62] Curiously, however, petitioner does not identify with any reasonable specificity when state trial court issued the order in question nor where in the voluminous record from the petitioner's trial court proceedings the order in question may be found.

B.    <u>State Court Disposition</u>

This Court has independently scoured through the petitioner's voluminous trial court record and has located a prosecution motion filed March 27, 2006, pursuant to Rule 705, Texas Rules of Evidence, requesting "discovery of the facts and data underlying an expert's opinion."[63] The motion in question concludes with a prayer that the trial court order either (1) the defense to provide the prosecution, within 48 hours of a defense expert's testifying at trial, with "copies of

---

[61] *Amended Petition*, at pp. 45-46.

[62] *Id.*
Petitioner does not identify with specificity exactly what documents were allegedly furnished to the prosecution. In fact, the petitioner's factual allegations supporting this claim conclude rather cryptically as follows:
> The undersigned met with Dr. Milam and she no longer has a file, so Dr. Milam is unable to inform counsel about what records, e-mails, and memos were provided to the state by the defense. The undersigned traveled to Austin, Texas and reviewed the state's file and discovered that there is no file that reflects what records, e-mails, and memos were provided to the state by the defense. *Id.*, at p. 46.

[63] Trial Transcript, Volume 3 of 6, at pp. 560-63.

57

any underlying facts and data relied upon by [that expert]" whom defense counsel anticipates

calling to present evidence, "including but not limited to testing forms, test answers, test scores,

any notes taken by the examiner/expert during the examination or thereafter if pertaining to the

examination, drawings or writings of the defendant if done during the examination, any other raw

data or documentation related to the examination, and any additional information apart from the

expert's examination of the defendant that the expert relied upon in reaching her opinion or (2)

all testifying defense experts to "bring with them to Court on the day of their testimony such facts

and underlying data."[64]  A handwritten notation appears to indicate the motion in question was

granted in some form or fashion on June 1, 2006.[65]  This Court's independent review of the

record reveals that, during a motions hearing on that same date, the trial judge verbally indicated

a desire to rule that the defense's expert should furnish the prosecution with a copy of any written

report she might produce in connection with her trial testimony.[66]  For unknown reasons,

petitioner did not present any complaint on direct appeal regarding the state trial court's order

directing the disclosure of Dr. Milam's file.

     In his first state habeas application, petitioner complained (1) in the same conclusory

manner as petitioner does in his second claim herein that unspecified materials "not subject to

disclosure under the Rules of Evidence" were tended to the prosecution after the trial court

---

[64] *Id.*

[65] Trial Transcript, Volume 3 of 6, at p. 562.

[66] S.F. Trial, Volume 4, at pp. 5-7.  It is far from clear from the cryptic comments made by the parties and the state trial judge exactly (1) what information the trial court was ordering the defense or the defense's expert to furnish to the prosecution or (2) exactly when that information was to be furnished to the prosecution. *Id.*

58

ordered the defense to tender "all materials prepared by Dr. Milam"[67] and (2) his trial counsel

rendered ineffective assistance in connection with the disclosure by Dr. Milan in the following

manner:

> In the instant case Dr. Milam was Court appointed to assist the defense in
> the preparation and presentation of possible defenses and mitigation. At a pretrial
> hearing the State requested disclosure of the underlying factual data of Dr.
> Milam's anticipated opinion. The Trial Court ordered disclosure and trial counsel
> did not object or raise the issue of Attorney-Client Privilege. (R. v. 4, page 7). At
> trial the Trial Court again addressed the issue of disclosure and again there was no
> discussion of Attorney-Client privilege or objection. (R. v. page 3-6). When the
> State was given the documents and notes of Dr. Milam they consisted of more
> than just underlying data, but also included privileged e-mails and memos
> between trial counsel and Dr. Milam. Disclosure of this material violated the
> Applicant's Right to Effective Assistance of Counsel and violated his Attorney-
> Client privilege. The State is entitled to the underlying data utilized by the
> testifying expert, but the communications between the expert and Trial Counsel
> involving trial strategy and presentation of defensive issues that was [sic]
> disclosed was clearly privileged. Applicant requests a hearing to determine the
> extent to which the Attorney-Client privilege was violated.[68]

The Texas Court of Criminal Appeals denied petitioner's first state habeas corpus application on

the merits. *Ex parte Ramiro Felix Gonzales,* WR 70,969-01, 2009 WL 3042409, at *1 (Tex.

Crim. App. September 23, 2009).

C.      Clearly Established Federal Law

In *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), the

Supreme Court recognized the attorney work product doctrine applies to criminal litigation but

held a criminal defendant had waived the privilege derived from the doctrine with regard to the

---

[67] First State Habeas Transcript, at p. 14.

[68] First State Habeas Transcript, at p. 16.

contemporaneous interview notes of a defense investigator by calling the investigator to testify as

to information related to the investigator by those whom the investigator had interviewed:

> The privilege derived from the work-product doctrine is not absolute.  Like other
> qualified privileges, it may be waived.  Here respondent sought to adduce the
> testimony of the investigator and contrast his recollection of the contested
> statements with that of the prosecution's witnesses.  Respondent, by electing to
> present the investigator as a witness, waived the privilege with respect to matters
> covered in his testimony.  Respondent can no more advance the work-product
> doctrine to sustain a unilateral testimonial use of work-product materials than he
> could elect to testify in his own behalf and thereafter assert his Fifth Amendment
> privilege to resist cross-examination on matters reasonably related to those
> brought out in direct examination.

*United States v. Nobles*, 422 U.S. at 239-40, 95 S.Ct. at 2170-71 *(Footnotes and Citations
omitted)*.


In *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), the

Supreme Court recognized that a criminal defendant's decision to offer expert psychiatric

testimony during the sentencing phase of a capital trial necessarily waived the defendant's right

to complain about disclosure of the evidentiary basis for the defense expert's testimony:

> if a defendant requests such an evaluation or presents psychiatric evidence, then,
> at the very least, the prosecution may rebut this presentation with evidence from
> the reports of the examination that the defendant requested.  The defendant would
> have no Fifth Amendment privilege against the introduction of this psychiatric
> testimony by the prosecution.

*Buchanan v. Kentucky*, 483 U.S. at 422-23, 107 S.Ct. at 2917-18.

D.     AEDPA Analysis

Accepting as true the factual allegations contained in petitioner's state and federal habeas

corpus pleadings, as best this Court can ascertain from the state court records now before this

Court and the petitioner's cryptic allegations in support of this second claim herein, what appears

to have happened is that (1) the prosecution filed a motion reasonably designed to request

information to which the prosecution was entitled pursuant to Rule 705(a), Texas Rules of

Evidence, i.e., the underlying facts or data supporting defense expert Dr. Milam's opinion

testimony at trial, (2) the state trial court indicated to the parties a desire to grant that motion and

did so in a rather ambiguous manner, (3) Dr. Milan's "file" was apparently furnished to the

prosecution, and (4) at some point it was determined Dr. Milam's "file" contained more than her

underlying data and other information properly subject to disclosure under state evidentiary rules

but also written communications of some sort between Dr. Milam and defendant's trial counsel.

It remains uncertain exactly who transmitted Dr. Milam's file to the prosecution and whether the

person or persons who did so were aware at that time that copies of Dr. Milam's written

communications with petitioner's trial counsel were included therein.  It is even less certain

exactly what information was included in Dr. Milam's file beyond the underlying data and facts

supporting her expert opinions and properly subject to disclosure under applicable state

evidentiary rules.  Thus, petitioner has alleged no specific facts from which it is possible to make

a determination as to whether any disclosure of allegedly privileged communications or work

product to the prosecution by the defense team was inadvertent, as opposed to intentional.

Once petitioner decided to call Dr. Milan to testify at his capital murder trial, petitioner

effectively waived any claim to confidentiality or privilege pursuant to the attorney work product

doctrine or the Fifth Amendment for the information and data which furnished the very basis for

Dr. Milam's expert testimony. *Buchanan v. Kentucky*, 483 U.S. at 422-23, 107 S.Ct. at 2917-18;

*United States v. Nobles*, 422 U.S. at 239-40, 95 S.Ct. at 2170-71.

With regard to the petitioner's allegations that additional documents were included in Dr.

Milam's file, including written communications between Dr. Milam and petitioner's trial counsel

regarding trial strategy, petitioner has alleged no specific facts showing either (1) the actual

contents of the allegedly disclosed written communications, (2) the circumstances surrounding

the disclosure of the written communications, i.e., whether the disclosure was deliberate or

inadvertent, (3) the identity of the person or persons who disclosed the written communications

to the prosecution, (4) any steps taken by the defense to rectify the disclosure once it was

discovered, or (5) how petitioner was harmed or prejudiced by the disclosure of the written

communications in question.  Petitioner has alleged no specific facts showing the alleged

disclosure of the written communications in question between Dr. Milam and defense counsel

was the product of any improper conduct by either the prosecution (which clearly had the right

under applicable state evidentiary rules to seek access to the data underlying Dr. Milam's expert

opinions) or the state trial judge (whose order appears to have been focused on directing

disclosure only of information properly subject to disclosure under Rule 705(a), *Tex.R.Evid*).

Petitioner's second claim herein is phrased not as a challenge to  the conduct or misconduct of

his own trial counsel (who apparently failed to ensure there were no privileged written

communications contained in Dr. Milam's file before that file was turned over to the

prosecution) but, rather, only as a challenge to the allegedly improper nature of the state trial

judge's *order* directing disclosure of the data and facts underlying Dr. Milam's expert opinion.

Under the clear holdings of the Supreme Court in *Nobles, supra*, and *Buchanan, supra*, however,

no constitutional error resulted from the state trial court's directive that Dr. Milam make

available for inspection by the prosecution the factual information, test scores, and other data

underlying Dr. Milam's expert testimony at petitioner's trial.  Accordingly, petitioner has failed

to allege any specific facts which show his federal constitutional rights were violated by virtue of

the trial court's order directing disclosure of the factual and evidentiary basis for Dr. Milam's expert trial testimony.

The record now before this Court includes no fact specific allegations, much less any evidence, showing the state trial court did anything to direct the disclosure of any privileged communications between Dr. Milam and petitioner's trial counsel. The facts and data underlying Dr. Milam's expert trial testimony were neither privileged nor otherwise exempt from disclosure. Under the facts alleged by petitioner herein, any inadvertent disclosure to the prosecution of allegedly privileged or work-product-protected communications by Dr. Milam, petitioner's trial counsel, or both was not the result of any erroneous ruling by the state trial court.

Petitioner has failed to allege any specific facts showing the alleged inadvertent disclosure was the result of any improper act or omission by the state trial court. Petitioner no longer asserts a claim of ineffective assistance arising from the disclosure in question. Thus, petitioner has failed to allege any specific facts showing that any error on the part of any person other than his own agents and legal representatives took place in connection with the alleged disclosure of the written communications, if any, contained in Dr. Milam's file. Petitioner has failed to allege any specific facts entitling him to federal habeas relief.

Moreover, respondent is correct that, under the skeletal facts alleged by petitioner herein, any error in petitioner's trial arising from the inadvertent disclosure by petitioner's own agents of allegedly privileged or work-product-protected communications between Dr. Milam and petitioner's trial counsel does not rise above the level of harmless error. *See Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993)(holding the test

for harmless error in a federal habeas corpus action brought by a state prisoner is "whether the error had substantial and injurious effect or influence in determining the jury's verdict").

## VII. Ineffective Assistance Claims

A.  Overview of the Complaints

In his first claim herein, petitioner argues that his trial counsel rendered ineffective assistance by (1) failing have petitioner evaluated for fetal alcohol spectrum disorders and to present expert testimony showing petitioner suffers from this condition, (2) failing to present expert testimony at trial showing the impact of either (a) the verbal, emotional, physical, and sexual abuse petitioner suffered as a child, (b) petitioner's substance abuse, (c) petitioner's neglect and rejection by his parents and family, or (d) petitioner's lack of maturity upon petitioner's development and the synergistic negative impact these problems had on petitioner, and (3) providing unspecified work product information to the prosecution.[69]

B.  Clearly Established Federal Law

The Sixth Amendment entitles criminal defendants to "the effective assistance of counsel," *i.e.*, legal representation that does not (1) fall below an objective standard of reasonableness in light of prevailing professional norms and the circumstances of the defendant's case (*Wong v. Belmontes*, 558 U.S. 15, 16-17, 130 S.Ct 383, 384, 175 L.Ed.2d 328 (2009); *Bobby v. Van Hook*, 558 U.S. 4, 7, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009)); and (2) give rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (*Porter v. McCollum*, 558 U.S. 30, 38-40, 130 S.Ct. 447, 452-53, 175 L.Ed.2d 398 (2009); *Wong v. Belmontes*, 558 U.S. at 19-20, 130 S.Ct. at 386).

---

[69] *Amended Petition*, at pp. 13-44.

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687-91, 104 S.Ct. at 2064-66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). "No particular set of detailed rules for counsel's

conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. at 7, 130 S.Ct. at 16; *Strickland v. Washington*, 466 U.S. at 688-89, 104 S.Ct. at 2065.  It is strongly presumed  counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068.  A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, 558 U.S. at 20, 130 S.Ct. at 386; *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542.  *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different. *Wong v. Belmontes*, 558 U.S. at 27, 130 S.Ct. at 390-91.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, i.e., those complaints which the state courts have addressed on the merits, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have

concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003), *cert. denied*, 540 U.S. 1154 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.* In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which petitioner failed to fairly present to the state courts), this Court's review of the un-adjudicated prong is *de novo. See Porter v. McCollum*, 558 U.S. at 39, 130 S.Ct. at 452 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. at 390, 125 S.Ct. at 2467 (holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Rogers v. Quarterman*, 555 F.3d 483, 489 (5th Cir. 2009), *cert. denied*, 558 U.S. 839 (2009); *Blanton v. Quarterman*, 543 F.3d at 235; *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000), *cert. denied*, 522 U.S. 1067 (2001).

Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone*, 535 U.S. at 698, 122 S.Ct. at 1852; *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066; *Scheanette v. Quarterman*, 482

F.3d at 820; *Sonnier v. Quarterman*, 476 F.3d 349, 356 (5th Cir. 2007), *cert.* denied, 552 U.S. 948 (2007); *Amador v. Quarterman*, 458 F.3d at 410; *Gonzales v. Quarterman*, 458 F.3d 384, 390 (5th Cir. 2006), *cert. denied*, 549 U.S. 1323 (2007).

C.      Failure to Investigate and Present Fetal Alcohol Evidence

      1.      The Claim

In his first assertion of ineffective assistance by his trial counsel, petitioner argues his counsel should have further investigated and presented evidence showing petitioner suffers from fetal alcohol spectrum disorder.[70]

      2.      Procedural Default

As respondent correctly points out, petitioner did not present any factual allegations or legal arguments complaining about his trial counsel's failure to investigate or present evidence concerning petitioner's fetal alcohol spectrum disorder until petitioner's second state habeas corpus application.[71] The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application pursuant to state writ-abuse principles. *Ex parte Ramiro F. Gonzales*, WR 70,696-02, 2012 WL 340407, at *1. Petitioner's failure to "fairly present" this ineffective assistance complaint until his summarily dismissed second state habeas corpus application constitutes a procedural barrier to merits review of that complaint in this federal habeas corpus proceeding. *See McGowen v. Thaler*, 675 F.3d 482, 499 n.72 (5th Cir.) ("Texas's abuse of the writ doctrine is a valid state procedural bar foreclosing federal habeas review."), *cert. denied*, \_\_\_

---

[70] *Amended Petition*, at pp. 18-19.

[71] Second State Habeas Transcript, at pp. 27-29.
No mention of this same ineffective assistance complaint nor any other complaint regarding the performance of petitioner's trial counsel that related in any manner to an alleged failure to present evidence concerning fetal alcohol spectrum disorders was included in petitioner's appellant's brief or in petitioner's first state habeas corpus application.

U.S. ___, 133 S.Ct. 647, 184 L.Ed.2d 482 (2012);  Coleman *v. Quarterman*, 456 F.3d 537, 542

(5th Cir. 2006)(holding the same), *cert. denied*, 549 U.S. 1343 (2007); *Aguilar v. Dretke*, 428

F.3d 526, 533 (5th Cir. 2005)(holding the Texas abuse of the writ rule ordinarily is an adequate

and independent procedural ground on which to base a procedural default ruling), *cert. denied*,

547 F.3d 1136 (2006); *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004)(holding the

violation of the Texas writ-abuse rule ordinarily furnishes an adequate and independent

procedural ground which bars federal habeas review of a claim), *cert. denied*, 543 U.S. 1124

(2005).  Furthermore, as explained below, this complaint possesses no arguable merit; therefore

petitioner cannot demonstrate prejudice arising from the failure of his state appellate or first state

habeas counsel to present this same complaint to the state appellate courts in a timely fashion.

*Coleman v. Quarterman*, 456 F.3d at 542.

       3.     Alternatively, No Merits on *De Novo* Review

       Because no state court has ever addressed the merits of petitioner's procedurally defaulted

first ineffective assistance claim is subject to *de novo* review by this Court.  In those instances in

which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review

of the un-adjudicated prong is *de novo*. *See Porter v. McCollum*, 558 U.S. at 39, 130 S.Ct. at 452

(holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was

necessary because the state courts had failed to address this prong of *Strickland* analysis);

*Rompilla v. Beard*, 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de*

*novo* review of the prejudice prong of *Strickland* required where the state courts rested their

rejection of an ineffective assistance claim on the deficient performance prong and never

addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding

the same).

<ol type="a"><li>No Deficient Performance</li></ol>

Petitioner's trial counsel presented extensive testimony to petitioner's punishment phase

jury establishing petitioner's mother Julia Saldana sniffed or "Huffed" paint, drank alcohol, and

abused marijuana and other drugs during her pregnancy with petitioner.[72]  Dr. Milam testified

extensively regarding the negative impact of those factors, as well as many others, on petitioner's

emotional and mental development, i.e., Dr. Milam diagnosed petitioner with paranoia, Reactive

Attachment Disorder, a lack of brain maturity, features of Schizotypal Personality Disorder, and

some elements of Antisocial Personality Disorder.[73]  Thus, petitioner's trial counsel can hardly be

accused of abandoning petitioner at the punishment phase of trial.  On the contrary, petitioner's

defense team presented extensive testimony from petitioner's family members and a mental

health expert regarding the culture of neglect, abuse, drugs, and criminal activity in which

petitioner grew up and the impact those factors had on petitioner's emotional and mental

---

[72] S.F. Trial, Volume 41, testimony of Virginia "Vicky" Wilson, at pp. 155-56; testimony of Emma Smythe, at pp. 191-92; testimony of Sammy Joe Sanchez, at pp. 202-06; Volume 42, testimony of Daneen Milam, at pp. 38-39.

[73] *See* note 41, *supra*, and accompanying text.
  Dr. Milam's diagnosis of Reactive Attachment Disorder was clearly intended to counter the diagnosis offered by prosecution expert Dr. Gripon suggesting petitioner had Antisocial Personality Disorder.  Dr. Milam spent a considerable portion of her testimony on cross-examination arguing that, while petitioner displayed many elements of Antisocial Personality Disorder, petitioner had shown remorse for his crimes and did feel guilt. S.F. Trial, Volume 42, testimony of Daneen Milam, at pp. 28-32, 38, 40, 75-77, 80-86, 91-93.  Dr. Milan testified, in pertinent part, that petitioner suffered from Reactive Attachment Disorder with features of both antisocial personality disorder and schizotypal personality disorder, all of which she traced to the fact the petitioner had never developed an emotional bond with any of his childhood care-givers. *Id.*, at pp. 28-32.  She characterized petitioner as a person who displayed bravado or "trash talking" due to deeply felt insecurity and a need for attention, a lack of maturity, and a manipulative nature. *Id.*  She described petitioner as someone who had never developed social skills, was less than honest, tended to tell others what he believed they wanted to hear, but emphasized petitioner's intelligence was within the normal range and that petitioner did not suffer from a mental illness. *Id.*, at pp. 32, 76, 82, 85.

development.  Petitioner's complaint about the lack of testimony at petitioner's trial regarding

petitioner's alleged fetal alcohol syndrome disorder must be viewed in that context.

Absent some showing that a counsel's subjective decision-making was objectively

unreasonable in view of the information and evidence then available to counsel, it is almost

impossible for a habeas corpus petitioner to overcome the presumption of reasonableness

afforded his counsel's strategic and tactical decisions under *Strickland. See Neal v. Puckett,* 286

F.3d 230, 237 (5th Cir. 2002)(recognizing that, in evaluating the performance of trial counsel

against a claim that said counsel failed to investigate and present mitigating evidence, the

relevant inquiry focuses on what counsel did to prepare for sentencing, what mitigating evidence

counsel accumulated, what additional leads counsel had, and the results said counsel might

reasonably have expected from those leads), *cert. denied,* 537 U.S. 1104, 123 S.Ct. 963, 154

L.Ed.2d 772 (2003); *Gutierrez v. Dretke,* 392 F.Supp.2d 802, 875-76 (W.D. Tex.

2005)(recognizing the burden on a habeas petitioner asserting a *Wiggins* claim includes

demonstrating that, in light of the potentially mitigating evidence and information available at the

time of trial, his trial counsel's efforts to investigate, develop, and present potentially mitigating

evidence were *objectively* unreasonable), *CoA denied,* 201 Fed. Appx. 196 (5th Cir. September

21, 2006), *cert. denied,* 549 U.S. 1227 (2007).

Despite the fact this Court held this cause in abeyance for the purpose of permitting

petitioner to return to state court and develop facts and evidence regarding his fetal-alcohol-

spectrum ineffective assistance complaint, in his second state habeas corpus proceeding

petitioner presented the state habeas court, and now presents this Court, with no fact-specific

allegations showing any qualified mental health expert has ever diagnosed petitioner with fetal

alcohol spectrum disorder.  A diagnosis of fetal alcohol spectrum disorder, which at the time of

petitioner's capital murder trial was not recognized as a mental disorder by the American

Psychiatric Association in the DSM-IV-TR, would not have offered a counter to Dr. Gripon's

diagnosis of Antisocial Personality Disorder.

On the contrary, as this Court has previously pointed out, evidence showing petitioner

suffered from fetal alcohol spectrum disorder or fetal alcohol syndrome would have constituted a

tacit admission that petitioner displayed the characteristics of a person possessing an antisocial

personality:

> Even more significantly, mitigating evidence showing petitioner actually
> suffers from Fetal Alcohol Syndrome or Fetal Alcohol Effects would necessarily
> have been double-edged in nature and might well have helped convince
> petitioner's capital sentencing jury to answer the future dangerousness special
> issue affirmatively. *See Sells v. Thaler*, 2012 WL 2562666, at 58 (discussing
> expert opinions associating prenatal alcohol exposure to damaged executive
> functioning with attendant socially inappropriate behavior, inability to apply
> consequences from past actions (i.e., an inability to learn from one's mistakes),
> lack of impulse control, rage reactions, physical aggression, high risk behaviors,
> and the inability to experience or display remorse)).  Presenting a Fetal Alcohol
> Syndrome or Fetal Alcohol Effects defense at the punishment phase of petitioner's
> capital murder trial would, in all reasonable likelihood, have reinforced the
> prosecution's arguments that petitioner was likely to pose a risk of future
> dangerousness for the rest of his life. *Sells v. Thaler*, 2012 WL 2562666, at *59-
> *60.

*Garza v. Thaler*, 909 F.Supp.2d 578, 648 (W.D. Tex. 2012), *CoA denied*, ___ F.3d ___, 2013
WL 6726841 (5th Cir. December 20, 2013).

As this Court has recently noted in a pair of capital habeas cases, as of the date of

petitioner's capital murder trial, "fetal alcohol syndrome" and "fetal alcohol effects" were terms

only just beginning to find acceptance among the mainstream within the mental health

community. *Garza v. Thaler*, 909 F.Supp.2d at 647; *Sells v. Thaler*, 2012 WL 2562666, *59

(W.D. Tex. June 28, 2012).  Neither term appears in the 2000 edition of the DSM-IV-TR.[74]

Thus, it is far from clear how petitioner's trial counsel can reasonably be faulted for failing to

themselves identify any signs of Fetal Alcohol Syndrome or Fetal Alcohol Effects which

petitioner might have allegedly displayed prior to trial.

Moreover, petitioner alleges no specific facts showing that his trial counsel were unaware

of the possibility the petitioner might suffer from fetal alcohol spectrum disorder of fetal alcohol

syndrome.  Contrary to the assertions contained in petitioner's pleadings herein, the punishment

phase trial testimony of Dr. Milam and several members of petitioner's family *presented by*

*petitioner's trial counsel* reveals that petitioner's trial counsel were well aware that many people

had witnessed petitioner's mother abusing drugs and alcohol and sniffing paint while she was

pregnant with petitioner.  Thus, the evidence and factual allegations currently before this Court

do not establish that the failure of petitioner's trial counsel to present evidence at the punishment

phase of petitioner's capital murder trial showing petitioner suffered from fetal alcohol spectrum

disorder or fetal alcohol syndrome was the result of anything other than a conscious, objectively

reasonable, decision not to present such evidence (in part because it would have reinforced the

testimony of the prosecution's mental health expert).

Under such circumstances, petitioner has failed to allege any specific facts which show

the failure of petitioner's trial counsel to investigate further into petitioner's mental health and

present evidence showing petitioner suffers from fetal alcohol spectrum disorder or fetal alcohol

---

[74] **American Psychiatric Association**, *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision ("DSM-IV-TR")(2000), at pp. 143-46, 168-70, 177-80, 212-23, 338-43, 405-09, 479-83, 562-65, 655-61.

syndrome caused the performance of petitioner's trial counsel to fall below an objective level of reasonableness.

          b.    <u>No Prejudice</u>

For similar reasons, petitioner's allegations herein about the absence of evidence showing he suffers from fetal alcohol spectrum disorder or fetal alcohol syndrome do not show a reasonable probability that, but for the failure of his trial counsel to investigate and present such evidence, the outcome of the punishment phase of petitioner's capital murder trial would have been different. Petitioner's trial counsel presented multiple witnesses who testified regarding petitioner's mother's abuse of drugs, inhalants, and alcohol during her pregnancy with petitioner. Dr. Milam testified extensively regarding the negative impacts of petitioner's history of neglect, abuse, abandonment by his mother, long-term drug abuse, lack of supervision, early sexual activity, and childhood typified by drug use and criminal activity. One of the major themes of Dr. Milam's punishment-phase testimony was that petitioner did not possess an antisocial personality because he felt remorse and guilt over his criminal misconduct. As explained above, evidence showing petitioner suffers from fetal alcohol spectrum disorder or fetal alcohol syndrome would have undermined Dr. Milam's mitigating opinions by reinforcing Dr. Gripon's diagnosis of antisocial personality disorder. Petitioner's jury was well aware that petitioner showed many of the symptoms of antisocial personality disorder. Dr. Milam conceded as much during her cross-examination.[75] Instead of an antisocial personality, however, she insisted the "true" diagnosis for petitioner was Reactive Attachment Disorder, i.e., the product of petitioner having been abandoned practically at birth by his biological mother and thereafter having been

---

[75] S.F. Trial, Volume 42, testimony of Daneen Milam, at pp. 80-86.

given almost no emotional support by his hard-working grandparents and other adult care-givers within his family.[76]

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, 558 U.S. at 20, 130 S.Ct. at 386; *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different. *Wong v. Belmontes*, 558 U.S. at 26-28, 130 S.Ct. at 390-91.

As explained above in Section I.D.1.,[77] the prosecution presented extensive evidence regarding petitioner's propensity for violent, criminal activity, petitioner's unwillingness to demonstrate sincere contrition or genuine remorse toward those whom he had harmed, and the escalating nature of petitioner's aggressive, sexually assaultive, conduct.  Numerous witnesses testified to petitioner's inability to comply with the rules of the local jail facilities in which he had been housed in the years prior to his capital murder trial and to petitioner's propensity for threatening others when he did not get his way.  Dr. Milam admitted during her testimony that petitioner showed many features of antisocial personality disorder, was immature, did not suffer from any mental illness, and had a normal intelligence.  But the most compelling testimony given during the punishment phase of petitioner's capital murder trial most likely came from a witness

---

[76] *Id.*, at pp. 85-86.

[77] *See* notes 21-36, *supra* and accompanying text.

petitioner's trial counsel could not contradict, i.e., the testimony of petitioner's surviving kidnap and rape victim, who detailed her harrowing encounter with petitioner in which he abducted and assaulted her, took her to a location near the one where Townsend's skeletal remains would later be discovered, and left her barricaded in a closet after sexually assaulting her. The television reporter who interviewed petitioner testified without contradiction that petitioner told her he had neither kidnaped nor raped his surviving victim and had pleaded guilty to those offenses only to save his own family the ordeal of a trial. Thus, there was ample evidence in the record supporting the conclusions of Dr. Gripon concerning petitioner's propensity for future violence and lack of genuine remorse for his criminal misconduct.

As correctly noted by respondent, there was very little difference between the observations made by the two mental health experts who testified at petitioner's trial regarding petitioner's observable conduct. Rather, the difference in their diagnoses was over the cause for those behaviors. There does not appear to have been any reasonable basis for believing that convincing the jury petitioner's behaviors were the result of fetal alcohol spectrum disorder (a condition not even recognized in the DSM-IV-TR), as opposed to Reactive Attachment Disorder,[78] would have resulted in a different verdict on either of the Texas capital sentencing special issues. Thus, evidence showing petitioner suffered from fetal alcohol spectrum disorder or fetal alcohol syndrome (as opposed to reactive attachment disorder) would not have offered any significant help to petitioner's trial counsel as they tried to convince the jury to answer either of the Texas capital sentencing special issues in a manner favorable to the defense.

---

[78] Reactive Attachment Disorder of Infancy or Early Childhood was described in Section 313.89 of the DSM-IV-TR, at pp. 127-30.

This Court concludes there is no reasonable probability that, but for the failure of petitioner's trial counsel to investigate petitioner's background further and to present evidence at the punishment phase of trial showing petitioner suffers from fetal alcohol spectrum disorder or fetal alcohol syndrome, the outcome of the punishment phase of petitioner's trial would have been any different.

### 4.   Conclusions

Petitioner procedurally defaulted on his first assertion of ineffective assistance herein, i.e., his complaint about his trial counsel's failure to investigate, develop, and present evidence showing petitioner suffers from fetal alcohol spectrum disorder or related conditions.  This Court has independently reviewed that complaint *de novo* and concludes that complaint satisfies neither prong of *Strickland* analysis.  Accordingly, the failure of petitioner's first state habeas counsel to fairly present the same complaint of ineffective assistance does not bring that procedurally defaulted complaint within the narrow scope of the Supreme Court's recent decisions in *Martinez v. Ryan, supra*, and *Trevino v. Thaler, supra*.  Petitioner's first assertion of ineffective assistance does not warrant federal habeas corpus relief.

### D.   Failure to Present More Mental Health Expert Testimony

### 1.   The Complaint

In his second assertion of ineffective assistance by his trial counsel, petitioner argues his trial counsel should have presented additional mitigating evidence in the form of expert mental health testimony linking petitioner's history of (1) childhood abandonment, (2) childhood neglect, (3) childhood physical, verbal, emotional, and sexual abuse, (4) early onset sexual activity, (5) substance abuse, (6) fetal alcohol and substance abuse exposure, (7) the synergy of

petitioner's multiple problems "had a significant, severe, and dysfunctional consequence on the cognitive, emotional, characterological [sic], and social development" of petitioner.[79]  More specifically, petitioner complains his trial counsel did not present expert testimony linking any of petitioner's developmental problems with petitioner's criminal misconduct, such as petitioner's demonstrated propensity for violent sexual assault.

      2.    <u>Procedural Default</u>

     Once again, as respondent correctly points out, petitioner did not present any factual allegations or legal arguments complaining about this alleged defect in his trial counsel's performance until petitioner's second state habeas corpus application.[80]  The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application pursuant to state writ-abuse principles. *Ex parte Ramiro F. Gonzales*, WR 70,696-02, 2012 WL 340407, at *1. Petitioner's failure to "fairly present" this ineffective assistance complaint until his summarily dismissed second state habeas corpus application constitutes a procedural barrier to merits review of that complaint in this federal habeas corpus proceeding. *McGowen v. Thaler*, 675 F.3d at 499 n.72;  Coleman *v. Quarterman*, 456 F.3d at 542; *Aguilar v. Dretke*, 428 F.3d at 533; *Matchett v. Dretke*, 380 F.3d at 848.  Furthermore, as explained below, this complaint possesses no arguable merit; therefore petitioner cannot demonstrate prejudice arising from the failure of his state appellate or first state habeas counsel to present this same complaint to the state appellate courts in a timely fashion. *Coleman v. Quarterman*, 456 F.3d at 542.

---

[79] *Amended Petition*, at pp. 20-25.

[80] Second State Habeas Transcript, at pp. 29-34.
    No mention of this same ineffective assistance complaint nor any other complaint regarding the performance of petitioner's trial counsel that related in any manner to an alleged failure to present evidence concerning fetal alcohol spectrum disorders was included in petitioner's appellant's brief or in petitioner's first state habeas corpus application.

3.     Alternatively, No Merits on *De Novo* Review

Because no state court has ever addressed the merits of petitioner's procedurally defaulted second ineffective assistance claim is subject to *de novo* review by this Court. *Porter v. McCollum*, 558 U.S. at 39, 130 S.Ct. at 452; *Rompilla v. Beard*, 545 U.S. at 390, 125 S.Ct. at 2467; *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542.

a.     No Deficient Performance

As was explained in detail above in Section I.D.2.,[81] petitioner's trial counsel presented extensive testimony from Dr. Milam and persons who knew petitioner as a child regarding (1) petitioner's abandonment by his mother almost at birth, (2) the lack of supervision petitioner received as a toddler, (3) the emotional, verbal, and physical abuse petitioner suffered as a child, (4) the sexual abuse petitioner suffered as a child, (5) petitioner's sexual relationship at an early age with a young woman who became pregnant and alleged bore petitioner a daughter, (6) petitioner's long history of drug abuse beginning in his early teen years, and (7) the culture of dysfunctional, criminal, activity which permeated petitioner's family during his childhood.

Petitioner argues petitioner should have called unidentified mental health experts to testify regarding the impact of petitioner's sexual abuse, drug abuse, and other dysfunctional aspects of petitioner's life history upon petitioner's emotional and social development.  More specifically, petitioner criticizes his trial counsel's performance because, in petitioner's view, Dr. Milam was not an expert on "sexual, emotional, physical, and biological abuse."[82]  This Court finds Dr. Milam testified extensively regarding the negative impact of those factors, as well as

---

[81] *See* notes 37-42, *supra*, and accompanying text.

[82] *Amended Petition*, at p. 24.

many others, on petitioner's emotional and mental development.[83]  Petitioner does not allege any

specific facts showing exactly what additional mitigating evidence he claims other or additional

experts could have furnished to petitioner's capital sentencing jury had they been called to testify

during the punishment phase of petitioner's capital murder trial.  Insofar as petitioner argues Dr.

Milam "failed to explain to the jury how the presence of all these issues impacted" petitioner,

this Court's independent, *de novo*, review of Dr. Milam's trial testimony refutes this contention.

Dr. Milam testified that all of the petitioner's problems culminated in petitioner (1) being

immature, well below his chronological age,[84] (2) displaying many features of an antisocial

personality disorder and schizotypal personality disorder,[85] (3) suffering from reactive attachment

disorder and the attendant sense that no one loved him and feelings of vulnerability,[86] and (4)

being "a very damaged young man," i.e., being developmentally delayed, lacking adequate verbal

skills as a child, being very paranoid, being attention-seeking, lacking social skills and coping

skills, failing to develop adequate internal cohesion, tending toward manipulative behavior, being

less than honest, feeling insecure and needy, being a loner, being "whiny," tending to minimize

and deny the bad things in his life, feeling unloved, having a low opinion of himself, *developing*

*alcohol and drug dependency in response to the post-traumatic stress he suffered (specifically*

*his childhood sexual and physical abuse)*, feeling vulnerable, and feeling depressed.[87]  Insofar as

---

[83] *See* note 73, *supra*.

[84] S.F. Trial, Volume 42, testimony of Daneen Milam, at pp. 12-13, 77-78.

[85] *Id.*, at pp. 31-32, 65, 71, 79-85, 88, 91-92, 94.

[86] *Id.*, at pp. 25, 28-32, 40, 47, 71, 75, 85-86, 88, 91-95, 98, 108.

[87] *Id.*, at pp. 15-16, 26-27, 30-32, 45, 50-51, 91-95,

petitioner argues Dr. Milam failed to explain to the jury the impact of petitioner's difficult childhood on petitioner's emotional and social development, that allegation is utterly baseless. Petitioner has not alleged any specific facts showing what additional expert testimony was available at the time of petitioner's capital murder trial which could have helped produce an answer to the Texas capital sentencing special issues favorable to the defense.

Under such circumstances, petitioner has failed to allege any specific facts showing the performance of petitioner's trial counsel fell below an objective level of reasonableness.

       b.    <u>No Prejudice</u>

As explained above, Dr. Milam's expert testimony during the punishment phase of petitioner's trial fills more than one hundred pages in the trial transcript and touched on a veritable cornucopia of matters explaining how petitioner's dysfunctional family life, childhood history of neglect, childhood exposure to criminal activity and drug abuse, and childhood history of physical, verbal, emotional, and sexual abuse did not cause any physiological damage to petitioner's brain or result in a diminished IQ but nonetheless led petitioner toward a life of drug abuse and criminal activity. Insofar as petitioner argues his trial counsel should have presented additional mitigating expert testimony, that argument fails to satisfy the prejudice prong of *Strickland* analysis because petitioner has failed to identify with any reasonable degree of specificity either (1) exactly what other expert testimony was available at the time of petitioner's 2006 capital murder trial which could have supplemented Dr. Milam's extensive testimony or (2) how that additional expert testimony would have helped petitioner's trial counsel overcome the mountain of evidence presented by the prosecution during the punishment phase of trial. *See Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994)(holding absent a specific, affirmative

showing of precisely what evidence or testimony was rendered unavailable due to a trial

counsel's failure to investigate, develop, and present same, i.e., a showing of exactly what the

missing evidence or testimony would have been, a court cannot even begin to apply the

*Strickland* analysis because it is very difficult to determine whether the defendant was prejudiced

by any such deficiencies in counsel's performance).

     As explained above, the prosecution presented a particularly compelling case at the

punishment phase of trial from which the jury could reasonably infer (1) petitioner had a long

history of violent conduct, (2) petitioner's escalating sexual violence was unlikely to

spontaneously diminish, (3) petitioner's expressions of remorse for his criminal conduct were

highly ambiguous and less than sincere, and (4) petitioner had a demonstrated history of

misbehavior while in custody (including during the months leading up to his capital murder trial

when logic would have suggested petitioner be on his best behavior).  It is difficult to quantify

the dramatic, emotional, impact of the trial testimony of petitioner's surviving kidnap and rape

victim, who (1) described in vivid detail how petitioner abducted and sexually assaulted her

before securing her in a closet only a short distance from the location where petitioner had left

Townsend's body only a short time before to be assaulted by the elements and (2) displayed to

the jury the scars left on her ankles and wrists by the duct tape petitioner used to restrain her

during her ordeal.  The petitioner's trial counsel were confronted by a record that showed the

petitioner himself repeatedly blamed his own drug abuse and "failing in with the wrong people"

for his criminal misconduct, not his grandparents or family.

     This Court independently concludes, following *de novo* review, there is no reasonable

probability that, but for the failure of petitioner's trial counsel to present unspecified, additional,

expert mental health testimony regarding the impact of petitioner's difficulty childhood upon petitioner's emotional, mental, and social development, the outcome of the punishment phase of petitioner's capital murder trial would have been any different.

### 4. Conclusions

Petitioner procedurally defaulted on his second assertion of ineffective assistance herein, i.e., his complaint about his trial counsel's failure to present additional expert testimony regarding the impact of petitioner's difficult childhood upon petitioner's emotional and social development. This Court has independently reviewed that complaint *de novo* and concludes that complaint satisfies neither prong of *Strickland* analysis. Accordingly, the failure of petitioner's first state habeas counsel to fairly present the same complaint of ineffective assistance does not bring that procedurally defaulted complaint within the narrow scope of the Supreme Court's recent decisions in *Martinez v. Ryan, supra*, and *Trevino v. Thaler, supra*. Petitioner's second assertion of ineffective assistance does not warrant federal habeas corpus relief.

### E. Providing Work Product to the Prosecution

#### 1. The Claim

In his third and final assertion of ineffective assistance in this cause, petitioner argues his trial counsel rendered ineffective assistance by providing unspecified 'work product" information to the prosecution which, in turn, permitted a "searing" cross-examination of Dr. Milam.[88]

---

[88] *Amended Petition*, at pp. 25-44.

2.     State Court Disposition

Petitioner fairly presented an abridged version of his third ineffective assistance

complaint herein as his second ground for relief in his first state habeas corpus application.[89]   The

Texas Court of Criminal Appeals denied petitioner's first state habeas corpus application on the

merits. *Ex parte Ramiro Felix Gonzales,* WR 70,969-01, 2009 WL 3042409, at *1 (Tex. Crim.

App. September 23, 2009).

Petitioner presented an expanded version of this same complaint part of his second

ground for relief in his second state habeas corpus application.[90]   The Texas Court of Criminal

Appeals dismissed petitioner's second state habeas corpus application pursuant to state writ-

abuse principles. *Ex parte Ramiro F. Gonzales*, WR 70,696-02, 2012 WL 340407, at *1.

3.     AEDPA Review

a.     No Deficient Performance

Petitioner alleges no specific facts showing exactly what privileged or work product

information was actually transmitted to the prosecution when the defense made Dr. Milam's file

available for inspection by the prosecution.   Petitioner alleges only in cryptic terms that e-mails

and memos between Dr. Milam and petitioner's trial counsel were included in the materials

transmitted to the prosecution.   Glaringly absent from petitioner's pleadings, in both the state

---

[89] First State Habeas Transcript, at pp. 14-16.   In that ground for relief, petitioner argued his trial counsel rendered ineffective assistance by failing to object to the state trial court's order directing Dr. Milam to furnish the prosecution with the data and factual basis underlying her expert opinions.   As was explained in detail above in Section VI.B., petitioner supported this claim with assertions that unspecified work product information and other "privileged" communications contained in e-mails and memos between Dr. Milam and petitioner's trial counsel were furnished to the prosecution in response to the trial court's order which directed only that the factual bases for Dr. Milam's opinions be furnished to the prosecution.

[90] Second State Habeas Transcript, at pp. 34-54.

court and this Court, are any fact-specific allegations showing what information was actually contained in the e-mails and memos in question.

Furthermore, it is apparent from the scope and content of Dr. Milam's cross-examination very late in the punishment phase of petitioner's capital murder trial that her file was not made available to the prosecution until late in the punishment phase of petitioner's trial. The prosecution renewed its request for access to the factual information underlying Dr. Milam's opinions on August 29, 2006 at the start of the punishment phase of petitioner's trial.[91] During Dr. Milam's cross-examination on September 5, 2006, Dr. Milam testified without contradiction that she first sent a copy of her file to the prosecution the previous Monday and the prosecution did not actually receive those materials until the previous Wednesday (i.e., August 30, 2006).[92] By August 30, 2006, all but five of the prosecution's fact witnesses and Dr. Gripon had already testified during the punishment phase of petitioner's trial.

Insofar as petitioner argues that the file turned over to the prosecution on or about August 30, 2006 contained "privileged" or "work product" information, petitioner has failed to allege any specific facts showing the apparently inadvertent disclosure of the information in question was objectively unreasonable. Any "trial strategy" contained in the inadvertently disclosed documents which related to the guilt-innocence phase of petitioner's trial was moot by that point in the trial. Likewise, any "trial strategy" that consisted of the details of Dr. Milam's upcoming testimony was likely apparent from a review of the facts and data underlying Dr. Milam's opinions which petitioner's trial counsel had properly been directed to disclose to the prosecution

---

[91] S.F. Trial, Volume 39, at pp. 3-8.

[92] S.F. Trial, Volume 42, testimony of Daneen Milam, at pp. 40-41.

months before.  Thus, petitioner has failed to allege any specific facts showing it was objectively

unreasonable for petitioner's trial counsel to make Dr. Milam's entire file available for

examination by the prosecution.  Even assuming there was some unspecified "privileged" or

"work product" information contained in Dr, Milam's file, petitioner has alleged no facts

showing that information was not otherwise readily apparent to the prosecution from either a

review of the facts and data underlying Dr. Milam's opinions or apparent from the other

information then available to the prosecution.  Without some fact-specific allegation concerning

precisely what allegedly privileged or otherwise confidential information was actually disclosed

to the prosecution during the punishment phase of petitioner's capital murder trial, petitioner has

failed to carry his burden of proving the conduct of his trial counsel fell below an objective level

of reasonableness.

　　　　As respondent correctly argues, the burden is on petitioner to overcome the strong

presumption of reasonableness which attaches to his trial counsel's decision-making. *Bell v.*

*Cone*, 535 U.S. at 698, 122 S.Ct. at 1852; *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at

2066; *Scheanette v. Quarterman*, 482 F.3d at 820.  Here, petitioner's conclusory allegations

regarding the apparently inadvertent disclosure of unspecified "work product" or "privileged"

information do not even begin to overcome this presumption. *See Woodfox v. Cain*, 609 F.3d

774, 809 n.17 (5th Cir. 2010)(holding conclusory assertions about trial counsel's failure to

present a study which was never made a part of the record could not support a complaint of

ineffective assistance premised upon trial counsel's failure to utilize the study to exclude other

prosecution evidence); *Gregory v. Thaler*, 601 F.3d 347, 353 (5th Cir. 2010)(conclusory

statements regarding the content of uncalled witnesses' testimony insufficient to demonstrate

ineffective assistance); *Day v. Quarterman*, 566 F.3d 527, 540-41 (5th Cir. 2009)(conclusory assertions of ineffective assistance during cross-examination and conclusory assertions trial counsel failed to examine medical records prior to trial failed to satisfy prejudice prong of *Strickland* analysis); *Collier v. Collins*, 300 F.3d 577, 587 (5th Cir.)(conclusory allegations of ineffective assistance do not raise a constitutional issue in a federal habeas corpus proceeding), *cert. denied*, 537 U.S. 1084 (2002).

b.    No Prejudice

Likewise, because petitioner has failed to allege any specific facts showing exactly what "privileged" or "work product" information was inadvertently disclosed to the prosecution during the punishment phase of trial, petitioner cannot satisfy the prejudice prong of *Strickland* analysis. *See Mallard v. Cain*, 515 F.3d 379, 383 (5th Cir. 2008)(holding conclusory complaint about trial counsel's failure to challenge a previous waiver of counsel by the petitioner did not satisfy prejudice prong of *Strickland* analysis); *Sayre v. Anderson*, 238 F.3d 631, 636 (5th Cir. 2001)(conclusory speculation about the effect of unidentified witness' testimony falls far short of the prima facie showing of prejudice necessary to warrant an evidentiary hearing).

4.    Conclusions

After an independent, *de novo* review, this Court concludes petitioner's conclusory complaints about the apparently inadvertent disclosure of unspecified "privileged" and "work product" information do not satisfy either prong of *Strickland* analysis. The Texas Court of Criminal Appeals' rejection on the merits in the course of petitioner's first state habeas corpus proceeding of this assertion of ineffective assistance was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's first state habeas corpus proceeding.  Petitioner's ineffective assistance complaint does not warrant federal habeas corpus relief.

## VIII. Certificate of Appealability

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA"). *See Hill v. Johnson*, 114 F.3d 78, 80 (5th Cir. 1997)(recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson*, 114 F.3d 43, 45 (5th Cir. 1997)(holding the standard for obtaining a CoA is the same as for a CPC).  The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson*, 151 F.3d 256, 259 n.2 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999); *Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997), *cert. denied sub nom. Monroe v. Johnson*, 523 U.S. 1041 (1998).  Effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases in United States District Courts requires this Court to issue or deny a CoA when it enters an order adverse to a federal habeas corpus petitioner.

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller-El v. Johnson*, 537 U.S. 322, 335-36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. §2253(c)(2).  Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is

granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002)(holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain*, 227 F.3d 228, 230 n.2 (5th Cir. 2000)(holding the same); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997)(holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted).  In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell*, 301 F.3d at 658 n.10; *Lackey v. Johnson*, 116 F.3d at 151; *Hill v. Johnson*, 114 F.3d at 80; *Muniz v. Johnson*, 114 F.3d at 45; *Murphy v. Johnson*, 110 F.3d 10, 11 n.1 (5th Cir. 1997); 28 U.S.C. §2253(c)(3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller-El v. Johnson*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983).

To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569; *Miller-El v. Johnson*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604; *Barefoot v. Estelle*, 463 U.S. at 893 n.4, 103 S.Ct. at 3394 n.4. This Court is required to issue or deny a CoA when it enters a final Order such as this one

adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338, 123 S.Ct. at 1040 (*quoting Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604). *Accord Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir.), *cert. denied*, 558 U.S.

90

993 (2009); *Moore v. Quarterman*, 534 F.3d 454, 460 (5th Cir. 2008); *Foster v. Quarterman*, 466 F.3d at 364; *Dickson v. Quarterman*, 462 F.3d 470, 476 (5th Cir. 2006); *Pippin v. Dretke*, 434 F.3d at 787; *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir. 2005), *cert. denied*, 548 U.S. 909 (2006).

Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See* Miller-El v. Cockrell 537 U.S. at 337, 123 S.Ct. at 1040 ("It follows that issuance of a COA must not be *pro forma* or a matter of course."); *Sonnier v. Quarterman*, 476 F.3d at 364-69 (denying CoA on a wide variety of challenges to the Texas capital sentencing scheme).

Reasonable minds could not disagree over this Court's conclusions as to petitioner's fifth through ninth claims herein. The Fifth Circuit has repeatedly rejected the contentions underlying the petitioner's fifth, sixth, eighth, and ninth claims herein, i.e., that the Supreme Court's opinions in *Daubert* and *Kumho Tire* overruled *sub silentio* the clear holding in *Barefoot* which authorizes the admission of expert testimony on future dangerousness during the punishment phase of a capital trial. Nor could reasonable jurists disagree with this Court's conclusion that the Texas Court of Criminal Appeals' holding that Dr. Gripon's expert opinion testimony was admissible under applicable state evidentiary rules forecloses federal habeas review of petitioner's argument to the contrary.

This Court independently reviewed the entire record from petitioner's trial, direct appeal, and multiple state habeas corpus proceedings and concluded petitioner's conclusory ineffective assistance complaints all fail to satisfy either prong of the *Strickland* test. Even if it were possible to quibble over this Court's analysis of the first prong of the *Strickland* test, petitioner has alleged no facts showing he was prejudiced within the meaning of *Strickland* by any of his

trial counsels' allegedly deficient performance.  Petitioner's capital sentencing jury was furnished with a wealth of information concerning petitioner's background, including testimony from petitioner's family members and Dr. Milam, who had personally evaluated petitioner.  Having carefully reviewed all of the testimony that was before petitioner's capital sentencing jury, there can be no reasonable disagreement with this Court's conclusion that petitioner has failed to allege any specific facts showing a reasonable probability that, but for the failure of petitioner's trial counsel to present evidence showing petitioner suffers from fetal alcohol spectrum disorder or other, unspecified, additional mitigating evidence, the outcome of the punishment phase of petitioner's trial would have been different.  The prosecution presented overwhelming evidence showing petitioner's propensity for violence, both inside and out of penal institutions, and petitioner's own statements undermined any argument that petitioner had demonstrated genuine remorse or sincere contrition for his criminal misconduct.  The jury could rationally have concluded that, at best, petitioner's comments to Dr. Milam and other indicated that he regretted the pain he had caused his family.  Petitioner's capital sentencing jury could reasonably have concluded petitioner's persistent denials of responsibility for his kidnaping and sexual assault of Florence Teich, despite his guilty pleas, are inconsistent with true remorse or any sense of empathy for his victim.  Even Dr. Milam admitted petitioner "is a very damaged young man."

There can be no disagreement among reasonable persons with this Court's conclusion that petitioner's first two ineffective assistance claims were procedurally defaulted by virtue of the failure of petitioner's first state habeas counsel to present those claims during petitioner's initial state habeas corpus proceeding.  As this Court has explained, neither of those two ineffective assistance claims satisfies either prong of *Strickland* analysis.  Petitioner's first state

habeas counsel cannot be faulted for failing to assert clearly meritless claims during petitioner's first state habeas corpus proceeding. Thus, the recently recognized exception to the procedural default doctrine is inapplicable to petitioner's first two ineffective assistance claims herein. Reasonable jurists could not conclude otherwise.

Petitioner's insufficient evidence claim is premised upon a misunderstanding of the applicable standard of review. The Texas corpus delicti rule plays no role in this Court's application of the familiar test of *Jackson v. Virginia*. The evidence before petitioner's jury at the guilt-innocence phase of trial, in the form of petitioner's written and oral confessions, was more than sufficient to permit a rational jury to conclude the prosecution had carried its burden of proving all the essential elements of the offense of capital murder. Reasonable jurists could not conclude otherwise.

Petitioner's challenge to the Texas statutory definition of mitigating evidence has repeatedly been rejected by this Court, expressly rejected by the Fifth Circuit, and denied certiorari by the Supreme Court. It is unworthy of encouragement to proceed further.

Finally, petitioner's cryptic complaint about the apparently inadvertent disclosure of unspecified "work Product" and other "privileged" information to the prosecution during the final stages of the punishment phase of petitioner's trial does not rise above the level of harmless error. Reasonable jurists could not conclude otherwise.

For the foregoing reasons, this Court concludes petitioner is not entitled to a Certificate of Appealability with regard to any of his claims herein. *See Blue v. Thaler*, 665 F.3d 647, 662-70 (5th Cir. 2011)(rejecting a CoA for a plethora of challenges to the Texas capital sentencing scheme), *cert, denied*, ___ U.S. ___, 133 S.Ct. 105, 184 L.Ed.2d 49 (2012).

Accordingly, it is hereby **ORDERED** that:

1.  All relief requested in petitioner's amended federal habeas corpus petition, filed October 25, 2012, docket entry no. 28, is **DENIED**.

2.  Petitioner is **DENIED** a Certificate of Appealability on all claims herein.

3.  Petitioner's request for an evidentiary hearing is **DENIED**.

4.  All other pending motions are **DISMISSED AS MOOT**.

5.  The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.

**SIGNED and ENTERED this** _15_ **day of January, 2014.**

**ORLANDO L. GARCIA**
**United States District Judge**

94